**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

1:21 - CV - 1075 (BKS/ML)

---

Victoria C. Navarro, Individually, and on behalf
of All Others Similarly Situated,

*Plaintiff,*

-against-

THE STATE OF NEW YORK, The New York
State Office of Children and Family Services,
COMMISSIONER SHEILA J. POOLE,
Individually and in her Official Capacity, THE
CITY OF NEW YORK, The New York City
Administration for Children's Services, ACS
COMMISSIONER DAVID A. HANSELL,
Individually and in his Official Capacity, JUDGE
JOHN F. UDOCHI, Individually and in his
Official Capacity, JUDGE NANCY M.
LEDERMAN, Individually and in her Official
Capacity, JUDGE MONICA DEBRA SHULMAN,
Individually and in her Official Capacity, CPS
CHIEMIKA C. ALOZIE, Individually and in his
Official Capacity, CPS SUPERVISOR II JUDINE
STEELE, Individually and in her Official Capacity,
ACS SUPERVISING ATTORNEY LISA RODIN,
ESQ., Individually and in her Official Capacity,
ACS ATTORNEY DANA LEE MARIE
NAUGHTON, ESQ., Individually and in her
Official Capacity, ACS ATTORNEY KIMBERLY
A. MCFARLANE, ESQ., Individually and in her
Official Capacity, ACS SUPERVISOR YLONIS
TINGUE, Individually and in her Official Capacity,
ACS ATTORNEY TRACY N. CLARRY, ESQ.,
Individually and in her Official Capacity, ACS
ATTORNEY MELISSA KELLER, ESQ.,
Individually and In her Official Capacity, CPS
ELIZABETH PEEBLES, Individually and in her
Official Capacity, CPS MICHAEL CHASAN,
Individually and in his Official Capacity, ACS
ATTORNEY MUNA YVE HEAVEN, ESQ.,
Individually and in her Official Capacity, COURT
ATTORNEY AUBREY J. WISLER, ESQ.,

Civil Case No.:

**Verified Complaint**

**Injunctive and Declaratory Relief**
**Jury Trial Demanded**


U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
SEP 3 0 2021
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

Individually and in her Official Capacity, ACS
BERNADETTA C. WHITFIELD, Individually and
in her Official Capacity, ATTORNEY FOR CHILD
GLENN E. KAPLAN, ESQ., Individually and in his
Official Capacity, the law firm of GLENN
KAPLAN, ESQ., ATTORNEY FOR CHILD
SUZANNE BLOND, ESQ., Individually and in her
Official Capacity, THE LAW OFFICE OF
SUZANNE BLOND, ATTORNEY FOR CHILD
DIANA KELLY, ESQ., Individually and in her
Official Capacity, the law firm of DIANA KELLY,
ESQ., FRANK M. GALCHUS, ESQ., Individually
and in his Official Capacity, THE LAW FIRM OF
FRANK GALCHUS, STEVEN M. GILDIN,
Individually and in his Official Capacity, THE
LAW OFFICES OF STEVEN GILDIN, CPS
SIMONE BEST, Individually and in her Official
Capacity, THE NEW YORK STATE CHILD
SUPPORT PROCESSING CENTER, JANE A.
MCGRADY, Individually, MICHAEL
TEPLANSKY, Individually, MICHELLE
MCHUGH, Individually, DOROTHY M. GOING,
ESQ., Individually and in her Official Capacity,
the law firm DOROTHY M. GOING, ESQ.,
HENRY ARNOLD, Individually, DANIEL
KOENIG, Individually, OFFICER ALLEN,
Individually, CPS SUPERVISOR I ROLANDO
ROMAN, Individually and in his Official Capacity,
CPS DEIDRA WELCH, Individually and in her
Official Capacity, CPS VALERIE JEAN-LOIUS,
Individually and in her Official Capacity, CPS
SUPERVISOR IRLANDE CELESTIN,
Individually and in her Official Capacity, CPS
NUVIA V. VELASQUEZ, Individually and in her
Official Capacity, CPS SCHERISE MORTON,
Individually and in her Official Capacity, CPS
TIKEMA MILAN, Individually and in her Official
Capacity, MIMOZA CELA RUCI, ROBERTI
RUCI, ANDREA LUCANA – MORALES,
PATRICIA CASTILLO - LOVAGLIO, MICHAEL
LOVAGLIO, GERD RUCI, DETECTIVE
LESLIE FRIDAY, Individually and in her Official
Capacity, POLICE OFFICER JANE and JOHN
DOES, Individually, COURT CLERKS JANE and
JOHN DOES, Individually and in his/her Official
Capacity, CPS SUPERVISOR JANE and JOHN

DOES, Individually and in his/her Official Capacity,
CPS JANE and JOHN DOES, Individually and in his/
her Official Capacity,    (Collectively "Defendants")
*Defendants.*

_____

Victoria C. Navarro ("Plaintiff"), brings this Complaint for fraud, civil conspiracy to commit fraud, abuse of process, federal violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1964 [c]) ("Federal RICO") and civil violations of the New York State Enterprise Corruption (NY PL 460.0) ("New York RICO") against Defendants The State of New York ("State"), The New York State Office of Children and Family Services ("OCFS"), The City of New York ("City"), The New York City Administration for Children's Services ("ACS")(a.k.a., "NYC Children, NYC Children's Services, NYC ACS, and NYC Administration for Children's Services"), The New York State Child Support Processing Center ("CSPC"), Sheila J. Poole ("Poole"), David A. Hansell ("Hansell"), Judge John F. Udochi ("Udochi"), Judge Nancy M. Lederman ("Lederman"), Jane A. McGrady ("McGrady"), Judge Monica Debra Shulman ("Shulman"), Aubrey J. Wisler ("Wisler"), Lisa Rodin ("Rodin"), Dana Lee Marie Naughton ("Naughton"), Kimberly A. McFarlane ("McFarlane"), Tracy N. Clarry ("Clarry"), Melissa Keller ("Keller"), Muna Yve Heaven ("Heaven"), Bernadetta C. Whitfield ("Whitfield"), Ylonis Tingue ("Tingue"), Irlande Celestin ("Celestin"), Judine Steele ("Steele"), Rolando Roman ("Roman"), Chiemika C. Alozie ("Alozie"), Elizabeth Peebles ("Peebles"), Michael Chasan ("Chasan"), Deidra Welch ("Welch"), Valerie Jean-Louis ("Louis"), Nuvia V. Velasquez ("Velasquez "), Scherise Morton ("Morton"), Tikema Milan, ("Milan"), Daliz J. Crbajal ("Carbajal"), Frank M. Galchus ("Galchus"), Diana Kelly ("Kelly"), Suzanne Blond-Hanau ("Blond"), Glenn E. Kaplan ("Kaplan"), Steven M. Gildin ("Gildin"), Dorothy M. Going ("Going"), Leslie Friday ("Friday"), Michael Teplansky ("Teplansky"), Henry Arnold ("Arnold"), Michelle McHugh (McHugh"), Officer Allen ("Allen"), Daniel Koenig ("Koenig"), Gerd Ruci ("Ruci"), Mimoza Cela Ruci ("Ruci'2"), Roberti Ruci ("Ruci 3"), Andrea Lucana-Morales ("Morales"), Patricia Castillo-Lovaglio ("Castillo-Lovaglio"), Michael Lovaglio ("Lovaglio"), and various Jane and John Does yet to be identified (collectively "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.      This is an action alleging fraud, civil conspiracy to commit fraud, conspiracy to commit kidnapping, abuse of process, selective and malicious prosecution, and racketeering, all arising from a scheme between City and State Defendants that was designed and implemented to defraud the Department of Health and Human Services, the United States Treasury Department, the Social Security Administration, New York State, violate Plaintiff's rights under color of law, and violate Plaintiff's civil rights under the United States Constitution, federal law, and New York State Constitution, state law and regulations.

2.      The Administration for Children's Services ("ACS") is a chartered municipal corporation operating within the City of New York that spans across five counties, i.e., Bronx, Kings, New York, Queens, and Richmond. By its charter, ACS ("Municipal Enterprise") has a monopoly on children's safety and welfare, authorized under its Commissioner. However, the Municipal Enterprise operates independent of the duties and powers under its Commissioner. It has an organized structure by Charter, but it also consists of a nexus that operates by association. On the one hand, it is as a tiered network of employees and agents. On the other hand, it has members within New York State agencies, administrations, departments, and offices that carry out its operations by incidental or causal connection(s).

3.      The emotional damage—and, far too often, physical, and psychological abuse—suffered by Plaintiff at the hands of a corrupt system designed to destroy families is unacceptable. That the responsible state and city officials have known about these problems and done nothing to fix them is inexcusable and criminal. The city and state are periodically audited by the New York City Comptroller, the results are published and public information. Each audit report consists of compounded, recurrent systemic failures that go uncorrected. Through the Office of Children and Family Services ("OCFS"), the Children's Bureau periodically audits the State's welfare system, to evaluate compliance with and use of various types of grant funding. Those results are just as deplorable. [1]

4.      Plaintiff brings this lawsuit on behalf of all parents ("Plaintiff Parents") whose child(ren) was, is, or will be a victim of the corrupt organization that executes

---

[1] 42 U.S.C. 671 §471 (13) ("...the State shall arrange for a periodic and independently conducted audit of the programs assisted under this part and part B of this title, which shall be conducted no less frequently than once every three years.")

Kidnapping Schemes to steal defenseless children by targeting vulnerable parents. The corrupt organization engages in racketeering, including but not limited to, kidnapping, pay-to-play, extortion, money laundering, and trafficking through fronts set up in family court.[2] Its employees and agents engage in extortion schemes to frustrate, delay, obscure, and impede requisite best interest of the child determinations. These tactics are meant to cause protracted and lengthy proceedings to coerce and force parents into compliance or go bankrupt fighting the corrupt organization. To finance the fronts, employees and agents create and use counterfeit business records, fabricate court records, and false instruments of filing.

5.      To maintain the appearance of legitimacy, its employees and agents suborn perjury, tamper with witnesses, intimidate witnesses, and a nexus of willing participants that corral vulnerable parents into a corner. To sustain its financing, its employees and agents both falsify and fabricate business records, falsify and fabricate accounting records, maintain dual sets of books, including validating false instruments of filing and constructive fraud. Each second spent on additional tasks required to conceal the actions and activities of the Municipal Enterprise corresponds to the payroll of an employee engaged in the illegal activities and affairs of the Municipal Enterprise. The employees of the corrupt organization consist of hourly and salaried city employees. Each invoice from an associate of the Municipal Enterprise for time incurred participating in the fronts, corresponds to payments from city and state coffers for the activities and affairs of the Municipal Enterprise.[3]

6.      Prior to stealing a child(ren), employees and agents of the Municipal Corporation use false, fraudulent, and fabricated reports, misrepresented as legitimate child protective services ("CPS") investigations, to selectively target, harass, intimidate, humiliate, and impede the rights of one parent and manipulate judicial decisions in favor of

---

[2] New York State Unified Court System, 2018 Annual Report ("[t]he Child Welfare Court Improvement Project (CWCIP) is a federally funded initiative to support the Family Court's mandate to promote the safety, well-being and permanent placement of children who are often traumatized by abuse, neglect, time in foster care, the termination of their parents' rights and adoption proceedings. It is overseen by the Office for Justice Initiatives… OJI works with the NYS Office of Children and Family Services to promote data-driven, continuous quality improvement, and it is based on a collaborative approach and the premise that neither the courts nor the social service provider can unilaterally succeed in the pursuit of excellence in the child welfare and legal-judicial systems.")

[3] I.R.C. §6103(b)(5)(B)(ii) ("[f]or purposes of applying subparagraph (A)(iii) to the subsections referred to in such subparagraph, any reference in such subsections to State law, proceedings, or tax returns shall be treated as references to the law, proceedings, or tax returns, as the case may be, of the municipalities which form and operate the governmental entity referred to in such subparagraph.")

the *preferred* parent. To maintain these schemes, former employees and agents of the Municipal Enterprise are appointed as Judges of the Family Court in New York City, while others are employed as assigned counsel or attorneys for the child(ren). Through these appointments, the affairs of the corrupt organization infiltrate vast sectors of family court proceedings and permeate all types of unsuspecting litigants.

7.      Through a pattern and practice of long-standing and well-documented corruption, OCFS —who are responsible for protecting New York State's children—ignore the abuses and violations committed against parents. New York State's family courts are causing devastating, ongoing, and long-lasting harm to parents and their child(ren). These consequences are the result of systemic deficiencies in which the state agency, the OCFS, is responsible for ensuring that federal funds are spent as required by the governing federal statutes and state statutes and regulations consistent with federal law, but neither monitors nor enforces those laws and regulations.

8.      The illegal conduct of the Municipal Enterprise of which Plaintiff complains has plagued families for far too long—a fact well known to City and State Defendants, all of whom have been in a position to change it but choose to cover for one another instead, "[d]espite using CONNECTIONS data for reports and performance measures, OCFS could not support how it ensures the accuracy of the direct placement data in the system."[4] In *Beauford v. Helmsley*, ___ S. Ct. ____ (1989), the Supreme Court held that it is not necessary to prove that multiple schemes, episodes or transactions occurred in order to establish a "pattern of racketeering activity," as long as the racketeering acts were "neither isolated nor sporadic."

9.      Plaintiff seeks a ruling from this Court that the systemic failures and long-standing corrupt organization described in this complaint, acting by and through the Municipal Enterprise, violate the statutory and constitutional rights of parents by and through its agents pursuant to the New York State Family Court Act ("FCA") §151.[5] Plaintiff seeks an injunction against the responsible city and state officials, individuals, and agencies named as Defendants in this lawsuit, directing that appropriate relief be granted so that Plaintiff is no longer irreparably harmed and damages for harm already suffered.

---

[4] Audit Report for Office of Children and Family Services' Oversight of Direct Placement of Children (March 2, 2020).
[5] Judges as Magistrates.

Plaintiff has a fundamental right to the care, custody, and control of her child(ren) and a right to be free from unwarranted, malicious City and State interference.[6]

10.    The framers were familiar with the English struggle and enacted the First Amendment to establish and preserve the right of the People to full information about the doings or misdoings of their government. *Grosjean,* 297 U.S. at 247-49. This case mirrors the framers' concerns. The government cannot accomplish indirectly what the Constitution forbids it to do directly.

11.    Plaintiff seeks to ensure that parents fundamental right to the care and custody of his/her child(ren) is not the subject of rampant, unwarranted State interference due to long-standing corruption and racketeering. Plaintiff asks this Court to protect that right.

## THE PARTIES

12.    Victoria C. Navarro ("Plaintiff") is the biological mother of R.R. (3) and L.N. (6), the former was kidnapped by the Municipal Enterprise and the latter is held for ransom to ensure Plaintiff's forced participation in a money laundering front. Plaintiff is a single mother, survivor of acts of domestic violence perpetrated by Defendant Ruci in front of R.R. (3). Until May 9, 2021, Plaintiff had an active full stay away order of protection ("OOP") from Queens County Criminal Court against Defendant Ruci. When it was initially issued on October 5, 2018, R.R. (3) was on the OOP.

13.    On January 22, 2019, City Defendants conspired to remove R.R. (3) from the OOP by providing the criminal Court with materially false information, "…Family Court has made it very clear this is not their order…[t]hey feel that if the child should be removed—which by the way the C.F.S. and A.C.S. Supreme Court investigation shows that they found no danger to the child…"[7] City Defendants concealed all trace of risk and safety for Plaintiff and R.R. (3) in the report, including but not limited to, the indicated finding of maltreatment entered against Defendant Ruci, the type of and number of pending charges caused by his actions on September 19, 2018. City Defendants also excluded the OOP to

---

[6] *See* Troxel v. Granville, 530 U.S. 57 (2000) ([a] The Fourteenth Amendment's Due Process Clause has a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests," Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772, including parents' fundamental right to make decisions concerning the care, custody, and control of their children, see, e.g., Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Pp. 2059-2060).

[7] Jewell Emergency Order to Show Cause (2/01/2019): Exhibit C – 1/22/2019 Transcript, AP-4 Judge Eugene Guardino.

manipulate the Referee's determination of risk and safety, "[b]ut is the child a protected party on that Order of Protection?"[8]

14.    They were not authorized to give the criminal Court confidential records,[9] nor were they authorized to impersonate a Family Court Referee. In fact, the Referee denied Defendant Ruci's request for unsupervised access, "[i]t does include the subject child. So, until I know more about what's going on in criminal court, I will modify it, only to the extent of allowing supervised visitation."[10] As a result of the materially false report, Defendant Ruci's criminal charges were reduced, R.R. (3) was removed from the OOP, and Plaintiff and her child were denied equal protection under the law. Plaintiff resides at 117 Woodhull Road, Huntington, New York with biological mother, Patricia Castillo-Lovaglio and stepfather, Michael Lovaglio.

15.    Defendant State of New York ("State") was, and is, a governmental entity. It is authorized by law to maintain and is ultimately responsible for the New York State OCFS, which acts as its agent in the child welfare system for children in New York State. The State assumes both contributory and incidental risks to the maintenance of the New York State Office of Children and Family Services.

16.    Defendant OCFS was, and is, an agency of the State responsible for supervising and coordinating child welfare services, which are administered by 58 Local District Social Services ("LDSS") throughout the State, including but not limited to, micro managerial functions like monitoring unauthorized access to its statewide programs and setting regulatory policies. At all times relevant hereto, the officials, agents, and employees of OCFS were acting under the color of law in the course and scope of their duties and functions as agents, servants, employees, and officials of OCFS and otherwise performed and engaged in conduct incidental to the performance of their duties for the Municipal Enterprise. The officials, agents and employees were acting for, and on behalf of, OCFS at all times relevant herein with the power and authority vested in them as agents and employees of OCFS and the State and incidental to their lawful pursuit of their duties as officials, employees and agents of the Municipal Enterprise.

---

[8] *Id*. at Exhibit B - 1/16/2019 Transcript, Part 48 Referee Wanda Wardlaw-Matthews.
[9] SSL §422.
[10] Jewell Emergency Order to Show Cause (2/01/2019): Exhibit B - 1/16/2019 Transcript, Part 48 Referee Wanda Wardlaw-Matthews.

17.     Defendant Sheila J. Poole is Acting Commissioner of OCFS and is sued in both her official and personal capacities. She is responsible for the policies, practices, and operation of Defendant OCFS, for ensuring its compliance with all applicable federal and state law, pursuant to New York State Social Services Law ("SSL") §§11 and 17, and for providing oversight to all LDSS's in the state. In her official capacity, Defendant Poole has enabled and concealed from the public the abuses Plaintiff, parents, and their child(ren), were, and are, subjected to by corrupt organizations. In the performance of her duties and powers by appointment,[11] Defendant Poole was, and is, complicit in the racketeering schemes. The deceptive stratagems, misrepresented as multi-faceted, collaborative, "corrective action", serves only to conceal how extensive and pervasive Plaintiff and parents' constitutional deprivations under color of law were known and permitted to occur[12] by and through the activities and affairs of the Municipal Enterprise.

18.     John F. Udochi is the Supervising Administrative Law Judge for Defendant OCFS, "…adjudicating cases, and implementing acts, rules, laws, regulations, and policies…involved in addressing issues affecting the welfare of the children and families of New York State…" whose "[e]xpertise includes knowledge in the complexities of the administrative hearing process and in the management of the New York City, Nassau County and Suffolk County Regional Offices of Administrative Hearings."[13] Defendant Udochi is an employee of Defendant OCFS and is being sued in his both his official and personal capacities due to his grossly negligent supervision of employees and agents administering the Fair Hearings for indicated findings of neglect and/or maltreatment that were, and are, maliciously determined against Plaintiff and parents. These purported administrative hearings are conducted with, and rely on, the use of counterfeit records from Connections, provided by employees and agents acting by and through the Municipal Enterprise.

---

[11] SSL §34 General Powers and Duties of the Commissioner.

[12] New York State's Child and Family Services Plan FY 2015 – 2019 (Referring to retroactively concealing fraud on the court and state-sponsored kidnapping, "OCFS meets frequently with the New York State Office of Court Administration (OCA) on three levels. There is the OCFS/OCA Leadership Team, which consists of high[-]level staff from OCA and OCFS; Specifically, from OCA: Deputy Chief Administrative Judge for outside of New York City, the Administrative Judge for NYC, several Family Court Judges, and the coordinator for the Court Improvement Project."

[13] https://www.linkedin.com/in/john-franklin-udochi-03239a16/

19.    Defendant City of New York ("City") was, and is, a municipal entity[14] created and authorized under the laws of the State of New York. It is authorized by law to maintain and ultimately is responsible for the New York City Administration for Children's Services, which acts as its agent in child protection, such as the safety and welfare of children in the City. The City assumes both incidental and contributory risks to the maintenance of the New York City Administration for Children's Services and its employment of attorneys, caseworkers, and others [15] engaged in the actions and affairs by and through the Municipal Enterprise.

20.    Defendant New York City Administration for Children's Services[16] was, and is, a municipal corporation of the City responsible for protecting the safety and welfare of all children in New York City.[17] At all times relevant hereto, the officials, agents and employees of ACS were, and are, acting under the color of law in the course and scope of their duties and functions as agents, servants, employees and officials of the Municipal Enterprise and otherwise performed and engaged in conduct incidental to the performance of their duties. The officials, agents and employees were acting for, and on behalf of, ACS at all times relevant herein with the power and authority vested in them as agents and employees of ACS and the City and incidental to the pursuit of their duties as officials, employees and agents of the Municipal Enterprise.

21.    Pursuant to its Charter, the City of New York and Defendant Hansell, as Commissioner of ACS, are responsible for ensuring that ACS complies with federal and state law. ACS purportedly became a "free-standing", "stand-alone", "chartered agency" in by Executive Order, "…created in 1996 to ensure the safety and well-being of children in the City of New York (the City). ACS' Division of Child Protection (DCP) is responsible for protecting children who are abused or neglected and for ensuring that they and their families are provided services specifically tailored to their needs. DCP's Child Protective Services Borough Offices (borough offices) are responsible for investigating reports of

---

[14] I.R.C. § 6103(b)(10) ("Chief Executive Officer — The term "chief executive officer" means, with respect to any municipality, any elected official and the chief official (even if not elected) of such municipality.")

[15] *See* Nicholson v. Williams, 205 F.R.D. 92 (2001) and Monell v. New York Dept. of Social Services, 436 U.S. 658 (1978).

[16] I.R.C. § 6103(b)(5)(A)(iii) ("for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4), and (p), any governmental entity.").

[17] Gotham Gazette (Referring to "…Commissioner Nicholas Scoppetta has been able to turn around the city's child welfare agency, renamed the Administration for Children's Services (ACS) [] when he took the helm and separated from the Human Resources Administration.") (10/01/2001).

alleged child abuse and neglect. The borough offices investigate an average of roughly 60,000 reports of alleged child abuse and neglect each year."[18]

22.     At all times hereinafter mentioned, Defendant SHEILA J. POOLE,[19] is the Acting Commissioner for OCFS, 52 Washington Street, Rensselaer, New York, and was acting in the course of his employment with Defendant THE STATE OF NEW YORK, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

23.     At all times hereinafter mentioned, Defendant JOHN F. UDOCHI, is the Supervising Administrative Law Judge for OCFS Bureau of Special Hearings, 163 West 125 Street, New York, New York, and was acting in the course of his employment with Defendant THE STATE OF NEW YORK, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

24.     At all times hereinafter mentioned, Defendant DAVID A. HANSELL,[20] is Commissioner of ACS, 150 William Street, New York, New York, and was acting in the course of his employment with Defendant THE CITY OF NEW YORK, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

25.     At all times hereinafter mentioned, defendant MONICA DEBRA SHULMAN[21] is an attorney registered with OCA in New York State and a Judge of the Family Court in New York City, 151-20 Jamaica Avenue, Queens, New York, and was acting in the course of her employment with defendant THE STATE OF NEW YORK, and in furtherance of the business of the Municipal Enterprise.

26.     At all times hereinafter mentioned, Defendant JANE A. MCGRADY, was a Court Attorney Referee with the Family Court of New York, Queens County, located at 151-20 Jamaica Avenue, Jamaica, New York, and was presiding over the custody litigation between Plaintiff and Gerd Ruci through July 2019, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

27.     At all times hereinafter mentioned, Defendant NANCY M. LEDERMAN, is the Administrative Hearing Officer for the Special Hearings Bureau, 163 West 125th Street-14th Floor, New York, New York, and was acting in the course of her employment

---

[18] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations (June 15, 2016).
[19] 26 U.S.C. §6041 Information at Source.
[20] Id.
[21] 26 U.S.C. §6041 Information at Source.

with defendant THE STATE OF NEW YORK, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

28.    At all times hereinafter mentioned, Defendant ATTORNEY AUBREY J. WISLER, is an attorney registered with OCA, 151-20 Jamaica Avenue, Jamaica, New York, is a Court Attorney to Defendant MONICA D. SHULMAN, and was acting in the course of her employment with defendant THE STATE OF NEW YORK, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

29.    At all times hereinafter mentioned, Defendant ATTORNEY FOR CHILD GLENN E. KAPLAN, is an attorney and principal in the law firm of GLENN KAPLAN, ESQ., located at 90-50 Parsons Boulevard, Jamaica, New York, and was an Attorney for Child ("AFC") appointed to act on behalf of child R.R. (3) in the custody litigation taking place in the Family Court of the State of New York, Queens County, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

30.    At all times hereinafter mentioned, Defendant the law firm of GLENN KAPLAN, ESQ., was a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 90-50 Parsons Boulevard, Jamaica, New York, and is owned, operated, maintained, and controlled by Defendant Glenn E. Kaplan, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

31.    At all times hereinafter mentioned, Defendant FRANK M. GALCHUS, ESQ., is an attorney with LAW FIRM OF FRANK GALCHUS, 61-43 186th Street, Fresh Meadows, New York, and was acting as counsel on behalf of Defendant Gerd Ruci in the custody litigation, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

32.    At all times hereinafter mentioned, Defendant LAW FIRM OF FRANK GALCHUS, is a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 61-43 186th Street, Fresh Meadows, New York, and is owned, operated, maintained, and controlled by Defendant Frank M. Galchus, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

33.    At all times hereinafter mentioned, Defendant ATTORNEY FOR CHILD SUZANNE BLOND, ESQ., is an attorney with LAW OFFICE OF SUZANNE BLOND, 153-01 Jamaica Avenue, Jamaica, New York, and was an Attorney for Child appointed to

act on behalf of child R.R. (3) in the custody litigation, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

34.     At all times hereinafter mentioned, Defendant LAW OFFICE OF SUZANNE BLOND, is a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 153-01 Jamaica Avenue, Jamaica, New York, and is owned, operated, maintained, and controlled by Defendant Suzanne Blond-Hanau, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

35.     At all times hereinafter mentioned, Defendant ATTORNEY FOR CHILD DIANA KELLY, is an attorney with the law firm DIANA KELLY, ESQ., 153-01 Jamaica Avenue, Jamaica, New York, and was an Attorney for Child appointed to act on behalf of child L.N. (6) in the sibling's litigation, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

36.     At all times hereinafter mentioned, Defendant the law firm DIANA KELLY, ESQ., is a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 153-01 Jamaica Avenue, Jamaica, New York, and is owned, operated, maintained, and controlled by Defendant Diana Kelly, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

37.     At all times hereinafter mentioned, Defendant ACS ATTORNEY LISA RODIN, ESQ., is the Supervising Attorney for Family Court Legal Services ("FCLS"), located at 151-20 Jamaica Avenue, Jamaica, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

38.     At all times hereinafter mentioned, Defendant ACS ATTORNEY DANA LEE MARIE NAUGHTON, ESQ., is an attorney for FCLS, located at 151-20 Jamaica Avenue, Jamaica, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

39.     At all times hereinafter mentioned, Defendant ACS ATTORNEY TRACY N. CLARRY, ESQ., is an attorney for FCLS, located at 151-20 Jamaica Avenue, Jamaica, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

40.     At all times hereinafter mentioned, Defendant ACS ATTORNEY KIMBERLY A. MCFARLANE, ESQ., is an attorney for FCLS, located at 151-20 Jamaica Avenue, Jamaica, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

41.     At all times hereinafter mentioned, Defendant ACS ATTORNEY MELISSA KELLER ESQ., is an attorney for FCLS, located at 151-20 Jamaica Avenue, Jamaica, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

42.     At all times hereinafter mentioned, Defendant ACS ATTORNEY MUNA YVE HEAVEN, ESQ., is an attorney for OCFS Special Hearings Bureau, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant ACS, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

43.     At all times hereinafter mentioned, Defendant DOROTHY M. GOING, is an attorney with the law firm Dorothy M. Going, ESQ., 101 East Park Avenue #939, Long Beach, New York, and was acting as counsel on behalf of Defendants' Patricia Castillo-Lovaglio and Michael Lovaglio in the sibling's litigation, and in various other legal proceedings, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

44.     At all times hereinafter mentioned, Defendant law firm DOROTHY M. GOING, ESQ., is a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 101 East Park Avenue #939, Long Beach, New York, and is owned, operated, maintained, and controlled by Defendant Dorothy M. Going, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

45.     At all times hereinafter mentioned, Defendant STEVEN M. GILDIN, is an attorney with the Law Offices of Steven Gildin, 61-43 186th Street, Fresh Meadows, New York, and was acting on behalf of Defendant Gerd Ruci in the support proceedings, and other legal proceedings and financial transactions, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

46.     At all times hereinafter mentioned, Defendant LAW OFFICES OF STEVEN GILDIN, is a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located at 61-43 186th Street, Fresh Meadows, New York, and is owned, operated, maintained, and controlled by

defendant Steven Gildin, and in furtherance of the business of the MUNICIPAL
ENTERPRISE.

47.     At all times hereinafter mentioned, Defendant COURT OFFICER Jane
and John Does, is a court officer, 151-20 Jamaica Avenue, Jamaica, New York, and was
acting in the course of his/her employment with Defendant Monica D. Shulman, and in
furtherance of the business of the MUNICIPAL ENTERPRISE.

48.     At all times hereinafter mentioned, Defendant CPS ELIZABETH
PEEBLES, is a caseworker with the Family Services Unit ("FSU"), 90-25 161st Street,
Jamaica, New York, and was acting in the course of her employment with Defendant the
ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business
of the MUNICIPAL ENTERPRISE.

49.     At all times hereinafter mentioned, Defendant CPS CHIEMIKA C.
ALOZIE, is a child protective specialist with the Division of Child Protection ("DCP"), 90-
25 161st Street, Jamaica, New York, and was acting in the course of his employment with
Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance
of the business of the MUNICIPAL ENTERPRISE.

50.     At all times hereinafter mentioned, Defendant CPS SUPERVISOR II
JUDINE STEELE, is a supervisor with DCP, 90-25 161st Street, Jamaica, New York, and
was acting in the course of her employment with Defendant the ADMINISTRATION FOR
CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL
ENTERPRISE.

51.     At all times hereinafter mentioned, Defendant CPS SUPERVISOR
YLONIS TINGUE, is a supervisor with DCP, 90-25 161st Street, Jamaica, New York, and
was acting in the course of her employment with Defendant the ADMINISTRATION FOR
CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL
ENTERPRISE.

52.     At all times hereinafter mentioned, Defendant CPS SIMONE BEST, is a
child protective specialist with DCP, 90-25 161st Street, Jamaica, New York, and was
acting in the course of her employment with Defendant the ADMINISTRATION FOR
CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL
ENTERPRISE.

53.     At all times hereinafter mentioned, Defendant BERNADETTA C. WHITFILED, is a legal case assistant for Defendant Lisa Rodin, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

54.     At all times hereinafter mentioned, Defendant CPS SUPERVISOR I ROLANDO ROMAN, is a supervisor with FSU, 90-25 161st Street, Jamaica, New York, and was acting in the course of his employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

55.     At all times hereinafter mentioned, Defendant CPS VALERIE JEAN-LOUISE, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

56.     At all times hereinafter mentioned, Defendant CPS NUVIA V. VELASQUEZ, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of his employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

57.     At all times hereinafter mentioned, Defendant CPS DEDRA WELCH, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of his employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

58.     At all times hereinafter mentioned, Defendant SCHERISE MORTON, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

59.     At all times hereinafter mentioned, Defendant CPS TIKEMA MILAN, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

60.     At all times hereinafter mentioned, Defendant CPS DALIZ J. CARBAJAL, Daliz J. Carbajal, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

61.     At all times hereinafter mentioned, Defendant CPS SUPERVISOR IRLANDE CELESTIN, is a supervisor with DCP, 150 William Street, New York, New York, and was acting in the course of her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

62.     At all times hereinafter mentioned, Defendant CPS MICHAEL CHASAN, is a child protective specialist with DCP, 150 William Street, New York, New York, and was acting in the course of his employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

63.     At all times hereinafter mentioned, Defendant CPS JANE and JOHN DOES, is a child protective specialist with DCP, 90-25 161st Street, Jamaica, New York, and was acting in the course of his/her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

64.     At all times hereinafter mentioned, Defendant CPS SUPERVISOR JANE and JOHN DOES, is a supervisor with DCP, 90-25 161st Street, Jamaica, New York, and was acting in the course of his/her employment with Defendant the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

65.     At all times hereinafter mentioned, Defendant DETECTIVE LESLIE FRIDAY, is a detective with Queens Child Abuse Squad, 112-25 Queens Boulevard, Queens, New York, and was acting in the course of her employment with the ADMINISTRATION FOR CHILDREN'S SERVICES, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

66.     At all times hereinafter mentioned, Defendant LIEUTENANT MICHAEL TEPLANSKY, is a Lieutenant with the Suffolk County Police Department ("SCPD"), 1071 Park Avenue, Huntington, New York, and was acting in the course of his employment with SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

67.     At all times hereinafter mentioned, Defendant POLICE OFFICER MICHELLE MCHUGH, is a police officer with SCPD, 1071 Park Avenue, Huntington, New York, and was acting in the course of her employment with the SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

68.     At all times hereinafter mentioned, Defendant POLICE OFFICER ALLEN, is a police officer with SCPD, 1071 Park Avenue, Huntington, New York, and was acting in the course of his employment with SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

69.     At all times hereinafter mentioned, Defendant SARGEANT HENRY ARNOLD, is a sergeant with SCPD, 1071 Park Avenue, Huntington, New York, and was acting in the course of his employment with SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

70.     At all times hereinafter mentioned, Defendant DANIEL KOENIG, is a police officer with SCPD, 1630 5th Avenue, Bay Shore, New York, and was acting in the course of his employment with SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

71.     At all times hereinafter mentioned, Defendant POLICE OFFICER JANE and JOHN DOES, is a police officer with SCPD, 1071 Park Avenue, Huntington, New York, and was acting in the course of his employment with SCPD, and in furtherance of the business of the MUNICIPAL ENTERPRISE.

72.     At all times hereinafter mentioned, Defendant COURT CLERK[22] Jane and John Does, is a clerk in the New York State Family Courts in New York City, and was acting in the course of his/her employment with the New York State Family Courts in New York City,[23] and in furtherance of the business of the MUNICIPAL ENTERPRISE.

73.     At all times hereinafter mentioned, Defendant GERD RUCI was the biological father of R.R. (3), never married to Plaintiff, and resided at 44-30 Douglaston Parkway – Apt. 3L, Little Neck, New York, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

74.     At all times hereinafter mentioned, Defendant MIMOZA CELA RUCI is not a United States Citizen, and is the biological mother to Defendant Ruci, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

75.     At all times hereinafter mentioned, Defendant ROBERTI RUCI is not a United States Citizen, and is the biological father to Defendant Ruci, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

76.     At all times hereinafter mentioned, Defendant PATRICIA CASTILLO-LOVAGLIO, is the biological mother to Plaintiff, and resides at117 Woodhull Road, Huntington, New York, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

77.     At all times hereinafter mentioned, Defendant MICHAEL LOVAGLIO, is stepfather to Plaintiff, and resides at117 Woodhull Road, Huntington, New York, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

78.     At all times hereinafter mentioned, Defendant ANDREA LUCANA-MORALES, is the paternal grandmother to Plaintiff, and resides at 430 Madeira Boulevard, Melville, New York, and was acting in furtherance of the business of the MUNICIPAL ENTERPRISE.

---

[22] General term, includes all types and levels of clerks, directly or indirectly, involved.
[23] Queens, New York, Bronx, Brooklyn, and Richmond. Brooklyn Daily Eagle, *New York City Family Court is Hearing Cases in Five Virtual Courtrooms* ("[t]he five virtual courtrooms have no physical location. They might involve a judge from Queens, a clerk from the Bronx, a lawyer from Brooklyn and a supervisor in Manhattan, for instance.") (4/20/2020).

**JURISDICTION AND VENUE**

79.     This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. §1964 (a), (c) and 28 U.S.C. §1331 because this action arises under the Federal Racketeer Influences and Corrupt Organizations Act ("Federal RICO").

80.     Plaintiff has standing to bring suit as an injured "person" under 18 U.S.C. § 1964(c).

81.     Plaintiff has standing to bring suit as an injured "person" discriminated by reason of disability in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794, and its implementing regulation, 45 C.F.R. Part 84.

82.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. §1332 et seq., because the amount in controversy exceeds $75,000, exclusive of interest and costs and there is complete diversity of citizenship between Plaintiffs and the Defendants.

83.     This Court has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction 28 U.S.C. §1367.

84.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. §§1983, 1985, and 1986. The Court has subject-matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§1331 and 1343 (a). The Court may exercise supplemental jurisdiction over the claims based on New York law pursuant to 28 U.S.C. §1367 (a).

85.     This Court has jurisdiction to issue injunctive relief pursuant to 28 U.S.C. §1343; the requested declaratory relief pursuant to 28 U.S.C. §§2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure; and costs and attorneys' fees under 42 U.S.C. §1988.

86.     There is complete diversity of jurisdiction between Plaintiffs and the Defendants for claims pursuant to 18 U.S.C. §1964 (b).

87.     This Court has jurisdiction over Plaintiff's complaint under 26 U.S.C. § 7433, et. seq., Civil Damages for Certain Unauthorized Collection Actions, related to mail

fraud initiated by offering false instruments of filing issued as support orders on default with forged signatures [24] in furtherance of kidnapping and child trafficking.

88.    This Court has jurisdiction pursuant to 15 U.S.C. § 1125(a) (Lanham Act), and there is an actual case or controversy.

89.    Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because the claims arise in this district. A substantial part of the actions and/or omissions giving rise to this case occurred within this District and four of the defendants reside within this District. OCFS administrative and managerial functions are operated out of its headquarters located in the Northern District of New York. The New York State Division of Child Support Enforcement, with its administrative and managerial functions operated out of its headquarters in Albany, New York, is in this District. On information and belief, Commissioner Sheila J. Poole both resides and is employed in this District. On information and belief, the New York State Office of the Attorney General, has its principal office located in Albany, New York, and is the presumed legal counsel for various Defendants herein.

90.    The district courts have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue pursuant to 28 U.S.C. §1340.

91.    This Court has jurisdiction pursuant to 26 U.S.C. §§7201, 7203, 7206, and 7213 (a) (2 - 5) because this action involves intentional acts to avoid payig taxes, falsifying tax documents, willfully failing to pay taxes from illegal proceeds, and unauthorized disclosure of tax information pursuant to 26 U.S.C. §6103.

92.    Further, OCFS, located in Albany, New York, is the primary recipient of all federal grants, subsequently disbursed among the individual social services districts, "[w]here a statute makes it illegal to receive money under certain circumstances and the recipient is given a check, venue is proper where the check is deposited and the proceeds credited to the recipient's account."[25] To determine compliance with funding, both state and federal audits rely on records, documents, and files, etc. directly in the possession of

---

[24]  42 U.S.C. §666 (g)(2)(A) (Referring to State Laws Voiding Fraudulent Transfers "…procedures under which, in any case in which the State knows of a transfer by a child support debtor with respect to which such a prima facie case is established, the State must seek to void such transfer.")

[25] *See* United States v. Chestnut, 399 F. Supp. 1292 (SDNY 1975).

OCFS, who controls the state's main reporting system, the State Central Register ("SCR").[26]

93.    This Court has personal jurisdiction over Sheila J. Poole under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court. Defendant Poole both resides and works in this district.

94.    This Court has personal jurisdiction over Judge John F. Udochi under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court. Defendant Udochi both resides and works in this district.

95.    This Court has personal jurisdiction over Judge Nancy M. Lederman under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

96.    This Court has personal jurisdiction over New York State Division of Child Support Enforcement, located at 40 North Pearl Street – 13th Floor, Albany, New York, is where the letters pertaining to the fraudulent support orders, with forged signatures, are being mailed from to facilitate racketeering for the Municipal Enterprise under 28 U.S.C. §1965 (a).

97.    This Court has personal jurisdiction over David A. Hansell under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

98.    This Court has personal jurisdiction over Judge Monica Debra Shulman under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

99.    This Court has personal jurisdiction over Defendants' Lisa Rodin, Kimberly A. McFarlane, Dana Lee Marie Naughton, Tracy N. Clarry, Melissa Keller, Bernadetta C. Whitfield, Judine Steele, Chiemika C. Alozie, Ylonis Tingue, Elizabeth

---

[26] Audit Report on the Office of Children and Family Services, *Connections System Equipment* ("[t]he first phase of the equipment installation…completed in September 1997, involved the purchase and installation of more than 14,500 Pentium personal computers, 2,478 printers, and a network of 296 file servers at more than 800 sites around the State…[t]his makes CONNEC TIONS one of the largest network installations of its type, in the world.") (02/29/2000).

Peebles, Rolando Roman, Simone Best, Muna Yve Heaven, Valerie Jean-Louis, Deidra Welch, Nuvia V. Velasquez, Scherise Morton, Tikema Milan, Daliz J. Carbajal, Irlande Celestin, Michael Chasan, and Jane and John Does under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

100.    This Court has jurisdiction over aforesaid Defendants[27] under 28 U.S.C. §7206 (1) in that aforesaid Defendants conspired to submit false, fraudulent, and fabricated returns[28] to engage in trafficking of persons, "for unlawfully bringing a needy person into a public welfare district. No person shall, without legal authority, send or bring, or cause to be sent or brought, any needy person into a public welfare district with the purpose of making him a charge on such public welfare district, or for the purpose of avoiding the responsibility of assistance or care in the public welfare district from which he is brought or sent."[29] On 8/26/2019, aforesaid Defendants conspired to sequester 2 minors from the County of Suffolk to the County of Queens, NY by registering a false anonymous report to the SCR[30] against Plaintiff. Aforesaid Defendants are required by New York State Law to identify themselves as mandated reporters.[31]

101.    Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over Defendant Hansell and Defendants ACS.[32]

102.    This Court has personal jurisdiction over Defendants' Frank M. Galchus, Suzanne Blond-Hanau, Diana Kelly, and Glenn E. Kaplan under 28 U.S.C. §1965 (b)

---

[27] I.R.C.§6103(b)(5)(A)(ii) ("for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4), and (p), any municipality.").
[28] *Id.* at §6103(b)(1) ("…any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed."); I.R.C. §6103(b)(5)(A)(iii)(I) ("which is formed and operated by a qualified group of municipalities.")
[29] SSL §148.
[30] I.R.C. §6103(b)(5)(A)(iii)(II) ("with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure.");
[31] SSL §413 Persons and Officials Required to Report Cases of Suspected Child Abuse or Maltreatment; SSL §415 Reporting Procedure; SSL §416 Obligations of Persons Required to Report; SSL §420 Penalties for Failure to Report ("[1] Any person, official or institution required by this title to report a case of suspected child abuse or maltreatment who willfully fails to do so shall be guilty of a class A misdemeanor. [2] Any person, official or institution required by this title to report a case of suspected child abuse or maltreatment who knowingly and willfully fails to do so shall be civilly liable for the damages proximately caused by such failure.")
[32] All those directly employed with the Administration for Children's Services in their various capacities.

because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

103.    This Court has personal jurisdiction over Defendants' Dorothy Going and Steven Gildin under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

104.    This Court has personal jurisdiction over Defendants' Michael Teplansky, Michelle McHugh, Daniel Koenig, PO Allen, and Henry Arnold under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

105.    This Court has personal jurisdiction over Defendants' Gerd Ruci, Mimoza Cela Ruci, and Roberti Ruci under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

106.    This Court has personal jurisdiction over Defendants' Patricia Castillo-Lovaglio, Michael Lovaglio, and Andrea Lucana-Morales under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

107.    Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over Defendants' Frank M. Galchus, Suzanne Blond, Diana Kelly, Glenn E. Kaplan, Dorothy M. Going, Steven M. Gildin, Michael Teplansky, Michelle McHugh, Daniel Koenig, PO Allen, Henry Arnold, Gerd Ruci, Mimoza Cela Ruci, Roberti Ruci, Patricia Castillo-Lovaglio, Michael Lovaglio, and Andrea Lucana-Morales.

108.    Defendants' Frank M. Galchus, Suzanne Blond-Hanau, Diana Kelly, Glenn E. Kaplan because they have purposefully directed its conduct to ex parte forum shop and breach judicial comity to conspire to and commit third party custodial interference, aid and abet state-sponsored kidnapping of a minor for amoral purposes, then

billed New York State taxpayers to finance the ransom award through the Department of Finance ("DOF"). Under the pretense of a "clerical error", Defendants then moved to stay the later fraudulently filed 12 copies of Defendants' Ruci and Galchus's order to show case ("OTSC") dated 10/08/2019 ("OTSC #1") for 10/10/2019FCA, to retroactively calendar the false instrument of filing, the purportedly pending, FCA Article 10 litigation.[33] The exercise of jurisdiction over aforesaid Defendants is reasonable at least because Defendants' Galchus, Blond, Kelly, and Kaplan conspired with Defendants' Tingue, Steele, Alozie, Rodin, Wisler, Peebles, Roman, Naughton, McFarlane, Clarry, and Shulman to offer multiple false instruments of filing, with the objective of retaining Defendant Ruci's dismissed actions to

    a) obstruct Plaintiff's then-pending custody litigation from SFC by "restoring" constructive fraud, misrepresented as various pending "trial ready conferences" at Queens Family Court ("QFC"), and

    b) sustain fraud on the court by simultaneously "restoring" and "removing" their constructive fraud on and off the Part 14 calendar.[34]

    c) falsify 18B vouchers to receive payments for constructive fraud on invalid and void docket numbers.

109.    Aforesaid Defendants participated in the Municipal Enterprise, which implemented the funding for the Kidnapping Scheme, to disrupt dismissal[35] of the custody litigation on Defendant Ruci's willful default under false pretenses and to provide an opportunity for re-litigation of Defendants invalidity defenses that were not pending in Queens County. Defendants conspired to remove Plaintiff's custody litigation to Defendant Shulman's courtroom, ex parte. Then, Defendants offered false instruments of filing to misrepresent pending litigation against Plaintiff, i.e., a money laundering front under FCA Article 10, to retain the custody litigation under false pretenses after it was dismissed, out of the jurisdiction of Suffolk County.

---

[33] FCA §1035 (a) ("[o]n the filing of a petition under this article where the child has been removed from his or home, unless warrant is issued pursuant to section 1037 of this part, the court shall cause a copy of the petition and a summons to be issued the same day the petition is filed...")

[34] Shulman's courtroom in Queens Family Court.

[35] See McNulty, 137 F.3d at 740 ("In sum, where the attorney's conduct has been found to be willful, the willfulness will be imputed to the party himself where he makes no showing that he has made any attempt to monitor counsel's handling of the lawsuit.")

110.    Aforesaid Defendants financed their participation over R.R.'s (3) kidnapping via docket *churning*,[36] "[h]er unsubstan[]t[i]ated assertion that this court part manipulates the calendar to both add and subtract cases that are not filed and her belief that this jurist manipulates other jurist's calendars in an attempt to hide the manipulation."[37] This Court further has personal jurisdiction over aforesaid Defendants under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

111.    Aforesaid Defendants submitted 18B vouchers to the New York City Department of Finance for payments related to money laundering fronts on various docket numbers, for which they were required to sign electronic affidavits for processing.[38]

112.    Given these facts and that no other district has personal jurisdiction over all Defendants, the ends of justice requires this Court's exercise of personal jurisdiction over the aforesaid Defendants.

113.    This Court has personal jurisdiction over Commissioner David A. Hansell because Defendant Hansell has purposefully directed his conduct at this forum with respect to the Municipal Enterprise Scheme. The exercise of jurisdiction over Defendant Hansell is reasonable at least because Defendant Hansell is an officer, he is the Commissioner of ACS, and personally participated in the activities alleged herein, through press releases with false information about the agency's performance, status, initiatives,[39] casual use of his name on boilerplate forms, i.e., false instruments of filing, which Defendants use to kidnap defenseless children and finance money laundering fronts in family court. This Court further has personal jurisdiction over Defendant Hansell under 28 U.S.C. §1965 (b) because in any action brought to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

---

[36] Plaintiff coined the term "churning" to describe the process of merging motions/OTSC's in UCMS.
[37] *Decision and Order on Application for Recusal As Made by Victoria Navarro* by Judge Shulman (4/14/2021).
[38] I.R.C. §7206 includes written statements, tax returns, or other documents containing a jurat or oath.
[39] *See Syracuse Man Pleads Guilty to Wire Fraud and Filing False Tax Returns* ("…made false representations to investors about how Brazzlebox was doing to cause them to invest more money and remain invested…Zinszer admitted…he inflated Brazzlebox's user numbers and told employees to create fictitious user accounts to inflate those figures, misrepresented purportedly revenue-generating strategic partnerships, forged documents to support those falsehoods, and forged a letter of intent to purchase Brazzlebox for millions of dollars.") https://www.justice.gov/usao-ndny/pr/syracuse-man-pleads-guilty-wire-fraud-and-filing-false-tax-returns

114.    This court has personal jurisdiction over Defendants' Lisa Rodin, Kimberly McFarlane, Dana Lee Marie Naughton, Tracy N. Clarry, Bernadetta C. Whitfield, Judine Steele, Chiemika C. Alozie, Ylonis Tingue, Elizabeth Peebles, Rolando Roman, Simone Best, Muna Yve Heaven, Valerie Jean-Louis, Deidra Welch, Nuvia V. Velasquez, Scherise Morton, Tikema Milan, Daliz J. Carbajal, Irlande Celestin, Michael Chasan, under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

115.    This court has personal jurisdiction over Defendant ACS Jane and John Does, employees engaged in the activities and affairs of the Municipal Enterprise under 28 U.S.C. §1965 (b) because in any action brought pursuant to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

116.    This Court has personal jurisdiction over Defendant ACS, because Defendant ACS has purposefully directed its conduct at this forum with respect to the Municipal Enterprise's racketeering schemes. The exercise of jurisdiction over aforesaid Defendant is reasonable at least because Defendant ACS, i.e., all those directly employed in it are engaged in the business of the corrupt organization, i.e., the Municipal Enterprise and participated in the activities alleged herein. This Court further has personal jurisdiction over Defendant ACS under 28 U.S.C. §1965 (b) because in any action brought to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

117.    Defendant ACS also participated in the Municipal Enterprise's racketeering schemes, which implemented funding for the Kidnapping Scheme to disrupt underlying litigation based on false pretenses and to provide an opportunity for re-litigation of Defendants invalidity defenses that were not pending due to its use of constructive fraud and offering false instruments of filing. Defendant ACS was directly involved in the racketeering schemes. At QFC, Defendant Rodin[40] has complete authority and control of the false instruments of filing, which facilitates the funding for the Kidnapping Scheme. Given these facts and that no other district has personal jurisdiction over all the defendants,

---

[40] ACS has a Borough Chief supervising family court legal services in each county.

the ends of justice require this Court's exercise of personal jurisdiction over Defendant ACS.

118.    This Court has jurisdiction over Defendant Shulman because she has purposefully directed her conduct at this forum, including but not limited to, with respect to the Municipal Enterprise's racketeering schemes, including impersonating a support magistrate to cause fraudulent orders to be sent to Defendant DCSE. Defendant Shulman is not a support magistrate, not employed as a support magistrate, and has never presided over any support or paternity matter involving Plaintiff. The exercise of jurisdiction over Defendant Shulman is reasonable at least because Defendant Shulman is an officer of the court, a former employee of Defendant ACS, an experienced proponent of the Municipal Enterprise[41] and personally participated in the activities alleged herein. This Court has further personal jurisdiction over Defendant Shulman under 28 U.S.C. §1965 (b) because in any action brought to the Federal RICO statute in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it.

119.    Defendant Shulman also participated in the Municipal Enterprise, which implemented the funding for the Kidnapping Scheme to disrupt the underlying custody litigation based on false pretenses and to provide an opportunity for re-litigation of Defendants invalidity defenses that were dismissed. This Court further has personal jurisdiction over Defendant Shulman because she approved 18B vouchers[42] for payment of assigned counsel fees for invalid and void docket numbers, pertaining to false instruments of filing to finance participation for child trafficking. Given these facts and that no other district has personal jurisdiction over all the defendants, the ends of justice require this Court's exercise of personal jurisdiction over Defendant Shulman.

120.    Furthermore, this Court has personal jurisdiction over Defendants' Gerd Ruci, Mimoza Cela Ruci, and Roberti Ruci because they conspired to kidnap R.R. (3) and provided the initial funding for the scheme. On or about September 22, 2018, Defendant Ruci e-mailed Jewell Law, PLLC to initiate custody litigation of R.R. (3) in Queens

---

[41] SSL §145-B (a) ("[f]alse Statements; Actions for Treble Damages It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.")
[42] 18B vouchers are submitted electronically, i.e., web vouchers.

County Family Court. On or about September 25, 2018, Defendant Ruci signed a contract with Jewell Law, PLLC for legal representation. On or about December 7, 2018, Defendant Ruci tried to get a fraudulent default judgment of custody of R.R. (3) entered against Plaintiff. That is, service of process was sent to Plaintiff's vacant apartment in Queens County, when Defendant Ruci knew, and had known, Plaintiff lived in Suffolk County.

121.    Now, Defendant Ruci accuses former counsel of delays for services of process when he stood to benefit from a fraudulent default order of custody of R.R. (3) by sending service of process to an empty apartment, "[Jewell] failed to effectuate proper service and timely service of Respondent prior to the parties initial court date of December 6, 2018, which increased the missed time between [Ruci] and his child."[43] Defendant Ruci conspired to kidnap R.R. (3) at any cost to punish Plaintiff for refusing to abort past 24 weeks gestation, which was prohibited by New York Law in 2018. Defendant Ruci has no respect for United States Laws and has incorrectly assumed that bribery is as permissible in New York as it is in his country of Albania. Defendant Ruci has been, and is, flooding the state with money from his business in Albania to both finance the trafficking of R.R. (3) and extort Plaintiff with fraud on the court.

122.    Due to his abnormal and irrational obsession with depriving Plaintiff of legal custody of R.R. (3), Defendant Ruci, through his co-conspirators, deleted[44] the only temporary record of paternity from the computer at QFC before a permanent order of support was signed and entered by the Magistrate.[45] Defendant Ruci has not established parentage of R.R. (3) in any U.S. court.[46] Therefore, Defendant Ruci has no legal standing to contest Plaintiff's presumed biological rights over legal custody of R.R. (3).[47] Defendants' Rodin and Shulman have been issuing de-facto fraudulent paternity orders on

---

[43] Gildin Verified Answer and Counterclaims - Index Number 655702/19 (12/10/2019).
[44] 42 U.S.C. §666 (a)(5)(E) Bar on acknowledgment ratification proceedings. ("[p]rocedures under which judicial or administrative proceedings are not required or permitted to ratify an unchallenged acknowledgment of paternity.")
[45] Id. at (5)(J) Temporary support order based on probable paternity in contested cases. ("[p]rocedures which require that a temporary order be issued, upon motion by a party, requiring the provision of child support pending an administrative or judicial determination of parentage, if there is clear and convincing evidence of paternity (on the basis of genetic tests or other evidence.")
[46] 42 U.S.C. §666(a)(5)(M) Filing of acknowledgments and adjudications in state registry of birth records.
[47] Id. at (5)(D) (ii)(II) ("[p]rocedures under which a signed voluntary acknowledgment of paternity is considered a legal finding of paternity, subject to the right of any signatory to rescind the acknowledgment within the earlier of the date of an administrative or judicial proceeding relating to the child (including a proceeding to establish a support order) in which the signatory is a party.") On 8/14/2019, Plaintiff's temporary support order was deleted and replaced with constructive fraud by Ruci.

default[48] to fix their deletion and supplant their constructive fraud with the Magistrate's forged signature.[49]

123.     Defendant Ruci wants his mother, Defendant Ruci 3, to raise Plaintiff's American-born child in Albania and has been desperately trying to achieve this since R.R. (3) was born, "[Jewell] recklessly and improperly advised [Ruci] that it might be possible for him to take his child out of the Country."[50] Defendant Ruci, with the help of his co-conspirators, has kidnapped and trafficked R.R. (3), though no U.S. court has determined his legal standing, absent offering false instruments of filings using PaintShop to draw the Clerk of Court's signature and fraudulent orders with forged signatures based on subsequent illegal acknowledgments of paternity.

124.     Defendant Ruci has even used fraudulent acknowledgments of paternity to establish parentage through Plaintiff, R.R.'s (3) biological mother, as the signatory in a fraudulent support order on default sent via e-mail on July 13, 2021, "[s]ection 1343 is not a general fraud statute, but instead criminalizes frauds that specifically involve the misuse of the wires. Pasquantino v. United States, 544 U.S. 349, 358 (2005) ("[T]he wire fraud statute punishes fraudulent use of domestic wires."). It reflects "the policy choice" to "free the interstate wires from fraudulent use, irrespective of the object of the fraud." Id. at 370. As we have explained, the wire fraud statute "protect[s] the instrumentalities of communication, making the use of the . . . wires as part of a fraudulent scheme an independent offense quite separate from any other potentially illegal conduct." Garlick, 240 F.3d at 792; see also id. at 793 (wire fraud statute is "directed at the instrumentalities of fraud") (quotations omitted)."[51]

125.     With help from Defendants' Shulman, Kaplan, Rodin, Gildin, and Galchus, Defendant Ruci was able to secure a U.S. passport for R.R. (3) by fraudulent

---

[48] Id. at (H) Default orders. ("[p]rocedures requiring a default order to be entered in a paternity case upon a showing of service of process on the defendant and any additional showing required by State law.")

[49] Id. at (7)(A) ("[p]rocedures...requiring the State to report periodically to consumer reporting agencies (as defined in section 603(f) of the Fair Credit Reporting Act (15 U.S.C. 1681a(f) )) the name of any noncustodial parent who is delinquent in the payment of support, and the amount of overdue support owed by such parent."); (17)(A)(ii) ("[p]rocedures under which the State agency shall enter into agreements with financial institutions doing business in the State in response to a notice of lien or levy, encumber or surrender, as the case may be, assets held by such institution on behalf of any noncustodial parent who is subject to a child support lien pursuant to paragraph (4); (B) "[t]he State agency may pay a reasonable fee to a financial institution for conducting the data match provided for in subparagraph (A)(i), not to exceed the actual costs incurred by such financial institution.")

[50] Gildin Verified Answer and Counterclaims - Index Number 655702/19 (12/10/2019).

[51] See United States v. Hussain, 19-10168 (9th Cir. 2020).

means. On October 10, 2019, Defendant Shulman gave Defendant Ruci a fraudulent temporary order of custody and visitation ("TOC/V"), issued on Plaintiff's invalid docket number V-05120-19/19A ("October TOC/V"). The October TOC/V was subsequently used to re-file Plaintiff's deleted temporary order of support as Defendant Ruci's docket number F-05491-19/19A. Defendant Ruci used the fraudulent October TOC/V to complete 2 applications for a U.S. passport for R.R (3), mailed from a USPS office in Queens County. On October 11, 2019, Defendant Shulman deleted the October TOC/V to supplant it with another fraudulent order issued on invalid docket numbers, V-05120-19 and V-20987-18 ("October TOC/V #2").

126.    Application #1 was rejected due to insufficient proof of custody of R.R. (3) and returned. On December 17, 2019, Defendant Ruci appeared at QFC with an unsealed flat rate USPS mailing envelope. According to Agent Zegarra from the Department of State, U.S. Passport/ VISA Fraud, Defendant Ruci mailed Application #2 using a temporary order of custody dated December 19, 2019 ("December TOC/V"). The conference was not held in Defendant Shulman's courtroom. Rather, Defendant Wisler presided over it in a different part of the courthouse on December 17, 2019.

127.    By January 31, 2020, Defendant Shulman had deleted the December TOC/V because Judge Elizabeth Fassler confirmed it was not in the computer. In fact, Judge Fassler said Defendant Shulman called her to say the December TOC/V existed, even though Defendant Galchus claimed his client had custody on an order dated August 26, 2019 ("August TOC/V"). Interestingly, Judge Fassler said the August TOC/V was not in the computer.

128.    Unbeknownst to Plaintiff, on March 9, 2020, Defendant Shulman gave Defendant Ruci another TOC issued solely on Plaintiff's void and invalid docket number, V-05120-19 ("March TOC"). On May 15, 2020, aforesaid docket number, including the March TOC, were completely deleted from QFC's records, including Dashboard.

129.    Defendant Ruci previously told Plaintiff he was the eponymous co-owner of a construction business with his father in Tirana, R.O.G.E.R.D., shpk. Defendant Ruci can only access his money via his parents, Defendants' Ruci 2 and Ruci 3, both of whom permanently live in Tirana, Albania, "I [Ruci] paid [Jewell] $15,000 for the retainer in

September of 2018. [t]hen I [Ruci] paid an additional $2,700 in October of 2018, $9,500 on November 30, 2018, $10,195 on January 7, 2019, and $5,000 on February 11, 2019."[52]

130.    To fund his fraudulent schemes in the U.S., Defendant Ruci communicates with Defendants' Ruci 2 and Ruci 3 via WhatsApp, and they wire his money wherever he wants, "I [Ruci] can transfer you the money tomorrow morning if you [Jewell] give me your account information."[53] All three Defendants have no physical ties, property, or business in the United States. Defendant Ruci only maintains an address for an apartment in Queens County to sustain Defendant ACS's financing for the Kidnapping Scheme by and through the Municipal Enterprise.

131.    Defendant Ruci was so desperate and anxious to kidnap an American child, he repeatedly begged Jewell to expedite his legal services without a signed retainer and under false pretenses. That is, claiming Plaintiff denied him access to R.R. (3),[54] meanwhile he planned to abscond to Albania to evade arrest for acts of domestic violence perpetrated on 9/19/2018.[55] When Defendant Ruci was arrested and charged on 10/05/2018, Plaintiff and R.R. (3) received a full stay away order of protection from Queens Criminal Court. Whereas before, Defendant Ruci was ok with using fraud to get a default judgment of custody entered against Plaintiff, in his countersuit, he accuses Jewell of, inter alia, fraud and legal malpractice for the custody litigation at QFC.[56]

132.    Basically, Defendant Ruci accuses Jewell of malpractice for the same illegal conduct performed by new counsel, Defendant's Gildin, Galchus, and Shulman, which was successfully effectuated via fraudulent means, "[Jewell] also improperly advised me that it might be possible for me to take my son on a trip out of the Country. I made travel plans and bought airline tickets. [Jewell] knew or should have known that there was a temporary order of protection in effect on behalf of my son and that any international travel requests would not be granted by the Court."[57] Defendant Ruci did obtain a U.S. passport for R.R. (3) but not with Jewell's help. Defendant Ruci does not want to pay Jewell's legal fees for the failed attempts and concocted false allegations under penalty of

---

[52] Affidavit of Defendant – Index Number 655702/19 (02/25/2020).
[53] Jewell Affidavit in Opposition to Motion to Change Venue, Exhibit C – 9/21/2020 E-mail from Ruci to Jewell– Index Number 655702/2019 (1/30/2020).
[54] *Id.* ("…I think it is clear that she will NOT let me see my son until the court decides.")
[55] Jewell Law, PLLC v. Gerd Ruci, Complaint New York County Supreme Court Index Number 655702-2019.
[56] Gildin Verified Answer And Counterclaims – Index Number 655702/19 (12/10/2019).
[57] Ruci Affidavit of Defendant – Index Number 655702/19 (02/25/2020).

perjury through Defendant Gilding. Defendant Ruci pays Defendant Gildin's legal fees for successfully obtaining 5 fraudulent support orders on default with forged signatures as proof of custody of R.R. (3).

### THIRD PARTY STANDING UNDER JUS TERTII

133.    New York State provides funding that is spent on child welfare services, and, through OCFS, is responsible for overseeing each local district social services ("LDSS") and ensuring that each complies with all applicable federal and state laws. Through OCFS, Defendant Poole is responsible for ensuring that each LDSS complies with all elements of the state plans (which OCFS signs as a condition of receiving child welfare funds from the United States Department of Health and Human Services) that document how the state will comply with certain core policies and procedures intended to, among other things, ensure that proper documentation exists to warrant state intervention in the first place as these records are subsequently subject to audits every 2 and 3 years.

134.    Some Parents are, or were, involved in child protective proceedings, with a child(ren) in the custody of City and/or State Defendants. Others had their child(ren) removed and/or seized by City and/or State Defendants. Some parents had their child(ren) removed and/or seized by City and/or State Defendants, while residing in another State and/or county under false pretenses. Furthermore, some cases involve the utilization of scouts assigned to represent a litigant, or the chil(ren) in custody proceedings, who vet their clients and groom the circumstances for a hostile takeover by City and/or State Defendants. At all times, City and/or State Defendants maintained legal responsibility for family court proceedings in New York State.

135.    As a recruiter, Defendant ACS supplies the funding for its indirect and direct members' participation and finances the ransom of children by subjugating the parent, "ACS is responsible for protecting the safety and promoting the well-being of children and their families…[t]o meet this mandate, ACS' responsibilities include investigating allegations of child abuse and neglect, overseeing foster care services, and coordinating affordable child care and early education services for over 100,000

children."[58] Defendant ACS also provides child support enforcement, which enables its employees and agents to access Defendant DCSE's records in furtherance of racketeering schemes.

136.    In New York State Citizen's Coalition for Children, the Coalition asserted third party standing to sue Commissioner Poole of OCFS on behalf of Plaintiff foster parents, "[w]hen any plaintiff asserts the rights of others, it has traditionally also faced, in our court, a rule of prudential standing: the so-called third-party standing bar. With some exceptions, this rule prevents "litigants from asserting the rights or legal interests of others [simply] to obtain relief from injury to themselves. (Keepers, Inc. v. City of Milford, 807 F.3d 24, 40 (2d Cir. 2015) (quoting Rajamin v. Deutsche Bank Nat. Trust Co., 757 F.3d 79, 86 (2d Cir. 2014)."[59]

137.    A parent has rights to uninterrupted custody of his or her child(ren) and a child(ren) has rights to remain with his or her parent(s); within wide limits, adults and children in a household are immune from state prying and intrusion. For example, some parents, were, and are victims of domestic violence that occurred in front of the child(ren), "domestic abuse particularly if physical of a mother or child will not be tolerated." Others are accused of perpetrating alleged acts of domestic violence in front of the child(ren). Both sets of parents are, or were, subjected to opposing and counterintuitive applications of this holding to remove the child(ren), "the state has the obligation to protect children from abuse, including, where clearly necessary to protect the child, the power to separate the [parent] and child." Defendants have developed a perverse misapplication of child protection, whereby enforcement is selective, subject to cronyism, and subject to funding.[60]

138.    If a mother alleges domestic violence in family court, the Court implicitly labels her "an alienator" or uncooperative. Further, if the mother expresses fear of the child's safety and well-being with her abuser, she will most certainly lose custody. Any attorney Plaintiff retained in the past, or was assigned, advised Plaintiff to remain silent about domestic violence in family court because "you will lose your child." And yet, under established law, including Federal Rules of Civil Procedure 17 (c) (1), parents lack standing to protect their own child(ren).

---

[58] Report to the Mayor and City Council on City Comptroller Audit Operations Fiscal Year 2019.
[59] See N.Y. State Citizens' Coal. for Children v. Poole, 922 F.3d 69 (2d Cir. 2019).
[60] See Nicholson v. Williams, 205 F.R.D. 92 (2001).

139.    For example, if a parent has a belief that his/her child is being abused, while in the custody of the other parent, such claims are often ignored or receive negative judgments from the Court. When mandated reporters call in reports of suspicious abuse or neglect of a child, the parent who is not responsible for the injuries repeatedly receives the Court's fury. Child abuse is uncooperative behavior, which Court's do not like. For example, parent Alicia Jagnarain's ("parent Jagnarain") 6-month-old daughter, A.A. (6) was diagnosed with a sexually transmitted disease ("STD") after unsupervised visits with her father. By the time A.A. (6) could speak, the STD was a recurrent diagnosis. The child's own admission about things that occurred at the father's home to the pediatrician resulted in a report to the SCR.

140.    As a woman, parent Jagnarain is more than familiar with proper hygiene and care for a baby girl but even the reverse will not result in an STD. The child's father, however, vehemently denied the child's allegations and told the family court parent Jagnarain was coaching A.A. (6). Even after A.A. (6) made a subsequent allegation to a counselor at her school, resulting in another report made to the SCR, parent Jagnarain was blamed. The counselor reiterated what A.A. (6) said about what occured at the father's home but parent Jagnarain was crucified in family court. The Court only saw its own biased mischaracterization: a woman lying against a man about sexual abuse of a child. To hide the sexual abuse and shut parent Jagnarain up, the Court transferred custody of A.A. (6) to the abuser.

141.    The first time Defendant ACS submitted an FCA 1034 report ("FCA 1034 #1) per a court order to "explore the circumstances" of the criminal court OOP against Defendant Ruci, they omitted the indicated finding and related notes to discredit the acts of domestic violence perpetrated against Plaintiff in front of R.R. (3) on September 19, 2018. Based on Defendant Kaplan's recommendation, the Court ordered "therapeutic" supervised visitation with psychologist, Dr. Ellen Weld ("Weld") in Forest Hills, Queens on January 16, 2019. Based on the misinformation provided in FCA 1034 #1, the Court refused to consider a closer location to Suffolk, "you left the marital home."

142.    The accusation of *leaving* was a direct reflection of the allegations Defendant Ruci made against Plaintiff in his custody petition, reiterated by Defendant ACS in FCA 1034 #1, and codified as "truth" by the Court. At the time, Defendant Ruci had 5

pending criminal charges, including 1 E Felony for unlawful imprisonment. Since Plaintiff did not live in Defendant ACS's jurisdiction, there was no financial incentive to protect her or R.R. (3) because the child's physical residence determines federal reimbursement claim eligibility. As such, Defendant ACS chose to advocate for Defendant Ruci to artificially reduce the number of SCR investigations in their jurisdiction.

143.    The Court ignored the indicated letter from OCFS because Defendant ACS left it out of FCA 1034 #1. Plaintiff was advised to stay silent about the pending criminal charges, or else be viewed as "uncooperative." When subsequent SCR reports for bruises and marks on R.R. (3) began in late June 2019, Defendants' Tingue, Alozie, Rodin, and Steele had already laid an inflammatory and repugnant foundation against Plaintiff as 3 fabricated FCA 1034 reports ("Fake 1034 #'s 4 – 6"), replete with premeditated references to allegations not yet made. That is, aforesaid Defendants knew Defendant Ruci was hostile, aggressive, and capable of hurting R.R. (3). Defendant Alozie inserted various false claims about bruises and marks purportedly made by Plaintiff because he anticipated it would happen and wanted to prematurely discredit the claims as unsubstantiated to conceal evidence of the agency's liability. To ensure the Court was sufficiently biased against Plaintiff, Defendants' Alozie, Steele, Tingue, Galchus, Rodin, and Ruci conspired to forge Suffolk County Department of Social Services ("SCDSS") signatures on the reports. This way, the reprehensible accusations of made-up domestic violence allegations against Defendant Ruci, made up allegations of abuse of R.R. (3) by Defendant Ruci, were allegations made by a scorned woman: Plaintiff, purportedly made by SCDSS.

144.    The denial of a mother, or father's, equal protection under the law by the selective predation of his/her child(ren) by city and state Defendants cannot go unchecked, "[t]here is considerable uncertainty as to whether the third-party standing rule continues to apply following the Supreme Court's recent decision in Lexmark v. Static Control Components, Inc., 134 S. Ct. 1377 (2014). In Lexmark, the Supreme Court cast doubt on the entire doctrine of prudential standing, explaining that a court can no more "limit a cause of action that Congress has created" than it can "apply its independent policy judgment to recognize a cause of action that Congress has denied." Id.at 1388. Nevertheless, in United States v. Suarez, a post- Lexmark case, we continued to hold that courts are required to

address third-party standing. (791 F.3d 363, 367 [2d Cir. 2015]) In Suarez, however, we did not address Lexmark."[61]

145.    It is fact that Plaintiff has a biological relationship to child(ren) R.R. (3) and L.N. (6) but the State asserts more right to custody over them for the wrong reasons and no reasons. And yet, any attempt to remove the chains, results in racketeering by and through the Municipal Enterprise. In this regard, Plaintiff Parents are similarly situated to the class of Parents who lost custody of his/her child(ren) due to racketeering; were, or are, deprived of familial association with his/her child(ren) by racketeering; and cases at risk for grooming, as in, will lose custody and/or be deprived of familial association with his/her child(ren), due to longstanding predatory and discriminative actions by State Defendants engaged in the activities and affairs of the Municipal Enterprise.

146.    It is likely the State will argue Plaintiff has failed to show that it would be "difficult if not impossible" for Plaintiff to protect her own rights. Nevertheless, "the third-party standing rule does not demand anything near impossibility of suit."[62] Instead, a mere "practical disincentive to sue"—such as a desire for anonymity or the fear of reprisal—can suffice to overcome the third-party standing bar.[63] Reprisal and retaliation are activities the Municipal Enterprise does very well. In addition, the city and state, by its own doing, has grossly failed to correct itself, to institute reform, and the resulting abuses and trauma done to Plaintiff Parents' child(ren) is the basis for this suit. If the city and state did not continue supporting its pre-Nicholson v. Scoppetta discriminatory practices, Plaintiff would have no cause of action to bring this suit against City and State Defendants.

147.    And here, Plaintiff can demonstrate that fear of retaliation and vindictive reprisal is common and expected from employees and agents by and through the Municipal Enterprise, aimed at anyone, who disagrees or disapproves with Defendant ACS's conduct. Plaintiff can adequately articulate examples of retaliation, not just from personal experience for speaking up against the abuses and predation of the Municipal Enterprise, but offer examples from other parents, who were also subjected to these smear campaigns. There is no doubt a manifest desire for anonymity constitutes a significant disincentive for those parents to sue in their own names, "the members feared retaliation because a state

[61] See N.Y. State Citizens' Coal. for Children v. Poole, 922 F.3d 69 (2d Cir. 2019).
[62] See James William Moore, Moore's Federal Practice § 101.51[3][c][iii] (3d ed. 2008).
[63] Id.; See also Keepers, 807 F.3d at 42; Comacho v. Brandon, 317 F.3d 153, 160 (2d Cir. 2003)

agency had previously retaliated against them after they had lodged a complaint against it."[64] In addition, protecting Plaintiff Parents anonymity arises out of concern for the safety and well-being of their own child(ren) due to the Municipal Enterprise's ability to exercise far reaching vendettas to settle perceived scores.

148.    Even foster parents feared there would be consequences if they joined the suit as named Plaintiffs, which could have jeopardized their ability to provide and care for their foster children, if their payments were suddenly cut off, "[i]t is no stretch to believe that foster parents, who have opened their homes to children in need, would forgo financial benefits to protect those children."[65] Attorney General Leticia James ("AG James") noted the same concern for the foster children in *Elisa W.*, "…and potentially retaliatory practices against those who complained directly to ACS or Contract Agencies. In total, the Constituent Affairs Department has received 559 complaints regarding ACS since January 1, 2014."[66]

149.    In March 2019, Defendant ACS retaliated against Plaintiff after being ordered to "clarify" their own mistakes in FCA 1034 #1 as a subsequent FCA 1034 investigation (FCA 1034 #2). Defendant ACS does not like being told what to do or told they made a mistake, even less when they are ordered to correct their mistakes by court order. Their resent manifested as withholding all SCDSS information from any report involving Plaintiff, including withholding court orders, reclassifying court orders, and having untrained social workers prepare CPS reports for a child they never saw.

150.    In June 2019, Plaintiff made various verbal and written complaints to several New York State Senators, the Mayor of New York City, including various agencies and organizations to raise concerns for Defendant ACS's mishandling, misrepresentations, and blatant lies against Plaintiff, submitted as CPS investigations for R.R. (3). Plaintiff also reported Defendant Steele's admission, "there is no policy for domestic violence related cases." That is, because Defendant ACS's efforts to conceal their own gross negligence, resulted in retaliation against Plaintiff, such as withholding to report information for subsequent violations of Plaintiff's OOP, the OOP issued to R.R. (3) by SCDSS, 2 more indicated findings, and 2 arrests for Defendant Ruci from FCA 1034 #2 in May 2019.

---

[64] *See* Elisa W., et al v. City of New York, et al.
[65] *See* N.Y. State Citizens' Coal. for Children v. Poole, 922 F.3d 69 (2d Cir. 2019).
[66] *See* Elisa W., et al v. City of New York, et al.

151.    In further acts of retaliation, Defendants' Alozie, Tingue, and Steele chose to write inflammatory content, such as calling Plaintiff "a psychopath," and grossly misrepresented repeated acts of domestic violence perpetrated by Defendant Ruci in front of R.R. (3)[67] as victim-blaming, and victim-shaming propaganda in FCSA 1034 #'s 4 - 6. The more Plaintiff reported Defendant ACS for gross misconduct, the more copy and paste manufactured "FSCA" 1034 reports were submitted to coerce the Court to change of custody of R.R. (3) to Defendant Ruci in family court.

152.    The threat is real, and Plaintiff can establish it as a recurrent matter, though it has never been legally addressed in a court of law. Plaintiff intends to incorporate the aforesaid ongoing retaliation theme, as it portrays the activities and affairs of the employees and agents by and through the Municipal Enterprise, operating more akin to a cartel, than purported officers of the court or mandated reporters. And yet, Defendant ACS does not have additional payroll allotted for in their budget for counterfeiting, wire fraud, or retaliation schemes.

153.    There are diverse household structures among Plaintiff Parents, "[i]n a heterogeneous, non-theocratic and democratic society such as ours, there is enormous diversity in domestic relationships and in the degree that they are founded on mutual respect and love (the norm) or malevolence…[p]articularly if there is a sexual relationship between the adults, the emotional interaction may be intense, sometimes flaring into psychological or even physical abuse…[t]he abuse may be endemic..[i]t may be directed against the children as well as the mother…[t]he children may be indirectly affected, as when they observe an abusive incident. [e]ven when the abuse is not physical, it may be so fierce as to be the equivalent of a beating. *See* Poppe v. Poppe, 3 N.Y.2d 312, 165 N.Y.S.2d 99, 144 N.E.2d 72, 75 (1957) (Fuld, J.) ("statements made ... may have an effect no less cruel and no less destructive of the marital relation, though their impact be upon the mind and spirit rather than the body.")…[t]he mother may lack the ability or resources to either protect herself or the children…[e]conomic, emotional, moral or other ties may, as a practical matter, prevent the mother from separating from the abuser or seeking governmental protection against him. She may hope for eventual reconciliation and

---

[67] "ACS COI" dated 6/06/2019 ("…the mother was abusive to him…and he never reported the incidents to the police or retaliated, instead the mother will call the police and fabricate stories to get him into trouble…").

sometimes it does occur…[m]yriad subtle reasons may prevent her from separating from the abuser, protecting the children, or seeking assistance…[i]n some households ethnic or social mores are relied upon to justify abuse as a "traditional right." Ability to deal with tensions induced by self, a partner, children, and economic and social factors varies enormously among those who become embroiled in domestic violence…[i]n short, this case presents the most intricate and recondite relationships, the stuff of thousands of novels, poems, newspaper accounts, and legal proceedings."[68]

154.    Defendant Ruci purposely totaled Plaintiff's car in 2016. He reneged on his promise to replace the car to make Plaintiff dependent on him for, inter alia, transportation to and from work, and to and from L.N.'s (6) sitter, Defendant Lucana-Morales. In 2018, Plaintiff was not employed, recovering from a cesarean section for R.R. (3) and financially dependent. Defendant Ruci took advantage of this by forcing Plaintiff to remain isolated in Queens and prevented Defendants' Castillo-Lovaglio and Lovaglio from helping and/or offering help. As a result, Plaintiff sustain an injury to the incision and was put on antibiotics to cure the infection. Plaintiff could not seek medical treatment in time because Defendants' Castillo-Lovaglio and Lovaglio lived in Suffolk County and Defendant Ruci worked all day or spent all night at his apartment with his mother.

155.    To force Plaintiff to remain at her apartment, Defendant Ruci falsely offered to help Plaintiff with daily household chores, such as vacuuming, cleaning, and walking the dog. If Plaintiff refused, Defendant Ruci threatened to cut off his financial help. Plaintiff's infection was caused by doing household chores and walking the dog because Defendant Ruci reneged. For example, there were 2 occasions when Defendant Ruci said he would come by Plaintiff's apartment in the morning to walk the dog and never did. Both those times resulted in Plaintiff's dog going to the bathroom in the apartment. Plaintiff also has cats and had to lift the heavy the containers to change the litter, since Defendant Ruci never came to help as he claimed.

156.    On 9/19/2018, Defendant Ruci pretended to forget he agreed to take Plaintiff and R.R. (3) to Defendants' Castillo-Lovaglio and Lovaglio's home for a scheduled interview with a potential school for L.N. (6). That morning, Defendant Ruci incessantly shadowed Plaintiff around the apartment as she gathered her things and packed

---

[68] *See* Nicholson v. Williams, 203 F. Supp. 2d 153 (E.D.N.Y 2002).

a bag for L.N. (6) and R.R. (3). Defendant Ruci even followed Plaintiff into the bathroom. After Plaintiff got dressed, she put on a wraparound swaddle and put R.R. (3) inside and continued to finish packing. Defendant Ruci was angry because Plaintiff was ignoring him, so he got physical. Instead of shadowing, he was physically closing the closet door as Plaintiff reached in to grab clothes; he closed the refrigerator door as Plaintiff opened it get the bottles of prepared breast milk for R.R. (3).

157.    When Plaintiff got to her bedroom, Defendant Ruci physically pushed her down as she tried to step away from his shadow. Each time Plaintiff tried to get up, Defendant Ruci threw her down. With her right arm protecting R.R. (3) tightly against her chest, Plaintiff used the left arm to defend herself from Defendant Ruci. Plaintiff screamed for help, so Defendant Ruci slapped her across the face and said, "shut up!" Plaintiff sat up and stared Defendant Ruci in the face, which caused him to go to the living room. There, Defendant Ruci grabbed the chair from L.N.'s (6) play area, placed it in front of the apartment door, and sat down. Plaintiff immediately texted Defendant Lovaglio to let him what happened. Defendant Ruci got up, ripped Plaintiff's phone from out of her hands and sat back down to block the front door. When Defendant Ruci saw Defendant Lovaglio's reply text, "unlawful imprisonment. calling the police", he got up, put on his sneakers and ran out of Plaintiff's apartment. Plaintiff called the police and filed a complaint.

158.    That same day, Defendants' Castillo-Lovaglio and Lovaglio picked up Plaintiff from Queens to stay in Suffolk County. The responding NYPD officers had told Plaintiff to do the same thing because Defendant Ruci, who had a key to the apartment, might come back to finish the job. All of Plaintiff, R.R. (3) and L.N.'s (6) belongings were left behind. In late October, Jewell sent Plaintiff an e-mail notifying her, inter alia, Defendant Ruci emptied the apartment after the lease ended on October 31, 2018. *(What did Plaintiff do wrong? It depends: do you blame the victim or the perpetrator?)*

159.    On appeal, the Coalition's third party standing for claims on behalf of foster parents was confirmed because the latter and the foster child(ren) are financially dependent on the adoption subsidies, "…the Adoption Assistance and Child Welfare Act of 1980 (the "CWA" or the "Act"), 42 U.S.C. § 670 et seq., creates a privately enforceable

right under 42 U.S.C. §1983 by which some foster care parents and providers may sue States for costs related to childrearing."[69]

160.    Likewise, the city and the state go after parents "for costs related to childrearing", such as child support 42 U.S.C. §659. However, 42 U.S.C. §670 et seq. also states, "…determining reasonable efforts to be made with respect to a child…the child's health and safety shall be the paramount concern;[70] reasonable efforts shall be made to preserve and reunify families prior to the placement of a child in foster care, to prevent **or eliminate the need for removing the child from the child's home.**"[71] Further, "[t] he district courts of the United States shall have jurisdiction, without regard to any amount in controversy, to hear and determine any civil action certified by the Secretary of Health and Human Services under section 452(a)(8) of this Act. A civil action under this section may be brought in any judicial district in which the claim arose, the plaintiff resides, or the defendant resides."[72]

161.    Under §452(a)(8), the Department of Health and Human Services ("HHS") is the authorized to, "receive applications from States for permission to utilize the courts of the United States to enforce court orders for support against noncustodial parents and, upon a finding…that utilization of the Federal courts is the only reasonable method of enforcing such order, approve such applications." Since HHS is the federal department that permits States to "utilize the courts of the United States to enforce" support orders and the ruling under NYS Citizen's Coalition established, inter alia, 42 U.S.C. §670 et seq. creates a privately enforceable right "for costs related to childrearing", then support orders are the equivalent of adoption subsidies and federal court is *the* proper venue for Plaintiffs counterclaims.

162.    Next, like a support petition originated in the family court against a non-custodial parent, foster parents apply for the subsidy payments prior to adoption.[73] In the same way jurisdiction functions to receive support from the non-custodial parent, foster parents sign a contract with [agencies like] ACS.[74] The definition of "child support" is

---

[69] *See* New York State Citizens' Coalition for Children v. Poole, 922 F.3d 69 (2d Cir. 2019).
[70] 42 U.S.C. 670 §471 (a)(15)(A).
[71] 42 U.S.C. 652 §452 (B)(i).
[72] 42 U.S.C. 660.
[73] 18 NYCRR 421.24 [b], [c][1].
[74] *Id.* at [c][3].

"…the legal obligations of an individual to provide such support, means amounts required to be paid under a judgment, decree, or order, whether temporary, final, or subject to modification, issued by a court"[75] but it does not *have* to come from a court "…or an administrative agency of competent jurisdiction, for the support and maintenance of a child…"[76] which equates an agency, like Defendant ACS, with an "administrative agency", authorized to distribute subsidized support.

    163.    Further, the longevity between support obligations and subsidies are also the same. That is, support orders are enforceable, "including a child who has attained the age of majority under the law of the issuing State, or a child and the parent with whom the child is living,"[77] whereas, "once approved, subsidy payments "shall be made until the child's twenty first birthday."[78] Even termination is determined in a similar way, payment of the subsidy may only be suspended if ACS "determines that the adoptive parents are no longer *legally responsible* for the support of the child or the child is no longer receiving any support from such parents."[79] Likewise, legal responsibility is established through parentage, "…a signed voluntary acknowledgment of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger, and under which the *legal responsibilities* (including child support obligations) of any signatory arising from the acknowledgment may not be suspended during the challenge, except for good cause shown."[80]

    164.    Nonetheless, all parents are obligated to support[81] a child under the age of 21[82] and to exercise a "minimum degree of care" in supplying the child with adequate food, clothing, shelter, and education.[83] This also gives standing to Defendants to bring about claims against parents in family courts as interested or third parties.[84] Plaintiff is properly

---

[75] 42 U.S.C. 659 et seq., §459 (i)(2).

[76] *Id.*

[77] *Id.*

[78] SSL §453 [1][a].

[79] *Id.* at [1][c]; *see* also 42 USC §673[a][4][A][ii], [iii].

[80] (D)(iii)

[81] 42 U.S.C. 659 § 459 (i)(2) ("…which provides for monetary support, health care, arrearages or reimbursement, and which may include other related costs and fees, interest and penalties, income withholding, attorney's fees, and other relief.")

[82] *See* Family Court §413[1][a]; [42 U.S.C. 660].

[83] *Id.* at §1012[f][i].

[84] *See* Barbara T v. Acquinetta T (1st Dept., 2018) ("… Family Court properly determined that an adoption subsidy should be considered as a resource of the child when determining child support, but that the court erred in failing to consider the mother's eligibility for the subsidy in determining whether the mother's basic child support obligation was unjust or inappropriate…[w]e also find that further proceedings are necessary to determine whether the subsidy may be made available to Ms. M retroactive to the date of its suspension, and remand for these further proceedings.")

positioned to represent its members' rights effectively because support obligations are enforceable rights through private action.[85] Plaintiff Parents are ready to enforce that private right of action to protect their seized children. The State cannot assert more rights over child(ren) than their own biological parents. Absent imminent risk, the State cannot detain child(ren), put them in harm's way or silence them and/or the parents, "[i]n the absence of some provision by the State of Tennessee for a reasonable alternative to assist illiterate or poorly educated inmates in preparing petitions for post-conviction relief, the State may not validly enforce a regulation which absolutely bars inmates from furnishing such assistance to other prisoners."[86]

165.    Further, "[t]he Appellate Division held that although the statute does not presently permit anyone other than an adoptive parent to receive the subsidy on the child's behalf, there is no statutory or regulatory requirement that the child continue to reside with the adoptive parent in order for the subsidy to continue."[87] Given State Defendants' rather relaxed view of compounded problems with misappropriated subsidy payments and overall lack of accountability, there is sufficient concern the State's interest in maintaining the adoption subsidies creates competition between the foster parents it pays and the Plaintiff Parents who want their children back, "[t]he Lanham Act includes a detailed statement of its purposes, including, as relevant here, "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition," 15 U. S. C. §1127; and "unfair competition" was understood at common law to be concerned with injuries to business reputation and present and future sales. Thus, to come within the zone of interests in a §1125(a) false advertising suit, a plaintiff must allege an injury to a commercial interest in reputation or sales. Pp. 10–13."[88]

166.    In determining whether a parent has neglected a child by failing to meet that standard, the court "must evaluate parental behavior objectively," by asking whether "a reasonable and prudent parent [would] have so acted, or failed to act, under the

---

[85] *See* Burns, supra, 367 N.J. Super. ("A non-custodial parent is relieved from child support obligations where he or she "is totally disabled" and "indisputably indigent, surviving solely on SSI benefits directed at providing him [or her] with the legislatively-established minimum level of subsistence."); *see* Kenneth N. Graby v. Janet R. Graby 87 N.Y.S.2d 577 (1996) ("... the Child Support Standards Act does not authorize the courts to either increase a non-custodial parent's income by the amount of Social Security disability payments paid to the children or to credit those benefits against the non-custodial parent's support obligation.")
[86] *See* Johnson v. Avery, 393 U.S. 483 (1969).
[87] *See* Barbara T v. Acquinetta T (1st Dept., 2018).
[88] *See* Lexmark Int'l, Inc. v. Static Control Components, Inc. 697 F. 3d 387, affirmed.

circumstances then and there existing."[89] It is because this standard is rarely, if ever applied, that Plaintiff brings forth this suit. Notwithstanding those members significantly impaired from pursuing those rights on their own, parents have an enforceable right of action under 42 U.S.C. §659, "each governmental entity specified in subsection (a) shall be subject to the same requirements as would apply if the entity were a private person, except as otherwise provided in this section."[90] Accordingly, Plaintiff concludes the third-party standing rule does not bar Plaintiff Parents from requesting federal court relief to assert a third-parties federal rights for questions of federal law.[91]

167.    Having found that Plaintiff Parents have standing, we turn to the questions in this case: Does the New York State statute interfere unnecessarily with parental control over the raising of children? Do parents have a right to maintain familial association with their child(ren)? Has the State violated the New York State Constitution when it assumes it has more right to the care and custody of a child(ren) than his or her own parent? Does Plaintiff have an enforceable right through a §1983 action when the State intrudes into the lives of private citizens without a warrant? As such, Section 1983 is a vehicle for individuals to enforce "any right[] . . . secured" by federal law 42 U.S.C. §1983, "Government officials may be held liable under §1983 for a failure to do what is required as well as for overt activity which is unlawful [***16] and harmful."[92]

168.    In Troxel v. Granville the Supreme Court held, "[t]he liberty interest at issue in this case-the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their

---

[89] See Nicholson v Scoppetta, 3 NY3d 357, 370 (2004).

[90] 42 U.S.C. §659 Consent by United States to Income Withholding SSA §459 ([h] MONEYS SUBJECT TO PROCESS. (1)(A)(i) compensation payable for personal services of the individual, whether the compensation is denominated as wages, salary, commission, bonus, pay, allowances, or otherwise (including severance pay, sick pay, and incentive pay.)

[91] See, e.g., Campbell v. Louisiana, 523 U.S. 392 (1998); Georgia v. McCollum, 505 U.S. 42, 54–56 (1992); Powers v. Ohio, 499 U.S. 400, 411–16 (1991); Craig v. Boren, 429 U.S. 190, 192–97 (1976); Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 62 (1976); Maness v. Meyers, 419 U.S. 449 (1975); Griswold v. Connecticut, 381 U.S. 479, 481 (1965).

[92] See Doe v. City of New York Dep't of Social Services 649 F.2d 134 (citing Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50L Ed. 2d 251 (1976); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S. Ct. 1202, 28 L. Ed. 2d 335 (1971); Holmes v. Goldin, 615 F.2d 83 (2d Cir. 1980); Duchesne v. Sugarman, 566 F.2d 817, 822 (2d Cir. 1977) ("where conduct of the supervisory authority is directly related to a denial of a constitutional right, it is not to be distinguished as a matter of causation, upon whether it was action or inaction.")

own." Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in Pierce that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Id., at 535, 45 S.Ct. 571. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary *66 function and freedom include preparation for obligations the state can neither supply nor hinder." Id., at 166, 64 S.Ct. 438."[93]

## CLASS ACTION ALLEGATIONS

169.    This action is also properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

170.    The general class is defined as all Parents who are now, have been, or will be, deprived of the right to maintain familial association with their child(ren) due to the longstanding violations of State Defendant Judges of the Family Court ("Plaintiff Parents" or the "Class").

171.    The Class is sufficiently numerous to make joinder impracticable. The Class consists of parents who were, are, or will be, targeted by the activities and affairs by and through the Municipal Enterprise as effectuated through its Judges under color of law. The Class consists of parents whose child(ren) were, are, or will be, removed under color of law. The Class consists of parents who were unlawfully separated from their child(ren) as part of the racketeering schemes.

172.    The questions of fact and law raised as claims by Plaintiff Parent's are common to and typical of those of each putative member of the Class whom they seek to represent. Plaintiff Parents are subject to unnecessary, unwarranted, including unlawful state intervention supported by long-standing and well-documented gross negligence that substantially departs from accepted professional judgment and constitutes deliberate

---

[93] *See* Troxel v. Granville, 530 U.S. 57 (2000).

indifference to the harm, risk of harm and violations of legal rights suffered by the Plaintiff Parents and their child(ren).

173.    Questions of fact common to the Class include:

    a.  whether State and City Defendants caused Plaintiffs physical, psychological and emotional harm;

    b.  whether State and City Defendants fabricate reasons and records to intrude in Plaintiffs private lives;

    c.  whether State and City Defendants concealed instances of abuse and domestic violence to seize Plaintiffs' children; and

    d.  whether State and City Defendants require federal supervision to ensure the safety and well-being of New York State's residents.

174.    Questions of law common to the Class include:

    a.  whether City and State Defendants' long-standing and well-documented gross negligence violated Plaintiffs' substantive rights under the due process clause of the Fourteenth Amendment to the United States Constitution and Federal RICO;

    b.  whether City and State Defendants long-standing and well-documented gross negligence violated Plaintiffs' right to maintain familial association with their child(ren) under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Federal RICO;

    c.  whether City and State Defendants' long-standing and well-documented retaliation violated Plaintiffs' rights under the 1st Amendment to the United States Constitution and Federal RICO;

    d.  whether City and State Defendants' long-standing and well-documented gross negligence violated New York State Constitution, Social Services Law and regulations adopted pursuant thereto and Federal RICO;

    e.  whether City and State Defendants' actions, including recruiting 3rd parties, to sustain Plaintiffs' child(ren) unlawful seizures, constitutes third party custodial interference; and

    f.  whether City and State Defendants violated the Trafficking Victims Protection Act when they fabricated evidence to kidnap Plaintiffs' child(ren) and financed the ransom with state and federal funding.

175.    The violations of law and resulting harms averred by Plaintiff are typical of the legal violations and harms and/or risk of harms experienced by all Plaintiff Parents in the Class.

176.    Plaintiff will fairly and adequately protect the interests of the Class she seeks to represent. Defendants have acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.

Plaintiff Parents know of no conflict among the Class members. Plaintiff respectfully requests this Court's permission to publish the Class Action for potential members of the Class.

177.    Pursuant to the New York Constitution and federal and state statutory law, Plaintiffs have the right to:

    a. Right to equal protection of the law and not discriminated or targeted for race, status, sex, religion, or age, U.S. Const. amend. XIV and I;

    b. Right to be free from fabricated accusations, kangaroo courts, and false allegations from non-licensed persons, U.S. Const. amend. XIV and VI;

    c. Right to remain silent and not subjected to coerced self-incrimination in exchange for the return of a child(ren), U.S. Const. amend. V and XIII;

    d. Right to raise and maintain familial association with a child(ren) without fear of unreasonable searches, seizures and interceptions, U.S. Const. amend. XIV and XIII;

    e. Right to free of malicious labels and character assassinations and inform the public, friends, or relatives without retaliation; criminal prosecutions for libel, U.S. Const. amend I.

178.    Children are being removed from their parent(s) pursuant to:

    a) partisan hearsay in the Family Court,

    b) fabricated danger of abuse or neglect if left with the parent, who is not responsible for hurting the child, or

    c) to conceal child abuse and/or domestic violence by punishing the parent who spoke up.

179.    Some parents are, or were, involved in child protective proceedings, with a child(ren) in the custody of State Defendants, as in the family court, or under supervision by Defendants ACS. Others had their child(ren) seized, while residing in another State and/or county under false pretenses. Further, in some cases, Defendants utilize scouts[94] in custody proceedings to vet their clients for unnecessary child protective proceedings and groom the circumstances for a hostile takeover. At all times, Defendant Poole maintained legal responsibility for all children in New York State.

---

[94] Attorneys previously employed by ACS, who are employed as 18B attorneys or attorneys for the child in the family court; a scout can also be a seasoned attorney, such as Defendants' Blond, Kelly, and Galchus.

180.    By means of this lawsuit, Plaintiff Parents seek that all Defendants be jointly and severally found liable to the extent of (i) treble damages incurred by Plaintiffs due to Defendants unlawful activity, including attorneys' fees and costs spent defending against the kidnappings, unlawful seizures and abuse of process, pursuant to Federal and New York State RICO statutes, (ii) payment for lost wages and income due to Plaintiff having to bring this lawsuit, and (iii) 1,000,000,000 or an amount otherwise to be decided by a jury in the form of punitive damages for Defendants' illegal and fraudulent activities.

## The Commercialization of Child Safety & Corrupt Organizations

181.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-179, above as if specifically set forth herein.

182.    In New York State, the misnomer, "problem solving courts" are the venue for all family court proceedings. Family Courts have a monopoly over all types of family matters within the state, including but not limited to, proceedings for neglect ("NN"), abuse ("NA"), juvenile delinquency ("JD"), person in need of supervision ("S") (aka "PINS"), paternity ("P") and child support ("F"), custody and visitation ("V"), guardianship ("G") proceedings, offense ("O"), foster care ("L"), and judicial surrender ("AS"). City and State Defendants, including its extensions either by assignment or incidental employment, as well as incidental agents and/or associates, execute the activities and affairs of the Municipal Enterprise.

183.    The Municipal Enterprise, by and through its various employees, agents, and associates execute the activities and affairs of the corrupt organization through its monopoly over all family matters within the state through its purported problem-solving courts. To execute the activities and affairs of the Municipal Enterprise, its various employees, agents, and associates engage in coercive control and subjugation over individual family units. Specifically, by and through its various employees, agents, and associates, the Municipal Enterprise operates the monopoly over all family matters as proceedings involving individual family units by engaging in racketeering.

184.    The employees and agents of the Municipal Enterprise consists of various levels and types of individual City and State Defendants, both incidentally and causally related, as reflected by his/her direct or indirect compensation for his/her involvement in

the execution, engagement and in furtherance of the activities and affairs of the corrupt organization. For example, the boots on the ground, so to speak, consists of directly compensated members exercising purported judicial functions, such as employee State Defendant judges, court attorney referees, and magistrates.

185.    By extension of the aforesaid, are "hands on" personnel, who, either by employment or assignment execute incidental racketeering schemes, such as, including but not limited to, tampering, altering, destroying, and counterfeiting court records, including tampering, altering, destroying, and counterfeiting entries in the court's computer and UCMS. By and through their incidental employment at the family court, these individuals consist of court attorneys, Part clerks, and other clerks.

186.    Also, by extension, are those incidentally involved through employment, consisting of various types and levels of clerks, court officers as well as other administrative support and supervisory staff/personnel. These individuals have direct access to the records and computers of the court, thereby knowledge of the racketeering schemes. For example, court officers deployed in individual Parts are tasked with roll call, which is a computer printout of cases scheduled for individual family units. For example, records room supervisors are charged with managing records clerks, which includes incidental administrative support staff, whose duties, include but are not limited to, filing, recording, and entering records provided by the individual Parts. Through their direct employment with the court and incidental involvement with the records for the individual family units, the various types and levels of clerks, court officers as well as other administrative support and supervisory staff/personnel both advance and perpetuate the activities and affairs of the corrupt organization.

187.    Another type of extension are those directly assigned to represent the litigants or the litigants' child(ren), such as court appointed counsel, attorney for the child(ren)("AFC") and guardian ad litem ("GAL"). By and through their assignment, conspire to execute incidental and causal racketeering schemes to both extend and frustrate the litigation, for personal financial benefits and job security. For example, in New York City, the individual judges, court attorneys, and magistrates choose the assigned counsel for litigants and their child(ren) whereas, in Suffolk County, the appointed attorney is not directly chosen by the family court judge. Direct involvement in the choice over a litigant's

assigned counsel creates a perverse, financially interdependent relationship between the judge and the assigned attorney, which advances the activities and affairs of the corrupt organization through implied expectations and job performance. Specifically, this entails advocating in support of arbitrary, capricious, and nonsensical decisions, conspiring to railroad the client with intentional misinformation and unsound legal expertise. Through their grossly negligent self-serving function, assigned counsel enables and corners the client to suppress constitutional violations and due process of law. That is, you either play by the judge's rules or go hungry; the former will get you more assignments, while the latter can get you blacklisted.

188.    Supervising Attorneys with the Family Court Litigation Unit are directly employed by City Defendant[95] under the Division of Family Court Legal Services of Defendant ACS. There is 1 supervising attorney deployed in each borough, responsible for overseeing and managing subordinate agency attorneys. As such, they have unrestricted direct access to the Court, courthouse, court files and computer records to execute racketeering schemes, such as, including but not limited to, suborned perjury, witness intimidation, trafficking, witness tampering, withholding court orders for CPS investigations, money laundering, offering false instruments of filing, and counterfeiting business records. This is done to isolate and subjugate unsuspecting parents under their control and finance their captivity through money laundering fronts.

189.    By extension and incidental assignment to prosecute their prisoner parents, subordinate attorneys also execute racketeering schemes, such as, including but not limited to, witness tampering, witness intimidation, suborned perjury, signing and notarizing false affidavits of service as well as tampering, altering, destroying, and counterfeiting entries in the court's computer and UCMS. To perpetuate the ransom and kidnapping schemes, agency attorneys obstruct justice, and knowingly provide false information and records to law enforcement to conceal their complicity in financing child abuse via selective and malicious prosecution.

190.    There are levels of recruiters and scouts operating within the family courts, individuals who are either directly, indirectly, or formerly employed by City Defendant. For example, the social workers tasked with preparing CPS reports from court

---

[95] Outside of New York City, the Supervisors are County Attorneys, who represent their respective LDSS in family court.

orders for either FCA 1034 investigations or COIs are recruiters in that he/she withholds registering the court order with the SCR to frustrate and intentionally endanger a parent and his/her child(ren) as well as to target a parent with selective and malicious prosecution in anticipation of submitting false claims to finance money laundering schemes. Aforesaid process of grooming is facilitated, enabled, and further aggravated by AFC's or assigned counsel previously employed with Defendant ACS. As such, these former employees recognize the setup and conspire against his/her client to finance protracted hearings for financial gains. Accordingly, the latter subset perform the function of scouts because, despite their extensive former experience as an agency attorney, he/she feigns legal incompetence and common sense to assist with subjugating his/her client under color of law.

191.    The incidental and indirect members of the Municipal Enterprise, or its associates in fact, consist of privately retained attorneys, attorneys for the various third-party foster care agencies, including but not limited to, evaluators, psychologists/psychiatrists, and police officers, who execute racketeering schemes as soon as he/she receives an invitation to join the money laundering fronts. For example, private attorneys will advise clients not to report child abuse or mention domestic violence in court proceedings, and willingly overlook receipt of fabricated records to run up legal bills for time spent litigating fraud on the court. Custody proceedings are protracted and prolonged due to blatant incompetence and legal malpractice, which enables the scouts assigned to the litigation and the recruiters preparing the fake CPS reports to spearhead a parent's loss of familial association with his/her child without due process of law. Despite not having a trial or a hearing, witnesses, evidence, or proof of imminent risk to the child(ren), private attorneys will further advise clients to play along with arbitrary and capricious rulings to financially exploit and ultimately bankrupt parents fighting to regain access to his/her child(ren).

192.    Evaluators, psychiatrists, and psychologists are purported experts chosen by the Court to make assessments for hearsay allegations of mental unfitness, imminent risk, and specious accusations of alienation made by the offending parent, opposing attorney, and/or the AFC. Aforesaid purported experts are known to the Court, opposing attorney, and/or AFC by trade and previous referral and do the bidding of the payee,

thereby enabling racketeering schemes through biased determinations founded on junk science. For example, the psychologist at the QFC Office of Mental Health was directed to diagnose Munchausen in 1 session by asking questions, like "how often do you wash your hands?" and "how often do you take your children to the doctor?" Without medical records for the parent or the child from which to refer, the purported psychologist did the bidding of the Court because that is who pays him. Had he successfully made the diagnosis after 1 4-hour session, his junk science approach to psychiatry would fly in the face of current pandemic guidelines by the Center for Disease Control ("CDC"), that adamantly recommends hand washing and repeated medical testing for COVID-19 based on an individual's perceived illness.

193.    The Municipal Enterprises schemes involve intentional delays for submissions and/or responses related to legal proceedings, where the delays are deceptive stratagems to collaterally attack allegations, accusations, and complaints made against City and State Defendants, for additional time to prepare the of offering false instruments of filing, replete with, including but not limited to, perjury, suborned perjury, fabricated exhibits, counterfeit records, fake documents, files, case notes, altering and tampering with court records to bolster their legal arguments.

194.    Acting as the Municipal Enterprise, Defendant ACS consists of officers, employees, and agents of a municipal corporation, created under City Defendant's Charter. The entity consists of individuals who work in concert to subjugate parents with various forms of coercive control by engaging and executing racketeering schemes, including but not limited to, falsifying CPS investigations to conceal danger and/or risk of repetitive violence by suppressing evidence and malignantly targeting the victim, thereby causing revictimization with abuse of process; forging signatures of co-Judges on orders to supplant underlying actions of previous, or new, false instruments of filing to sustain subjugation via jurisdiction by fraud; using and serving fraudulent orders with forged signatures to retain financing over the subjugation by concealing its underlying purpose as a petition; surveilling the e-mails of other Justices to gain advantages over litigation; offering false instruments of filing to execute warrantless seizures and finance kidnapping schemes under the pretense of child protection; altering business records, reports, and case note entries in Connections to backdate CPS investigations not performed; backdating and altering case

notes to conceal grossly negligent failures and/or oversights retroactively to falsify compliance with internal rules and policies for child protective records and investigations; falsify court records, reports, and entries in UCMS to retroactively fabricate compliance with procedural due process, previously denied and suppressed; disobeying and defying court orders for CPS investigations by withholding to register them with the SCR; closing SCR investigations and reports to artificially reduce CPS investigation numbers in their jurisdiction; fabricating, falsifying, altering, and tampering with court transcripts of procedural pre-removal hearings for Title IV claims.[96]

195.    In addition, the Municipal Enterprise has extensive non-monetary resources, personnel, influence, and privilege with which to maintain constitutional violations under color of law indefinitely, and a unique ability to *tweak* Standards & Goals. Defendant Poole hands out "get out of jail free" cards for agents and employees of ACS after deplorable state and federal audits.[97] Defendant ACS is notorious for magically manifesting documents, records, policies, guidelines, etc. during state audits, an act that is concurrently performed in the family court to delay, frustrate, hamper, and obstruct the return of Plaintiff Parents' child(ren). The situation escalates when Defendant ACS decides to target a parent. It is easy to get on the ACS cartel's bad side: defend and uphold your parental rights to the care and custody of your child(ren); defend and uphold your constitutional right to due and substantive process. Absolutely never, *ever*, *ever* call out Defendants mistakes or you *will* feel the pain of a revolving Social Security Administration account.[98]

196.    State and City Defendants, including their nexus of members, engaged in a scheme to defraud the Federal Government, defraud New York State, and defraud New York State Parents of their sacrosanct parental rights and constitutional right to maintain

---

[96] §1356.21 (d)(1) (Referring to, "[i]f the reasonable efforts and contrary to the welfare judicial determinations are not included as required in the court orders identified in paragraphs (b) and (c) of this section, a transcript of the court proceedings is the only other documentation that will be accepted to verify that these required determinations have been made."); tampered 8/30/2019 and 9/04/2019 Part 14 transcripts.

[97] *See* Elisa W., et al v. City of New York, et al ("The first CFSR audit, which was published in 2002, found that New York State failed to conform to federal expectations in five of the seven safety, permanency and well-being indicators, and in three of the seven systemic factors. Seven years later, New York State performed worse. During the second CFSR audit, which was published in 2009, the federal government determined that New York State failed to conform to federal expectations in all seven safety, permanency and well-being indicators, and in five of the seven systemic factors.")

[98] Title IV-A §418 (TANF) [42 U.S.C. 618]; Title IV-B §422 Stephanie Tubbs Jones Child Welfare Services Program [42 U.S.C. 622]; Title IV-D §458 Child Support and Paternity. [42 U.S.C. 658a]; Title IV-D §469B Access and Visitation Programs [42 U.S.C. 669b]; Title IV-E Foster Care, Prevention, and Permanency §470 [42 U.S.C. 670]; and Title XX-A §2001 Social Services Block Grant [42 U.S.C. 1397].

familial association with their child(ren) under color of law. Aforesaid Defendants operate the Municipal Enterprise, which funds the Kidnapping Scheme to seize Plaintiff Parents' child(ren). The Municipal Enterprise uses creative and constructive fraud, racketeering, including but not limited to, grand larceny, money laundering, offering false instruments for filing, falsifying business records, witness intimidation, suborned perjury, extortion, and witness tampering to initiate and finance subjugation and sequestrations.

## CONSPIRACY TO CONCEAL THE EXISTENCE OF THE MUNICIPAL ENTERPRISE

197.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-196, above as if specifically set forth herein.

198.    Within the City of New York, Defendants' ACS use their monopoly over child protection to operate a Municipal Enterprise with breadth of continuity and an array of social services in the form of a structured, purposeful organization, that extends beyond the time required to commit individual crimes, "[t]he City's Financial Management System (FMS) reflects that ACS spent $237 million, $224 million, and $213 million in adoption subsidies in Fiscal Years 2018, 2019, and 2020, respectively."[99]

199.    For example, as a condition to receiving SSA Title IV-B award, the Stephanie Tubbs Jones Child Welfare Services program, City Defendants agreed to "…ensure the safety and well-being of children and families residing in New York City by providing child welfare, juvenile justice and education services…[]contracts with private nonprofit organizations to support and stabilize families at risk of a crisis through preventive services[] and provides foster care services for children not able to safely remain at home…[and] currently has contracts with 23 foster care providers for a total amount of $1,067,312,031."[100]

200.    Not surprisingly, New York State Attorney General Leticia James had to sue Defendants' ACS and OCFS for grossly mishandling the care of its foster children, "[o]n an ongoing basis, the Office of the Public Advocate Constituent Affairs Department…receives complaints from constituents in all five boroughs alleging

---

[99] Audit Report on the Administration for Children's Services' Controls Over Adoption Subsidies.

[100] Report to the Mayor and City Council on City Comptroller Audit Operations Fiscal Year 2019.

deficiencies and lapses in responsibilities by both ACS and Contract Agencies…for instance, failure to investigate allegations of abuse of children in ACS custody, failure to initiate timely TPR proceedings, failure to follow proper procedures when removing children from their family home or foster home, failure to provide required services for both biological parents and foster children, failure to honor ACS vouchers and potentially retaliatory practices against those who complained directly to ACS or Contract Agencies. In total…559 complaints regarding ACS since January 1, 2014 [were received]…the Public Advocate identified ACS as an agency whose practices warrant investigation."[101]

201.    Like a taxpayer who makes or subscribes a false statement through his or her accountant or tax preparer, by supplying the accountant or tax preparer with incorrect information, Defendant ACS fabricates the information it supplies on federal claims for seized children by making knowingly false statements about the circumstances of the removal. As the intermediary of the audits, and the recordkeeper of both the state's physical records and electronic program records via Connections under the control of Defendant OCFS, Defendant Poole has known, or should have known, the information used to obtain reimbursements was patently false.

202.    That the Municipal Enterprise spearheads the destruction of the family in New York State is done with Defendant Poole's unwavering support was, and is, documented in various public records, including but not limited to, city, state, and federal audit reports; city and state child fatality reports as well as press coverage for the avoidable deaths of a child(ren) known to City and/or State Defendants; media coverage for gross negligent hirings; press coverage for employees and agents criminally charged with falsifying child protective records; and various public hearings with city council members.

203.    Defendant Poole is being sued in her personal capacity because the persistent accumulation of substandard, gross mishandling of documents, records, and files via the entity she oversees, Defendant OCFS, has been, and is, maintained, in whole or in part, by the counterfeiting of records in the SCR, including but not limited to, altering, backdating, and tampering case note entries to retroactively misrepresent corrective action and/or compliance with purported managerial reviews in Connections.

---

[101] *See* Elisa W. v. City of N.Y., No. 15 CV 5273-LTS-HBP (S.D.N.Y. Sep. 12, 2016).

204.    As the recordkeepers of Plaintiff Parents' and their child(ren)'s SCR investigations, Defendant Poole, through OCFS, has failed to adequately monitor, supervise, and/or reign in the illegal activities of Defendant ACS, who execute seizures with improperly documented, or grossly undocumented, case notes in Connections. A component of the Municipal Enterprises scheme involves withholding registering court orders for CPS investigations, such as when Defendant ACS receives a court order for a COI and/or FCA 1034 investigation but grossly neglects to register it with the SCR and fails to perform a mandated duty pursuant to SSL §§413, 415, and Title 6.

205.    The program, "CONNECTIONS was developed in response to the provision of federal financial incentives to develop a Statewide Automated Child Welfare Information System (SACWIS) to provide a more efficient and effective administration of child welfare programs and to meet the federal mandate for state collection of a set of foster care and adoption related data elements [the Adoption and Foster Care Analysis and Reporting System (AFCARS)]. CONNECTIONS, in accordance with these mandates, is designed to create a single, statewide, integrated system for the collection and recording of child protective services, preventive services, foster care and adoption services information."[102]

206.    Defendant OCFS manages, controls, and maintains the SCR as well as employs the operators in the call center, who take in the reports of suspected abuse and neglect, "Dannhauser, the CEO of the foster care agency Graham Windham, called it "astonishing" how easily anonymous callers can send the government into someone's home and agreed statewide changes to reporting laws may be needed."[103] The operators are required to assess the information in the reports to determine if it rises to the level of suspected abuse or neglect, a process that also includes assessing court orders for FCA 1034 investigations and COI's. In the Discovery Plaintiff received from Defendant Heaven, there is evidence that Defendant Alozie used the State's paid for cell phone to make the anonymous call. Unlike the other source-revealing information that was left unredacted, the source specific voicemail message was excluded from the case notes by Defendants ACS.

---

[102] 05-OCFS-ADM-02 Office of Children and Family Services Administrative Directive.
[103] The Imprint, *New York City Child Welfare Chief Calls For Changes to Mandated Reporting System* (3/15/2021).

207.    For example, Defendant ACS submitted altered FCA 1034 reports for R.R. (3) in January, May, June, and August of 2019 as well as October 2019. Aforesaid reports pertained to court orders issued in December 2018, and May, June, and July 2019. In October 2020, Defendant ACS submitted 3 unregistered CPS reports for both R.R. (3) and L.N. (6) for the October sham proceeding at QFC, for which Plaintiff did not receive prior notice nor was a corresponding letter(s) from Defendant OCFS mailed in October 2020 to confirm Defendant ACS registered the court order(s). Inclusive, Defendant ACS submitted 2 fake CPS reports to Judge Hughes at SFC for both R.R. (3) and L.N. (6) in October 2019 and September 2020. In September 2019, Judge Hughes ordered an FCA 1034 investigation, which SCDSS registered with the SCR. Though Defendant ACS prepared a report with contradictory allegations about the source in their purported Article 10, it was never entered in Connections. In September 2020, Judge Hughes ordered another FCA 1034 investigation, for which Defendant ACS prepared a report that, again, contradicted its previous report and contained allegations previously disputed by SCDSS. As with the September 2019 report, Defendant ACS never entered its September 2020 report, case notes, or findings in Connections.

208.    Defendant ACS submitted the same type of false, fraudulent, fabricated report in October 2020, almost 5 months after it was ordered in May, for sons' N.C. (2) and G.C., (4) in parent Anthony Cibelli's ("Cibelli") case at QFC. Despite the pandemic, the lockdowns, and Defendant ACS's publicly reported abstention from in-home visitations and its purported virtual replacement, the caseworker noted, "CPS has made visits to the home and observed the children G.C. (4) and N.C. (2)…[t]he most recent visit to the home was on October 6th, 2020."

209.    In parent Alicia Jagnarain's ("Jagnarain") custody proceedings at Nassau County Family Court, Defendant ACS in New York County was ordered to investigate suspected sexual abuse reported and documented by mandated reporters for child A.A. (6). Defendant ACS grossly neglected to register the court order and provided a CPS report with incohesive numbered pages, and missing pages. Due to the inadequate, subpar, grossly insufficient information in the report, Judge Ellen Greenberg ("Greenberg") subsequently barred parent Jagnarain from access to A.A. (6), transferred custody to the father, prohibited her from access to any medical records, including from speaking to current

and/or former pediatricians, attending physicians, school counselors and anyone who treated the child's recurrent, inexplicable sexually transmitted condition, which originated while in the father's care.

210.    For example, in parent R.M.'s ("R.M.") proceedings at Kings County Family Court, Defendant ACS submitted numerous false, fraudulent, and fabricated FCA 1034 reports to malign and discredit any parental concerns he expressed for child M.'s safety and well-being. Apparently, the child's visible deteriorating health, while living in a shelter with her mother and half-sibling for over 2 years, resulted from abuse perpetrated by the half-sibling, who suffered from unmedicated and untreated bipolar disorder. Due to the previous social worker's diligent documentation of the child's pattern of severe abuse[104] caused by the half-sibling with the mother's participation, she was ultimately replaced by the current one, who engages in smear campaigns to discredit and re-write child abuse by replacing it with malignant accusations against parent R.M. Rather than ensure the child's safety, Defendant ACS aids and abets in witness of a child by keeping her with the abuser and his enabler and accuses parent R.M. of "making false reports."

211.    Defendant OCFS routinely remits directives and legal memorandum, as well as establishes policies and guidelines for each of the 58 local district social services ("LDSS"), including Defendant ACS. Defendant OCFS consistently fails to ensure that Defendant ACS complies with the aforesaid or implements corrective action after an audit, "[w]e found overall that the progress notes contained no evidence that any supervisors noted any case workers' failure to comply with any of the 130 directives mentioned below...[a]ccording to the supervisors we met with concerning these cases, they all agreed that ACS needed a better system for tracking compliance with the directives, expressing concern that the current system, which requires that supervisors read through a case's many progress notes to assess compliance, did leave room for negligence and errors...[o]ur review of the progress notes revealed that case workers failed to comply with 130 (37 percent) of the supervisory directives."[105]

---

[104] Per the Connections records given to R.M., there was an incident where M.. was held down by her mother as the half-sibling bit off her toenail with his teeth. The previous social worker repeatedly reported the half-sibling had a history of aggression and appeared to be taking it out on his little sister. Also reported in the case notes were instances of coaching and coercing the child to lie about the circumstances she sustained bruises and marks.

[105] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

212.    Inclusive, as a condition to the federal awards, both for program implementation and grants, State Defendant, through Defendant OCFS, agreed to execute the terms and conditions imposed by the Department of Health and Human Services through its funding under the SSA. Therefore, Defendant Poole, knows, or should have known, that, not only did she fail to abide by federal the terms and conditions but its own terms and conditions, whereby Defendant ACS impose its own policies was, and is, non-a conspiracy to conceal non-existent fallacies.

213.    That is, based on the various audit reports by the New York City Comptroller regarding the deplorable, and excoriating gross failures to properly document warrantless seizures, to follow their own policies, and/or guidelines, let alone the policies and guidelines instituted by Defendant OCFS, the City was aware of, on notice of, and was deliberately indifferent to Defendant ACS's gross negligence. Despite numerous recommendations, published reports, letters, and waivers to address and implement corrective action, reforms, policy changes, Defendant ACS continues operating under the same schemes, but utilizes more enhanced forms of censorship and witness intimidation tactics to suppress its existence.

214.    Despite auditors uncovering lacking, insufficient, inadequate records and documentation in Connections, Defendant Poole, through her representatives, offered casual indifferent responses, implying that Defendant OCFS does not micromanage compliance with State and Federal laws and any authority it had over Defendant ACS ends at the hand off to family court judges. Defendant Poole continued to accept federal grants on behalf of Defendant ACS, despite blatant violations of federal and state laws resulting from predatory warrantless seizures, "[i]ndeed, the defendant could have returned the checks to AMPI, or destroyed them, or never caused their delivery to the advertising agency, or even recalled them after Lennen & Newell had physically received them, in which event no crime would have been committed since the final element of the crime would have been lacking. The receipt or acceptance of the contribution occurred when the checks were deposited in New York in payment of a Humphrey campaign bill. The offense occurred in this district and venue was proper."[106]

---

[106] *See* United States v. Chestnut, 399 F. Supp. 1292 (SDNY 1975).

215.    Despite Defendant Poole's knowledge of and access to aforesaid audits, Defendant ACS was consistently held unaccountable, when compared to the Department of Correction, who made it onto the New York City Comptroller's Watch List in 2018, "[t]he Agency Watch List spotlights city agencies that raise the most budgetary concerns due to rapidly increased spending and meager measurable results."[107]

216.    Defendant Poole's responses for incomplete and/or non-existent proof of "imminent risk", or actual risk, in Connections are intended to deflect Defendant OCFS's responsibility for gross negligence from past actions, as though warrantless seizures of children and coerced subjugation of parents are "grandfathered in" and exempt from hindsight. More importantly, if Connections records are inadequate, incomplete, and subpar, then Judges in family court do not have physical proof to either sustain a child protective proceeding or sever a parent's right to maintain familial association with his/her child(ren). As such, they are acting outside of all jurisdiction and the law, when capriciously deciding to change custody or remanding a child under agency/court supervision. Defendant Poole justifies due process violations committed in court as being outside of her control, yet grossly fails to enforce accountability to prevent it.

217.    To the extent that Defendant Poole's appointment as Commissioner of the entire welfare system in New York State makes her the Official responsible for ensuring that children are not subjected to state-sanctioned abuse paid by taxpayers is exactly why a repeat offender, like Defendant ACS, is permitted to engage in kidnapping schemes, for as long as it has. It appears that Defendant Pool is more preoccupied with receiving Defendant ACS's robust federal grant awards, than preventing child abuse. Rather than protect vulnerable, defenseless children, Defendant Poole prefers maintaining the status quo due to the economic advantage of receiving federal funding to offset the state's child welfare system's expenses, "[c]arrying the cultural sensitivity that motivated family preservation to an absurd length, one of the foundations proclaimed that child "'abuse' " (in sneer quotes) may simply "reflect a group's cultural norms." This ideology found a receptive audience in the new social-work establishment, which, going to the opposite extreme from earlier

---

[107] FY 2022 Agency Watch List, Department of Correction.

excesses, began to view keeping even the most dangerous families together as almost always "reasonable"—and not doing so as unacceptably judgmental."[108]

218.    For example, an audit of the foster parent certification process found, "...ACS has no process in place to independently verify that its contracted foster care providers are properly certifying prospective foster care families in accordance with City and State requirements prior to their issuance of certifications and the placement of children with foster families...[w]e found that, when using ACS's audit methodology, 9 (24 percent) of the 37 homes that ACS found to be compliant with City and State certification requirements during its audits were in fact not compliant because they lacked the requirements for certification."[109] And yet, these are the people Defendant Poole prefers Defendant ACS to choose, instead of the seized child's parent(s). That is, a completely unvetted or improperly vetted stranger is better than a parent, regardless of taking proper precautions as to the child's safety, health, or well-being, ""[i]f you are leaving children in the home just to leave them in the home, that is bad practice and we will fix it.""[110]

219.    In an adoption subsidies audit, the "we will fix it" strategy unraveled the consequences of speed-induced processes of seizures and the lax disregard for ongoing monitoring and/or supervision over its seized child(ren), "...ACS relies solely on death notifications it may or may not receive from the family or a friend of the deceased person or from an OCFS death match report. ACS' passive reliance on these external sources appears insufficient to prevent improper payments from continuing after the named payee or beneficiary dies."[111] In a last ditch effort to justify the lack of oversight and/or control of seemingly drug induced acts of mass seizures, "[a]t the May 25 [2021] exit conference, ACS officials informed us generally that ACS had made efforts to investigate our findings and stated that ACS had determined that an unspecified number of adoptive parents referenced in our findings may be alive...[w]e asked ACS for supporting documentation...[h]owever, none of the information we received in response to that

---

[108] City Journal, *Massacre of the Innocents: New York's misguided family-reunification policies continue to have fatal consequences,* Winter 2018.
[109] Audit Report On the Oversight of The Administration For Children's Services' Certification Process For Foster Parents (5/03/2019).
[110] *Id.* at p.5.
[111] Audit Report on the Administration for Children's Services Controls over Adoption Subsidies (6/03/2021).

request contained information about any of the 42 persons we provisionally identified as deceased in this finding of our audit."[112]

220.    The audit of the Close to Home ("CTH") Program for Non-Secure Placement ("NSP") of alleged juvenile delinquents found, "ACS does not have any written policies or procedures for the oversight and monitoring of the CTH NSP providers and their programs…"[113] Defendant ACS does not, nor can it be bothered to, care about its wards and will place both children and adolescents with anyone, anywhere. To get approval or deter further regulatory inquiries into its policies or practices, Defendant ACS will patently lie to officials, "…ACS'[s] audit-related acknowledgment of and explanation for its failure to have written CTH program policies and procedures stands in stark contrast to earlier statements ACS made to the Comptroller's Office…[s]pecifically, in its Calendar Year 2014 annual Directive #1 Financial Integrity Statement ACS informed the Comptroller's Office that all of its programs are conducted in accordance with clearly defined management policies, and that these policies are properly communicated to the appropriate agency staff, and reflected in formal written operating procedures."[114]

221.    An audit over its investigative procedures for child abuse and neglect allegations found Defendant ACS inconsistently applied and/or adhered to its own policies, "[a]ccording to ACS' policy, "Division of Child Protection staff are required to document all case related events in CNNX within 5 business days of such events…[o]ur review of 25 sampled cases consisted of 580 progress notes, of which 119 (21%) notes— pertaining to 24 of the 25 cases—had late CNNX entries, one 37 days late. The late entries raise further concerns because none of the case workers investigating these 24 cases had any notebook entries corresponding to these progress notes, meaning that the case workers relied solely on memory when recording the details into CNNX. The progress notes contained evidence of supervisory reminders to record entries in a timelier manner for only 33 (28 percent) of the 119 cases with late entries."[115] That is because Defendant ACS thrives in an

---

[112] *Id.*
[113] Audit Report on the Oversight of the Close to Home Program Non-Secure Placement by the New York City Administration for Children's Services (6/16/2016).
[114] *Id.*
[115] Audit Report on the Administration for Children's Services Controls Over Its Investigation of Child Abuse and Neglect Allegations (6/15/2016).

environment that is completely insulated from accountability, prosecution, and actions knowingly taken in bad faith.

222.    When Defendant ACS cannot be bothered to do a proper CPS investigation, the social worker's gross dereliction of a mandated duty is further concealed by his/her supervisor. In the event the Court orders Defendant ACS to commence an FCA Article 10, because it does happen and the latter willingly complies, the previously blank Connections' entries are retroactively updated to obtain financing for intentional malicious prosecution. If the policy requires, "[s]pecific time frames for recording entries in Connections (CNNX) guide and support good case practice by assuring recall of case actions and assessments, continuity of work done with the case, and ongoing maintenance of CNNX records,"[116] then Defendant ACS will do the opposite. Later, Defendant ACS will claim "overburdened caseloads" or "understaffing" or "it's an isolated case", etc. etc. to explain away what is ubiquitously, willfully done.

223.    Defendant Poole is not overseeing the State's child welfare, social services, or child protection system. Rather, Defendant Poole is endorsing the commercialization of children through the family courts because Defendant OCFS's records are either inadequate and/or incomplete, or non-existent. The warrantless seizures by City Defendant and illegal interference by State Defendant, both of which conspire to sever and/or intrude between a parent and his/her child, under specious pretenses, are illegally preventing familial associations under color of law. If Defendant Poole had this information in Connections, then the auditors would have noted it in various reports – it did not.

224.    What has been permitted to occur is an implied policy endorsed by the State through Defendant Poole's grossly incompetent mishandling of the state's welfare system, which dictates State Defendant has more right to a child than his or her own parent. And permitted the rampant seizure of children by Defendant ACS, "...the Mayor's Office of Management and Budget (OMB) has been able over time to negotiate with federal officials higher reimbursement rates for civilian fringe benefits, which means that ACS has been reimbursed more money for those staff members whose fringe costs are partially covered under state child welfare funding...[t]hese annual negotiations have accounted for

---

[116] *Id.*

$24.5 million of the increase from 2013 through 2017."[117] That policy, "State child welfare funds are also used to reimburse the city for some of ACS's fringe benefits costs"[118] is being enforced through the family courts, where the Judges have no proof that a child(ren) should be removed from his or her own home but enables the sequestrations and kidnappings under color of law.

**To legitimize the racketeering fronts in the family courts, <u>counterfeit records are also submitted as Discovery</u> in fair hearings to reinforce dispositions of neglect or abuse.**

225.    Defendant OCFS is also responsible for overseeing and overall management of its Bureau of Special Hearings, which are administrative hearings, or its misnomer, i.e., fair hearings, to review indicated findings of maltreatment, for which Defendant Poole knows, or should have known, have been, and are, conducted, in whole or in part, with the use of counterfeit Connections' records. First, Defendant OCFS increased its hiring of administrative hearing officers, which consist of either retired judges or attorneys, charged with administering fair hearings between the parent and the agency, to either substantiate or overturn the indicated finding. Second, Defendant Poole's record of increased indicated findings are related to family court proceedings, for which the number of SCR reports has decreased. Therefore, the purpose of hiring more administrative law judges to oversee fair hearings portrays deception: the children are being recruited for proceedings by other means, not recorded, tracked, or documented.

226.    Defendant Udochi's gross negligence reinforces the denial of due process, sustaining illegal convictions against Plaintiff and parents, which further sustains the illegal seizure of their children. Through his feigned ignorance of due process violations, Defendant Udochi knows, or should have known, counterfeit records are the basis of illegal determinations in the fair hearings that reinforce dispositions of neglect from fronts in the family court The counterfeit records are so blatantly obvious that only Defendant Udochi's willing participation could justify its pervasive infiltration as legitimate evidence in these administrative hearings. As such, the subsidized commercialization of Plaintiff and parents' child(ren) is caused by the denial of equal protection under the law in furtherance of the Kidnapping Schemes. Defendant Udochi is responsible for the deprivation of familial

---

[117] New York City Independent Budget Office, *Governor's Budget Would Cut Funding to NYC for Child Welfare and Juvenile Justice by $190 Million,* March 2018.
[118] *Id.*

association between child(ren) and parents, since these administrative determinations uphold illegal convictions that further supports foster care placements and eventual adoption of the children illegally seized by and through the Municipal Enterprise.

**The misappropriation of federal and state funding is repeatedly overlooked and ignored.**

227.    Defendant Poole has attended and participated in numerous public hearings about the violations of due process, pertaining to the deplorable standards of Defendant OCFS's recordkeeping, mismanagement of child protective records in the SCR, and constitutional violations done by and through the City and State Defendants engaged in the activities and affairs of the Municipal Enterprise in family courts.

228.    Defendant OCFS knows that Defendant ACS holds coercive interrogations called "Child Safety Conferences," where the latter misrepresent their authority under parens patriae as cruel and unusual forms of psychological warfare to inflict intentional emotional distress for the potential loss of a child via, including but not limited to coercion, duress, threats of incarceration, threats of foster care, threats of fabricated charges, and threats to an extended loss of familial association by sequestering the child in exchange for receiving hand-written false self-incriminating confessions from Plaintiff Parents. These so-called "conferences" have also been a point of contention among New York City Officials, "[o]ther proposed bills, authored by Manhattan council members Carlina Rivera and Margaret Chin, would require caseworkers to at least disclose to parents their right to an attorney, and other rights, similar to so-called Miranda warnings police must offer criminal suspects."[119]

229.    Every time the SCR registers a report with allegations of suspected child abuse or neglect, a history of the family dynamics is created, recorded, and documented, which can assist in determining whether the state can intervene through its courts, "[o]nce the case is assigned to the borough office for investigation, the supervisor reviews the allegation, along with any prior intake reports and investigations pertaining to the family (if applicable), and schedules a pre-investigation conference with the case worker to review the case details and develop a preliminary investigation plan."[120] Defendants ACS are

---

[119] The Imprint, *New York City Debates Lawyering Up Parents Early in Child Safety Investigations*, (10/31/2019).
[120] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

weaponizing the SCR to target parents in cases already assigned to them as a result of CPS investigations ordered by the Court.

230.    The reason unfounded reports remain in the registry is, in the event of the death of a child, for example, any previously reported information can assist with uncovering the perpetrator based a pattern of previous allegations. For example, a pattern of unexplained marks and bruises on a child that cannot walk, as documented by mandated reporters for R. R. (3), was information Defendant OCFS had for almost 1 year until Defendant ACS retroactively altered it. That Defendant OCFS had the ability, capacity, and duty to monitor the handling of CPS investigations based on its exclusive, and direct access to Connections, was grossly ignored. Defendant ACS was, and is, tampering with the Defendant OCFS's records to directly conceal their compounded gross negligence and indirectly, protecting Defendant Ruci. In both instances, the liability of one establishes the liability of the other.

231.    In fact, the records Plaintiff obtained from the Children's Bureau, showed numerous subsequent additional information reports ("Add Info") with new Intake Stage ID numbers made by Defendant ACS, who was creating new SCR investigations under Plaintiff's name to redirect jurisdiction, thereby transferring responsibility to SCDSS and closing out the open report on their end. Specifically, to artificially reduce the number of SCR investigations in its jurisdiction, Defendant ACS indirectly changed the subject of the report from Defendant Ruci to Plaintiff, which speciously deferred responsibility to SCDSS, by registering an add info report with the SCR. By re-directing jurisdiction, Defendant ACS was manipulating the SCR to prevent SCDSS from making a subsequent indicated finding against Defendant Ruci, thereby closing the report naming him as the subject and causing an add info report for Plaintiff, when the injuries occurred while R.R. (3) was in Defendant Ruci's care, i.e., Queens County.

232.    Defendant ACS was, and is, enabled by Defendant Poole, despite the former's demonstrated capacity to deceive parents about their purported authority to kidnap their child(ren) "…for over 40 percent of the children whose placement ended, the field for explaining why a child was removed from direct placement was blank…[w]ithout accurate and complete information, OCFS cannot effectively monitor direct placements using

CONNECTIONS."[121] On the other hand, Defendant Hansell knowingly deceives the public and public officials about the purported reforms and corrective actions implemented since *his* appointment.

233.    Defendant OCFS has known about Defendant ACS's track record of gross negligence for improperly documented, and undocumented, CPS investigations to substantiate a child's removal, including grossly inadequate documentation for the well-being of a child previously removed, "[a]s described in this report, our access to case files and CONNECTIONS records was limited…[i]n addition, we found instances where information in CONNECTIONS could not be relied upon, as it was inaccurate and/or incomplete…[a]s a result, we placed limited reliance on the data, mainly using it to select our sample and for background information."[122] These records pertain to children who are placed in the home of a relative, after being removed from his/her main caregiver/parent based on Defendant ACS's subjective perception of imminent risk.

234.    Defendant ACS hands off their proverbial ball of *lies*, amounting to a blatant dereliction of duty, to grossly shift all responsibility away from themselves and onto the Court for its warrantless seizures. Regardless, the tax funded keepers of the records, Defendant OCFS, have no excuse for falling asleep behind the wheel for over a decade, "while it is a family court judge who makes the legal decision as to whether a child will be placed or continue in direct placement, this decision is based, in part, on input from the Local Districts…[w]ithout proper oversight, OCFS has no way of ensuring that Local Districts are providing all relevant information to the courts."[123] Defendant Poole has sat by and watched how blind family court judges continue to make decisions that destroy families. The "I was just following orders" defense was rejected during the Nuremberg Trials and there is no excuse for its current use.

235.    Notwithstanding reported, publicized, and published retaliation from Defendant ACS, Defendant Poole failed to exercise a minimum degree of due diligence to investigate the allegations. Acts of retaliation continue to endanger those who both speak up.[124] Defendant Poole was, and is, aware that every budget proposal Defendant ACS

---

[121] Audit Report on The Office for Children and Families: Oversight of Direct Placement of Children, March 2, 2020.
[122] *Id.*
[123] *Id.*
[124] Child Welfare Monitor, *Lethal Reunifications: two children dead in New York and Florida* (08/17/2021) (Blaming COVID-19 for miscommunication, whereas Defendants had no qualms about fabricating fake records and giving it to the FBI for Plaintiff,

submits must be reviewed before it is approved. There is no line item for, or like, administrative costs to silence dissent, nor is there a line item for, or similar to, other administrative costs for smear campaigns. Every second that any employee or agent of Defendant ACS is on the clock and engages in any form of retaliation or retribution is theft of federal and state funding.

236.    Defendant ACS has no money to quash vendettas and/or finance retaliation schemes. And yet, such instances have been, and are, reported. That Defendant ACS manages retaliation schemes by and through the Municipal Enterprise is evident in its access to city and state resources, for which Defendant Poole does an excellent job of concealing and hiding blatant misappropriation of grant funds. That Defendant ACS executes smear campaigns to punish Plaintiff and parents was, and is, public information that Defendant Poole ignores.

237.    These constitutional violations are rampant in New York State, but more sinister in New York City, where past and current Mayoral administrations have been speciously appointing former ACS attorneys to the family courts as both judges and referees.

238.    Defendant Hansell is sued in his official capacity, for his direct involvement with the affairs and actions of Defendant ACS, whose employees and agents perpetuate the racketeering by and through the Municipal Enterprise. He is responsible for the perversion of policies, practices, and operations that are permitted to occur. He has grossly failed to ensure that employees and agents complied with all applicable federal and state laws, pursuant to the Charter of the City of New York, Chapter 24-B §§ 615 and 617.

239.    Instead, Defendant Hansell permits gross abuses via misrepresentations self-proclaimed power,[125] encourages usurpation of authority to change established rules,[126] laws, and statutes to conceal compounded systemic failures from the public. In his official

---

("[i]t appears that the COVID-19 pandemic had some role in the transformation of a weekend visit into a custody change that resulted in a child's death. Davis told a local TV station, PIX-11 that a caseworker told her the visit had been extended due to the pandemic, and the extension never ended. Sources told the New York Post [] that the mother was officially granted custody in June 2021, though the circumstances are unclear. The decision to return Julissia to her mother appears to have been made at the recommendation of SCO Family of Services [], a foster care nonprofit that was managing the case for ACS.")

[125] Affirmation in Opposition to Summary Judgment by Mohammed T. Shaikh (5/10/2021) ("…[h]owever, the case will be heard according to court rules, but that does not in any way mean that ACS cannot file a case on the weekends, holiday, or at 2:32 A.M. This court does not have the authority to limit when ACS can file an Article 10 petition.")

[126] New York State Rules of the Chief Judge. http://ww2.nycourts.gov/rules/chiefjudge/index.shtml

capacity, Defendant Hansell repeatedly lied to the public about purported changes and reform to further misrepresent corrective action.[127]

240.    Defendant Hansell is personally[128] liable for handing out boilerplate forms, with his pre-printed name, that deviate from official court forms[129] and facilitate circumventing the manner and method of legal filings, issuance of summons, and service of process as prescribed in the FCA. To facilitate the commercialization of child protection, Defendant Hansell extends his authority to state agents, acting through his powers and duties, who in turn, subcontract those powers and duties to unauthorized third parties, to subvert prescribed forms of origination and jurisdiction[130] through constructive fraud and fraud to sequester children through Kidnapping Schemes, subjugate parents, and destroy families under color of law. The boilerplate forms have been used like blank checks to finance trafficking and money laundering fronts by and through the Municipal Enterprise at will.[131]

241.    Defendant Hansell seeks to change the law to protect compounded, ongoing constitutional violations done to the public through warrantless intrusions and sequestrations done by City and State Defendants under color of law. Both Defendants' Hansell and Poole know that court ordered investigations and FCA 1034 investigations are registered with the SCR because they are reports of suspected abuse ordered by the family court. The failure of a mandated reporter's duty to register a report of suspect abuse is against the law, as in SSL §§413 and 415 and punishable under SSL§420 as a Misdemeanor crime with up to 1 year in jail as well as a fine.

242.    For example, in 2001, the same year Defendant ACS was voted in by the people of the City of New York, members of the New York City Council put forth a bill to

---

[127] The Imprint, *New York City Welfare Chief Calls For Changes to Mandated Reporting System* (03/15/2021); The Imprint, *New York City Foster Care Agency Cuts Ties With Columbia Professor After Pedophilia Studies Resurface* (12/15/2020); NY Post *ACS Chief Says City Bill Guaranteeing Lawyers Could Endanger Children* (10/31/2019); NY Post *ACS Worker Who Served Time for Murder Arrested for Assaulting Child* (08/07/2018).
[128] *See* Matter of Bernstein 2017 NY Slip Op 00162 ("[m]ore specifically, the respondent admitted, among other things, that he failed to properly supervise his paralegal. Under rule 5.3(b) of the Rules of Professional Conduct (22 NYCRR 1200.0), the standard for liability to attach is knows or should have known (see Rules of Professional Conduct [22 NYCRR 1200.0] rule 5.3[b][2]). As part of his plea, the respondent represented that he undertook remedial measures to effect stricter supervision over his employees, which necessarily indicates that the supervision in place during the relevant time period was inadequate or lax."
[129]
[130] FCA §114 Exclusive Original Jurisdiction ("exclusive original jurisdiction" means that the proceedings over which the family court is given such jurisdiction must be originated in the family court in the manner prescribed by this act.")
[131] Rules of the Chief Judge Part 3 §3.1 Hours of Court ("…for the disposition of business before the court shall commence not later than 9:30 a.m. and conclude not earlier than 5 p.m.")

have a Special Federal Prosecutor investigate Defendants ACS and the family courts for 4th, 5th, 6th, and 14th Amendment violations.

243.    In 2017, Defendant Hansell was appointed Commissioner due to the previous commissioner's failures after, "…a new spate of child fatalities…[was]…brought in to clean up ACS after these deaths has retained the nation's leading institutional advocate for family preservation to review the agency's practices."[132] Defendants' Poole, State and City conspired to keep the compounded failures hidden from the public, "[a]nd last Friday, Jan. 27, [2017] the state's Office of Children and Family Services approved a monitor for ACS whom Mayor de Blasio said on Dec. 13 [2016] he would appoint — without mentioning that Gov. Cuomo had ordered the city to do so one day earlier."[133] Before former ACS Commissioner Gladys Carrion resigned, she was the former Commissioner for Defendant OCFS, who replaced former ACS Commissioner Ronald Richter, a former New York County Family Court Judge. Richter, replaced former ACS Commissioner, John B. Mattingly, "who presided over the Administration for Children's Services during the high-profile child deaths of Nixzmary Brown and Marchella Brett-Pierce has resigned after seven years at the helm."[134]

244.    Former ACS Commissioner Mattingly's predecessor was former ACS Commissioner William Bell, "who served from 2002 to 2004…and former Child Welfare Administration official whom Scoppetta had brought over as deputy commissioner when ACS was formed" that resigned amid the revelation Defendant ACS had "allowed more than 100 HIV-positive foster kids to be used as guinea pigs in medical experiments over the past 12 years"[135] And before him, Defendant ACS was mired in controversy under former ACS Commissioner Nicholas Scoppetta, who was appointed to the newly created agency after the tragic death of Eliza Izquierdo. To say that child protection is difficult to determine or emotionally consuming is not remotely within the purview of Defendant ACS, it is an afterthought. The agency was drowning in incompetence before the name change in 1996

---

[132] City Journal, *Massacre of the Innocents: New York's misguided family-reunification policies continue to have fatal consequences* (Winter 2018).
[133] Queens Chronicle, State-ordered ACS Monitor is Approved: Four children known to city child welfare officials dead since Sept. (2/02/2017).
[134] New York Daily News, *ACS Commissioner John Mattingly Leaving Post After Seven Years; Presided During Nixmary Brown Death* (7/26/2011).
[135] The New York Post, *100 Guinea-Pig-Kids-Shocking New Number in HIV Tests* (3/02/2004).

and well before the tragic death of Eliza Izquierdo, since the public only knows about their deaths when people speak up.

245.    City and State Defendants do not care about the savage and inhumane manner of severing familial associations between a parent and his or her child, when they protect the swamp of corruption that is Defendant ACS. To fathom more children must die before City and State Defendants are held accountable for their own role and participation in cleaning up after Defendant ACS is sickening. And yet, the funding for annual coroner reports for dead children known to Defendant ACS saw its last year in 2018, well after Defendant Hansell took over. More sinister, when it was revealed in 2002 that Defendant ACS was using vulnerable hostages as cheap test subjects for 12 years, "…given dangerously high doses of experimental AIDS drugs[,]" Defendant Hansell was the Associate Commissioner for HIV Services and was instrumental in "helping the DOH provide funding to combat HIV/AIDS in communities of color."[136]

246.    Hiding the accumulated coincidences of incidental resignations for each of its Commissioners was unrelated to the death of an innocent child, is saying our children are expendable sacrificial lambs, whose deaths are good publicity. Because publicity means money. Defendant ACS has been broken from its inception because of the people employed there, not an egregiously incompetent chieftain. There is no corrective action and no amount of taxpayer funded reform campaigns, spearheaded by specious intentions, that could replace legitimate accountability for traumatizing children illegally seized, "ACS misinterprets our use of the term "corrective actions," believing that we are referring to disciplinary actions taken against ACS personnel."[137]

## MUNICIPAL LIABILITY

247.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-246, above as if specifically set forth herein.

248.    The heightened standard for establishing municipal liability for Defendants ACS actions, and those in relation thereto, states, "[t]o hold a city liable under

---

136 The BodyPro, *Farewell David Hansell: OTDA Commissioner Heads to D.C.; Advocates Praise His Efforts in New York* (6/17/2009).
137 Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

§1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (Spencer v. Ellsworth, 2011 U.S. Dist. LEXIS 49984 [S.D.NY 2011]). "To state a viable claim of municipal liability under 42 U.S.C. §1983, a plaintiff must plausibly allege that the violation of his constitutional rights was caused by an official policy or custom of the municipality." (Bennett v. City of New York, 2011 U.S. App. LEXIS 14029 [2d Cir. 2011]). Municipal governments such as the City of New York, may be sued only for unconstitutional or illegal policies, not for the illegal acts of their employees."[138]

249.    Plaintiff is not stating that Defendant OCFS's actions were consistent with policies and customs of the state or the city, because there were policies and guidelines in place. The problem is that Defendant OCFS know, or should have known, that Defendant ACS is a repeat offender. Despite Defendant OCFS's knowledge and awareness of the subpar, inadequate, and oftentimes non-existent, case note entries in Connections by Defendant ACS, warrantless seizures and constitutional deprivations under color of law have been permitted to occur. That Defendant ACS's perversion of statutes, laws, and policies, etc. result in warrantless seizures of Plaintiff Parents' children was, and is, known to Defendant OCFS by virtue of being the recordkeepers of the state's all-inclusive program, Connections.

250.    That Defendant Poole knows, or should have known, protracted and prolonged constitutional deprivations by and through Defendant ACS was, and is, carried out in the family courts is further corroborated by virtue of her access to information in Defendant OCFS's records of the SCR, whose employees and agents review the agency's determinations of indicated findings, carried out by its Bureau of Special Hearings for reconsideration, but also run concurrent with the malicious prosecutions against Plaintiff Parents. Specifically, Defendant Poole has the ability and access to both sides of the process, such as the non-existent entries in Connections that correspond to warrantless seizures prosecuted in the family courts as well as the SCR's records to review the challenged determinations, whereby Plaintiff Parents and the agency resubmit evidence in

---

[138] *See* Pilcher v City of New York, 68 Misc.3d 1211(A) (2020), *citing* Monell v. Department of Social Services, 436 U.S. 658 (1978).

defense and/or opposition, which are ultimately transferred to its other sector, the Bureau of Special Hearings.

251.    Therefore, upon the SCR's receipt and review of documents, records, and evidence, and the subsequent comparison of its own internal records from Connections, the inconsistent, lacking, subpar pre-removal case note entries substantiating Defendant ACS's purported child protective proceedings, were intentionally and grossly overlooked to further conceal non-compliance and violations of both federal and state laws. In addition, this further establishes that Defendant Poole was, and is, aware that Defendant ACS and the family court judges are engaged in and executing malicious prosecutions under color of law.

252.    Further, in specious attempts to retroactively provide purportedly updated policies and procedures to the City's auditors, Defendant ACS admitted there were policies and guidelines in place. Specifically, Defendant ACS was trying to underhandedly change the audit results by fabricating policies and guidelines that did not exist and was not mentioned. Nonetheless, the auditors noted, notwithstanding the purported updates, magically appearing over a year into the audit, there was no proof that Defendant ACS follow either the old or the new policies and guidelines. As such, Defendant ACS makes up its own policies and guidelines at will, on notice, and to conceal violations of due process, carried out as money laundering fronts in the family courts.

253.    Since these reports are conducted by the New York City Controller and published, City and State Defendants have known for years about Defendant ACS's gross negligence and were deliberately indifferent to their unconstitutional patterns and practices for warrantless seizures and malicious prosecution. That the aforesaid actions by City and State Defendants constitutes a deliberate indifference for a pattern of unconstitutional conduct by Defendant ACS and the judges, constitutes a deliberate indifference to the rights and safety of U.S. citizens and citizens of the State of New York[][,] entitle Plaintiff and Plaintiff Parents to recover damages from the City under 42 U.S.C. §1983 and pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978)."[139]

254.    Furthermore, Defendant ACS began targeting Plaintiff since day 1: December 13, 2018, the day they were ordered to "explore" Defendant Ruci's pending

---

[139] *Id.*

criminal charges in Queens County Criminal Court for acts of domestic violence he perpetrated on her in front of R.R. (3) and received a full stay away OOP, "[t]he court found that ACS unnecessarily, routinely charged mothers with neglect and removed their children where the mothers — who had engaged in no violence themselves — had been the victims of domestic violence; that ACS did so without ensuring that the mother had access to the services she needed, without a court order, and without returning these children promptly after being ordered to do so by the court; that ACS caseworkers and case managers lacked adequate training about domestic violence, and their practice was to separate mother and child when less harmful alternatives were available; that the agency's written policies offered contradictory guidance or no guidance at all on these issues; and that none of the reform plans submitted by ACS could reasonably have been expected to resolve the problems within the next year."[140]

## THE MUNICIPAL ENTERPRISE: PLAINTIFF'S NARRATIVE: Part 1

255.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-254, above as if specifically set forth herein.

256.    On August 26, 2019, there was no lawful basis for removing Plaintiff's child from her custody, directing Defendant Ruci to withhold returning R.R. (3) to her lawful custody, much less issuing a temporary "custody and supervision" order, i.e., August TOC/V based on uncorroborated hearsay from the attorney for the child. Simply put, Defendant McGrady, was the presiding referee over the custody litigation with only jurisdiction to hear and report, not to hear and determine. Absent a signed stipulation of consent from Plaintiff, Defendant McGrady had no legal authority to make such a ruling.

257.    Defendant Kaplan admitted to having spoken frequently with Defendant Galchus regarding August 12, 2019 ("August Incident") and "played phone tag" with a purported "Lieutenant Teplansky." Defendant Kaplan lives in Melville, New York, which is about 15 minutes from the 2nd Pct. in Huntington. Somehow, he never took it upon himself to validate or verify the accusations before using it to make an uninformed, incompetent opinion to remove Plaintiff's child. He admitted to speaking directly with the

---

[140] See Nicholson v. Scoppetta 3 N.Y.3d 357 (NY 2004).

purported Lieutenant only two days before, on Saturday August 24, 2019. There was a report, albeit an unregistered FCA 1034 report ("FCA 1034 #8), which contradicted the false allegations of risk made by Defendant Kaplan. In fact, he discredited FCA 1034 #8's mention of bruises and marks reported on R.R. (3) to conceal his role in refusing to assist SCDSS obtain his client's medical records for FCA 1034 #2.

258.    Such a monumental decision could only properly be made upon consent and stipulation, pursuant to the Family Court Act, upon proper notice, a petition and hearing. Specifically, under Family Court Act § 1012(f)(i)(B), "a neglected child is a child under eighteen … whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care."

259.    Based on this standard, "[a] party seeking to establish neglect must show, by a preponderance of the evidence first that a child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired, and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing proper supervision or guardianship." (Id.) (emphasis supplied).

260.    The standard of proof in a neglect proceeding is preponderance of the evidence. Nicholson v. Scoppetta, 3 N.Y.3d 357 (2005). The burden of proving neglect by a preponderance of the evidence rests upon the party seeking to establish neglect. Id., 3 N.Y.3d at 368. Defendant McGrady blatantly disregarded the legal standards she was required to use. There was no evidence whatsoever the children were being harmed by Plaintiff. Further, there was no evidence that Plaintiff had failed to exercise proper supervision or guardianship over her child.

261.    Worse still, Defendant McGrady flagrantly denied Plaintiff's rights to due process. No petition had been filed to remove custody of Plaintiff's child. No notice had been given to Plaintiff that her child might be taken away from her. No opportunity had been given to Plaintiff to present evidence or cross-examine adverse witnesses. No notice had been given to Plaintiff that she had 30 days to appeal Defendant McGrady's summary removal of her child. In short, Defendant McGrady had taken Plaintiff's child away without any due process whatsoever, and in so doing, had acted without any jurisdiction, and

grossly exceeded her authority to hear and report as a court attorney referee, absent a binding stipulation of consent.

262.    Apart from the complete absence of due process, Defendant McGrady made her decision without any evidence whatsoever to support removing the child from Plaintiff's custody. Defendant Kaplan, the AFC, had not provided any evidence to the Court that even remotely established "neglect" or "abuse" of the child by Plaintiff. It was Defendant Ruci who had three indicated findings of maltreatment, inadequate guardianship for, inter alia, acts of domestic violence perpetrated on Plaintiff in front of R.R. (3). There was simply no basis whatsoever for taking Plaintiff's child away from her.

**Extensive, prolonged custody proceedings are caused by recruiters, and scouts working together to frustrate, delay, and target one parent with extortion schemes.**

263.    Defendant ACS conspired to execute racketeering schemes to intentionally frustrate Plaintiff's custody litigation by, inter alia, submitting several false, fraudulent, fabricated FCA 1034 reports with inflammatory, humiliating, insulting, and emotionally distressing information, directly aimed at Plaintiff to redirect the Court's focus away from their grossly negligent misinformation.

264.    Defendant ACS violated Plaintiff's right to equal protection under the law by grossly reducing her traumatic experience with acts of domestic violence perpetrated by Defendant Ruci, in front of R.R. (3), to 1 small, insignificant paragraph in FCA 1034 # 1.[141] Meanwhile, they also reduced Defendant Ruci's level of risk and pending criminal court charges to discredit the batterer, "[i]n the remaining case (involving an allegation of domestic violence), ACS argues that no Domestic Violence (DV) screening was required because the alleged perpetrator was arrested and referrals for counseling had been made…[h]owever, ACS' policy specifically requires a DV screening to be conducted for all allegations, without exception…[t]his policy makes sense because, absent a DV screening, ACS cannot demonstrate that it appropriately assessed the situation and determined that (1) there are no remaining signs of domestic violence, and (2) it identified all of the service needs of the family."[142]

---

[141] 1/16/2019 FCA 1034 Report, i.e., FCA 1034 #1.
[142] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

265.    That is, the domestic violence was given 1 miniscule paragraph out of 8 pages in FCA 1034 # 1 whereas, Defendant Ruci was afforded every inch of the report to undermine his severity and propensity for aggression, hostility, and prior acts of domestic violence against Plaintiff, "[w]e found that ACS has failed to create an effective mechanism to enable supervisors and managers to monitor whether staff consistently follows the required investigatory steps…[t]he lack of an effective tracking mechanism significantly hinders ACS' ability to ensure that: (1) there is sufficient monitoring and oversight of the investigation; and (2) all of its policies and procedures are carried out in the course of an investigation…[t]his failure increases the risk that investigative results may be based on incomplete, insufficient information or that cases may improperly be deemed unfounded, leaving children in potentially dangerous situations."[143]

266.    In that the aforesaid was maliciously manifested by Defendants to stigmatize, humiliate, and falsely condemn Plaintiff for being a victim of domestic violence was purposeful and premeditated, "…annexed as Ex.1 to plaintiff's opposition, detail conduct that a trier of fact could find rises to the level of intentional infliction of emotional distress and therefore, this claim as to defendant, Alston remains. (Berrios v. Our Lady of Mercy Med. Ctr., 20 AD3d 361 [1st Dep't 2005]). The court finds defendant, Alston's argument that plaintiff's intentional infliction of emotional distress claim is barred by public policy unpersuasive in light of the alleged facts."[144]

267.    In March 2019, Ref. Matthews ordered Defendant ACS to clarify various safety and risk-related omissions from the court order for FCA 1034 #1 by issuing a subsequent court order, FCA 1034 #2. Defendant ACS does not take orders and does not like being told what to do, so they *reclassified* the Court's order as a "Home Study" to evade accountability and grossly negligent oversight, "[i]t is further ordered CPS/COI is reordered to explore and report on the allegations that there is currently a pending Suffolk County indicated case involving this child…[t]he report [is] to include the identified respondent and further details regarding the nature of the allegations involved in domestic in front of the child."[145]

---

[143] *Id.* at p. 15.
[144] Pilcher v City of New York, 68 Misc.3d 1211 (A) (2020).
[145] Navarro-Discovery.

268.    Defendant ACS does not play nice with child protection counterparts from other counties when given secondary role in multi-jurisdictional cases, so they viciously target the other LDSS with false accusations, "[w]hen two or more LDSSs must address a report, the SCR must assign primary responsibility to one LDSS and secondary responsibility to any other districts involved…[h]owever, whenever there is a joint jurisdictional assignment, it is important to remember that both the primary and secondary CPS units are responsible for the safety and protection of all the children in the report."[146]

269.    In May 2019, Defendants' Alozie and Steele received Defendant McGrady's court order for an already open SCR investigation. They grossly neglected to register the court order to evade accountability and avoid explaining why they grossly failed to notify the Court of the open SCR report against Defendant Ruci.

270.    At the return date in June 2019, Defendant Rodin blamed SCDSS for not submitting a FCA 1034 #3, issued in May 2019, "[a] court may issue a Section 1034 order even when a CPS unit in another county will be assigned primary responsibility for the investigation. The SCR's jurisdictional assignment procedures are the same for COIs as for any other type of intake report."[147]

271.    By withholding to register court orders, Defendant ACS seeks to control the narrative of any CPS investigation within its control.[148]  Defying and/or disobeying, failing to comply with a court order, such as when the Court issues an order for an FCA 1034 investigation is contempt of court, "[a] court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced…"[149]

272.    The reason Defendants' ACS withhold registering court orders with the SCR and close SCR investigations by making false anonymous reports is to *control the narrative* of the family's history, which requires a blank slate from which to backdate or retroactively record information to misrepresent compliance and corrective action, "[t]he

---

[146] Office of Children and Family Services, Child Protective Services Manual 2020.
[147] 19-OCFS-LCM-05
[148] SOS §422 (2)(a) ("[i]f the records indicate a previous report concerning a subject of the report, the child alleged to be abused or maltreated, a sibling, other children in the household, other persons named in the report or other pertinent information, the appropriate local child protective service shall be immediately notified of the fact.")
[149] Civil Contempt Judiciary Law §753(A).

central register shall include but not be limited to the following information: all the information in the written report; a record of the final disposition of the report, including services offered and services accepted; the plan for rehabilitative treatment; the names and identifying data, dates and circumstances of any person requesting or receiving information from the register; and any other information which the commissioner believes might be helpful in the furtherance of the purposes of this chapter."[150]

273.     Rather than conduct CPS investigations per their mandated duty, Defendants' Alozie, Steele, and Tingue chose to malign, silence through humiliation, castigate, and retaliate against Plaintiff under color of law, solely because aforesaid Defendants did not want to do their job, nor investigate suspected reports of abuse and/or neglect for R.R. (3).

274.     Instead, Defendant Alozie began closing the SCR reports against Defendant Ruci, then blamed it on Richter during Plaintiff's court proceedings, " [t]he failure to conduct timely manager reviews significantly undermines ACS' efforts to ensure that complete and thorough investigations are conducted, including the ability of the Deputy Directors at each borough office to carry out their responsibilities and ensure that managers are performing their required reviews…since only high priority investigations require managers to give their final approval prior to closing the investigation, these managerial reviews take on added importance…[a]ccordingly, failure to perform all of the required reviews increases the risk that some investigations may not be handled in accordance with established guidelines, and that such occurrences may go undetected."[151]

275.     For example, on March 17, 2019,[152] Defendant Ruci returned R.R. (3) with 3 diagonal shaped marks across his neck and a red circular mark on the top of his head. Rather than jump to conclusions, Plaintiff texted Defendant Ruci to ask what happened to R.R. (3) and received no response. Given Defendant Ruci's prior history of refusing to take R.R. (3) to see a doctor when injured and/or possibly injured as a precaution, such as like what occurred on August 15, 2018. That day, despite kicking R.R. (3) out of the basket,

---

[150] SOS §422 [3].
[151] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[152] Curiously, Defendants scheduled a sham proceeding, based on 2 false instruments of filing, and issued a fraudulent order on default dated 3/17/2021.

Defendant Ruci refused to take Plaintiff to Cohen's Children's Hospital to have him checked out by medical professionals.

276.    Plaintiff had every reason to be concerned about R.R. (3) and exercised a minimum degree and prudent standard of care when Defendant Ruci returned him soaked in his own urine, and the milk and food containers provided to Defendant Ruci were returned in the same manner given to him earlier that morning, i.e., full. When Plaintiff asked Defendant Ruci about these concerns, he provided no explanation about the marks on R.R. (3) or his condition.

277.    Upon information and belief, on or about late March 2019, SCDSS interviewed Defendant Ruci at the office located in Ronkonkoma, New York for the March 17, 2019 SCR investigation.

278.    Upon information and belief, during the interview with SCDSS, Defendant Ruci voluntarily confessed to the incident on August 15, 2018,[153] where he forcefully grabbed the handles of the Moses basket R.R. (3) slept in, swung it around, lost grip, and dropped the basket. This caused R.R. (3) to be flung out of the basket and bounced off the hardwood floor several times before landing several feet away from the basket.

279.    Upon information and belief, Defendant Ruci further admitted to repeatedly refusing to drive Plaintiff to Cohen's Children's Hospital to have R.R. (3) checked by a doctor. Upon information and belief, Defendant Ruci admitted the reason he refused to take Plaintiff and R.R. (3) to Cohen's Children's Hospital was solely because he did not want to admit, nor explain, how he caused R.R. (3) to be thrown out of the Moses basket to the doctors.

280.    Upon information and belief, Defendants' ACS and Kaplan were informed of this by SCDSS, who subsequently contacted Plaintiff for help and assistance with obtaining R.R.'s (3) medical records from Cohen's Children's Hospital because Defendants' ACS did not care.

281.    Upon information and belief, Plaintiff was told SCDSS contacted Defendant Kaplan for help obtaining R.R.'s (3) medical records from Cohen's Children's

---

[153] It is not a coincidence that after Richter sent R.R.'s (3) medical records to Defendants' Alozie and Steele, a fraudulent proceeding was subsequently entered in UCMS on 8/14/2019.

Hospital for 8/15/2018, but he declined offering any assistance stating, "I'm not too concerned about that."

282.    At no time did Plaintiff accuse Defendant Ruci of abuse nor tell the doctors there were bruises on R.R. (3). All references to bruises on R.R. (3) for, or related thereto, to the SCR investigation dated March 17, 2019, solely came from Defendants' Alozie, Tingue, and Steele. That is, Plaintiff unequivocally stated R.R. (3) had 3 red slash marks around his neck, which the doctor's reported as red "long, oval" marks in the SCR report. Defendant ACS, acting as agents of chaos and destruction, literally made it up and inserted references to bruises in the fabricated June 2019 FCA 1034 reports.

283.    Defendant ACS did nothing.

284.    On March 24, 2019, Defendant Ruci violated Plaintiff's OOP during the exchange because of the undue burdens and expectations placed on her by Defendant Kaplan. Plaintiff noticed Defendant Ruci did not strap R.R. (3) properly into his car seat. Plaintiff asked Defendant Ruci to check the car seat to make sure R.R. (3) was properly strapped in. Rather than walk around the front of his red Ford SUV, Defendant Ruci chose to walk in Plaintiff's direction, i.e., towards the back of the vehicle, where he subsequently pushed her for absolutely no reason. Plaintiff was not in Defendant Ruci's way. Defendant Ruci was subsequently arrested for violating Plaintiff's OOP.

285.    Defendant ACS did nothing.

286.    Plaintiff thought the red slash marks around R.R.'s (3) neck from the week before might have been due to an improperly fastened seatbelt, since the location of the marks aligned with the straps. However, Defendant Ruci refused to respond or explain the marks. As his mother, Plaintiff is required to exercise a minimum degree of care for R.R. (3) or face false accusations for failing to do so. The doctors could not say what caused the marks because Defendant Ruci provided no explanation and Plaintiff was not there when R.R. (3), who did not talk, sustained the marks around his neck.

287.    On March 25, 2019, at Defendant Ruci's arraignment in Suffolk County First District Court, SCDSS obtained a full stay away OOP in favor of R.R. (3) against him since Defendant ACS remained unconcerned, "[i]n the remaining case (involving an allegation of domestic violence), ACS argues that no Domestic Violence (DV) screening was required because the alleged perpetrator was arrested and referrals for counseling had

been made…[h]owever, ACS' policy specifically requires a DV screening to be conducted for all allegations, without exception…[t]his policy makes sense because, absent a DV screening, ACS cannot demonstrate that it appropriately assessed the situation and determined that (1) there are no remaining signs of domestic violence, and (2) it identified all of the service needs of the family."

288.    Defendant ACS did nothing. In fact, after the May 2019 FCA 1034 report, i.e., FCA 1034 #2, Defendant Steele subsequently told Plaintiff, "ACS does not have a policy for domestic violence-related cases" and "domestic violence does not factor into subsequent reports."

289.    Defendants' Alozie, Steele, and Tingue conspired to conceal their knowledge of and receipt of this information, knowing the FCA 1034 investigation ordered on March 14, 2019, was still open and the subsequent SCR investigation from March 17, 2019, was also open. Instead, aforesaid Defendants conspired to close the subsequent SCR investigation, backdate records not yet entered in Connections, and use that to persecute Plaintiff later, "[w]e understand this question to ask whether a court reviewing an Article 10 petition may find a respondent parent responsible for neglect based on evidence of two facts only: that the parent has been the victim of domestic violence, and that the child has been exposed to that violence. That question must be answered in the negative."[154]

290.    Aforesaid Defendants knew that, by intentionally excluding this information from the FCA 1034 #2 and refusing to communicate with Richter, the deficient report would influence and misguide the Court's decisions and determinations for R.R.'s (3) health and safety in Defendant Ruci's custody. In fact, they were only interested in absolving themselves of accountability, for omitting the indicated finding from the FCA 1034 # 1, so they chose to remain silent about their awareness of subsequent incidents to target Plaintiff for the acts of domestic violence.

291.    Specifically, Defendants' Steele, Tingue,  and Alozie were grossly negligent in the preparation of CPS reports by omitting entries in Connections related to Defendant Ruci's criminal history, history of domestic violence, and escalated acts of hostility and aggression aimed at Plaintiff, in front of R.R. (3), thereby placing both in harm's way, "[t]he injunction, in relevant part, "prohibit[ed] ACS from carrying out ex

---

154 *See* Nicholson v. Scoppetta 3 N.Y.3d 357 (N.Y. 2004).

parte removals `solely because the mother is the victim of domestic violence,' or from filing an Article Ten petition seeking removal on that *367 basis."[155]

292.    Defendants' Steele Tingue, and Alozie conspired under color of law to deprive Plaintiff's right to maintain a familial relationship with R.R. (3) by intentionally and maliciously reclassifying the March 14, 2019[156] court order, which sought information on Defendant Ruci's indicated finding of inadequate guardianship and maltreatment of R.R. (3), to "Home Study."

293.    Specifically, aforesaid Defendants wanted to conceal wrongdoing and false reporting of acts of domestic violence perpetrated on Plaintiff in front of R.R. (3). As such, aforesaid Defendants grossly and maliciously neglected to perform their mandated duty to report, after having been fully aware of the risks to Plaintiff and R.R.'s (3) health and safety, by Defendant Ruci's repeated acts of domestic violence, including SCDSS's OOP for R.R. (3).

294.    Due to their gross, maliciously negligent and vindictive actions, and no fault by Plaintiff, Defendants' Alozie, Tingue, and Steele facilitated Defendant Ruci's ex parte Amended OOP for R.R. (3) on March 29, 2019 at Suffolk County First District Court. Aforesaid Defendants pretended not to know what was happening, consistent with their missing entries in Connections, "[a]n SCR Database Check (sometimes referred to as an "SCR clearance" or "SCR screening") is a search of the SCR database conducted by the SCR to determine if a person is a confirmed subject of an SCR report or reports…[t]he inquiring agency will be notified that a person is known to the SCR as a confirmed subject so long as the individual has at least on substantiated allegation in an indicated report upheld by a preponderance of evidence that has been determined to be relevant and reasonably related to employment, certification or employment; or, the individual has at least one substantiated allegation in an indicated report and the individual has waived their right to an administrative appeal."[157]

295.    Defendants' Alozie, Tingue, and Steele willfully and grossly concealed their knowledge of the March 17, 2019 SCR investigation and subsequent indicated

---

155 *See* Nicholson v. Scoppetta, 344 F3d 154, 164 [2d Cir 2003] (internal citations omitted).
156 Defendants have 2 unspecified false instruments of filing dated 3/15/2021 on docket NN-17995-19.
[157] Office of Children and Family Services, Child Protective Services Manual 2020.

finding, the violation of Plaintiff's OOP on March 24, 2019 and R.R.'s (3) full stay away OOP issued on March 25, 2019.

296.    Specifically, aforesaid Defendants were the intermediaries of communication and information between QFC, where Plaintiff's custody proceedings took place, and SCDSS, where Plaintiff and R.R. (3) physically resided, "[w]hen two or more LDSSs are assigned investigative responsibility, communication among the districts is of key importance, and each CPS unit must assume a fundamental role and responsibility for the safety and protection of all the children in the report."[158]

297.    On March 31, 2019, Defendant Ruci showed up to Plaintiff's home to resume visitations with R.R. (3), resulting in the subsequent violations of both OOP's.

298.    Defendant ACS did nothing.

299.    Defendants' Alozie, Steele, and Tingue had refused to cooperate or communicate with SCDSS, remaining grossly silent and immobile, deferring their responsibility to notify the Court to Defendant Galchus purportedly filed an OTSC on April 2, 2019, to modify the March TOV and misrepresent his client's subsequent arrests and violations of Plaintiff and R.R.'s (3) OOP's, "[a]ccording to ACS policy, a Domestic Violence (DV) "screening is required for all families with Children's Services involvement, regardless of the allegations." Every family must be screened for DV and if specific conditions apply, the case worker must continue with the DV protocol worksheet, which outlines the specific steps that must be followed to ensure the children's safety. However, we found problems related to DV screenings with 16 (64 percent) of the 25 cases we reviewed...[s]pecifically, six cases in our sample had no evidence of DV screenings and the other 10 that required the protocols were incomplete...[w]hile these screenings are integral to any case investigation, they are critical for cases where domestic violence issues have been observed at the start."[159]

300.    On May 16, 2019, in response to an SCR report concerning Defendant Ruci's mental health, Shakera Smith ("Smith") called Plaintiff to request a copy of Defendant Ruci's social media post and asked that it be sent via e-mail.

---

[158] *Id.*
[159] *Id.* at 21.

301.    Smith was the after-hours ACS social worker that contacted Plaintiff about the aforesaid SCR investigation, "…[d]uring non-business hours (evenings, weekends, holidays), the SCR notifies an on-call person at the LDSS that a report has been assigned…[t]he on-call person must have access to CONNX[] and must access the report electronically upon notification and determine whether the report will be accepted."[160]

302.    Defendant ACS gave FCA 1034 # 2 to Smith,[161] the after-hours ACS social worker who was either improperly trained, or not trained at all, in its preparation because SCDSS's sections were left entirely blank, "[b]oth the primary district and the secondary district are responsible for fulfilling the statutory and regulatory requirements for a report of suspected child abuse or maltreatment…[t]his includes, when appropriate, initiating Family Court Article 10 proceedings in accordance with FCA §1015."[162]

303.    More importantly, Smith was not even R.R.'s (3) case worker. Despite 3 indicated findings, 2 FCA 1034 reports, and 2 SCR investigations, purportedly active family court proceedings at QFC, Defendant ACS will conveniently claim errors, such as an error from the SCR intake report, where Defendant Ruci was listed as "unknown", or the system was down and not available for normal case processing, including purported "understaffing," resulted in Smith's preparation of FCA 1034 #2 "…[t]he child protective service shall have a sufficient staff of sufficient qualifications to fulfill the purposes of this title and be organized in such a way as to maximize the continuity of responsibility, care and service of individual workers toward individual children and families. A social services district shall have flexibility in assigning staff to the child protective service provided that each staff assigned to such service has the staff qualifications and has received the training required by the department regulations promulgated pursuant to subdivisions four and five of section four hundred twenty-one of this title."[163]

304.    Nonetheless, to further discredit ongoing abuse and conceal ongoing risk to both Plaintiff and R.R. (3), Defendant ACS conspired to include illegal wiretapping audio, which Smith transcribed and entered in the section SCDSS should have completed, but did not, of their reclassified FCA 1034 #2. As such, "[w]e found limited evidence that

---

[160] *Id.*
[161] Interestingly, none of Defendant Heaven's counterfeit Connections records included Smith's name, nor listed in the aforesaid SCR investigation
[162] Office of Children and Family Services, Child Protective Services Manual 2020.
[163] SOS §423 (c).

supervisory directives and other key required investigatory steps were performed in a timely manner…[f]urther, we found limited evidence that supervisors and managers identified and addressed such failures…[o]ur review of the progress notes and other available supporting documentation for the 25 cases we sampled indicate that each case had one or more deficiency in case worker, supervisor and/or manager compliance with supervisory directives or the completion of other required investigatory steps."[164]

305.     Had Defendant ACS exercised a modicum of due diligence, it would have been evident that Defendant Ruci's social media post was a veiled threat intended for Plaintiff to understand, since the significance of the ring in the picture was something only intimate friends of his would know. Incidentally, the date Defendant Ruci posted his veiled threat coincided with his Suffolk County Criminal Court appearance on May 15, 2019, where Suffolk County Assistant District Attorney Leslie Stevens' ("ADA Stevens") refused to drop the charges against him for violating Plaintiff and R.R.'s OOP on March 31, 2019. In court, Defendant Ruci was noticeably livid as ADA Stevens informed Judge McDonough, she intended to call on the Suffolk County Sheriff's Department as the County's witness.

306.     Alternatively, ACS in Kings County was irrationally hypervigilant of parent R.M.'s arrest, scheduled criminal court proceedings, pending charges, and guilty plea, which took place in an unknown Municipal Criminal Court in an unknown county, on the same exact days of his supervised visitations. Plaintiff is not saying that Defendant ACS should have fabricated criminal charges against Defendant Ruci, since they did it to parent R.M. Rather, Plaintiff is unequivocally stating that ACS in Queens and ACS in Kings are Defendant ACS in two different counties, who approached a case with domestic violence from completely opposing ends of the spectrum.

307.     Smith also did not run a background check on Defendant Ruci, and entered, "[u]nable to obtain"[165]; she did not contact Plaintiff about the preparation of FCA 1034 #2, and entered, "[t]o be submitted by Suffolk County CPS"[166]; and, attempted to pass off the illegal wiretapping as legitimate statements made by Plaintiff because Defendant

---

[164] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[165] 5/22/2019 FCA 1034 Report, i.e., FCA 1034 #2.
[166] *Id.*

Ruci claimed he was secretly recording her conversations with her family. The inclusion of this uncorroborated, unwarranted, wiretapping in FCA 1034 #2 was intended to humiliate and punish Plaintiff for causing Defendant ACS more "paperwork" than they cared to do, since there was no financial benefit to them to intervene. That is, Plaintiff lived in Suffolk County, so the financing of an FCA Article 10 proceeding meant SCDSS was the eligible jurisdiction, not Defendant ACS.

308.    And just as was reported in FCA 1034 #1, "Mr. Ruci became angry the day Ms. Navarro was scheduled to leave. Mr. Ruci swung Ms. Navarro around and slapped her while she was holding child R[.] Mr. Ruci then took Ms. Navarro's phone and would not let her leave the house blocking her with a table and chairs,"[167] whereas, a similar cas was flagged in Defendant ACS's audit, ""[o]ne case lacking a DV screening had been coded as a high priority domestic violence case…[t]he allegation stated that the parents had fought in front of their infant child, which escalated to the father "severely hitting" the mother in front of the infant. However, the progress notes contained no evidence that the supervisor reminded the case worker to complete the DV screening."[168]

309.    Moreover, the auditor's flagged another domestic violence case that Defendant ACS grossly overlooked, "[i]n one case (#8) concerning an allegation that the father was physically abusing the mother in front of their three children (ages 8, 10 and 16), the case worker received a directive to ask the children how they felt about not residing with their father…[t]he case worker also received another directive, to interview all the adults residing in the household, as required by ACS policy…[t]hough the case progress notes reported that the children were in emotional distress, there was no evidence that the case worker noted in the progress notes that he/she followed either directive…[f]urther, we found no supervisory note reminding the case worker to comply with the directives; the lack of such compliance may increase the risks to the children…[t]he deficiencies also raise the concern that the supervisors are not adequately ensuring that their directives are being followed and that the case workers' actions are properly documented as required."[169]

---

[167] 1/16/2019 FCA 1034 Report, i.e., FCA 1034 # 1.
[168] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016 (p.21).
[169] Id. at 17.

310.    Defendant ACS acted under color of law, grossly neglecting to register the court order with the SCR on May 31, 2019 to maliciously cover up their mishandling of FCA 1034 #'s 1 & 2, which contributed to the subsequent acts of domestic violence against Plaintiff in front of R.R. (3), including their knowledge of Defendant Ruci's pending criminal charges for violating Plaintiff's order of protection ("OOP"), and R.R.'s (3) OOP against Defendant Ruci obtained by SCDSS. Specifically, Defendant Alozie called Plaintiff to display his anger for the additional "paperwork" he was expected to do on such *short notice*. Defendant Alozie was angry that Plaintiff filed an Emergency OTSC on Friday May 31, 2019, and the Court ordered Defendant ACS to perform a FCA 1034 investigation for R.R. (3). By virtue of his access to Connections, Defendant Alozie knew about the SCR report and had sat on it for at least 5 days by the time Plaintiff sought action from the Court to compel him to fulfill his mandated duty.

311.    In addition, Defendant Alozie threatened to put R.R. (3), in foster care, "I have the power to put your son in foster care if you don't start getting along with the father!" Defendant Alozie acted with malice, "you're giving me more work. I have other cases, too. I can't spend all my time on your case!" thereby expressing his intent to disobey the court order for a CPS investigation because it was almost 5:00 pm on a Friday.

312.    In that Defendant Alozie speciously implied there was insufficient personnel to handle weekend, or after-hours, CPS investigations for a registered court order was portrayed as veiled threats and witness intimidation because he wanted to control the context and narrative of R.R.'s (3) report during his work hours. Nothing, except not registering the court order with the SCR, barred SCDSS from performing a CPS investigation. However, doing so would alert SCDSS that the Court sought information about Defendant Ruci, which Defendant Alozie wanted to prevent.

313.    As such, Defendant Alozie resorted to self-serving accusations to justify his purpose for withholding to register the court order, "the father said you made the call." Defendant Alozie knew FCA 1034 #3 was due in court on June 3, 2019, because Defendant McGrady scheduled it on the court order, given to Defendant ACS at QFC, and written on Plaintiff's Emergency OTSC.

314.    On or about June 3, 2019, Defendant Alozie did not submit FCA 1034 # 3. Interestingly, when Plaintiff arrived at QFC, she was told that Defendant McGrady was

overheard on the telephone with the "supervisor", presumably Defendant Rodin, who blamed SCDSS for not submitting a report. More interesting, Defendant Kaplan brought Defendant Rodin to Plaintiff's custody proceeding and introduced her as, "my friend and colleague," and not in her official capacity or title. Defendant McGrady gave Defendant Rodin another court order for FCA 1034 #4 and scheduled a brief adjournment.

315.    At no time did Plaintiff receive a letter from OCFS to confirm the court order was registered with the SCR, nor was SCDSS aware Defendant McGrady ordered an FCA 1034 investigation. Shapiro also did not inform Plaintiff that receipt of an OCFS letter with the date of the Court's order is the proper procedure. Plaintiff subsequently learned that the aforesaid is the proper procedure for registering court orders for CPS investigations. Nonetheless, Plaintiff was billed $1,742.50 because Defendant McGrady was overbooked, and Defendant ACS grossly failed to register the court order.

316.    On or about June 6, 2019, Defendant Rodin brought a false, fraudulent, and fabricated FCA 1034 # 4 to Plaintiff's custody litigation, which she intentionally misrepresented as having been sent by SCDSS. Plaintiff was made to wait several hours because Defendant Rodin claimed she was waiting for SCDSS to send the FCA 1034 report. However, to Plaintiff's detriment, Shapiro missed the date of the purported fax, which indicated it was sent the day before, on "06-05- '19." Nonetheless, Plaintiff was billed $1,285.00 by Shapiro for her time spent waiting, while Defendant ACS was using PaintShop, copying and pasting a purported "FCSA 1034" and forging Richter and her supervisor's signature on the reports.

317.    That Defendant ACS exhibits disdain for Nicholson v. Scoppetta and uses victim-blaming language to discredit domestic violence was, and is, evident in Plaintiff's FCA 1034 #4, "[h]e alleged that the mother was abusive to him when they were dating, and he never reported the incidents to the police or retaliated, instead the mother will call the police and fabricate stories to get him into trouble."[170] Another example, "[m]r. Ruci said the mother has falsely accused him on many occasions that he grabbed or hit her when he went to Long Island couple of months ago to pick up his son and the police arrested him for violation of the order of protection and he spent some days in jail."[171]

---

[170] "ACS COI" dated 6/06/2019. (Court Ordered Investigation "COI")
[171] Id.

318.    And yet, Defendant Ruci pleaded guilty each time.

319.    Defendant ACS maliciously inserted victim-blaming language and references in the reports to casually infer that Plaintiff voluntarily left with R. R. (3), or lacked mitigating circumstances warranting immediate safety, not that Defendant Ruci's actions put her and R.R. (3) at risk of harm by perpetrating domestic violence, "[a]s the Subclass A members point out, for a battered mother — and ultimately for a court — what course of action constitutes a parent's exercise of a "minimum degree of care" may include such considerations as: risks attendant to leaving, if the batterer has threatened to kill her if she does; risks attendant to staying and suffering continued abuse; risks attendant to seeking assistance through government channels, potentially increasing the danger to herself and her children; risks attendant to criminal prosecution against the abuser; and risks attendant to relocation."[172]

    a.  "CPS has been unable to observe Mr. Ruci's interaction with child R. because of child new resident and current temporary order full stay away order of protection against Mr. Ruci in favor of child R. and respondent mother Ms. Navarro."[173]

    b.  "Mr. Ruci reported that the respondent keeps the child away from him."[174]

    c.  The father said all the arguments, fighting and lies between them may have some negative impact on their son as he grows up."[175]

320.    Defendant ACS maliciously accused Plaintiff of "stalking" Defendant Ruci "at his job" without a single shred of evidence or statement from a witness to corroborate the false allegation. As a matter of fact, Plaintiff did not have a car because Defendant Ruci totaled it in 2017 and reneged on his promise to replace it. Since Plaintiff was still recovering from a cesarean section the day Defendant Ruci attacked her on September 19, 2018, then flung into guerilla warfare at QFC, she was unemployed and fully focused on caring for both sons at home.

    a.  "The father said the mother sometimes will call his job questioning his boss whether he came to work because she did not see his car in the parking lot."[176]

    b.  "The father said he's scared because he feels someone is following him and they might hurt him."[177]

---

[172] Nicholson v. Scoppetta 3 N.Y.3d 357 (N.Y. 2004).
[173] 1/16/2019 FCA 1034 Report Item E.
[174] FCA 1034 #2.
[175] "ACS COI" dated 6/06/2019.
[176] Id.
[177] Id.

    c. "Mr. Ruci said he uses different cars when he's dropping his son off to the mother because she constantly monitoring his movement."[178]

    321.    Defendant ACS weaponized the false, fraudulent, fabricated FCA 1034 #4 to retaliate against Plaintiff, by injecting malignant insults to humiliate her and indirectly challenge and discredit her fitness to care for R. R. (3), when psychopathy is a psychological diagnosis, which Defendants' Alozie, Steele, or Tingue were not qualified to make. That is, absent a valid license to practice medicine, registered with NYS Department of Education, aforesaid Defendants made the allegations to intimidate Plaintiff and suppress the domestic violence or jeopardize her right to maintain physical custody of R. R. (3):

    a. "The father said the mother of his son is a psychopath who needs to be mentally evaluated because of her abnormal behaviors."[179]

    b. "Mr. Ruci says he regrets every day that he had a child with the mother of his son because she's making his life a living hell."[180]

    c. "He [Gerd Ruci] said he has several documents to substantiate his claims that the mother has a serious mental health problem."[181]

    d. "The father said he's frustrated from all the lies and manipulations from the mother because he refused to get back with her."[182]

    322.    Defendant ACS persecuted, maligned, and accused Plaintiff under color of law with unsubstantiated third-party hearsay allegations and accusations to negatively influence the Court's perception of her fitness to care for and maintain custody of R.R. (3), thereby conspiring to deprive her of familial association with R.R. (3), and openly advocated for extended visitation and custody awards for Defendant Ruci:

    a. "Mr. Ruci said he would like the court to grant him the overnight visits because he wants to bond with his son especially at this tender age."[183]

    b. "The father said the mother created a Facebook account where she was harassing the paternal grandmother on 5/25/2019 when he just picked his son up asking her to tell him to return her son back to her immediately."[184]

    c. "The father said the mother was also calling his ex-girlfriend in Barcelona telling her all kinds of bad things about him."[185]

---

[178] *Id.*
[179] "ACS COI" dated 6/06/2019.
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.*
[184] *Id.*

    d. "The father said he believes the mother called ACS against him because she wants to stop the visits."[186]

    323.    Per their training and knowledge of the SSL Title 6, Defendants' Alozie, Tingue, and Steele knew, or should have known, it was impermissible bias in an official CPS investigation, where child safety is the focus of the investigation. Since aforesaid Defendants knew the court orders were not registered with the SCR, there was no purpose or need to comply with its scope and/or parameters. Instead, they used it to malign Plaintiff as an unfit alienator, while portraying Defendant Ruci, not as the perpetrator of acts of domestic violence in front of R.R. (3) that he pleaded guilty to, but to make him appear as the victim of malicious accusations, thereby absolving themselves of the accumulated grossly negligent failures.

    324.    In that Defendant ACS intentionally, knowingly, and willfully weaponized the context of their false, fraudulent, and fabricated report to advocate for extended visitation for Defendant Ruci and influence the litigation to solicit favors, awards, and benefits from the Court was, and is, in direct violation of SSL Title 6:

    a. "According to Mr. Ruci the ACS worker saw how he was bonding with his son during the visit, and all his basic needs were met."[187]
    b. "The father said he love his son very much and he will never hurt him."[188]

    c. "The Administration for children's Services hopes this information provided herein will be helpful to the court in making the best decision for the child."[189]

    d. "The father said he wants a stable and loving environment for his son which he's trying to provide for him now and in the future."[190]

    e. "The father has made the choice to have the exchange of his child at a local precinct on each visit."[191]

    f. "The conflict remains where the birth mother has expressed concerns regarding the care the father provides for their son after every visit."[192]

    325.    Defendants Alozie and Steele speciously injected references to "marks and bruises" when no allegations of marks or bruises was made but to fabricate an alibi that would prevent, prohibit, and suppress any future SCR reports related to R.R.'s (3) safety

---

[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] "ACS COI" dated 6/10/2019.
[192] *Id.*

and well-being in Defendant Ruci's care from because he refused to answer Plaintiff's questions about what happened on March 17, 2019, "[m]inimum degree of care" is a "baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet" (Besharov, at 326). Notably, the statutory test is " minimum degree of care" — not maximum, not best, not ideal — and the failure must be actual, not threatened (see e.g. Matter of Hofbauer, 47 NY2d 648, 656 [recognizing, in the context of medical neglect, the court's role is not as surrogate parent and the inquiry is not posed in absolute terms of whether the parent has made the "right" or "wrong" decision])"[193]

    a. "He expressed that she's making up stories that he's inflicting bruises on his son because she does not want him to have overnight visits with his son." [194]

    b. "During their investigation the worker did body check on his son and found no bruises on him."[195]

    c. "On 6/07/2019, Ms. Richter called the ACS worker stating that she was able to speak to the doctor, who treated the subject child R. R. on 5/28/2019 at Cohen's Children's Hospital in New Hyde Park and he started that the child did not have any visible marks or bruises on him that he was shaken, choked or twisted as reported."[196]

    326.    Apparently, Defendant Alozie was more concerned with concealing he visited "extensively" with Defendant Ruci on May 24, 2019, though he grossly neglected to enter it in Connections and maliciously reneged on his mandated duty to report by not registering the court order with the SCR on May 31, 2019 to fabricate his alibi. He conspired to conceal he did nothing about the SCR investigation from May 27, 2019. Specifically, Defendant Alozie did not interview Defendant Ruci, nor document any communication between himself and Richter. Interestingly, even though FCA 1034 # 2 was given to Shakera Smith, Defendant Alozie claims to have visited with Defendant Ruci 2 days later, "[d]uring the interview with the father on 5/24/19, the father expressed some concerns that since his son will be coming on Saturday for overnight visits he's convinced that a new report might be made against him for abusing his son." [197]

---

[193] *See* Nicholson v. Scoppetta 3 N.Y.3d 357 (N.Y. 2004).
[194] "ACS COI" dated 6/06/2019.
[195] *Id.*
[196] "ACS COI" dated 6/10/2019.
[197] *Id.*

327.     First, Defendant Ruci obtained overnight visits from Defendant McGrady's temporary court order for visitation dated May 22, 2019. Defendant McGrady did not issue a subsequent order for either an FCA 1034 investigation or a COI.

328.     Second, by May 22, 2019, only 2 FCA 1034 investigations were ordered, and 2 unrelated SCR investigations were registered. That is, there were only a total of 4 SCR investigations for Defendant Ruci, none of which contained allegations of abuse, and 2 of which were ordered by Ref. Matthews. Regardless, out of the aforesaid 4 CPS investigations, Defendant Ruci was indicated 3 times for inadequate guardianship and maltreatment of R.R. (3), "[t]he 10 cases with incomplete screenings lacked details such as the "Overall Case Assessment," which flags any immediate danger to the children and any adult victim…[a]lso lacking was the "Suspected Batterer's Interview," which contains the suspect's version of events[,] and which can be compared to what the alleged victim and children have conveyed during their interviews."[198]

329.     Third, the only reason Ref. Matthews ordered FCA 1034 # 2 was because Defendant ACS omitted Defendant Ruci's indicated finding from FCA 1034 # 1, which Plaintiff brought to the Court's attention on March 14, 2019, by presenting the OCFS letter dated January 28, 2019 with the determination.

330.     Grossly missed from Defendant Poole's oversight of Defendant OCFS was Defendant Steele's written disdain for Nicholson v. Scoppetta in Connections, which unequivocally reflected resent for the 2ⁿᵈ Circuit Court's ruling, appropriately manifested as victim-blaming and victim-shaming language against Plaintiff.

331.     On or about June 6, 2019, Defendant Galchus attempted to offer Defendant McGrady copies of purported social media posts, which she refused to accept. Instead, Defendant McGrady told Defendant Galchus to give it to Defendant McFarlane. Defendant McFarlane willingly accepted the copies of unverified and purported social media posts.

332.     Upon information and belief, Defendant Ruci tried to give the same, or similar, records to SCDSS on 2 prior occasions but it was rejected for being outside the scope of CPS investigations.[199]

---

[198] *Id.* at 18.
[199] Per Heaven's Discovery, the case notes for the separate instances were combined into 1 retroactive record for June 2019 to falsely accuse SCDSS of receiving it and frame them for the inflammatory content.

333.    Defendant McFarlane received the court order for another FCA 1034 investigation (FCA 1034 # 4) to, inter alia, focus on R.R. (3)'s medical records, previously requested but excluded by Defendant Alozie, who prepared FCA 1034 #3 to humiliate Plaintiff. Since Plaintiff had already provided R.R.'s (3) medical records to the Court on May 31, 2019, Defendant ACS was ordered to investigate the allegations. Richter had previously reported to Defendant Alozie that R.R. (3) was exhibiting strange behavior after each return from Defendant Ruci's home for overnight weekend visits. Plaintiff was exclusively breastfeeding R.R. (3) at the time, and this could have been due to his lack of coping skills, resulting from the abrupt changes based on the misinformation provided by Defendant ACS.

334.    At the return date, Defendant Rodin brought another fraudulent unregistered report, FCA 1034 # 5. Interestingly, Defendant Galchus's social media posts were attached to the end of the report, right behind SCDSS's purported FCSA 1034. Like her subordinate, Defendant Rodin misrepresented the report as having been sent by SCDSS and pointed to the drawn-in fax information at the top of the page, "FROM- Suffolk County DSS."

335.    The copies Defendant Galchus handed McFarlane were whiter or lighter, but the copies Defendant Alozie included with the report were put through a copy machine to give the paper a darker, more shaded appearance. This was done to humiliate Plaintiff, claiming Defendant ACS gave SCDSS Defendant Galchus's copies, and the latter included them in the report. That is, to misrepresent that SCDSS, and not Defendant ACS, discredited Plaintiff and closed the SCR investigations due to insufficient proof. And, just as the previous FCA 1034 reports, Plaintiff did not receive a letter from OCFS in the mail, nor did SCDSS come to her home for a CPS investigation ordered by the Court.

336.    Defendant ACS was grossly negligent, refused to conduct CPS investigations, conduct interviews, or enter case notes in Connections, as required by law and provided by training, "(18 NYCRR §428.5) Case progress notes must begin upon receipt of a report of suspected child abuse or maltreatment and must continue until the case is closed to all services."[200] The compounded gross negligence ultimately led to R.R.'s

---

[200] Office of Children and Services Child Protective Services Manual 2020.

(3) kidnapping via third party custodial interference by Defendants' Alozie, Steele, Tingue, and Rodin.

**Due process is routinely bypassed to effectuate a transfer of custody to the abuser and vilify the innocent parent for trying to protect the child.**

337.    Defendant Kaplan also participated in the ex parte conspiracy to sequester R.R. (3) and use malicious prosecution to finance a money laundering front. To afford his lifestyle, Defendant Kaplan routinely offers up his indigent assignments and child clients to Defendant ACS by knowingly providing subpar, incompetent representation.

338.    Defendant Kaplan is also a former employee of Defendant ACS and fully familiar with the proof required to remove a child. Instead, he violated the Attorney as Witness Rule by using hearsay allegations from an unverified source to traffic his client, R.R. (3), into the jurisdiction of Defendant ACS for the sole purpose of financing the Kidnapping Scheme.

339.    For example, on March 14, 2019, Defendant Kaplan verbally told Plaintiff, "you are responsible for making sure R.R. (3) is correctly strapped into the car seat." Defendant Kaplan knew there was an active order of protection for Plaintiff against Defendant Ruci, so he made this comment right when her former attorney stepped away, "[i]n representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."[201]

340.    Defendant Kaplan is former ACS, he knew he was exerting undue influence on Plaintiff, regarding blame for Defendant Ruci's careless exercise of safety for R.R. (3), because he is an agent of chaos. Essentially, Defendant Kaplan setup Plaintiff with misinformation, intending to frustrate the custody litigation to finance his personal agenda, by placing undue burdens, hardships, and expectations to compromise her safety. As such, Defendant Kaplan conspired to jeopardize Plaintiff's custody of R.R. (3) by exposing his client to a repeat offender: Defendant Ruci to further discredit his acts of domestic violence in the custody litigation.

---

[201] 22 N.Y.C.R.R. Part 1200 Rule 4.2 (a).

341.    Defendant Kaplan continued to represent R.R. (3) for a purported child protective proceeding against Plaintiff, knowing it was he who provided the false allegations, subsequently submitted as suborned perjury from Defendant Alozie on the false instrument of filing on August 30, 2019.

342.    In December 2019, Plaintiff confronted Defendant Kaplan about his ethical violations and asked him to recuse himself because she intended to call him as a witness. In response, Defendant Naughton openly stated, "I will quash any subpoena" that Plaintiff intended to serve Defendant Kaplan with. As such, to control the suborned perjury from Defendant Alozie, which facilitated the financing for the Kidnapping Scheme, Defendant Naughton became Defendant Kaplan's attorney, for the sole purpose of sustaining Defendant ACS's malicious, selective prosecution over Plaintiff. Essentially, Defendant Naughton's confirmed she would provide Defendant Kaplan with legal representation to conceal his ethical violations, thereby suppressing Plaintiff's right to due process.

**Defendant Rodin routinely endorses the commercialization of children and uses their captivity to finance money laundering operations at QFC.**

343.    Grooming is the process by which, someone like Defendant Rodin, is brought in, by someone like Defendant Kaplan, to intercede in a custody litigation that is ripe for a hostile takeover. First, *grooming* is not possible in all cases because certain factors must be present before someone like Defendant Kaplan, including like Defendant Galchus, is able to frustrate and agitate the litigation. For example, contentious, or the common misnomers "complicated" and/or "complex" resulting from withholding to register court orders for CPS investigations. Former ACS attorneys execute the grooming of their assigned cases by feigning incompetence and providing subpar legal representation for their assigned indigent clients. Based on his former experience working for Defendant ACS, Defendant Kaplan knew, or should have known, the purported FCA 1034 reports his "colleague and friend" Defendant Rodin repeatedly submitted for Plaintiff's custody litigation were fake, fraudulent, and fabricated.

344.    To tip Plaintiff's case over the edge, Defendants' Rodin, Alozie, Steele, Tingue, Galchus, Kaplan, and Ruci conspired to withhold registering 3 subsequent court orders, resulting in 3 Fake 1034 #'s 4 – 6 with forged signatures, 15 copies of Oral

Transmittal Reports with source identifying information obtained without subpoenas and perjury to discredit another unregistered FCA 1034 report ("FCA #8") to conceal a pattern of reported bruises and marks on R.R. (3) and take him on August 26, 2019.

345.    Defendant Rodin openly advocated for R.R.'s (3) summary removal by lying about her knowledge and awareness of the records containing proof of reported marks and bruises to obtain physical jurisdiction for the sole purpose of commercializing and trafficking R.R. (3). Defendant Rodin acted with forethought in that, by initiating malicious prosecution, she would conceal her role in aiding and abetting withholding court orders for FCA 1034 investigations, contacting SCDSS to misrepresent and mislead the purpose of her calls, including, inter alia, demand source identifying information not authorized by law.

**Defendant Rodin routinely authorizes offering false instruments of filing to sequester children and subjugate their families by and through the Municipal Enterprise.**

346.    On August 28, 2019, Defendants' Rodin, Galchus, Kaplan, Ruci, and Alozie's conspiracy came to fruition: execute Plaintiff's malicious prosecution to conceal child abuse, grossly negligent mishandling of court orders for FCA 1034 investigations, domestic violence, and repeated acts of domestic violence via violation of Plaintiff's OOP. Aforesaid Defendants solicited Defendant Shulman ex parte to change venue to engage in selective and malicious prosecution against Plaintiff, based on uncorroborated hearsay made by, inter alia, Defendant Kaplan on August 26, 2019.

347.    Plaintiff's case was pending adjournment before another Justice of the court, scheduled for September 4, 2019. Defendant Shulman was acting in all absence of the law when she agreed to steal a Co-Jurists pending case without all parties being present, without sending notice to all parties, and denying Plaintiff the right to object or be heard about a change in venue.

348.    As a former employee of Defendant ACS, Defendant Shulman is fully familiar with the proof required to remove a child and blatantly disregarded the legal standards she was required to use. Defendant Shulman conspired to violate Plaintiff's right

to due process by pretending Defendant McGrady "transferred" the custody litigation to her court, which she relied on to circumvent a pre removal hearing [202] to determine the risks.

349.    Defendants' Shulman, Rodin, Galchus, Ruci, Kaplan, Alozie, Steele, McGrady, and Tingue conspired to execute the Kidnapping Scheme and take Plaintiff's child away from her, based on issuing a fictional temporary Order of Custody and Visitation, which only granted Plaintiff with supervised visits with her child, that was not recorded in the Court's minutes during the Court appearance on August 26, 2019, nor was it entered in the court file by or before January 31, 2020, when Judge Fassler said, "I don't see an order for August 26."

350.    Defendant ACS conspired under color of law to deprive Plaintiff through gross practice of not performing CPS investigations, such as court ordered investigations ("COI's"), FCA 1034 and SCR Investigations, and a gross policy of fabricating reports submitted in legal proceedings, "[w]hen a court orders an investigation under Section 1034 of the FCA, the law requires the investigation be in compliance with the rules for such investigations as required by the SSL. As such, court-ordered investigations (COI) are transmitted to the SCR."[203]

## State-Sanctioned Racketeering

351.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-350, above as if specifically set forth herein.

352.    More than negative publicity, Defendant ACS dislikes increased numbers of SCR reports and being told *who* the victim of domestic violence is. Defendant ACS prefers to create the victim(s) and finance expensive crusades against perceived perpetrators. Unbeknownst to residents in the City of New York lies a heinous and amoral secret Defendants' ACS would rather stay hidden: taxpayers are funding a $2.65 billion Municipal Enterprise that funnels taxpayer funds for its Kidnapping Scheme, including but not limited to witness tampering, suborned perjury, destruction of business records, offering false instruments of filing, trafficking, money laundering, and witness intimidation

---

[202] FCA §1027 (ii) ("[i]n any such case where the child has been removed, any person originating a proceeding under this article shall, or the attorney for the child may apply for, or the court on its own motion may order, a hearing at any time after the petition is filed to determine whether the child's interests require protection pending a final order of disposition. Such hearing must be scheduled for no later than the next court day after the application for such hearing has been made.")
[203] 19-OCFS-LCM-05.

in the family courts. If you dare challenge Defendants in court, i.e., family, civil, even federal, be prepared to feel the brute force equivalent of a well-organized, robustly funded cartel because that is exactly how they operate.[204]

353.    Court Attorney Referee Wanda Wardlaw-Matthews ("Ref. Matthews") presided over the Defendant Ruci's first appearance at QFC on December 6, 2018, for his speciously filed petition or about October 22, 2018.

354.    Since Ref. Matthews is a family court attorney referee, each time Plaintiff appeared with new counsel or replacement counsel a new stipulation of consent was signed for the Court's determination, issued via written orders and/or decisions, to be binding, "[t]he application was denied by the Referee because [Jewell], himself, had previously signed a written consent authorizing the Referee to hear and determine the matter."[205]

355.    Litigants do not walk into family court knowing basic contract law,[206] procedures or statutes,[207] nor do attorneys advise their clients they can reject the referee,[208] and request the matter be heard before a judge, "[a]fter speaking with the…Court Clerk's Office yesterday, [Jewell and Ruci] were able to confirm that it is policy of [][QFC] to first assign proceedings raising issue…to a special referee."[209] Instead, litigants, i.e., parents not versed in the law, are preyed on, and exploited by their own attorneys, regardless of whether the appointment is done by the court or privately retained.

356.    By Defendant ACS's illegal practice of artificially reducing the number of SCR reports in its jurisdiction, the malicious targeting of Plaintiff and R.R. (3) began with the Court's initial order for an FCA 1034 investigation ("FCA 1034 #1") issued on December 13, 2018. That day, batterer Defendant Ruci displayed his obsession with controlling Plaintiff by controlling the child, R.R. (3).  That is, Plaintiff disobeyed Defendant Ruci's demands to abort R.R. (3) up until his due date. Having lost his ability to control and manipulate Plaintiff, Defendant Ruci set his eyes on hurting an innocent child to punish his Mother's disobedience, indirectly. Defendant ACS helped him gain the upper

---

[204] *See* Ex Parte Young 209 U.S. 123 (1908) (Rejecting Young's argument that he was acting on behalf of the state, the Court found that an official who engages in an unconstitutional action cannot be held to be performing it on behalf of the state, even if the official complies with the state's own laws.)
[205] *Id*. at ¶ 14.
[206] CPLR §2104.
[207] CPLR §4301, Rule 4311.
[208] CPLR 4312 (2).
[209] 2/01/2019 - Jewell Emergency Order to Show Cause.

hand by suppressing mandated reporters, intimidating Plaintiff, and ultimately destroying her SCR records.

357.    Despite having a full stay away OOP entered against him from Queens Criminal Court, pending criminal charges, including 1 Felony, Defendant Ruci demanded access and visitation with R.R. (3). The Court had this information in his petition, but the Court did not read it because Defendant Ruci's attorney did not file it. Nonetheless, Defendant Ruci's constructive fraud ended up on the calendar of the Part 40. *(At QFC, the Chief Clerk of Court is merely the means to successfully passing a Title IV-E audit. Other than that, Defendants ACS exclude him from the process of filing petitions and issuing summons.)*

358.    That day, Plaintiff informed the Court of the Criminal Court full stay away OOP, and Ref. Matthews ordered Defendant ACS to perform a CPS investigation, i.e., an FCA 1034 investigation. Per the registered Court's Order, "Queens Family Court Referee Wanda Wardlaw Matthews orders a 1034 on Docket # V-20987-18. Due Date 1/16/19…ACS is ordered to explore and report to the court on the circumstances that caused the criminal court full stay away order of protection in favor of both mother and the subject child."[210]  Specifically, the Court wanted to know what happened to Plaintiff and R.R. (3) on September 19, 2018.

359.    Unbeknownst to Plaintiff, Defendant ACS does not perform its duties to report suspected abuse and/or neglect as required by law, unless there is a financial incentive to do so. The maliciously targeted obstruction of Plaintiff's and R.R.'s (3) rights to equal protection under the law was manifested as material misrepresentations in the preparation of FCA 1034 #1, which "minimized" the severity of and "obfuscated" the propensity for violence and aggression by Defendant Ruci. Defendant ACS sought to redirect the Court's focus away from SCDSS's safety and risk-related determination and corresponding case notes, by targeting Plaintiff for the acts of domestic violence perpetrated by Defendant Ruci.

360.    To do this, Defendant ACS omitted the indicated finding of maltreatment entered against him, including leaving out Janet Richter ("Richter"), R.R.'s (3) assigned SCDSS caseworker's, notes in Connections, which substantiated the indicated finding

---

[210] Connections Stage Summary (12/14/2018).

against Defendant Ruci, "…[a]llegations of XOTH are substantiated against father Ruci as it could be shown that the physical, mental or emotional condition of his children were placed at risk of impairment by his actions."211 In the report, Defendant ACS left out the material misrepresentation as, "The father/petitioner has no indicated history with NYC children services."212

361.    By grossly misrepresenting material facts and withholding the indicated finding of maltreatment from FCA 1034 #1, Defendant ACS was, in effect, openly advocating and vocalizing in his defense and discrediting Plaintiff's traumatic experience. Specifically, Defendant ACS intended to influence and manipulate the Court's determinations of custody and access to R.R. (3) in favor of Defendant Ruci by knowingly supplying misinformation to the criminal court to obstruct Plaintiff's right to face her abuser: Defendant Ruci. Defendant ACS denied Plaintiff and R.R.'s (3) right to equal protection and caused a miscarriage of justice.

362.    On January 22, 2019, at Queens Criminal Court, Judge Guarino was given a physical copy of FCA 1034 #1 and relied on Defendant ACS's material misrepresentations of safety and risk to ultimately remove R.R. (3) from the full stay away OOP as Defendant ACS's "official position." The omissions were intentional in that Defendant ACS sought to discredit Plaintiff's account of what transpired on September 19, 2018, thereby falsifying compliance with a CPS investigation they never performed. Then, by causing the removal of R.R. (3) from the full stay away OOP, Defendant Ruci successfully negotiated for lesser charges. Not only did the aforesaid facilitate discrediting Plaintiff's right to equal protection but enabled Defendant Ruci to further demand more access to R.R. (3).

363.    On January 31, 2019, former 18B attorney, Michelle Langone ("Langone"), sent Plaintiff an e-mail to inform her that Defendant Ruci filed an OTSC ("Jan. 2019 E-OTSC"), "I have just been served with an order to show cause asking to reargue the judge's order for supervised visits. His attorney claims that the criminal court order of protection was dismissed last week on 1/22…I haven't finished reading his motion because it's 70 pages long, but I just wanted to inform you that you might have to come to

---

211 Connections Stage Summary, "Legal Definition of Maltreatment".
212 1/16/2019 FCA 1034 Report, i.e., FCA 1034 #1.

court within the next week or so."213 Langone never said she rejected service of Defendant Ruci's Jan. 2019 E-OTSC; she also did not inform Plaintiff about the reason she rejected service, "[t]he attorney prematurely served me with papers, they were not signed by the judge. He went to court yesterday and will have to serve me with completed papers by next Friday."214

364.    Plaintiff learned about the hearing scheduled for February 5, 2019, the night before, "I will be appearing and if you would like to appear you can. I don't think that it's necessary, like I said, it is a nonsense motion. His attorney is making baseless accusations against the Referee and is trying to forum shop... I would still like to know how you found out about the motion?"215 The reason Langone was preoccupied with *how* Plaintiff found out is because, in the course of submitting the fake OTSC on January 31, 2019, it was revealed that Defendant Ruci did not have a petition pending, nor had a petition been filed.

365.    Interestingly, Defendant Ruci submitted a subsequent Emergency OTSC dated February 1, 2019 ("Feb. 2019 E-OTSC") directly to Defendant Shulman,216 who signed it, entered it,217 and scheduled it. On or about November 8, 2019, Jewell filed a lawsuit against Defendant Ruci to collect the outstanding balance of his account. In the various motions and OTSC's submitted by Defendant Gildin, who is representing him for the suit, neither Defendant accuses Jewell of, inter alia, fraud or double billing for the Jan. 2019 E-OTSC, "[d]uring the court date of January 31,2019 [Jewell] failed to secure any unsupervised parenting with my child on my behalf."218 While Defendant Gildin added to Defendant Ruci's aforesaid claim, "...which increased the missed time between [Ruci] and his child."219

366.    On February 5, 2019, Langone e-mailed a copy of the Feb. 2019 E-OTSC, which included the previous Jan. 2019 E-OTSC, which appeared to be signed, though Langone said it was "prematurely served." To defend against Defendant Ruci's specious

---

213 1/31/2019 E-mail from Langone to Plaintiff.
214 2/04/2019 E-mail from Langone to Plaintiff.
215 *Id.*
216 2/01/2021 Shulman signed Orders to Show Cause for Rodin.
217 Shulman made the computer entry as Ref. Matthews, not as herself.
218 Ruci Affidavit of Defendant – Index Number 655702/19 (02/25/2020)
219 Gildin Verified Answers And Counterclaims – Index Number 655702/19 (12/10/2019).

tactics and Langone's incompetence, Plaintiff borrowed $6,000.00 from George W. Navarro220 to hire Richard Lefkowitz ("Lefkowitz") on February 4, 2019.

367.    In June 2021, Plaintiff obtained a computer printout report for all the entries under her file number, since the beginning. On February 5, 2019, there were 2 entries for Defendant Ruci's constructive fraud on docket on V-20987-18. Alternatively, e-courts showed only 1 entry for a motion on docket V-20987-18 for February 5, 2019. There were no entries on February 1, 2019, either.[221] According to Defendant Gildin, the former attorney was vexatious, "[o]n February 1, 2019, [Jewell] presented an [OTSC] that his firm purportedly had drafted seeking to remove the Court Referee from presiding over the matter" because "…this action was frivolous, fraudulent and or otherwise improper."[222] By "purportedly had drafted" Defendant Gildin means Jewell was not the attorney listed at QFC for Defendant Ruci.

368.    Per Defendant Gildin's counterclaims, Jewell committed, inter alia, legal malpractice because "[he] failed to file an emergency Order to Show Cause to commence the case, which would have expedited it," [223] because that is what Defendant Gildin did on October 9, 2020, when he agreed to represent Defendant Ruci for 2 false instruments of filing on dockets F-04656-20 and F-05491-19/20B. Specifically, Plaintiff obtained a copy of Defendant Gildin's purportedly filed NOA for F-04656-20, while the false affidavit of service was on F-05491-19/20B.

369.    On or about October 20, 2020 ("Gildin OTSC"), to schedule aforesaid dockets, not pending after October 9, 2020, i.e., disappeared from the calendar by October 10, 2020, Defendant Gilding submitted his OTSC to Magistrate Grey-Humphrey's, who subsequently crossed out docket F-04656-20 from it and replaced it with F-05491-19/10B. On or about October 21, 2020, Defendant Gildin instructed his law clerk to e-mail Plaintiff the OTSC without the exhibits.

370.    Interestingly, Defendant Ruci also accuses Jewell of, inter alia, fraud, "[he] improperly billed [][Ruci] by, including, but not limited to, over-charging, charging for his errors…charging for repetition…charging for work of other persons not then

---

[220] Plaintiff's biological father.
[221] 2/01/2021, Shulman entered a series of OTSC's on docket NN-17995-19, not scheduled or pending, for 2/01/2021 and again on 2/09/2021, under the pretense of scheduling a hearing on the papers.
[222] Gildin Verified Answers And Counterclaims – Index Number 655702/19 (12/10/2019).
[223] *Id.*

authorized to work on [Ruci's] case and double billing for various tasks that were undertaken by more than one person."224 He also accuses Jewell of the fraud pulled on Judge Guarino, while conveniently leaving out all mention of his co-conspirator, Defendant ACS, "[Jewell] also improperly interfered with my criminal case, for which I had already retained another lawyer whom he referred to me, by demanding that he be involved with certain tasks within the criminal case…and pressured me to take certain actions which contradicted the advice from the criminal attorney…"225

371.    Defendant Ruci will only pay for fraud that is successful, such as offering false instruments of filing as OTSC's to substitute the underlying action, i.e., the petition on docket V-20987-18, under false pretenses to secure Plaintiff's jurisdiction by fraud as occurred on December 6, 2018, "[Jewell] asserted to the Referee that he was using the Court's electronic filing system to process various documents, when in fact, no such mechanism is available in that Court."226 The summons for Defendant Ruci's purported petition is dated December 7, 2018 and Plaintiff's previous apartment in Jackson Heights, Queens, NY is listed as the address for service of process.

372.    Apparently, it was ok for the criminal court attorney to have a copy of an altered FCA 1034 #1 from the family court on January 22, 2019, without obtaining Ref. Matthews permission because Defendant ACS waived SSL §422 by virtue of being an exception to the rule. The only reason Ref. Matthews issued the therapeutic supervised visitation order was because Defendant Ruci lied that the last time he saw R.R. (3) was September 19, 2018.227

373.    And, like Defendant Gildin himself, the former attorney was also a liar, "…[Jewell] failed to learn that the Referee was scheduled, in advance, to be off the bench on that date."228 Defendant Gildin takes no issue lying about *who* signed the "frivolous" Feb. 2019 E-OTSC, since Defendant Shulman is helping him by forging Magistrate Grey-Humphreys signatures on fraudulent support orders on default for their mutual client: Defendant Ruci.

---

224 *Id.* at Paragraph 38.
225 Ruci Affidavit of Defendant – Index Number 655702 (02/25/2020).
226 Gildin Verified Answer and Counterclaims – Index Number 655702/19 (12/10/2019).
227 Ruci's fraudulent petition on docket V-20987-18 refutes and contradicts his false claims.
228 *Id.*

374.    On March 13, 2019, Defendant Galchus e-mailed Lefkowitz a false instrument of filing, misrepresented as an OTSC to modify the supervised visitation order, just like the Jan. and Feb. 2019 E-OTSC's. Since the Jan. 2019 E-OTSC was used to substitute the underlying false instrument of filing on docket V-20987-18, the Feb. 2019 E-OTSC was used to replace the scheduled date of March 20, 2019, to the updated one on March 14, 2019; and the third false instrument of filing on docket V-20987-18 was used to add Defendant Galchus as the attorney for Defendant Ruci. That is, for March 14, 2019, Defendant Ruci's fraudulent docket was listed as 3 separate entries whereas Plaintiff's docket number V-05120-19 only had 1 entry.

375.    Interestingly, on March 14, 2019, Ref. Matthews asked Defendant Galchus if his client wanted to pursue his motion for her recusal. After Defendant Galchus stammered and replied "no, Your Honor", Ref. Matthews claimed to dismiss it as "frivolous." Based on Defendant ACS's altered FCA 1034 #1 and the specious removal of R.R. (3) from the criminal court OOP, Ref. Matthews rejected OCFS's indicated letter stating, "this looks like it's you." Defendant Kaplan concurred. Furthermore, due to the compounded effect of the aforesaid, plus Defendants' ACS and Kaplan's feigned ignorance of Defendant Ruci's 2 subsequent arrests for violating Plaintiff's OOP and R.R.'s (3) OOP, Defendant's Galchus and Ruci got away with more jurisdiction by fraud.

376.    On April 2, 2019, Defendant's Galchus and Ruci offered another false instrument of filing ("April OTSC") under the pretense of modifying the temporary order of unsupervised visitation dated March 14, 2019 ("March temporary order") to purportedly change the place of exchange to SCPD 2nd Pct. Instead of the forged signature on Defendant Ruci's Jan. 2019 E-OTSC, Defendant Galchus signed for Ref. Matthews and claimed it was purportedly scheduled for April 5, 2019. Per the printout report, nothing was entered on April 2, 2019, two supplementary dockets, i.e., V-20987-18/19A and V-05120-19/19A, were listed. Neither Defendant ACS nor Defendant Kaplan appeared in court on.

377.    Without prompting or requesting it from QFC records, Plaintiff received Defendant Ruci's purported Consent to Change Attorney dated March 11, 2019, signed by Jewell and Defendant Galchus. Interestingly, the form was not notarized, nor does it have a dated court stamp from QFC to show it was filed. According to Jewell, "[o]n or about

March 10, 2019, Jewell Law sent Ruci a final bill entitled that showed the balance due from Ruci was $42,108.16 (the "Final Bill").[229]

378.    Upon information and belief, neither Defendant Ruci nor Defendant Galchus contacted Jewell to request the client file.

379.    Upon information and belief, Jewell did not have a copy of said record nor did Defendant Galchus ask him to sign a consent to change attorney.

380.    Therefore, Jewell's signature was forged, and the form was retroactively placed in the court file at QFC on or about July 2021. No doubt, this was done to discredit evidence that Defendant Shulman was, and is, approving Defendant Galchus's 18B vouchers under Plaintiff's docket number, V-05120-19/19C. In other words, Defendant Galchus is also Plaintiff's attorney, as far as getting paid.

381.    More interesting, Langone never told Plaintiff that Defendant Ruci's counsel on February 5, 2019, was not Jewell or that another OTSC was filed, "[o]n February 5, 2019, [Jewell] again presented an [OTSC] that his firm purportedly had drafted seeking to remove the Court Referee from presiding over the matter."[230]

382.    In fact, Jewell was not listed as Defendant Ruci's attorney on e-courts. An attorney by the name of "Kenneth Allen Jewell," registered in New Jersey was.[231] Plaintiff received Robyn Mann's ("Mann") signed NOA dated February 5, 2019.[232] Unlike the other fake's, this one had a dated court stamp showing it was filed on February 5, 2019.

383.    Apparently, Mann *was* Defendant Ruci's attorney, "…[Jewell] had told [Ruci] that he would not be charging for his Associate Attorney's time in getting caught up on the case,"[233] which is why her name was listed outside Part 48 on March 14, 2019, and not Defendant Galchus, "[o]n or about February 20, 2019, [Ruci] was presented with a second retainer agreement and was directed to sign it."[234] Moreover, Defendant Ruci claims, "I discharged [] [Jewell] as my attorney on March 11, 2019"[235], which establishes Defendant Galchus had sufficient forethought to offer the same false instrument to

---

[229] Jewell Law, PLLC v. Gerd Ruci, Complaint – Index Number 655702-2019 (11/08/2019).
[230] Ruci Affidavit of Defendant – Index Number 655702 (02/25/2020).
[231] Shulman made the entry and listed the wrong attorney for Ruci. By 5/09/2019, the 2/01/2019 OTSC was removed from the court file.
[232] Mann was an associate attorney in Jewell's law firm.
[233] Gildin Verified Answer And Counterclaims – Index Number 655702 (12/10/2019).
[234] *Id.* at Paragraph 17 "(retainer B)".
[235] Ruci Affidavit of Defendant – Index Number 655702/19 (02/25/2020).

Lefkowitz on March 13, 2019, to sustain jurisdiction by fraud. On March 14, 2019, the 3 separate entries on docket V-20987-18 included Jewell's previous OTSC, "[the Referee] also accused us of 'forum shopping'."[236]

384.    Upon information and belief, Defendant Galchus did not contact Jewell for Defendant Ruci's court file. However, Plaintiff also received a copy of Defendant Galchus's signed NOA purportedly dated March 11, 2019, which bears no court stamp. Defendant Galchus knew, or should have known, based on his veteran experience with stipulations of consent and court attorney referees, that neither Mann nor Jewell were Defendant Ruci's counsel because Kenneth Allen Jewell was. As such, the stipulation of consent signed on January 16, 2019, between Langone and Jewell, was no longer biding on Plaintiff, effectively terminating the litigation retroactively.

**These jurisdictional defects are cured by the Court as specious entries into the court's computer, for which the Court itself *files* the supplementary petition on behalf of the litigant and his/her attorney.**

385.    Defendant Galchus speciously filed his false instrument to supplant his client's terminated cause of action over Plaintiff in anticipation of March 14, 2019, when a new stipulation of consent would bind the parties to the proceeding. To subvert service of process for a legally filed supplementary petition, Defendant Galchus substituted the underlying action with his fraudulent OTSC. That is why the purported April 5, 2019 modification was for a petition, "Temporary Order on Petition for Modification of Order of Visitation Made by Family Court" dated April 5, 2019, on dockets V-20987-18/19A and V-05120-19/19A.

386.    Defendant Galchus knew his new client's purported custody litigation terminated even before Defendant Shulman's erroneous entry of the Feb. 2019 E-OTSC, so he conspired to lure Plaintiff back to his jurisdiction under false pretenses: e-mailing another false instrument of filing to Lefkowitz on April 2, 2019, misrepresented as an OTSC to modify the March temporary order.

387.    On April 5, 2019, Plaintiff was not permitted to enter the courtroom. Lefkowitz said, "you're going to lose your child if you don't agree to the change." Plaintiff was not permitted to mention Defendant Ruci's arrests because Lefkowitz secretly agreed to "modify" the previous order with Defendant Galchus in exchange for the latter's silence

---

[236] *Id.* at ¶ 14.

about the former's responsibility for his client's second arrest. When Plaintiff entered the courtroom, Ref. Matthews stated, "counsel agreed to the modification" and waived the April OTSC. Lefkowitz was not permitted to enter into an agreement without Plaintiff's consent. To do this, Lefkowitz ambushed Plaintiff with a copy of an e-mail sent to Defendant Galchus around 11:00pm on March 29, 2019. Therefore, admitting he lied to Plaintiff on April 2, 2019, by claiming, "I'm just reading this now", in reference to aforesaid e-mail.

388.    Plaintiff fired Lefkowitz for his deception and for conspiring against his client to conceal it was his fault Defendant Ruci was arrested, as a pretext to enter into an agreement. Apparently, Lefkowitz was aware Defendant Ruci planned to pick up R.R. (3) on March 31, 2019, but grossly neglected to notify Plaintiff. Perhaps, Lefkowitz and Defendant Galchus conspired against Plaintiff together and conspired to get Defendant Ruci arrested to ensure his success at obtaining full custody.

389.    Nonetheless, Lefkowitz's self-serving legal malpractice put Plaintiff and R.R. (3) at risk because he knew, or should have known, Defendant Ruci was, and is, prone to violence. Lefkowitz was hired to protect Plaintiff's rights as well as R.R.'s (3) safety and well-being. However, as is egregiously common, attorneys, like Lefkowitz, are the norm: exploit a client's lack of legal expertise via fraud and deception to bank roll their predatory billing. This is *how* things are done in family court.

390.    The reason why Defendant Kaplan did not attend on April 5, 2019, is because he was not R.R.'s (3) attorney, as far as getting paid. Before he could participate, he needed to make sure Defendant Galchus's false instruments of filing, i.e., the April OTSC, and Jan. and Feb. 2019 E-OTSC's were "re-processed" as the underlying actions for supplemental docket numbers, V-20987-18/19A and V-05120-19/19A. Langone knows the scheme, so she concealed her knowledge of Defendant Ruci's fraudulent Jan. 2019 E-OTSC's from Plaintiff, "[n]otably, neither Michelle Langone, attorney for Ms. Navarro, nor Glenn Kaplan, Attorney for the Child, showed up at all during the time [Jewell and Ruci] were at the courthouse."[237]

391.    Perjury without punishment *is* the business of the Court, "[e]qually important is that neither Mr. Ruci nor I provided written consent to this Court binding us to

---

[237] Feb. 2019 E-OTSC.

a special referee to hear the instant proceeding."[238] This is *why* custody litigation drags on for years, families are destroyed, children are traumatized, and opportunists, like Defendants' Rodin, Kaplan, and Galchus, seek out their prey.

392.    On May 9, 2019, Plaintiff obtained a copy of the April OTSC from QFC records with someone's handwritten "V-05120-19/19A" and "/19A" ("April OTSC #2") next to Defendant Galchus's typed up "V-20987/18" on the front. The April OTSC Defendant Galchus e-mailed had "V-20987/18" and "V-05120/19" typed up. Plaintiff received a third version of the April OTSC ("April OTSC #3") from QFC records in October 2020.

393.    In June 2019, Defendants' Rodin, Steele, McFarlane, Tingue, and Alozie submitted 3 unregistered FCA 1034 reports with forged signatures of SCDSS social worker Richter, her supervisor, and 1 purported director, "[w]e found that supervisors did not conduct the required supervisory case reviews on a consistent basis. Even when the reviews took place, supervisors failed to consistently note when certain key investigation steps were not performed. In the cases where required steps were not completed, supervisors rarely reminded the case workers that such steps were necessary or ensured that corrective actions took place."[239]They also drew fax numbers at the top of each page with PhotoShop, including copying and pasting the official Suffolk County logo on fabricated forms labeled, "FCSA 1034," in anticipation of Plaintiff's custody litigation before Defendant McGrady.

394.    Curiously, while Plaintiff's FOIA records did not have any registered Intake Stage ID numbers coinciding with the June 2019 FCA 1034 court orders, Defendant Heaven's counterfeit Discovery contains scattered entries for the aforesaid June reports. Had Plaintiff also sent Defendant Heaven the January and May 2019 reports, there is no doubt it would have been retroactively entered in Connections and part of the 368 pages of counterfeited Discovery she intended to use in the OCFS fair hearing.

395.    Most, if not all, attorneys are familiar with using fax machines, i.e., sending and receiving faxes. Yet, no amount of clerical experience will deter a willing attorney's gross indifference to specious irregularities in family court proceedings, such as inconsistent fax information at the top of every page Defendant ACS's fabricated

---

[238] *Id.* at ¶ 25.
[239] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

unregistered FCA 1034 reports submitted for Plaintiff's custody proceedings in May and June 2019. Despite Defendants' Rodin and McFarlane's claims that SCDSS "faxed" the reports to QFC, the actual fax information showed the reverse. While sending and/or receiving a fax is not an uncommon office function, Plaintiff could not afford to pay Shapiro to notice the inconsistencies on May 22, 2019, June 7, 10, and 13, 2019.

396.    Intending to pull an illegal underhanded maneuver against Plaintiff, Defendant ACS mistakenly reversed the fax information, which awkwardly reflected that QFC had a special fax machine devoted to SCDSS. Defendant ACS drew "From- Suffolk County DSS" at the top to make it easier for themselves to point to it, rather than perjure themselves, if asked directly. As a result of the extortion schemes caused by Defendant ACS's fraudulent reports with frustrating misinformation and inflammatory disinformation targeting Plaintiff, Shapiro billed for the time spent litigating fraud on the court on 6/03/2019, 6/07/2019, 6/10/2019, and 6/13/2019.

397.    In fact, Defendants' Galchus, Rodin, and Kaplan misrepresented the fraudulent FCA 1034 reports as "confidential" and told Shapiro Plaintiff could not get a copy. However, Plaintiff is familiar with sending and/or receiving faxes due to employment in office settings, would have sought criminal and/or civil remedies to address the fraudulent FCA 1034 reports, including sending them to SCDSS.

## Conspiracy to Extort Plaintiff for Ransom seized Child, R.R. (3)

398.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1- 396, above as if specifically set forth herein.

399.    From December 2018 to August 2019, Defendants Tingue, Alozie and Steele conspired to conceal direct knowledge of the source of the report's information as recorded directly in Connections by the SCR, "[a]ll of the details of each investigation must be documented by the case worker and supervisor in a timely manner within the progress notes section of CNNX. Supervisors are supposed to regularly review the case workers' progress notes in CNNX and make comments and suggestions there as needed."[240]

---

[240] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

400.    Defendants' Steele, Tingue, Alozie, Rodin, McFarlane, Ruci, Kaplan, Naughton, McGrady, and Galchus conspired to, inter alia, conceal reported patterns of bruises and marks made to the SCR by mandated reporters against Defendant Ruci, while R.R. (3) was in his exclusive custody, "[w]ithin 48 hours of making an oral report, the mandated reporter must provide a signed, written report to the local child protective service (CPS) on OCFS Form LDSS-2221A (rev 09/2016)."[241]

401.    By employment and licensure, Defendants' Tingue, Alozie, and Steele are persons required to report, "[m]andated reporters are those individuals who are required by law to report suspected child abuse or maltreatment to the Statewide Central Register of Child Abuse and Maltreatment (SCR), operated by the New York State Office of Children and Family Services (OCFS) [SSL §413]."[242] As an exception to the law, Defendant ACS *chooses* when he or she is mandated to do anything.

402.    Just as with Plaintiff, Defendants ACS were directed to contact R.R.'s (3) pediatrician and Cohen's Children's Hospital on May 31, 2019 but chose to retaliate under color of law against Plaintiff because she informed the Court about their gross negligence, "[i]n another case (#2) that involved an allegation of educational neglect, the mother stated that the child's asthma had caused the child's absence from school. The supervisor issued a directive for the case worker to verify the severity of the child's asthma with the child's pediatrician. We found no evidence in the progress notes that the case worker complied with the directive and no evidence of the supervisor's follow-up."[243]

403.    Defendant Ruci was indicated 3 times for inadequate guardianship and maltreatment of R.R. (3), "...for cases deemed "indicated" where the family has ongoing service needs, case workers must assess the risk to children of future abuse or maltreatment...[i]n instances where the case workers determine that additional services are required for the duration of the investigation, the case workers are responsible for arranging the services and for working with the family to address the possible risks to the

---

[241] Office of Children and Family Services, Child Protective Services Manual.
[242] Office of Children and Family Services, Child Protective Services Manual.
[243] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

child…[w]hen required, case workers also work with ACS legal staff to file petitions with Family Court for supervisory oversight of the family or for the children's removal."[244]

404.    In fact, Defendants' ACS were so grossly negligent in the preparation of the FCA 1034 #1, Avinash Sukhee forgot to sign it before submitting it for Plaintiff's custody proceeding on January 16, 2019, though it was signed by a Supervisor, Michelle Sellare, who grossly failed to notice her subordinate's missing signature, "ACS lacked sufficient controls over its process for investigating allegations of child abuse and neglect…[w]e found limited evidence that supervisors and managers performed required case reviews on a consistent basis… [i]nsufficient oversight to ensure that ACS staff consistently follow guidelines and directives weakens any controls that may be established and increases the risk that investigatory results may be flawed. Consistent with this concern, our review of 25 sampled cases revealed multiple areas within each case where staff did not adhere to ACS guidelines and these issues were not detected during the course of the investigation."[245]

405.    Defendants' ACS never met with, or physically saw Plaintiff's son, though required to make direct observations of interactions between Defendant Ruci with R.R. (3). Instead, Defendants ACS substituted real life for pre-recorded video, "Mr. Ruci has provided CPS Mr. Sukhee with video footage of time spent with child R. in the bedroom of their Jackson Heights apartment. CPS observed in the video Mr. Ruci cuddling with child R. R. and in another video attempting to calm child R. from crying while in his bassinet."[246]

406.    However, Defendant ACS has a documented history of grossly mishandling CPS investigations and lying about it, "…[i]n one of the remaining two cases (in which we cite a case worker for failing to follow up with a pediatrician treating a child with asthma), ACS argues that the contact was noted in the redacted medical records to which we had limited access…[h]owever, this assertion is inconsistent with statements

---

[244]Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[245] *Id.* at p. 2.
[246] 1/16/2019 FCA 1034 Report, i.e., FCA 1034 #1.

made by the case supervisor, who acknowledged that contact with the child's pediatrician was not made."[247]

407.    On August 26, 2019, Defendants' Rodin, Steele, Alozie, Tingue, Galchus, Ruci, McGrady, Kaplan, and McFarlane seized R.R. (3) under fabricated pretenses, to conceal a gross accumulation of misinformation provided by Defendant ACS, submitted as racketeering schemes, i.e., harassment, humiliation, extortion, and intimidation, in various unregistered false, fabricated, and fraudulent FCA 1034 investigations and reports. In court, Defendants' Rodin, Galchus, Ruci, Kaplan, and McGrady took turns committing perjury to execute the summary removal of R.R. (3) from Plaintiff's custody and violate her right to due process.

408.    Inclusive, aforesaid Defendants conspired to register an anonymous false report to the SCR against Plaintiff, for the sole purpose of weaponizing the state's resources and steal R.R. (3) from her custody, then file false reimbursement claims to finance his sequestration and her subjugation.

409.    This was done to thrust Plaintiff into an illegal money laundering scheme, whereby Defendants' Alozie, Rodin, Tingue, and Steele circumvented the requisite proof for a pre-removal hearing, to force Plaintiff's participation in a child safety conference ("CSC") at their office under false pretenses. First, Defendant Alozie called Plaintiff on the afternoon of August 28, 2019, with a purported CSC scheduled for August 30, 2019. Then, at 6:00 pm, Defendant Alozie called back to reschedule the "CSC" for August 29, 2019, because "I did not know my supervisor was in training that day and she has to be present." When Plaintiff asked, "what is a CSC and why do I have to go?" Defendant Alozie responded, "if you want to get your son back, you have to come to the meeting." To conceal his role, Defendant Alozie made his anonymous report at 6:13pm, so no one would suspect it was him.

410.    Defendant Kaplan is a predator and an opportunist, who anticipated profiting from a closed, unfounded SCR investigation dated August 12, 2019, by conspiring to register a new one against Plaintiff. Specifically, upon information and belief, SCDSS rejected Defendant Alozie's demands to initiate Plaintiff's malicious prosecution,

---

[247] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

"…[t]he preliminary, or seven-day, assessment of safety begins with CPS's first review of a report of suspected child abuse or maltreatment and the first contact with persons relevant to the intake information, including the source of the report."[248]

411.    Upon information and belief, Defendant Kaplan contacted SCDSS on Friday 8/23/2019 to ascertain the social workers position on removing L.N. (6) from Plaintiff's custody. Defendant Kaplan expected to profit from the representation of two children in protracted proceedings based on the uncorroborated misinformation given to him first, by Defendant Galchus, then by Defendant Rodin.

412.    Upon information and belief, Defendant Kaplan was told by SCDSS neither R.R. (3) nor L.N. (6) would be removed from Plaintiff's custody, "[j]urisdictional assignments can be changed by the LDSS in limited circumstances…[w]hen the SCR has made jurisdictional assignments per these guidelines, but the LDSS obtains information after intake that affects the appropriateness of the assignments, or the LDSSs involved otherwise agree to change the assignments, the LDSSs are responsible for reassigning the reports as needed."[249]

413.    Defendant Alozie, as a mandated reporter, registered a malicious anonymous report against Plaintiff, and did so under color of law, "[c]ertain individuals, including some professionals with certifications or licenses issued by New York State, are mandated reporters of child abuse and maltreatment [SSL §413(1)(a)] (see Chapter 2, Reporters). Mandated reporters are required to submit LDSS Form 2221-A to the CPS of the county where the child resides within 48 hours of the SCR registering the report [SSL §415]."[250]

414.    Defendants' Steele, Alozie, and Tingue also wanted to seize L.N. (6), so Defendant Alozie included his name in his anonymous report, "…[g]enerally, the SCR assigns joint jurisdictional assignment when the subject(s) and the child(ren) alleged to be maltreated or abused are located in more than one LDSS…[i]n these situations, SCR usually assigns two or more LDSSs to jointly address the report and protect the children named in a report."[251]

---

[248] 18 NYCRR 432.2(b)(3)(i); Office of Children and Family Services, Child Protective Services Manual 2020.
[249] Office of Children and Family Services, Child Protective Services Manual 2020.
[250] *Id.*
[251] *Id.* at p. 52.

415.    That is, Defendants' Alozie, Steele, Best, Ruci, and Tingue conspired with Defendants' Rodin, Galchus, Kaplan to weaponize their knowledge of and experience with the SCR to speciously establish R.R.'s (3) physical location in Queens County under the pretense of initiating a false CPS investigation against Plaintiff, during pendency of an adjournment, "[s]ection 487 thus permits a civil action to be maintained by any party who is injured by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation, and it provides for treble damages. (*See* Fields v. Turner, 147 N.Y.S.2d 542, 543-44, 1 Misc.2d 679, 680-81 (N.Y.Sup.Ct. 1955) (holding that the predecessor to section 487 provides a remedy to any party injured by the deceit of an attorney representing a party to an action, not only that attorney's client). The act of deceit need not occur during a physical appearance in court; the statute applies to any oral or written statement related to a proceeding and communicated to a court or party with the intent to deceive. Id. at 544, 1 Misc.2d at 681, 147 N.Y.S.2d 54."[252]

416.    That aforesaid Defendants knowingly conspired to circumvent procedural jurisdictional assignment by the SCR to steal Plaintiff's child is evidenced by Defendant Alozie's anonymity, to preclude SCDSS from challenging it, "[t]he specialist then assigns jurisdiction and immediately transmits the report electronically via CONNX to the appropriate CPS unit."[253] The district court further found that the other evidence, described above, of "a persistent pattern of unethical behavior," id. at 203, constituted a "chronic, extreme pattern of legal delinquency," Izko Sportswear, 809 N.Y.S.2d at 122, 25 A.D.3d at 534, to the extent (if any) such a finding was required under New York law."[254]

417.    Upon information and belief, Defendant Alozie was repeatedly told there was no basis to file an FCA Article 10 proceeding for an anonymous call to the SCR, "[u]nder federal and state law, LDSSs have a responsibility, where appropriate, to make reasonable efforts to prevent or eliminate the need for removal of the child from the home…[t]he term "reasonable efforts" is not defined in statute or regulation."[255]

418.    Upon information and belief, Defendants' Alozie and Steele subsequently demanded SCDSS relinquish jurisdiction of R.R. (3) to Queens County ACS under the

---

[252] Amalfitano v. Rosenberg 533 F.3d 117 (2nd Cir. 2008).
[253] Office of Children and Family Services, Child Protective Services Manual 2020.
[254] *See* Amalfitano, 428 F.Supp.2d at 207 n. 36.
[255] Office of Children and Family Services, Child Protective Services Manual 2020.

false pretense of conducting a CPS investigation, which never took place, "…[o]nce a report has been accepted by an LDSS, the SCR does not reassign the report or add jurisdictions…[t]his must be done at the district level…[f]or more information, see CONNECTIONS Step-by-Step Guide: Training for CPS Workers."[256]

419.    Defendants' Galchus, Ruci, Kaplan, Alozie, and Rodin used the adjournment was used to initiate a money laundering front in Queens County, "Armand Rosenberg's filing of the complaint falsely alleging standing when none existed and the subsequent submission of knowingly and materially false affidavits did work a deceit on the court, and therefore the certified questions should be altered accordingly."[257]

420.    Unlike Defendants ACS, SCDSS had physically observed R.R. (3) in Plaintiff's custody and care and supported Plaintiff's custody of R.R. (3) and L.N. (6). Rather than file an Article 10 petition, SCDSS indicated Defendant Ruci 3 times and obtained a full stay away order of protection in favor of R.R. (3) against Defendant Ruci, immediately following his arrest for violating Plaintiff's order of protection on March 25, 2019.

421.    On August 29, 2019, Defendant Steele threatened to incarcerate Plaintiff, unless Plaintiff signed a false confession to deny reports of suspected abuse or neglect were made by mandated reporters for R.R. (3). Defendant Steele threatened to violate Plaintiff's right to maintain custody of R.R. (3) unless Plaintiff agreed to never having seen bruises and marks on R.R. (3). Defendant Steele threatened to forcibly separate R.R. (3) from his sibling L.N. (6) unless Plaintiff agreed to sign a false confession, written by Defendant Best, stating bruises and marks were never documented, i.e., photographed, by Plaintiff or other mandated reporters.

422.    Defendant Steele threatened to seize L.N. (6) from Suffolk County with an "Order of Special Jurisdiction" and put him in foster care unless Plaintiff agreed to sign a false confession, written by Defendant Best, stating Plaintiff never saw bruises or marks on R.R. (3). Defendant Steele threatened to seize L.N. (6) from Plaintiff unless Plaintiff agreed to sign a false confession, written by Defendant Best, that "doctors never reported" bruises or marks on R.R. (3).

---

[256] *Id.* at 69.
[257] *See* Matter of Schildhaus, 23 AD2d 152; Schindler v Issler Schrage, 262 AD2d 226; Guardian Life Ins. Co. of Am. v Handel, 190 AD2d 57; Salouaara v Eckert, 222 F3d 19.

423.    Plaintiff repeatedly refused to sign the false confession, written by Defendant Best, and refused to agree to deny that various reports of suspected abuse or neglect were registered with the SCR by mandated reporters, so Defendants' Steele, Best, and Alozie threatened to seize R.R. (3) indefinitely.

424.    Defendants' Steele and Alozie further threatened Plaintiff with placing R.R. (3) in the custody of the subject of all the SCR reports, Defendant Ruci, unless Plaintiff agreed to self-incriminate by stating she "exposed [R.R. and L.N.] to acts of domestic violence" perpetrated by Defendant Ruci.

425.    Defendant Alozie admitted he never spoke to the "Lieutenant Detective" and the allegations in the false instrument of filing were solely based on Defendant Kaplan's hearsay statements from August 26, 2019.

426.    On October 9, 2019, Defendant Alozie said Defendant Steele's supervisor, Defendant Tingue, authorized legal proceedings against Plaintiff.

427.    On November 18, 2019, Judge Hughes allowed Plaintiff to copy the FCA 1034 report submitted by Defendant Alozie, where he further admitted the money laundering front in the Part 14 was based on Defendant Kaplan's hearsay allegations and confirmed the false instrument of filing on docket NN-17995-19 consisted of his suborned perjury.

428.    Subsequently, during a phone call with ACS Director Robyn Church, Plaintiff was told the decision to register the anonymous report with the SCR was made on 8/26/2019 and Defendant Alozie was directed to make the call.[258]

429.    In that Defendants' ACS sought to commercialize R.R.'s (3) safety under various provisions of the Social Security Act is evidenced by Defendants' Alozie and Steele's knowledge of the jurisdictional requirement for originating money laundering fronts, i.e., an FCA Article 10, because only SCDSS had jurisdiction to file and did not. Defendant Alozie made a false report to the SCR against Plaintiff anonymously, "...[i]f the neighboring LDSS finds that it is necessary to initiate a court proceeding, the actions based upon those findings must be undertaken by the "home" LDSS in its own jurisdiction [FCA §1015]."[259]

---

[258] *Id.* at p. 40 ("[t]he mandated reporter law is not intended to require more than one report from any institution, school, facility or agency on any one incident of suspected child abuse or maltreatment [SSL §413(1)(b)].")
[259] *Id.*

430.    One component of the Municipal Enterprises scheme involves withholding registering court orders with the SCR for CPS investigations ordered by the Court, such as when Defendant ACS receives a court order for a COI and/or FCA 1034 investigation. As such, during litigation, employees and agents grossly neglect to register the court order and does not perform his/her mandated duties pursuant to SSL §§413, 415, and Title 6 but submits a fraudulent, false, and fabricated report under the pretense of a valid, legitimate CPS investigation.

431.    For example, Defendant ACS submitted altered FCA 1034 reports for R.R. (3) in January, May, June, and August of 2019 as well as October 2019 and October 2020 for both R.R. (3) and L.N. (6) for purported legal proceedings at QFC and 2 in SFC.

432.    For example, in parent Jagnarain's proceedings in Nassau County Family Court, Defendants' ACS in New York County were ordered to investigate suspected sexual abuse reported and documented by mandated reporters for child A.A. (6). Defendants ACS grossly neglected to register the court order. Due to the inadequate, subpar, grossly insufficient information in the report, Judge Ellen Greenberg ("Greenberg") subsequently barred parent Jagnarain from access to A.A. (6) and her medical records, including from speaking to current and/or former pediatricians, attending physicians, school counselors or anyone who treated the child's recurrent, inexplicable medical condition.

433.    For example, in parent R.M's proceedings in Kings County Family Court ("KFC"), Defendants' ACS submitted numerous false, fraudulent, and fabricated FCA 1034 reports to malign and discredit his concerns for child M. safety and well-being. Parent R.M. expressed concerns for M. deteriorating health, while living in a shelter with mother, and half-sibling for almost 2 years. ACS social worker P.G. repeatedly attacked, insulted, and accused parent R.M. of causing M. harm by "making false reports," even though the previous social worker had diligently documented a pattern of severe abuse[260] caused by the half-sibling, who suffered from unmedicated and untreated bipolar disorder. In fact, Defendants ACS knew his mother had neglected to treat his condition for a long time, resulting in M.'s abuse.

---

[260] The former case worker noted in Connections there was an incident where M. was held down by Mother, while half-sibling bit off her toenail with his teeth. It was repeatedly noted that half-sibling had a history of aggression and appeared to be taking it out on his little sister, M..

434.    Defendants ACS know the propaganda they prepare are not *real* CPS investigations, so they choose when to start it and what to say. Likewise, State Defendants, i.e., judges of the family court, who selectively feign ignorance and familiarity with formal and official FCA 1034 report(s), judiciously extend their authority to validate constructive fraud on par with defiance of a court order. Per Judiciary Law §750(A)(3) the court has the authority to punish a person for criminal contempt for willfully disobeying a lawful mandate. "As with any other criminal charge, each element of criminal contempt must be proven beyond a reasonable doubt" (Gouiran Holdings, Inc. v McCormick, 163 AD2d 44 [1st Dept 1990]; see also Usina Costa Pinto, S.A. v. Sanco Sav Co., 174 AD2d 487 [1St Dept 1991]; Rush v Save My Home Corp., 145 AD3d 930 [2nd Dept 2016])."

435.    Defendant ACS likes to control the narrative of any CPS investigation,[261] including the Court's request for a FCA 1034 investigations with a court order, "[a] court of record has power to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced…"[262] After all, this *is not* about child safety or best interest determinations.

436.    For example, in Plaintiff's case, Ref. Matthews ordered Defendants' ACS to clarify various safety and risk-related omissions from the court order for FCA 1034 #1 by issuing a subsequent court order because Defendant ACS does not take orders and does not like being told what to do. They *reclassified* the Court's order as a "Home Study" to evade accountability and grossly negligent oversight, "[i]t is further ordered CPS/COI is reordered to explore and report on the allegations that there is currently a pending Suffolk County indicated case involving this child…[t]he report [is] to include the identified respondent and further details regarding the nature of the allegations involved in domestic in front of the child."[263]

437.    Defendant ACS does not play nice with child protection counterparts from other counties. For example, when given secondary role in multi-jurisdictional cases, Defendants ACS viciously target the other LDSS with false accusations. In June 2019,

---

[261] SOS §422 (2)(a) ("[i]f the records indicate a previous report concerning a subject of the report, the child alleged to be abused or maltreated, a sibling, other children in the household, other persons named in the report or other pertinent information, the appropriate local child protective service shall be immediately notified of the fact.")
[262] Civil Contempt Judiciary Law §753(A).
[263] Navarro-Discovery.

Defendant Rodin blamed the SCDSS for not submitting an FCA 1034 report ("FCA 1034 #3"), when Defendant Alozie admitted he received it on May 31, 2019, "[a] court may issue a Section 1034 order even when a CPS unit in another county will be assigned primary responsibility for the investigation. The SCR's jurisdictional assignment procedures are the same for COIs as for any other type of intake report."[264]

438.    In Plaintiff's case, Defendants' Alozie and Steele received Defendant McGrady's court order for an open SCR investigation, also in May 2019. They grossly neglected to register the court order to evade accountability, such as avoid explaining why they failed to notify the Court. At the return date, Defendant Rodin blamed SCDSS for not submitting a report, "[w]hen two or more LDSSs must address a report, the SCR must assign primary responsibility to one LDSS and secondary responsibility to any other districts involved…[h]owever, whenever there is a joint jurisdictional assignment, it is important to remember that both the primary and secondary CPS units are responsible for the safety and protection of all the children in the report."[265]

439.    Defendant ACS intentionally frustrated the custody litigation for R.R. (3) by submitting several false, fraudulent, fabricated FCA 1034 reports with inflammatory, humiliating, insulting, and emotionally distressing information, directly aimed at Plaintiff to redirect the Court's focus away from their themselves. Further, Defendant Steele's hatred for Plaintiff is portrayed in her case notes from Connections, where she blames Plaintiff for the Court ordering FCA 1034 investigations and COI's. The aforesaid were ordered because Defendant Ruci had pending criminal court charges for acts of domestic violence in front of R.R. (3). Clearly, Defendant Steele's victim-blaming, victim-shaming case note entries in Connections, representing Defendants ACS disdain for Nicholson v. Scoppetta, were conveniently missed by Defendant Poole's due diligence exercises.

440.    The Municipal Enterprises' scheme also involves intentional delays for submissions and/or responses related to legal proceedings, where the delays are deceptive stratagems to collaterally attack allegations, accusations, and complaints made against Defendants' ACS, who want additional time to prepare offering false instruments of filing, replete with including but not limited to perjury, suborned perjury, fabricating records,

---

[264] 19-OCFS-LCM-05
[265] Office of Children and Family Services, Child Protective Services Manual 2020.

documents, files, case notes, altering and tampering with court records, witness tampering, and witness intimidation, to bolster their legal arguments.

441.    In Plaintiff's case, the following are some examples:

a. False instrument of filing on docket NN-17995-19 dated 8/30/2019 was created with suborned perjury from Defendant Alozie, who closed SCR investigations made by mandated reporters for bruises and marks on R.R. (3), withheld court orders for FCA 1034 investigations from SCDSS, and admitted the neglect case was based on Defendant Kaplan's hearsay on 8/26/2019.[266]

b. Discovery consisting of 368 pages of, inter alia, backdated case notes entries, hand drawn borders, crooked headings, retroactive CPS investigations, chronologically asymmetrical purported managerial reviews, malignant and discriminatory supervisory comments.[267]

c. To replace 12 false instruments of filing with Defendant Galchus's OTSC dated 10/08/2019 as the underlying action, Defendant Rodin fabricated 2 sets of 5 Orders to Show Cause dated 1/25/2021 and 2 "restore to calendar" motions to replace the originals from 7:09 am and 7:10 am.

442.    That aforesaid tactics were also shamelessly and unscrupulously utilized by Defendants ACS against AG James is true, "[o]n or about April 1, 2015, the Office of the Public Advocate sent a letter to ACS threatening legal action if they did not comply with the data request and also requested access to ACS's Legal Tracking System in order to investigate constituent complaints concerning significant delays and inefficiencies occurring in Family Court proceedings in which ACS is involved. Following this correspondence, ACS provided Scorecard evaluations, but did not provide the underlying data used to produce them, or the other requested information."[268]

443.    Defendants ACS use racketeering to conceal incriminating gross misconduct, and to evade any accountability related to it by leveraging their power over the family courts in exchange for exculpatory favors. When Plaintiff Parents refuse to provide Defendants ACS with any of their unlawful requests, the latter retaliates by offering false instruments of filing under FCA Article 10, for example, to extort parental compliance under threat of intentionally cruel and unusual protracted family court proceedings that

---

[266] 18 U.S.C. §§1512 Tampering With a Witness, Victim, or Informant and 1513 Retaliating Against a Witness, Victim, or Informant.

[267] 3/26/2021 - 2 attachments from Muna Yve Heaven sent via e-mail; 18 USC 2318 [b] Counterfeit Documentation or Packaging (These are supposed to be computer printouts from Connections but the borders in both reports were clearly drawn by marker. The alignment is completely off, the linear border lines are slanted. The label at top right corner is crooked, or off-center. There are manually entered FCA 1034 reports without Intake Stage ID's and missing dates.)

[268] *See* Elisa W. v. City of N.Y., No. 15 CV 5273-LTS-HBP (S.D.N.Y. Sep. 12, 2016).

result in the termination of parental rights due to the prolonged sequestration of the child.[269]

444.    In the alternative, when Plaintiff Parents' hold out, such as Plaintiff, and parents' Cibelli, Jagnarain, and R.M. have done, Defendants ACS utilize other tactics, such as recruiting and suborning perjury from family members or relatives, friends, police officers, social workers, attorneys for the child, case workers and others to assist with executing forms of character assassination, attacking a parent's credibility for refusing to hide child abuse or reporting misconduct, and/or chastising a parent's unwillingness to participate in the commercialization of his/her child for refusing to comply with ransom demands.[270]

445.    For example, Plaintiff's repeated refusal to both partake in money laundering and the Kidnapping Scheme of R.R. (3) and L.N. (6), jurisdiction of which was taken by force through various forms of fraud, resulted in Defendant Blond's concocted accusation that Plaintiff was refusing to see R.R. (3) on June 11, 2021. Although Defendant Blond knew, or should have known, about the dismissal order, her participation is financed under void and invalid docket numbers on false instruments of filing under file number 180803. On May 4, 2020, a week after Plaintiff reported R.R.'s (3) abduction to law enforcement, Defendant Blond lied about sending an e-mail to notify Plaintiff of Defendant Ruci's plan to travel to Albania, in the middle of worldwide travel bans imposed by the COVID-19 pandemic, when the only travel permitted was for repatriation.

446.    Defendant Blond never sent an e-mail to Plaintiff because she did not have Plaintiff's e-mail address nor was the purported e-mail produced as evidence of notice. Defendant Blond's deliberate lie was done to misrepresent notice to Plaintiff and obstruct a police investigation. On May 26, 2020, Defendant Blond wrote, "I do," in an e-mail from Defendant Rodin, which included a copy of a void and invalid TOC for R.R. (3), issued on Plaintiff's dismissed docket number V-05120-19 dated March 9, 2020, to obstruct the FBI investigation of international abduction. Therefore, Defendant Blond is interfering with Plaintiff's right to maintain familial association with R.R. (3) in retaliation after being

---

[269] 18 U.S.C. §1951 Interference with Commerce by Threats or Violence.
[270] *Id.*; 18 U.S.C. §§1512 and 1513.

called out for deliberate obstruction of justice, pursuant to 18 U.S.C. §1503, under color of law.[271]

447.    Further, City and State Defendants unscrupulously falsely accuse Plaintiff Parents of "noncompliance" for refusing "to engage in services or programs" or refusing to "accept referrals to services or programs" to extort them for money to pay for services and programs that Defendants' ACS are legally required to pay for, in the first place.

448.    For example, Defendants' Alozie and Steele approved Plaintiff's psychological evaluation provider. In October 2019, Defendants' Alozie and Best rejected the psychological evaluation, "ACS only accepts evaluations from our own doctors", as in *their* preferred psychologist. Their preferred provider was Dr. Miller, from Mental Health Services Office at QFC because they controlled him. Plaintiff agreed to do the evaluation and scheduled the appointment. Plaintiff was repeatedly told by Defendant Alozie that doing these things would speed up R.R.'s (3) return – he lied. The evaluation was both a misappropriation of taxpayer's money and Plaintiff's time. On the one hand, Defendant Shulman intended to use the Mental Health Order ("MHO") to substitute Dr. Samantha Stehle's ("Stehle") report from August 26, 2019 ("Stehle's Report"), which she and Defendants' Galchus, Ruci, Rodin, Kaplan, wanted to conceal.

449.    On the other hand, it supplanted the July 2019 Forensic Order ("Forensic Order") issued by Defendant McGrady as a retroactive record for R.R.'s (3) removal from Plaintiff's custody. Defendant Shulman was not authorized to terminate a co-Justices' orders, since Defendant McGrady had no jurisdiction absent signed consent. Thus, aforesaid Defendants never intended Dr. Miller's report to serve as an evaluation of Plaintiff's fitness because it was Defendant Alozie who made the false allegations of mental illness to the SCR and Defendant Kaplan used hearsay from a non-expert, unverified individual suffering from white supremacy.

---

[271] *See Former Brooklyn Assemblywoman Sentenced to Prison for Multiple Fraud Schemes and Witness Tampering* ("Pamela Harris…held responsible for stealing tens of thousands of dollars in government funds set aside for underserved children and funds allocated for victims of Hurricane Sandy…lying and presenting fraudulent documents to the FBI when her crimes were uncovered.") https://www.justice.gov/usao-edny/pr/former-brooklyn-assemblywoman-sentenced-prison-multiple-fraud-schemes-and-witness; *see Former New York State Senator and Putnam County Executive-Elect Pleads Guilty to Obstruction of Justice and Tax Charges* ("Sampson was also convicted of two counts of making false statements to agents of the Federal Bureau Investigation.") https://www.justice.gov/usao-edny/pr/former-new-york-state-senator-john-l-sampson-sentenced-5-years-obstruction-justice-and

450.    Defendant Alozie is not authorized to practice medicine or make diagnoses; he is a mandated reporter who made the Anonymous Report to hide his involvement with forged signatures on CPS investigations.[272] Instead, Defendants' Ruci, Kaplan, Rodin, Galchus, McGrady, and Shulman conspired to conceal Stehle's incriminating report: Defendant Ruci failed to go to his scheduled appointment. Further, Plaintiff met with Stehle, and there is every reason to presume Stehle's Report was destroyed, concealed, or removed because it was favorable and discredited the unsubstantiated allegations of mental illness. Alternatively, had Stehle's Report questioned Plaintiff's mental fitness, Defendants' McGrady, Rodin, Galchus, Kaplan, and Ruci would have served it up on a silver platter on August 26, 2019.

451.    Dr. Miller's report consisted of hyper-sexualized descriptions of Plaintiff, including but not limited to, her gait, clothing, and appearance on December 3, 2019, whereas the rest was insight into a sexually frustrated man that cherry picks specific overly sexual questions from a questionnaire.[273] Without prompting, he said Defendant Shulman "personally vetted" all the documents he was given to use in the evaluation.[274] Dr. Miller also said the other attorneys, i.e., Defendants' Galchus, Naughton, and Kaplan also "vetted" the records. Interestingly, during the evaluation, he repeatedly called Defendant Shulman "my boss" and "I don't want to upset my boss."

452.    Although Defendant Naughton obtained the report on December 17, 2019, Defendant Clarry waited until January 9, 2020, to falsely allege "new evidence" was uncovered. Other than Defendant Shulman's threat, in open court, to extort Plaintiff for money to pay for private counsel or else Defendant Galchus will get a copy of the report, nothing more has ever been said about Dr. Miller's evaluation. Interestingly, in February 2021, Defendant Peebles sent an e-mail demanding Plaintiff pay for another evaluation and included a list of providers. Plaintiff responded to Defendant Peebles' uninformed referral because the latter knew about Dr. Miller's report and falsely claimed, "[e]fforts to engage the respondent mother in services has been unsuccessful. She has refused service referrals

---

[272] NY Penal Law §240.55 (3) (falsely reporting an incident in the second degree)] in regard to such report; or (ii) the subject of the report presents clear and convincing evidence that affirmatively refutes the allegation of abuse or maltreatment; provided however, that the absence of credible evidence supporting the allegation of abuse or maltreatment shall not be the sole basis to expunge the report" (Social Services Law § 422 [5] [c]; see L 2000, ch 555).

[273] Dr. Miller told Plaintiff the Missouri Questionnaire, "is not going in my report, it's for internal purposes only."

[274] The Mental Health Order listed COI's and petitions as the records used for the evaluation but the box was not checked off; the July 2019 Forensic Order focused on 2 SCR reports, including 2 FCA 1034 reports, and Ruci's criminal court charges..

and refused to sign a HIPAA for release of information"[275] in the same proceeding on 10/26/2020.

453.    In October 2019, Defendant Alozie tried to coerce Plaintiff into signing blank HIPAA forms and made a spectacle on the 3rd floor waiting area at QFC. Defendant Alozie got angry because Plaintiff reminded him of the signed HIPAA form from September 2019 already in his possession. Plaintiff also reminded Defendant Alozie that he never utilized it. It should be noted that Defendant Alozie brought several blank HIPAA forms, intending to coerce Plaintiff to sign them, including by making false accusations against Plaintiff. For example, Defendant Alozie accused Plaintiff of grabbing papers out of his hand and was called out by Soffer who was there when no such thing occurred.

454.    Apparently, Defendant Alozie forgot the purported incident occurred while Soffer was speaking to him. Defendant Alozie made the accusation to avoid answering questions about his need or use of signed blank HIPAA forms. Defendant Alozie wanted to use these forms to facilitate a fishing expedition under false pretenses, "I don't know what I am going to need, so just leave that part blank and sign it." Defendant Alozie did not want Plaintiff to fill in any section of the HIPAA form and pretended not to know what records he needed. Defendant Alozie's attempts were so specious that a bystander intervened, identified herself as a social worker and scolded him for lying to get blank signed HIPAA forms from Plaintiff.

455.    Another example of this occurs was published in The Imprint in 2019, "[ACS] said they wanted me to take more urine tests [for marijuana] — to adjust my schedule with my three children, to take more tests than I was already taking. I told them no, and asked to speak to a supervisor," the council heard from Ray Watson, a parent leader for Rise Magazine, a publication written for and by parents involved in the child welfare system. "I caught my initial ACS case in 2007. It took me 10 years to learn what I did and didn't have to comply with. This is information that should have been given to me the same way police 'mirandize' people when they arrest them."[276]

456.    Defendants' ACS submit, utilize, and rely on knowingly false, fabricated, fraudulent information to execute, sustain, and finance unlawful severance of familial

---

[275] That information was submitted in an unregistered FCA 1034 report, included as Exhibit C in Lisa Rodin's for the sham proceeding on 10/26/2020.
[276] The Imprint, *New York City Debates Lawyering Up Parents Early in Child Safety Investigations* (10/31/2019).

associations between parent and child in a premeditated conspiracy to sequester a minor for amoral purposes, thereby causing and facilitating an industry within the family courts that commercializes child safety, "[w]hoever knowingly provides or obtains the labor or services of a person--

    (1)  by threats of serious harm to, or physical restraint against, that person or another person;

    (2)  by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

    (3)  by means of the abuse or threatened abuse of law or the legal process shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both."[277]

    457.   A component of the Municipal Enterprise involves weaponizing familiarity, access, and control over the SCR by registering anonymous false reports against unsuspecting parents because they have a longstanding deplorable track record for child safety, "…[i]f the report involves either (i) an allegation of an abused child described in paragraph (i), (ii) or (iii) of subdivision (e) of section one thousand twelve of the family court act… (ii) suspected maltreatment which alleges any physical harm when the report is made by a person required to report pursuant to section four hundred thirteen of this title within six months of any other two reports that were indicated, or may still be pending, involving the same child, sibling, or other children in the household or the subject of the report, the office of children and family services shall identify the report as such and note any prior reports when transmitting the report to the local child protective services for investigation."[278]

    458.   Defendants' OCFS manage, control, and maintain the SCR as well as employ the operators in the call center, who take in the reports of suspected abuse and neglect, "Dannhauser, the CEO of the foster care agency Graham Windham, called it

---

[277] 18 U.S.C. §1589.
[278] SOS §422 [2][a]; 18 U.S.C. §1952.

"astonishing" how easily anonymous callers can send the government into someone's home and agreed statewide changes to reporting laws may be needed."[279] The operators are required to assess the information in the reports to determine if it rises to the level of suspected abuse or neglect, a process that also includes assessing court orders for FCA 1034 investigations and COI's. In the Discovery Plaintiff received from Defendant Heaven, there is evidence that Defendant Alozie used the State's paid for cell phone to make the anonymous call. Unlike the other source-revealing information that was left unredacted, the source specific voicemail message was excluded from the case notes by Defendants ACS.

459.    As the recordkeepers of Plaintiff Parents' children in New York State, Defendants' OCFS have failed to monitor and reign in Defendants' ACS improperly documented, or grossly undocumented, seizures, "CONNECTIONS was developed in response to the provision of federal financial incentives to develop a Statewide Automated Child Welfare Information System (SACWIS) to provide a more efficient and effective administration of child welfare programs and to meet the federal mandate for state collection of a set of foster care and adoption related data elements [the Adoption and Foster Care Analysis and Reporting System (AFCARS)]. CONNECTIONS, in accordance with these mandates, is designed to create a single, statewide, integrated system for the collection and recording of child protective services, preventive services, foster care and adoption services information."[280]

460.    Defendants' OCFS routinely remit directives and legal memorandum, as well as establish policies and guidelines for each of the 58 local district social services, like Defendants' ACS. Defendants' OCFS consistently fail to ensure that Defendants' ACS comply with the aforesaid or take corrective action after their audits, "[w]e found overall that the progress notes contained no evidence that any supervisors noted any case workers' failure to comply with any of the 130 directives mentioned below...[a]ccording to the supervisors we met with concerning these cases, they all agreed that ACS needed a better system for tracking compliance with the directives, expressing concern that the current system, which requires that supervisors read through a case's many progress notes to assess compliance, did leave room for negligence and errors...[o]ur review of the progress notes

---

[279] The Imprint, *New York City Child Welfare Chief Calls For Changes to Mandated Reporting System* (3/15/2021).
[280] 05-OCFS-ADM-02 Office of Children and Family Services Administrative Directive.

revealed that case workers failed to comply with 130 (37 percent) of the supervisory directives."[281]

461.    Defendants' OCFS know that Defendants' ACS hold interrogations called "Child Safety Conferences," where the latter misrepresent their authority under parens patriae as cruel and unusual forms of psychological warfare to inflict intentional emotional distress for the potential loss of a child via, including but not limited to coercion, duress, threats of incarceration, threats of foster care, threats of fabricated charges, and threats to an extended loss of familial association by sequestering the child in exchange for receiving hand-written false self-incriminating confessions from Plaintiff Parents. These so-called "conferences" have also been a point of contention among New York City Council members, [o]ther proposed bills, authored by Manhattan council members Carlina Rivera and Margaret Chin, would require caseworkers to at least disclose to parents their right to an attorney, and other rights, similar to so-called Miranda warnings police must offer criminal suspects."[282]

462.    Refusing to explain what a "CSC" meeting was or what it was for, but to lure Plaintiff to attend, Defendant Alozie called to say, "if you want your son back you must come to the meeting on the 29th." Plaintiff was subjected to hours of forced interrogation at 90-25 161st Street – 3rd floor by Defendants' Alozie, Steele, and Best, who prepared a written false confession for her to sign, a recitation of Defendant Alozie's false anonymous report to the SCR on August 27, 2019 ("Anonymous Report").

463.    The reason Defendants' ACS withhold registering court orders with the SCR and close SCR investigations by making false anonymous reports is to *control the narrative* of the family's history, which requires a blank slate from which to backdate or retroactively record information to misrepresent compliance and corrective action, "[t]he central register shall include but not be limited to the following information: all the information in the written report; a record of the final disposition of the report, including services offered and services accepted; the plan for rehabilitative treatment; the names and identifying data, dates and circumstances of any person requesting or receiving information

---

[281] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[282] The Imprint, *New York City Debates Lawyering Up Parents Early in Child Safety Investigations*, (10/31/2019).

from the register; and any other information which the commissioner believes might be helpful in the furtherance of the purposes of this chapter."[283]

464.    Defendants ACS also cause false reports to the SCR to be made against suspecting parents by third parties, such as police officers and detectives, including identifying themselves as SCR operators to order child welfare checks under false pretenses. For example, ACS worker Shakeyla Whitaker claimed a purported NYPD Detective Perez said, "I am tired of getting calls about this family. I am not taking on any more cases about this family" in an unregistered FCA 1034 report for parent Jagnarain's custody proceeding in Nassau County Family Court. Interestingly, in May 2019, the same phrase was said to Plaintiff by Defendant Alozie, who withheld registering the court order from Ref. McGrady. In June 2020, a purported ECS worker from ACS went to parent Jagnarain's home in Nassau County and falsely stated she was there for a COI ordered by Judge Brantley back in February 2020.

465.    The purported ECS worker also claimed she was there to do an "emergency evaluation" of A.A. (6) on behalf of the "assigned caseworker", David Cameron, from SCDSS. The ACS ECS social worker, identified herself as "Raquel Welch." Only months later, when the aforesaid unregistered FCA 1034 report was submitted to Judge Brantley, did parent Jagnarain learn of "Shakeyla Whitaker's" name because that is who prepared the report. Interestingly, parent Jagnarain's daughter recognized, Shakeyla Whitaker, the misidentified ACS ECS social worker, as "the lady who came to the house that time." Like Plaintiff, parent Jagnarain was repeatedly falsely accused of making numerous false police reports A.A.'s (6) father in custody proceedings. And, just like Plaintiff, proof of the false police reports was never provided to the Court to substantiate the allegations, yet custody determinations were made based on uncorroborated hearsay.

466.    Every time the SCR registers a report with allegations of suspected child abuse or neglect, a history of the family dynamics is created, recorded, and documented, which can assist in determining whether the state can intervene through its courts, "[o]nce the case is assigned to the borough office for investigation, the supervisor reviews the allegation, along with any prior intake reports and investigations pertaining to the family (if

---

[283] SOS §422 [3].

applicable), and schedules a pre-investigation conference with the case worker to review the case details and develop a preliminary investigation plan."[284] Defendants ACS are weaponizing the SCR to target parents in cases already assigned to them as a result of CPS investigations ordered by the Court.

467.    The reason unfounded reports remain in the registry is, in the event of the death of a child, for example, any previously reported information can assist with uncovering the perpetrator based a pattern of previous allegations. Likewise, a pattern of unexplained marks and bruises on a child that cannot walk, reported by mandated reporters for R. R. (3), was grossly ignored by Defendants ACS to protect Defendant Ruci. In fact, according to the records Plaintiff obtained from a FOIA request in 2019, Defendants ACS were not only ignoring the persistent reports, but creating new cases under Plaintiff's name for the open SCR reports against Defendant Ruci to redirect the jurisdiction to Suffolk County. By re-directing the jurisdiction, Defendants ACS were manipulating the SCR to change the subject of the report to Plaintiff, when the injuries occurred while R.R. (3) was in Defendant Ruci's care. As such, they were knowingly concealing child abuse.

468.    In a recent publication, Defendant Hansell misrepresented his knowledge of the steady decline in SCR report numbers as independent of reports of suspected abuse or neglect issued by court orders from family court proceedings, such as FCA 1034 investigations and COI's to misinform the public about Defendants ACS mishandling of SCR reports from mandated reporters, "I'm happy to say we really haven't seen any indicators" of an increase in undetected child abuse, Commissioner of the Administration for Children's Services David Hansell told the City Council. As evidence, he cited the lack of any "significant changes" in emergency room usage citywide, which "you think would happen if there were more children suffering any kind of serious physical abuse."[285] Plaintiff and parent Jagnarain are proof that Defendants ACS routinely reject SCR investigations made by mandated reporters in the medical field.

469.    Take, for example, the reported concerns of suppressed domestic violence and child abuse reporting from last year due to the pandemic lockdowns in New York. Various media outlets, including The Imprint, reported the numbers of suspected abuse

---

[284] New York City Comptroller Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[285] The Imprint, *No Evidence of Pandemic Child Abuse Surge in NYC* (6/15/2021).

declined whereas, the number of family court proceedings for family offenses and child protective proceedings increased. There should be an analogous relationship between SCR reports and child protective proceedings: if one goes up, so should the other. Family Court Judges are required to order updates from social workers and case workers in the form of COI's for children involved in child protective proceedings, children under court and/or ACS supervision, and children in foster care or kinship guardianship, etc., "[s]ection 1034 of the FCA authorizes Family Court judges to issue a court order for the child protective services (CPS) unit of the appropriate LDSS to conduct a child protective investigation, as described by the Social Services Law (SSL), and report its findings to the court."[286]

470.    Family Court Judges also order COI's when a family offense proceeding is filed and there is a child involved, "[s]uch order may be granted whenever there is a matter pending before the Family Court judge or to determine whether an Article 10 proceeding should be initiated…[o]nly a judge authorized to preside over an Article 10 proceeding may order a CPS investigation under Section 1034 of the FCA…[t]his includes Family Court judges, referees who are acting as Family Court judges (a Family Court referee or a Family Court hearing examiner), and Supreme Court judges when a Supreme Court has decided to accept jurisdiction over a proceeding under the FCA…[o]therwise, the Supreme Court does not have the authority to order a CPS investigation."[287]

471.    These situations should increase the numbers of SCR reports based on the increase of family court child protective proceedings because the family court has no other way of knowing if a child has been abused or neglected, "[f]or the next 60 days, Washington said, the city's Administration for Children's Services investigated "intimate details of my life, my community care network – anyone that supported me and my family, ACS was at their door asking questions about my mothering and my motherhood."[288] Yet, it was claimed, the number of SCR reports decreased by a whopping 54% during the lockdowns.

472.    However, "[r]eports of serious physical abuse over several months last spring were down 60%, with an even higher percentage deemed "unfounded."[289] That

---

[286] 19-OCFS-LCM-05
[287] Id.
[288] The Imprint, *New York Child Welfare Chief Calls For Changes to Mandated Reporting System* (3/15/2021).
[289] The Imprint, *No Evidence of Pandemic Child Abuse Surge in New York City, But Some See Other Crises For Child Welfare System* (6/15/2021).

number includes Plaintiff's report to the SCR on April 27, 2020, to report that a child, purportedly under "ACS supervision," was taken out of the United States by Defendant Ruci on April 25, 2020, using an Albanian passport, with no return flight scheduled, which Defendants ACS grossly neglected to report to the SCR as an international kidnapping to a non-extradition country. In fact, Defendants ACS ignored the purported "not pre-planned" trip to continue collecting payments for the money laundering front on docket NN-17995-19 for R.R. (3). Plaintiff's report to the SCR for R.R.'s (3) abduction, for which a corresponding FSS case was open, should have been flagged by the internal guidelines Defendant Poole purportedly has in place – it was not.

473.    The heightened standard for establishing municipal liability for Defendants ACS actions, and those in relation thereto, states, "[t]o hold a city liable under §1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (Spencer v. Ellsworth, 2011 U.S. Dist. LEXIS 49984 [S.D.NY 2011]). "To state a viable claim of municipal liability under 42 U.S.C. §1983, a plaintiff must plausibly allege that the violation of his constitutional rights was caused by an official policy or custom of the municipality." (Bennett v. City of New York, 2011 U.S. App. LEXIS 14029 [2d Cir. 2011]). Municipal governments such as the City of New York, may be sued only for unconstitutional or illegal policies, not for the illegal acts of their employees."[290]

474.    That the aforesaid actions by City and State Defendants constitutes a deliberate indifference for a pattern of unconstitutional conduct by Defendants and a deliberate indifference to the rights and safety of U.S. citizens and citizens of the State of New York[][,] entitle Plaintiffs to recover damages from the City under 42 U.S.C. §1983 and pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978).[291] Plaintiff reported the illegal actions of Defendants ACS to the ombudsmen and a confirmation letter of the filed complaint was sent via e-mail but nothing was done. In fact, Plaintiff was told in October 2020 that the complaint was given to the ACS Director Robin Church ("Church"), who closed the investigation. Not only was Plaintiff not sent a letter regarding

---

[290] See Pilcher v City of New York, 68 Misc.3d 1211(A) (2020), citing Monell v. Department of Social Services, 436 U.S. 658 (1978).
[291] Id.

the closure of the complaint, but the ombudsmen stated that Church claimed to have contacted Plaintiff prior to closing the investigation. Church lied.

475.    Furthermore, based on the various audit reports by the New York City Comptroller regarding the deplorable, and excoriating gross failures to document, to follow their own policies, and guidelines, let alone the policies and guidelines instituted by Defendant OCFS, the City was aware of, on notice of, and was deliberately indifferent to Defendants ACS gross negligence, despite numerous recommendations to address and implement corrective action. More importantly, despite the aforesaid, Defendants ACS were consistently held unaccountable, when compared to the Department of Correction, who made it onto the New York City Comptroller's Watch List in 2018, "[t]he Agency Watch List spotlights city agencies that raise the most budgetary concerns due to rapidly increased spending and meager measurable results."[292]

476.    Plaintiffs are not stating that Defendant OCFS's actions were consistent with policies and customs of the State, because there were policies and guidelines in place. The problem is the State does not enforce its equal protection laws to protect its citizens from unwarranted seizures and intrusion. For example, Defendants ACS admitted there were policies and guidelines during their various audits but consistently and grossly neglected to follow them, which was clearly reflected in the reports. Since these reports are conducted by the New York City Controller and published, the City knew for years about Defendants ACS gross negligence, and it was deliberately indifferent to unconstitutional patterns and practices by Defendants ACS. For example, in 2001, the same year Defendants ACS were voted in by the people of the City of New York, members of the New York City Council put forth a request to have a Special Federal Prosecutor investigate Defendants ACS and the family courts for 4th, 5th, 6th, and 14th Amendment violations.

477.    Despite auditors uncovering lacking, insufficient, inadequate records and documentation in Connections, attorneys for Defendant Poole offered casual indifferent responses to the effect that, Defendant OCFS's responsibility to monitor and enforce Defendants ACS compliance with State and Federal laws ended when cases are handed off to family court judges. Despite inadequate document serving as proof of ongoing constitutional violations, Defendant Poole accepted federal grants related to Defendants

---

[292] FY 2022 Agency Watch List, Department of Correction.

ACS unlawful seizures, "[i]ndeed, the defendant could have returned the checks to AMPI, or destroyed them, or never caused their delivery to the advertising agency, or even recalled them after Lennen & Newell had physically received them, in which event no crime would have been committed since the final element of the crime would have been lacking. The receipt or acceptance of the contribution occurred when the checks were deposited in New York in payment of a Humphrey campaign bill. The offense occurred in this district and venue was proper."[293]

478.    Defendant Poole's responses are intended to justify the lack of information constituting warrantless kidnapping of Plaintiffs' children based on incomplete and/or non-existent proof of "imminent risk" or actual risk in Connections. If the Judges in family court do not have physical proof to either sustain a child protective proceeding or sever a parent's right to maintain familial association with his/her child(ren), then they are acting outside of all jurisdiction, and the law when, in their official capacity, issue orders that do.

479.    For example, in an audit for the certification process for foster parents, the auditors found, "…that ACS has no process in place to independently verify that its contracted foster care providers are properly certifying prospective foster care families in accordance with City and State requirements prior to their issuance of certifications and the placement of children with foster families…[w]e found that, when using ACS's audit methodology, 9 (24 percent) of the 37 homes that ACS found to be compliant with City and State certification requirements during its audits were in fact not compliant because they lacked the requirements for certification."[294]

480.    Another example, in an audit report for adoption subsidies the auditors reported, "…ACS relies solely on death notifications it may or may not receive from the family or a friend of the deceased person or from an OCFS death match report. ACS' passive reliance on these external sources appears insufficient to prevent improper payments from continuing after the named payee or beneficiary dies… [a]t the May 25 [2021] exit conference, ACS officials informed us generally that ACS had made efforts to investigate our findings and stated that ACS had determined that an unspecified number of adoptive parents referenced in our findings may be alive. We asked ACS for supporting

---

[293] *See* United States v. Chestnut, 399 F. Supp. 1292 (SDNY 1975).
[294] Audit Report On the Oversight of The Administration For Children's Services' Certification Process For Foster Parents (5/03/2019).

documentation. However, none of the information we received in response to that request contained information about any of the 42 persons we provisionally identified as deceased in this finding of our audit."[295]

481.    In an audit report for the Close to Home Program for Non-Secure placement of alleged juvenile delinquents the auditors found, "ACS does not have any written policies or procedures for the oversight and monitoring of the CTH NSP providers and their programs…[h]owever, ACS' audit-related acknowledgment of and explanation for its failure to have written CTH program policies and procedures stands in stark contrast to earlier statements ACS made to the Comptroller's Office…[s]pecifically, in its Calendar Year 2014 annual Directive #1 Financial Integrity Statement ACS informed the Comptroller's Office that all of its programs are conducted in accordance with clearly defined management policies, and that these policies are properly communicated to the appropriate agency staff, and reflected in formal written operating procedures."[296]

482.    For example, in another audit report for investigations on child abuse and neglect allegations the auditors found, "[a]ccording to ACS' policy, "Division of Child Protection staff are required to document all caserelated events in CNNX within 5 business days of such events." The policy also states that, "Specific time frames for recording entries in Connections (CNNX) guide and support good case practice by assuring recall of case actions and assessments, continuity of work done with the case, and ongoing maintenance of CNNX records." Progress notes are an integral investigative tool that allow the case worker to capture critical information for making a case determination and that allow the supervisor to review the investigation status to assess its progress…[o]ur review of 25 sampled cases consisted of 580 progress notes, of which 119 (21%) notes— pertaining to 24 of the 25 cases—had late CNNX entries, one 37 days late. The late entries raise further concerns because none of the case workers investigating these 24 cases had any notebook entries corresponding to these progress notes, meaning that the case workers relied solely on memory when recording the details into CNNX. The progress notes

---

[295] Audit Report on the Administration for Children's Services Controls over Adoption Subsidies (6/03/2021).
[296] Audit Report on the Oversight of the Close to Home Program Non-Secure Placement by the New York City Administration for Children's Services (6/16/2016).

contained evidence of supervisory reminders to record entries in a timelier manner for only 33 (28 percent) of the 119 cases with late entries."[297]

483.    Defendant Poole is not overseeing the State's child welfare, social services, or child protection system. Rather, Defendant Poole is enforcing the State's commercialization of children through the family courts because she does not have records of child abuse warranting interference, severance, or intrusion of familial association. If Defendant Poole had this information in Connections, then the auditors would have noted it in their various reports. What has been permitted to occur is an implied policy from the State, which dictates it has more right to a child than his or her own parent. That policy is being enforced through the family courts, where the Judges have no proof that a child(ren) should be removed from his or her own home but enables sequestrations under color of law. These constitutional violations are rampant in New York City, where the Mayor has been speciously appointing former ACS attorneys to the family courts as judges and referees.

484.    Defendants' ACS, Shulman, Wisler, Galchus, Ruci, Blond, and Kelly employed the United States Postal Service ("USPS") to initiate and carry out schemes for the Municipal Enterprise, due to repeated submissions of false instruments of filing in UCMS, including the fraudulent support orders with forged signatures of a Magistrate. Defendants' Alozie and Steele initiated the scheme against Plaintiff via USPS by mailing fraudulent documents to both establish funding for the Kidnapping Scheme of R.R. (3) by defrauding the federal government and set up the money laundering front in the Part 14. (Exhibit A #'s 1-3).

485.    Another example in Plaintiff's case, where Defendants ACS employed the USPS for racketeering, such as sustaining the 18B money laundering scheme, whereby Defendant Judge Shulman was extorting Plaintiff for money to pay for legal representation for the false instrument of filing on docket NN-17995-19, was submitted as the underlying action in other false instruments of filing under various articles of the FCA. These fraudulent documents were remitted by both mail and e-mail, which was triggered each

---

[297] Audit Report on the Administration for Children's Services Controls Over Its Investigation of Child Abuse and Neglect Allegations (6/15/2016).

time Defendants made manual entries into the court's computers and UCMS.[298] (Exhibit A #'s 4 - 21)

486.    In addition, the fraudulent support letters mailed to Plaintiff's home correspond to 5 fraudulent orders with Magistrate Grey-Humphreys forged signature, which she confirmed were "fraudulent orders" on April 29, 2021, in front of Defendants Gildin and Ruci. In fact, the underlying false instruments of filing on docket numbers F-04656-20 and F-05491-19, dated February 28, 2020, were fabricated in Defendant Shulman's courtroom on February 28, 2020.

487.    On March 26, 2021, with Defendant Shulman's blessing, Defendants' Rodin and McFarlane attempted to speciously serve Plaintiff 2 Support Orders on Default, which they called "The Father's Affidavit" and claimed to have e-mailed it earlier that day. Defendant Rodin said, "I will send it again" as everyone else remained silent about not having received "The Father's Affidavit." Immediately, Plaintiff received 1 e-mail from "@secure File:180803" with 2 attachments, i.e.,

   a. Attachment #1: "Order Terminating an Order of Support on Default" on docket number "F-05491-19/20B" for Case ID number PB37270Z1 dated 3/17/2021 at the top, "March 19, 2021" at the bottom and electronically signed on "20210322."

   b. Attachment #2: "Findings of Fact" on docket number "F-05419-19/20B" for Case ID number PB37270Z1 dated 3/17/2021 at the bottom and electronically signed on "20210317."

488.    On 4/29/2021, Magistrate Grey-Humphreys confirmed the 2 Support Orders on Default sent to Plaintiff on March 26, 2021, as "The Father's Affidavit," and the August support order, sent by mail, were "fraudulent orders." And yet, Plaintiff continues to receive mail from CSPC for Defendants' Shulman and Rodin's fraudulent orders.

489.    Defendant Shulman was, and is, extorting Plaintiff for money to pay for private counsel, when the latter qualifies for assigned counsel, "[i]n 1972, the New York State Court of Appeals ruled that "an indigent parent, faced with the loss of a child's society, as well as the possibility of criminal charges is entitled to the assistance of counsel." *In Re Ella B.*, 30 N.Y.2d 352 (1972). Emphasizing that parents have a

---

[298] *See* U.S. v Hussain, 19-10168 (9th Cir. 2020) (holding, "[t]he Second Circuit also evaluated § 1343 under the Morrison framework and similarly concluded that "the regulated conduct is not merely a 'scheme to defraud,' but more precisely the use of the . . . wires in furtherance of a scheme to defraud." Bascuñán v. Elsaca, 927 F.3d 108, 122 (2d Cir. 2019); see also United States v. Napout, 963 F.3d 163, 179 (2d Cir. 2020)."

constitutional right to the care and custody of their children, the Court noted the "gross inherent imbalance of experience and expertise" between the State and unrepresented parents…[t]he Court explained that "it is fundamentally unfair, and a denial of due process of law for the state to seek removal of the child from an indigent parent without according that parent the right to the assistance of court-appointed and compensated counsel." Moreover, the Court declared, failure to provide the parent with a lawyer would constitute not only a violation of due process but, "in light of the express statutory provision for legal representation for those who can afford it, a denial of equal protection of the laws as well."

490.    Had the false instrument of filing been for a valid, legitimate proceeding and not part of a money laundering scheme, Plaintiff was entitled to "Mandated Representation – Legal representation of any person financially unable to obtain counsel without substantial hardship who is (1) accused of an offense punishable by incarceration; (2) entitled to representation under §262 or §1120 of the Family Court Act, Article 6-C of the Correction Law, §407 of the Surrogate's Court Procedure Act, §259-i of the Executive Law or §717 of the County Law; or (3) otherwise entitled to counsel pursuant to constitutional, statutory or other authority."[299]

491.    Unbeknownst to Plaintiff, assigned counsel was being denied by Defendant Shulman because the city and state County 18B funds were being funneled to pay Defendant Galchus's legal fees to represent Defendant Ruci for the money laundering front via Plaintiff's docket number V-05120-19/19C."[300]

492.    For example, on October 8, 2019, Defendant Shulman authorized, i.e., signed, Defendant Galchus's OTSC to "restore" Plaintiff's petition on docket numbers V-05120-19, 19B, dismissed on September 4, 2019, even though Plaintiff previously filed in SFC on October 1, 2019, "…(1) restoring the custody petitions (Dockets V-05120/19, V-05120-19/19B, **V-05120-19, 19C**, V-20987-18, and V-20987-18/19B) which the parties had previously filed before the neglect petition against the mother, and which were dismissed in Part 16 on September 4, 2019."[301] Defendant Shulman restored terminated

---

[299] NYSBA Standards for Providing Mandated Representation.
[300] *See* Former State Senator "Maziarz pleaded guilty to Offering of a False Instrument for Filing in the Second Degree, related to a pass-through scheme in which he used money from his campaign committee to funnel secret campaign payments to a former Senate staffer, Glen Aronow, who had left government service amid charges of sexual harassment.") https://ag.ny.gov/press-release/2018/ag-schneiderman-announces-guilty-plea-and-admission-former-state-senator-georgeoo
[301] Galchus Order to Show Cause (10/08/2019).

dockets but never issued an order establishing the Court's granting of Defendants' Galchus and Ruci's OTSC dated October 8, 2019 because the default was intentional and in commission of fraud.[302]

493.    Included in the OTSC dated October 8, 2019, was Plaintiff's supplementary docket number V-05120-19/19C, previously assigned to an Emergency OTSC filed on May 31, 2019, and speciously misrepresented by Defendant Galchus as having been *erroneously dismissed* on September 4, 2019. In fact, it was not pending in the Part 40, or elsewhere, since June 13, 2019, "[d]ouble billing is not permitted. If an attorney is present in court to represent more than one client, the total time must be apportioned among the cases to reflect the actual time spent representing each client. Double billed time will be reduced by the Payment staff. The online system warns the attorney if there is double billing."[303]

494.    Prior to October 1, 2019, Plaintiff did not know the August TOC/V existed. Defendants' Galchus and Kaplan wanted to restore it or there would not be an underlying case to get paid on for their 18B vouchers, "[i]n order to receive payment, attorneys must provide the date on which the services were rendered[,] and the time expended on each activity...[t]he time the billable activity began and ended must be accurate to the nearest five minutes."[304]

495.    The August TOC/V terminated upon entry of the dismissal order. Aforesaid Defendants, including Defendants' Alozie, Steele, Tingue, Rodin, Wisler, and Shulman, conspired to speciously remove pending dockets from assigned Judge Anne-Marie Jolly, then, tried to circumvent jurisdiction by "restoring" terminated dockets on default more than 30 days after its entry. As such, "...consistent with the federal offenses of bribery and gratuities under 18 U.S.C. §201 (*see* 9 U.S.A.M. §§ 85.101 through 85.105), where the corpus of the corrupt payment inures to the benefit of a person or entity other than the public official most courts have also required proof of a quid pro quo understanding between the private corrupter and the public official." [305]

---

[302] *See* Original Appalachian Artworks, Inc. v. Yuil Int'l Trading Corp. 105 F.R.D. 113, 116 (S.D.N.Y. 1985).
[303] New York City Department of Finance (DOF), Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments.
[304] *Id.* at 14.
[305] *See* United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir.), cert. denied, 469 U.S. 1072 (1984) ("a Hobbs Act prosecution is not defeated simply because the extorter transmitted the extorted money to a third party."); United States v. Margiotta, 688 F.2d 108 (2d Cir. 1982), cert. denied, 461 U.S. 913 (1983) (insurance agency made kickbacks to brokers selected

496. Defendant Shulman was never given proof of abuse or neglect for R.R. (3) that pointed to Plaintiff. Initially, Defendant Shulman let Defendant Galchus make the opening misrepresentations that Defendant McGrady transferred Plaintiff and Defendant Ruci's "pending neglect case." Defendant McGrady did not have a pending neglect case or custody litigation for or against Plaintiff because she had no jurisdiction to hear and determine without a signed stipulation of consent.

497. Defendants' ACS, Shulman, Kaplan, Rodin, Galchus, and Ruci maliciously and fraudulently misrepresented the loss of jurisdiction at QFC as a "clerical error" because the willful default terminated jurisdiction over Plaintiff and R.R. (3). Defendant Rodin stayed silent as no record of the purported FCA Article 10 petition appeared filed on October 1, 2019. Defendants' Galchus and Ruci created the OTSC #1 as a substitute for the false instrument of filing on docket NN-17995-19 to usurp jurisdiction by fraud, "[w]here the method of procedure in any proceeding in which the family court has jurisdiction is not prescribed by this act, the procedure shall be in accord with rules adopted by the administrative board of the judicial conference or, if none has been adopted, with the provisions of the civil practice act to the extent they are suitable to the proceeding involved. Upon the effective date of the CPLR, where the method of procedure in any proceeding in which the family court has jurisdiction is not prescribed, the provisions of the civil practice law and rules shall apply to the extent that they are appropriate to the proceedings involved."[306]

498. Defendant Galchus *filed* docket NN-17995-19 via OTSC #1, i.e., Motion #1, to fraudulently confer jurisdiction over Plaintiff and R.R. (3) on behalf of his co-conspirators Defendants ACS, to validate the fraud and collect payment, "[i]n order to receive compensation in excess of the set statutory limit, an attorney must complete an online affirmation of "extraordinary circumstances" along with their voucher and submit to ACP. ACP will send voucher to the judge for approval."[307] Further, Defendant Shulman

---

by political leader of town); United States v. Scacchetti, 668 F.2d 643 (2d Cir.), cert. denied, 457 U.S. 1132 (1982); United States v. Forszt, 655 F.2d 101 (7th Cir. 1981); United States v. Cerilli, 603 F.2d 415 (3rd Cir. 1979), cert. denied, 444 U.S. 1043 (1980); United States v. Trotta, 525 F.2d 1096 (2d Cir. 1975), cert. denied, 425 U.S. 971 (1976); United States v. Brennan, 629 F.Supp. 283 (E.D.N.Y.), aff'd, 798 F.2d 581 (2d Cir. 1986). But see McCormick v. United States, 500 U.S. 257 (1991) (allegedly corrupt payment made in the form of a campaign contribution to a third[-]party campaign organization was insufficient to support a Hobbs Act conviction absent evidence of a quid pro quo).
[306] FCA §165 (a) Procedure.
[307] New York City Department of Finance (DOF), Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments.

supported and enabled fraud on the court by directing her Court Attorney, Defendant Aubrey Wisler, to speciously *serve process* for the money laundering front, as an e-mail containing the signed OTSC dated October 8, 2019 and an additional attachment containing the false instrument of filing as a Nunc Pro Tunc CPS Order on docket NN-17995-19. In direct contravention to statutes in the FCA, Defendant Shulman is able to fabricate orders for false instruments of filing that have no record of being entered by the Chief Clerk of Court, who is required to issue summons the same day a petition is filed.

499.    Payments for 18B attorneys cover legal representation for assignment of petitions filed by litigants in the Family Court, not restarting multiple cases via 1 OTSC dated 10/08/2019 on behalf of opposing litigants. During assignment, it is presumed an attorney can be paid for filing motions and OTSC's related to representation. Instead, Defendants' Galchus and Ruci submitted an all-encompassing substitute underlying action to restore multiple dockets that were dismissed on Defendant Ruci's default, including dockets for Plaintiff, who was not Defendant Galchus's client. The purpose of the restore was further misrepresented as a clerical error, "[o]ther non-billable time includes a mere recitation of "open file", "closed file", or "reviewed file" is not permitted…[a]dditionally, "setting up a file"[…]is not permitted…[v]oucher preparation is not compensable…[t]he failure to be specific with individual time records may result in your voucher being returned to you."[308]

500.    Defendant Shulman judicially carried out a scheme to deprive Plaintiff of due process under color of law by misrepresenting the money laundering scheme through self-perpetuated false narratives of "previously determined" rulings that never took place to deny repeated requests for assigned counsel. This was repeatedly done in furtherance of the misappropriated funding to Defendant Galchus and to extort Plaintiff for money to pay private counsel, which Defendant Shulman knew Plaintiff did not have. Defendant Shulman used the extortion to create delays and extended adjournments for the money laundering front long enough for her to fabricate more false instruments of filing and enter them in the court's computer and UCMS,

501.    In fact, "[i]n 1975 the New York State Legislature codified the right to assigned counsel in a range of family law proceedings involving "the infringements of

---

[308] *Id.*

fundamental interests and rights, including the loss of a child's society and the possibility of criminal charges." *N.Y. Family Court Act §261.* Currently, these include cases brought in Family, Surrogate's, and Supreme Court involving child custody and visitation, abuse/neglect, foster care placement and review, termination of parental rights, "destitute child", adoption, paternity, and family offense (domestic violence) proceedings. Additionally, assigned counsel is available to a person charged with contempt of court for violation of a prior court order (including willful violation of a child support order), and persons in any other proceeding in which the judge concludes that the constitution of the State of New York or of the United States, requires the assignment of counsel. *N.Y. Family Court Act §262.*"

## **Trafficking Victims Protection Act**

502.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-501, above as if specifically set forth herein.

503.    Plaintiff affirms Defendants are ripe for review under the Trafficking Victims Protection Act and U.S. Const. art. I, §8, cl.3 Commerce Clause in that the pattern of criminal activity and the involvement of individuals at all levels of the corporate municipal structure, including voluntary participation of individuals outside the corporate structure, such as including but not limited to judges, referees, magistrates, 18B/assigned and retained counsel, attorneys for the child, psychologists, various levels of clerks, law enforcement, and court officers, all of whom are incidentally connected through family court proceedings, is sufficient to establish the formation of a nexus of participants, operating from within and/or directing others to commit crimes on their behalf, "[h]uman trafficking is the transportation of any person or group of people for an illegal purpose, whether or not the person or people transported consent to their movement", including but not limited to "…the movement of children or adults abducted or kidnapped and held for sale or ransom." It is undisputed that children cannot consent to their abduction, transport, movement or use by adult handlers, disguised as "child protective services."[309]

504.    Accordingly, "[h]uman trafficking refers to the elements of "fraud, force, or coercion" that result in the victim's inability to escape the traffickers' control. Although

---

[309] Bouvier Law Dictionary - Human Trafficking.

the topic of human trafficking most often rears its head when discussing sex crimes, the involuntary-servitude prohibition under R.C. 2905.01 does not require the compulsion of sexual acts. Indeed, the historical roots of human-trafficking legislation stem from the intent to criminalize forced labor. Labor trafficking may consist of forced labor, debt bondage, involuntary domestic servitude, and forced child labor. As such, inherent in the definition of involuntary servitude—"being compelled to perform labor or services for another against one's will"—are the concepts underlying the labor-trafficking component of human trafficking."[310]

505.    In addition, "[h]uman trafficking "is comprised of three distinct offenses" set forth in section 236, subdivisions (a) through (c). (People v. Shields (2018) 23 Cal.App.5th 1242, 1248-1249, 233 Cal. Rptr. 3d 701.) Gonzalez was charged with and convicted of the definition of human trafficking set forth in section 236.1, subdivision (b), which applies where a "person . . . deprives or violates the personal liberty of another with the intent to effect or maintain a violation" of one of several specific crimes including pimping (§ 266h) and pandering (§ 266i)."[311]

506.    R.R. (3) and L.N. (6) were seized under color of law to limit and control Plaintiff's freedom of movement by leveraging her child(ren) in exchange for coerced cooperation and forced compliance for receipt of federal reimbursements and state funding, "[s]ome courts have held that a Hobbs Act violation does not require that the public official have de jure power to perform any official act paid for as long as it was reasonable to believe that he/she had the de facto power to perform the requested act."[312]

507.    There is substantial evidence proving Defendant ACS was, and is, counterfeiting Connections records, which they intentionally misrepresent as evidence for legal proceedings to subjugate parents to illegal proceedings and finance the ransom of their child(ren).

---

[310] *See* State v. Logan, Ohio Appeals Court, Third District (Dec 11, 2017).
[311] See People v. Gonzalez (California Court of Appeal, 4th District [Jan 30, 2020]).
[312] *See* United States v. Nedza, 880 F.2d 896, 902 (7th Cir. 1989) (victim reasonably believed state senator had the ability to impact a local business); United States v. Bibby, 752 F.2d 1116, 1127-28 (6th Cir. 1985); United States v. Sorrow, 732 F.2d 176, 180 (11th Cir. 1984); United States v. Rindone, 631 F.2d 491, 495 (7th Cir. 1980) (public official can extort money for permit beyond control of his office, so long as victim has a reasonable belief that he could affect issuance); United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979); United States v. Harding, 563 F.2d 299 (6th Cir. 1977), cert. denied, 434 U.S. 1062 (1978); United States v. Brown, 540 F.2d 364 (8th Cir. 1976); United States v. Hall, 536 F.2d 313 (10th Cir.), cert. denied, 429 U.S. 919 (1976); United States v. Hathaway, 534 F.2d 386 (1st Cir.), cert. denied, 429 U.S. 819 (1976); United States v. Mazzei, 521 F.2d 639, 643 (3rd Cir.) (en banc), cert. denied, 423 U.S. 1014 (1975); United States v. Price, 507 F.2d 1349 (4th Cir. 1974).

508.    There is substantial evidence that family court judges were, and are, counterfeiting court records to subjugate, coerce participation, force attendances, and finance litigious abuse under color of law.

509.    On March 26, 2021, Defendant Heaven e-mailed Plaintiff 2 attachments, conveniently misrepresented as "Discovery", which consisted of 367 pages of backdated and retroactive counterfeit records from Connections, including various visibly altered ORT's. Defendant Heaven intends to introduce the counterfeit records as evidence in Plaintiff's purported fair hearing to substantiate the malicious indicated finding made by Defendant Alozie, who also made the corresponding false Anonymous Report to execute financing for the Kidnapping Scheme as a false jurisdictional claim.

510.    The counterfeit records are substantially different from those Plaintiff obtained from the Children's Bureau via FOIA request in 2019, such as the time and date format.

511.    The ORT's contain various programmatic corrupted entries, such as instances of multiple person identification numbers ("PID") for Plaintiff, Defendant Ruci, and R.R. (3). For example, Defendant Ruci and R.R. (3) are listed under the same PID, which should have prompted the error message, "ERR: Merge will cause Prsn to be subj. & MA/ AB child in the same Allegation," corresponding to the problem, "[i]f the persons being merged exist in the same allegation, one as the maltreated/abused child and the other as the alleged subject, the merge is not allowed." And yet, the merger appears to have been successfully implemented by Defendant ACS because a corresponding entry in the counterfeit Connections records has, "Gerd Ruci is not a child of school age."

512.    The entries are backdated because the FOIA records show no SCR investigations pending against Defendant Ruci, and multiple Add Info reports opened by various employees and agents of Defendant ACS, under Plaintiff's name. That is, all the SCR investigations against Defendant Ruci were closed by Defendant ACS prior to Defendant Alozie's false Anonymous Report against Plaintiff. The counterfeit Connections case notes have neither corresponding Intake Stage ID's nor dates for the backdated unregistered FCA 1034 reports scattered in various entries.

513.    That is, there are backdated FCA 1034 reports in the counterfeit records but no Intake Stage ID number because Defendant ACS never registered the court orders

with the SCR in May, June, or July 2019, prior to submitting them for Plaintiff's custody litigation.

514.    Likewise, the case notes for SCDSS's entries substantiating indicated determinations made against Defendant Ruci were scattered, indecipherable, chronologically impaired entries. The aforesaid was immersed between inconsistent managerial and/or supervisory reviews and fake background check information, ""ACS could not provide us with the cases reviewed…[a]lthough ACS procedures state that managers are to save the reviews on the agency's internal computer system (the S drive), this requirement is not enforced…[o]ur review of the agency's computer system revealed that managers inconsistently saved the reviews performed…[f]urthermore, managers did not indicate the dates they conducted reviews for those they saved…[i]n the absence of evidence documenting these reviews, we have limited assurance that managers are performing them and that the Deputy Directors have ensured that they take place."[313]

515.    However, Defendant Hansell seeks to change the law to protect compounded, ongoing constitutional violations done to the public through warrantless intrusions and sequestrations done by City and State Defendants under color of law. Both Defendants' Hansell and Poole know that court ordered investigations and FCA 1034 investigations are registered with the SCR because they are reports of suspected abuse ordered by the family court. The failure of a mandated reporter's duty to register a report of suspect abuse is against the law and a punishable offense.

516.    For example, R.R. (3) did not reside in Queens County for 6 months prior to Defendants ACS claim for a child protective proceeding using false instruments of filing, misrepresented as Nunco Pro Tunc records dated August 30, 2019 to satisfy the deadline requirement of submitting claims on the 1st of the following month. Rather, Defendant ACS submitted claims with false, fraudulent, and fabricated records to conceal gross negligence for discrediting Plaintiff's domestic violence allegations, advocating for R.R.'s (3) removal from the OOP, facilitating the reduction of pending criminal charges and subsequent violations of Plaintiff's and R.R.'s (3) OOP, and purposely mishandling various court orders for CPS investigations to protect Defendant Ruci:

---

[313] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016

    a.   1 false instrument of filing: FCA Article 10 petition on docket NN-17995-19 dated August 30, 2019.

    b.   1 fraudulent supervised release/parole order: Nunc Pro Tunc CPS Order #7259254 dated August 30, 2019.

    c.   1 set of fabricated transcripts of proceedings in Part 14 on August 30, 2019.

517.    The next time Defendant ACS attempted to do this was October 26, 2020. This time, Defendants' Shulman, Wisler, Galchus, Blond, Kelly, Going, Rodin, McFarlane, Peebles, Steele, Alozie, Roman, Tingue, and Ruci added Plaintiff's other son, L.N. (6), and Defendants' Galchus and Ruci supplied a retroactively dated motion, i.e., October 6, 2019, on docket NN-17995-19. This was a specious attempt to retroactively supplant the August 30, 2019 "filing"/October 10, 2019 "restore" with another false instrument of filing to sustain financing after the 12 months are up. Hence, why Defendant Shulman's written decision was never filed and why Defendant Rodin stated L.N. (6) was not part of the neglect case in her purported OTSC. Interestingly, she also never filed it. In fact, none of aforesaid Defendants motions, submitted for the purported sham proceeding on October 26, 2020, were filed in Plaintiff's court file. Hence, it was a sham proceeding.[314]

518.    Operating from within the physical locations of the family courts in their jurisdiction, Defendant ACS fabricates a "front" called "child protective proceedings," which consists of false instruments of filing, called "petitions" to funnel federal, state, city, and county funds by leveraging assets, i.e., "seized children" and subjugating their parents i.e., collateral. That is, through Defendant OCFS's gross failure to monitor the accuracy and adequacy of information, consistently and effectively, in Connections, the Municipal Enterprise known as Defendant ACS has successfully and conspicuously implemented the fronts to fund, including but not limited to, Kidnaping and Extortion Schemes.

519.    As such, Defendants' Shulman, Rodin, Wisler, Galchus, Blond, Kelly, Going, Peebles, Alozie, Roman, Tingue, Steele, and Ruci have commercialized Plaintiff's children, R.R. (3) and L.N. (6) as fixed assets, while expending both administrative and legal costs to subjugate Plaintiff to the Part 14.

---

[314] See Former Internal Revenue Service Employee Indicted for Attempted Wire Fraud and Making False Statements "…Smith took steps to cause the SSA to resume wiring her SSDI benefit payments she was not entitled to receive. SSA wired SSDI benefit payments from the U.S. Treasury in Kansas City, Missouri, to Smith's credit union account in Methuen, Massachusetts."; see IRS Employee Charged with Tax Fraud, "…Williams intentionally included materially false deductions in IRS Forms 1040, U.S. Individual Income Tax Returns, for tax years 2014, 2015, and 2016 that she knew the taxpayers were not entitled to claim…").

520.    The Municipal Enterprise materializes its scheme by "stuffing" the court file with false instruments of filing, such as including but not limited to, materially invalid amended petitions, petitions[315], orders of protection, etc., used to fabricate procedural compliances to sustain its eligibility and receive payments under various federal grants and programs, and state sources of funding. During any of the SSA Title IV-D or Title IV-E audits, it is paramount for the Municipal Enterprise to have these records in the court file to maintain the false appearance of documentary compliance.

    a.  Summons & Return of Process

    b.  Arraignments

    c.  Best Interest Hearings

    d.  Pre-removal hearings (FCA §§1022, 1023, 1024, 1026 and 1027)

    e.  FCA §1028 Hearings

    f.  Permanency Planning Hearing Orders

521.    For example, in Plaintiff's case, Defendants' Rodin, Steele, Tingue, Alozie, Shulman, Kaplan, Galchus, and Ruci conspired to kidnap R.R. (3) by staging a pre-removal hearing via ex parte meeting on August 28, 2019 in the Part 14, "[t]he neglect petition against the mother was first heard by this court on August 28, 2019…[i]t was adjourned to September 4th, the day the custody petitions were on."[316]

522.    Then, Defendants' Rodin, Steele, Alozie, Tingue, Shulman, Wisler, Galchus, Ruci, Blond, Going, and Kelly sustained Plaintiff's subjugation by utilizing various tactics to hold hearings under false pretenses and retroactively document procedural due process, which Plaintiff was never intended to, and did not, receive. This was done to conceal the prevalence of due process and litigious abuse, including specious spontaneous "restore to calendar" events with predetermined dates, without prior notice or notice of the purpose. In other words, the dockets were arbitrarily removed without notice to Plaintiff, then spontaneously restored with predetermined dates, none of which was sent to her in advance or at all. Aforesaid Defendants repeatedly misrepresented their fraud as "clerical errors" to continuously obtain Plaintiff's jurisdiction by fraud.

523.

---

[315] FCA Article's 3, 4, 5, 6, 7, 8, and 10.
[316] Galchus Order to Show Cause (10/08/2019).

**Clerical errors to hide fraud on the court, constructive fraud, counterfeit court records, and racketeering by judicial process.**

524.    On October 1, 2019, Plaintiff discovered nothing was scheduled under file number 180803 for October 10, 2019. Back on September 4, 2019, Defendant Shulman purportedly entered the October 10, 2019, Part 14A conference with Defendant Wisler. The conference was subsequently retroactively scheduled via Defendant Galchus's OTSC #1 on 10/08/2019.

525.    On October 2, 2019, Defendants' Shulman, Ruci, Wisler, Galchus, Kaplan, Alozie, and Rodin conspired to hold an impromptu on-the-record hearing to "transfer" Plaintiff's pending SFC petition to "this Court" without consent. On or about October 8, 2019, Defendant's Galchus and Ruci supplied the pretext: false instrument of filing on OTSC dated October 8, 2019 ("OTSC #1") to "restore" the dismissal.

526.    On October 10, 2019, aforesaid Defendants did not obtain an order to restore the dockets because Defendant Shulman never issued one. Though OTSC #1 sought to, inter alia, "restore" the dismissed dockets to the Part 14 calendar, the hearing to "transfer" Plaintiff's petition was a pretense to conceal the intended effect of OTSC #1's use to obtain jurisdiction by fraud. That is, Defendants wanted to fabricate a record to retroactively satisfy the service of motion requirement.

527.    This is evident in tampered transcript #2, where numerous references to "transfer" were added after the fact for the feigned clerical error. Specifically, the order of dismissal for Defendant Ruci's petition determined custody of R.R. (3) with Plaintiff by default, thereby terminating the purported FCA Article 10 because neither lived in Defendant ACS's jurisdiction.

528.    On October 10, 2019, using 7 of the 12 copies of OTSC #1, Defendants' Shulman and Wisler artificially calendared 7 individual conferences for December 17, 2019, to force Judge Matthew Hughes ("Judge Hughes") in SFC to relinquish Plaintiff's SFC petition pending for October 18, 2019.

529.    Then, Defendants' Shulman, Galchus, Ruci, Rodin, Naughton, Alozie, Steele, Tingue, Kaplan, and Wisler conspired to recreate the dismissal on default by staging an FCA Article 4 proceeding. On December 5, 2019, Defendant Ruci staged his default by not appearing in the Part 28 when the case was called. Plaintiff received Magistrate Grey-

Humphrey's Order of Dismissal ("December Dismissal") on Defendant Ruci's default the same day. Interestingly, on December 17, 2019, Defendant Shulman sua sponte restored Plaintiff's docket V-05120-19 to the calendar without a hearing.

530.    Since, Defendant Ruci's original Acknowledgment of Paternity ("AP #1") for R.R. (3) was tied to Plaintiff's May 2019 temporary support order[317] ("May support order") on docket F-05491-19, Defendants' Shulman, Rodin, Galchus, Ruci conspired to stage a re-filing of the custody litigation as the underlying false instruments for fake support proceedings to retroactively align aforesaid proceedings with the CPS Order. That is, aforesaid Defendants deleted the May support order and replaced it with the August order.

531.    On or about January 9, 2020, Defendants' Shulman, Galchus, Ruci, Rodin, Naughton, Clarry, and McFarlane conspired to create false instruments of filing: 1 support petition on docket number F-05491-19, and 1 paternity petition on docket number F-04656-20 to supplant the 2 copies of OTSC #1, i.e., stamped at 7:09 am and 7:10am.[318] In addition, aforesaid Defendants also fabricated 1 retroactive Summons dated 2/28/2020 ("retro summons") for the CPS Order, scheduled for a "Trial Ready Conference" March 9, 2020,[319] with Chief Clerk of Court Steven Byrne's ("Chief Clerk #2") signature via PaintShop. On February 28, 2020, the conspiracy came to fruition.

532.    On or about March 15, 2020, while an FBI investigation for R.R.'s (3) kidnapping was pending, Defendants' Shulman, Wisler, Rodin, Galchus, Blond, Kelly, Ruci, Alozie, Peebles, Roman, Steele, and Tingue conspired to remove all trace of the May 18, 2020, Fact Finding from the calendar under the pretense of COVID-19. That is, all the dockets under Plaintiff's file number 180803 were deleted. At that time, there was an Administrative Order directing all family court judges to notify their supervising judge of all pending child protective proceedings for immediate rescheduling. Plaintiff's dockets were deleted to obstruct the federal investigation, so no immediate notification to Supervising Judge Gilbert Taylor ("Taylor") was sent.

---

[317] 42 U.S.C. 666 §466 (a)(5)(J) ("[t]emporary support order based on probable paternity in contested cases…pending an administrative or judicial determination of parentage, if there is clear and convincing evidence of paternity…")
[318] 1 copy for docket V-20987-18 whereas, the 2nd was for docket NN-17995-19, i.e., CPS Order.
[319] FCA Statewide Process. §154[c] ([w]here service of a petition and summons upon a non-resident or non-domiciliary respondent is required, such service shall be made at least twenty days before the return date.")

533.    On the week of August 10, 2020,[320] the day after Defendant Rodin said Defendant Ruci and R.R. (3) were expected to return to the U.S., all the dockets under file 180803 spontaneously re-appeared on the calendar of the Part 14, pre-scheduled for a "Fact Finding" on October 26, 2020.[321] Interestingly, while the removal of the dockets triggered notices to be mailed to Plaintiff's home, the reverse did not trigger the same.

534.    On or about August 13, 2020, Defendant Going notified Defendants' Castillo-Lovaglio and Lovaglio she would inquire about their request for unsupervised visitation with R.R. (3). On or about September 17, 2020, Defendants' Going, Castillo-Lovaglio, and Lovaglio conspired to offer false instruments of filing to substitute L.N.'s (6) missing TOC via an OTSC ("Grandparent's Application"). On 9/21/2020, Defendants' Rodin, McFarlane, Shulman, Wisler, Ruci, Galchus, Blond, Kelly, Going, Castillo-Lovaglio, and Lovaglio misrepresented a "hearing on the papers" for a purported "Application for Expanded Access" as the proceeding scheduled for October 26, 2020.

535.    On September 16, 2020, all the dockets were scheduled for a Fact Finding in October in the Part 14. By the following day, the dockets were moved to the "Visiting Judge/JHO/Hearing Examiner – Part Virtual Chambers" and the Grandparent's Application appeared as Motion 5 on docket NN-17995-19. The purported hearing had nothing to do with expanded access to R.R. (3) because that went against Defendant Ruci's explicit orders. The sham proceeding was held to retroactively fabricate non-existent proceedings and determinations, such as false narrative to backdate the determination of custody of R.R. (3), backdate the pre-removal hearing for R.R. (3), and falsify a best interest hearing for R.R. (3) and L.N. (6), siblings who were separated by fraud and malfeasance without a hearing. Their right to grow up together took backstage to Defendants' Rodin and Shulman's pay-to-play child trafficking schemes.

536.    Defendants' Shulman and Rodin are operating on a schedule, and Plaintiff delayed their false narrative entries in UCMS with evidence of fraud. They had to reconstruct a false narrative in the court's computer to further sustain Plaintiff's bondage, since the court file was transferred to SFC in the middle of their money laundering scheme

---

[320] Interestingly, there was a proceeding on 8/14/2019, in which a fraudulent support order on Plaintiff's docket number F05491-19 was issued.
[321] The Mental Health Order was signed on 10/18/2019; a proceeding in SFC was scheduled for 10/18/2019; according to the 6/11/2021 transcripts, Shulman scheduled a return date for 10/30/2021, though she said 9/30/2021 in court.

to establish financing, by supplanting support proceedings with custody litigation to backdate the existence of the CPS Order.

537.    On January 27, 2021, Defendants' Rodin and Whitfield attempted to cover up the appearance of motion #'s 6 - 10 on docket NN-17995-19, scheduled for March 26, 2021, as 5 OTSC's dated January 25, 2021, speciously e-mailed to Plaintiff at 11:00pm. As expected, Defendant Whitfield previously sent the corresponding notices of motion on January 12, 2021, to all, except Plaintiff. More interesting, the 5 OTSC's were said to be for an unscheduled date. Plaintiff received copies of suborned affidavits of service for perjury, corresponding to the notices of motion with Defendant Rodin's e-mail address fcls.victoria.n@acs.nyc.gov, listed as Plaintiff's. They suborned affidavits were also sent to Soffer. However, just before noon on 2/01/2021, Defendants' Wisler, Shulman, Galchus, Blond, Kelly, Ruci, Rodin, and Going spontaneously began scheduling Defendant Whitfield's 5 OTSC's to the calendar of the Part 14 for 2/01/2021.

538.    After Plaintiff sent an e-mail to "all counsel" about something they overlooked, i.e., they sent 5 OTSC's but only entered motions 11 – 14 for 12:00pm and #5 was a retroactive "restore to calendar" motion for 11:00am, Defendant Wisler inserted 2 retroactive motions, i.e., 15 – 16 for 12:30 pm. Accordingly, by 2:15pm, the calendar of the Part 14 showed motion #'s 11 – 16 and 1 "restore to calendar" motion scheduled for 2/01/2021, which Defendant Wisler further misrepresented as another purported "hearing on the papers" scheduled for 2/09/2021. Unlike before, when Defendants' Shulman and Wisler did not enter motions and OTSC's the day it was received but scheduled them for an already pending court date. But not now.

539.    Essentially, the 12 copies of OTSC #1 from October 10, 2019, previously used to schedule the "clerical error" to the calendar of the Part 14, were switched out and replaced with 12 OTSC's on docket NN-17995-19 dated January 25, 2021,from  Defendant Rodin. Since the exculpatory medical records obtained by fraud and deception were unfavorable, Defendant Rodin fabricated false instruments of filing under the pretense of a hearing for medical records. If child protection was the focal point, Defendant Rodin would have subpoenaed records from Huntington Hospital. Since Defendant Rodin perpetuates the activities and affairs of the Municipal Enterprise, the medical records were requested

from Cohen's Children Hospital, who did not have record of the marks and bruises on R.R. (3).

540. To prove both sets of OTSC #1 were intentionally stamped and entered as underlying actions for Defendant Ruci's docket V-20987-18 and Defendant ACS's docket NN-17995-19, consider this: on January 28, 2021, Plaintiff submitted Defendant Shulman's Order on Motion dated March 9, 2020 ("Order on Motion"), which purported to dismiss "mother's motion 5" on docket V-20987-18, via the Electronic Document Delivery System ("EDDS"). Plaintiff also requested it be filed by the clerk. This was the one- and only-time confirmation of filing from the QFC clerk was sent. As soon as the order was filed on Monday February 1, 2021, it triggered the additional 2 "restore to calendar" motions hidden on February 1, and February 9, 2021. For two hours, Defendants' Shulman and Wisler played jenga with the order of the motions and OTSC's until it looked legitimate on e-courts.

541. Defendants' Rodin, Alozie, Steele, Tingue, Peebles, Roman, McFarlane, Galchus, Ruci, Blond, Kelly, and Going have a reciprocal relationship with Defendant Shulman, where the former remain silent, enabling Plaintiff's violation and subjugation under color of law, while the latter defends and conceals their fraud, legal malpractice and criminal activities.

542. Likewise, in parent Cibelli's case, where his court-appointed attorney, labeled "legal advisor," feigns so much legal ignorance during the court proceedings, it borders malpractice and gross incompetence. This common scenario sprouted out as an extension of the Municipal Enterprise's pay to play scheme, where child protective proceedings have become lucrative assignments and the feigned ignorance ensures guaranteed cash flow to indigent counsel. The culture of feigned legal education has become so embedded within the family court that it seeks to deprive Plaintiff Parents of competent zealous representation, where the Court seeks to control the outcome of the proceeding by reigning in their legal advocate.

543. In New York City, family court judges assign counsel to indigent litigants. *Whoever* the Judge assigns depends on the outcome they seek to determine. This is unequivocally clear when you study patterns and associations in the individual Part

calendars to determine how often the same name appears for proceedings under a particular Judge. Like teachers, judges also have pets: preferred 18B and preferred ACS attorney.

544.    Defendants Castillo-Lovaglio and Lovaglio knew that Defendants' Rodin, Clarry, Galchus, Ruci, Blond, Kelly, Roman, and Peebles knowingly lied and provided false records to federal agents and law enforcement when questioned during active investigations into R.R.'s (3) kidnapping on January 31, 2020, and April 25, 2020, including the investigation into the U.S. passport obtained by fraudulent means. To castigate Plaintiff for causing state and federal investigators to pry into the affairs and activities of the Municipal Enterprise by reporting R.R.'s (3) abduction to Albania, Defendant Shulman concealed their criminal conduct in an annotated fabrication of inculpability, "² [t]he mother has been found by ACS to repeatedly make unsubstantiated allegations that the child R.R. (3) is being harmed in the father's care and has reached out to various government agencies including but not limited to the FBI, New York State Senators, The Commissioner of Social Services and local police with her unfounded claims."[322]

545.    Further, for the sham hearing on the papers, i.e., "Grandparents Application for Expanded Access", Plaintiff noted, inter alia, that Defendant Rodin provided 3 unregistered FCA 1034 reports, i.e., Exhibits C, D, and E, by including an OCFS publication, attesting to the blatant defiance of withholding to register court orders for CPS investigations in a Writ of Error ("Writ of Error"). In other words, no notice was sent to Plaintiff about a court order for an FCA 1034 investigation issued by Defendant Shulman. Specifically, no letter from OCFS was mailed to Plaintiff's home with an Intake Stage ID number and date of the report that corresponded to Defendant Shulman.

546.    Instead, Defendant Rodin submitted 3 false, fraudulent, and fabricated reports (" for a CPS investigation, not pursuant to SSL Title 6, that did not occur, for a sham proceeding on 10/26/2020. Specifically, Plaintiff stated Defendants ACS defied the Court's orders by withholding to register a CPS investigation with the SCR for R.R. (3) and L.N. (6). Rather than hold Defendants ACS in contempt for disobedience, Defendant Shulman maliciously targeted and castigated Plaintiff by sustaining the false narrative to aid and abet the false instrument of filing on docket NN-17995-19, "[h]er assertion that the

---

[322] *Decision on Application for Expanded Access* by Judge Shulman (10/26/2020).

court is biased towards her because it is willing to proceed with the fact finding on the neglect proceeding filed under NN-17995/19 as she does not believe that case has been legally filed."[323]

547.    For the purported hearing on the papers on October 26, 2020, Defendant Rodin was permitted to include suborned perjury from Defendants Peebles and Alozie as Exhibits C, D, and E, which further assisted in covering up investigations into R.R.'s (3) kidnapping to Albania; concealed the existence of medical records for injuries to R.R.'s (3) hand because Defendant Ruci left a pot unattended on a lit gas stove; concealed that Defendant Ruci ignored R.R.'s (3) cries, forcing him to walk barefoot on hot pavement; concealed that R.R.'s (3) pediatrician retired from the practice before he was supposedly seen for a routine visit; and concealed that Defendant Ruci used an Albanian passport to kidnap R.R. (3) without a return date until Plaintiff contacted agencies and departments for assistance with returning R.R. (3) to the US. Conveniently omitted was Defendant Alozie's admission to Plaintiff, that he would report R.R.'s (3) kidnapping to law enforcement because Defendant Ruci never notified the agency or obtained permission to leave.

548.    For the sham proceeding on 10/26/2020, Defendants' Rodin, Galchus, Kelly, and Going submitted motions affirming their various positions and included Plaintiff on the e-mails. However, in Defendant Shulman's written Decision, Defendant Kelly's motion was not mentioned as submitted, "the court has received an affirmation in opposition to the expansion of the grandparent's visitation from ACS, the child protective agency supervising the child R.R. (3) in connection with the neglect matter, an affirmation in opposition from the non-respondent father who has temporary custody of R.R., and an affirmation in opposition from the attorney who represents the child R.R. Lastly the court has received a Reply from the grandparent's counsel. This application is deemed fully submitted" because she opposed continuing the forced separation of siblings.

549.    Case in point: On the morning of 10/26/2020, Defendant Kelly submitted a 2nd motion in support of sibling's visitation between R.R. (3) and L.N (6), though never sent it to Plaintiff. Due to the financial arrangements between the 18B Defendants, i.e., Defendant Shulman approves their 18B vouchers, Defendant Kelly remained quiet about the Courts' blatant refusal to acknowledge her submission for going against the agenda:

---

[323] *Decision and Order on Application For Recusal As Made by Victoria Navarro* by Judge Shulman (4/14/2021).

violating Plaintiff's right to maintain a familial association with R.R. (3) and L.N. (6). Interestingly, Defendant Blond's animosity for Plaintiff manifested itself as excluding Plaintiff from the e-mail with her purported motion in opposition to sibling's visitation.

550.     Defendants' Blond and Kelly were present on 3/09/2020 and know there was never a hearing to determine R.R. (3) and L.N.'s (6) forced separation. Defendants' Blond and Kelly also know there was never a hearing to determine why the Grandparent's, Defendants Castillo-Lovaglio and Lovaglio, should be supervised, since Defendants' Galchus and Peebles failed to provide an explanation on 3/09/2020 when asked by Defendant Shulman. The point is: Defendants cover fraud and false narratives for each other and not that Plaintiff is collaterally attacking the basis of an un-filed Decision for a money laundering front under a false instrument of filing, i.e., Defendants ACS fraudulent FCA Article 10.

551.     It is because Defendants' ACS, Galchus, Blond, Kelly, and Ruci depend on Defendants' Shulman and Wisler's assistance to initiate and/or support misrepresentations for the purpose, or context, of a proceeding, that Plaintiff's bondage and R.R.'s (3) kidnapping is a conspiracy fully supported by judicial enforcement. Defendants, collectively, have created an inter-twined and inter-dependent relationship, where each leg of the constructive fraud depends on the support of the other participants to survive.

552.     As previously noted, the hearings, hearings on the papers, proceedings, including the various privately held hearings, ex parte hearings, spontaneous "restore to calendar" motions, etc. constitute the money laundering fronts because that is how the Municipal Enterprise generates the money needed to sustain the racketeering in the family courts. Defendants OCFS know that "CPS must make every reasonable effort, with due regard for any necessity for immediate protective action, to inform the parent or person legally responsible for the child's care (PLR)[324] of CPS's intention to seek a temporary order of removal, an order for the provision of services or assistance, or an order of protection [FCA §1023]."[325] But their failure to monitor the lacking entries in Connections, connected to the fronts, has resulted in their complicity and participation in the Municipal Enterprise, which funds the Kidnapping Scheme.

---

[324] PLR means Person Legally Responsible.
[325] Office of Children and Family Services, Child Protective Services Manual 2020 (p. 257)

553.    To satisfy the terms and conditions of their federal grants, such as
Stephanie Tubbs Jones Child Welfare Services Programs under SSA Title IV-B Subpart 1
or Title IV-E, Defendants ACS must document each procedural hearing, the purpose of
each proceeding, and the determination, i.e., an Order, for which the purport to prosecute,
all of which must be in the court file at the time of audit, "[t]he Division of Performance
Measurement and Improvement consists of two teams: the Child and Family Services
Review (CFSR) Team and the Data Analytics and Reporting Team…[t]he Child and
Family Services Review (CFSR) Team, in partnership with the Administration for
Children and Families Regional Offices, implements the CFSR process to determine if
State child welfare agency practices are in conformity with Federal child welfare
requirements, assess what is actually happening to children and families as they are
engaged in State child welfare services, and assist States to enhance their capacity to help
children and families achieve positive outcomes.[326]

554.    The consistent and repeated failure to have the necessary documentation in
Connections and records has been routinely and repeatedly uncovered in various audits by
the New York City Comptroller's Office, AG James' lawsuit for Elisa W., et al, and the
Children's Bureau. And yet, through some miraculous intervention, the Municipal
Enterprise persists without regulation or accountability.

555.    For example, Defendants' Galchus, Blond, Kelly, and Kaplan can only get
paid for their involvement in the money laundering fronts by assignment, "[a]t the
conclusion of a family court matter, the assigned attorney must complete and submit the
online voucher indicating the name of the last judge or presiding judge assigned to the case.
ACP will review and validate then send the voucher to court for signature/approval."[327]
Then, Defendants' OCFS should have sufficient documentation in Connections to justify
the seizure of a minor in Connections as entered by Defendants' ACS but this is not
possible when Defendants' OCFS fail to identify fraudulent records, like the unregistered
FCA 1034 investigations and COI's that proliferate the fronts in family court. Without
documented justification, a "removal" is simply the kidnapping of a child, supported by a
money laundering front in family court.

---

[326] Children's Bureau Organization Structure https://www.acf.hhs.gov/cb/about/organization-structure.
[327] New York City Department of Finance (DOF) Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorney and Experts on Payments (p.13 - 14).

556.    Just as money laundering covers the scheme of fraudulent motions submitted for payment via 18B vouchers, the same applies to payments for Defendant Lederman's services related to Plaintiff's Fair Hearing, which resulted from Defendant Alozie's false anonymous report to the SCR on 8/27/2019. Consequently, Defendant Lederman's employment with OCFS, i.e., Administrative Hearing Officer, is under contract number S010213 as Consultant - Legal Services, which covers the period of 3/01/2019 to 2/29/2024 for $100,000. There is every reason to suspect that Defendant Lederman has presided over fair hearings originated by false instruments of filing for fronts created by the Municipal Enterprise during the span of her contractual employment with OCFS, where her determinations were based on fraudulent PaintShop records, i.e., printouts of Connections, submitted by Defendants' ACS. Therefore, the same concept extends to other contracted Administrative Hearing Officers.

557.    The benefit to creating an insurmountable number of docket numbers to supplant and/or substitute underlying false instruments of filing for the fronts in family court is a two-fold benefit for Defendant Shulman. On the one hand, Defendant Shulman can feign dispensing with "the business of the court system" in a way that circumvents double dipping, *"the practice by which state judges collect both pensions and salaries after they hit retirement age"[328]* by increasing the number of current cases, i.e., proliferating the number of dockets, during the span of her active employment, which also increases the numbers used to calculate her pension at retirement. On the other hand, Defendant Judge Shulman *is* manipulating her daily statistical reports in Dashboard, which is intended to measure her rate of compliance with "Standards and Goals", i.e., disposing of cases in 180 days. By replacing petitions with motions, compliance standards are misrepresented because only petitions and supplemental petitions and permanency planning hearings are counted in the daily reports. Consequently, that means Chief Judge Janet DiFiore's annual reports, State of the Judiciary, which began 3 years agon, upon implementation of the Dashboard Tool, are inaccurate.

---

[328] Courthouse News, *Retired Judges Fight For Right to Double Dip* (03/21/2017); Courthouse News, *Judicial Double-Dipping Struck Down in NY* (05/04/2017); New York Post, *Court Bars Judges from Taking Both Salaries and Pensions* ("[t]he ruling found that "New York's public policy strongly disfavors the receipt of state pensions by persons also receiving state salaries." [05/06/2017]).

558.    For example, Defendant Shulman's Order on Motion, issued on Defendant Ruci's docket number V-20987-18, to dismiss "mother's motion 5," did not correspond to Plaintiff's OTSC dated 2/07/2020 ("February '20 OTSC"), though it was incidentally noted as such on the order. Rather, it was a pretext to remove motion #5 on docket V-20987-18 from the court's computer and replace it with another motion on docket V-01066-20. Defendant Shulman deleted the petition on docket number V-01066-20 and re-entered it as "Motion Seq. 5." That explains why motions 6 – 10 on docket NN-17995-19 appeared in the Part 14 and corroborated in Plaintiff's Emergency OTSC dated 12/26/2019 ("December E-OTSC"), which listed Motions 1 – 4 pending for January 9, 2020.

559.    The computer screen printouts Plaintiff received from the clerks at QFC, with all the entries under file 180803 since the beginning, show 2 separate entries for docket NN-17995-19 on September 21, 2020, for the Grandparent's Application. The entry should have been made on docket number V-01066-20 had it been legitimate, not money laundering. Further, the package of records Plaintiff received in October 2020 did not include a copy of the Order on Motion because it was never filed. It was not intended to be valid.

560.    On September 21, 2020, 2 copies of the Grandparent's Application were entered to replace the 2 copies of OTSC #1 stamped at 7:09 am and 7:10 am, intended to re-file, i.e., re-start, the CPS Order in the October 26, 2020, sham proceeding.[329] This is because Plaintiff's report to the SCR on April 27, 2020, caused Defendant ACS to close the open FSS case from August 28, 2019. The Grandparents Application was merged with the CPS Order. While Defendants' Going, Castillo-Lovaglio, and Lovaglio's Grandparent's Application was submitted on September 17, 2020, it was entered on September 21, 2020.

561.    None of the motions and OTSC's for the October shamp proceedings, submitted by Defendants' Rodin, Galchus, Kelly, Going, and Blond, were in the court file, though aforesaid Defendants purported to have submitted it via EDDS.[330]

---

[329]*See Former IRS Employee in Fresno Pleads Guilty to Aiding and Assisting in the Preparation of False Tax Returns* ("Angela Milton, of Sacramento, pleaded guilty today to aiding and assisting in the preparation and presentation of false and fraudulent tax returns." [06/04/2021] https://www.irs.gov/compliance/criminal-investigation/former-irs-employee-in-fresno-pleads-guilty-to-aiding-and-assisting-in-the-preparation-of-false-and-fraudulent-tax-returns.

[330]*See Former IRS Service Center Employee Pleads Guilty to Filing Hundreds of False Tax Returns* ("[t]he charge of filing a fraudulent tax return by an employee of the United States provides for a sentence of up to five years in prison, three years of supervised release, a fine of $250,000 and restitution. Sentences are imposed by a federal district court judge based upon the U.S. Sentencing Guidelines and other statutory factors." [09/09/2020]) https://www.justice.gov/usao-ma/pr/former-irs-service-center-employee-pleads-guilty-filing-hundreds-false-tax-returns

562.    On October 27, 2020, Defendant Wisler e-mailed a purported written Decision dated October 26, 2020 ("October Decision") to "all counsel," but did not file it, as in Plaintiff did not receive an e-mail from @SecureFile:180803 within 5 days of its entry or thereafter. Unbeknownst to Plaintiff, 7 copies of the October Decision were being processed. Defendants' Shulman and Wisler conspired to substitute the October Decision as the underlying action for each of the individual V-dockets under file 180803, while Defendant Galchus's "Ruci - affirmation in opposition" speciously dated "October 6, 2019"[331] served as the updated retroactive replacement for his previous OTSC #1.

563.    After Plaintiff sent the purported October Decision to the Appellate Division Second Department in November 2020, aforesaid Defendants terminated their plan, removed Plaintiff's Notice of Appeal, and completed RADI form, Decision from the court file. QFC never sent a copy of the October Decision, or related records, for Plaintiff's appeal, as noted in the Appellate Division's Decision and Order on Motion dated January 4, 2021. All the records related to the November 2020 appeal were sent to Plaintiff from @SecureFile:180803 in July 2021, which proves the records were removed from the court file and resubmitted. Had Plaintiff's records been in the court file, it would have been rejected as a duplicate submission.

564.    Not surprisingly, aforesaid Defendants conspired to re-file all the dockets again, as a cumulative and combined entry of the V-dockets. After Plaintiff caught Defendants' Rodin, Blond, Shulman, and Wisler manipulating 2 co-Justice's calendars with false instruments of filing to supplant the financing for their money laundering schemes, Plaintiff made a second written request for Defendant Shulman's recusal.

565.    As expected, Defendant Shulman denied recusing herself but took the opportunity to churn Plaintiff's Motion for Recusal ("Motion for Recusal") into 8 separate copies. On April 15, 2021, Wisler e-mailed 1 attachment with "NAVARRO RUCCI RECUSAL final signed" dated April 14, 2021. Five days later, on April 20, 2021, Plaintiff received an e-mail from @SecureFile:180803 with 1 attachment listed as 8 individual "Order: Decision on recusal" for each of the dockets under file 180803.

---

[331] The signature page of the 10/08/2019 OTSC was dated as 10/06/2019.

566.    Plaintiff's persistent request for an explanation for *how* "Motion 4" on docket V-05120-19/19C was calendared for April 15, 2021, without a corresponding confirmation of filing sent by EDDS, was ignored.

567.    On May 21, 2020, the day after fraudulent support order on default #5 was e-mailed, Defendant Galchus speciously sent a purported OTSC ("May '21 OTSC") on docket NN-17995-19 to Plaintiff's personal e-mail. The May '21 OTSC was submitted the same day. In fact, it was approved, purportedly filed, and calendared the same day, and all before 5:00pm. Like the fake January 25, 2021, OTSC's, the May '21 OTSC was signed in its entirety and purportedly scheduled for June 11, 2021. As planned, Defendant Ruci left the U.S. with R.R. (3) on May 24, 2021, using the Albanian passport to prevent Plaintiff from being notified via the Child Passport Issuance Alert Program ("CPIAP") for the U.S. passport.

568.    On June 11, 2021, Defendants' Shulman, Galchus, McFarlane, Rodin, Ruci (from Albania), Blond, Kelly, Wisler, Castillo-Lovaglio, and Lovaglio, including Leona Krasner ("Krasner") and Herbert Smith ("Smith") pretended to participate in a sham proceeding for the May '21 OTSC requesting, inter alia, permission to take R.R. (3) to Albania. Defendant Shulman's sham proceeding was necessary to establish a false record for various false instruments of filing she intended to offer as the underlying actions for all the V-dockets and NN-17995-19.

569.    So, on 6/11/2021, without prompting, Defendant Shulman blamed the clerks at QFC by stating "it takes days" for them to "file EDDS submissions" and "put them on the calendar" to establish a false alibi for herself and Defendant co-conspirators and put it on-the-record, in the event Plaintiff used the transcript in an appeal. Interestingly, Plaintiff was previously informed, notwithstanding the filing of new petitions, the individual part clerks are responsible for entering, filing, and scheduling EDDS submissions. Specifically, the clerks only enter, file, and schedule new petitions received via EDDS whereas, everything else is sent to the individual Part Clerks.

570.    On 6/15/2021, in furtherance of a scheme related to offering false instruments of filing secretly pending, Defendant Peebles initiated communication by harassing Plaintiff via text under the pretense of complying with the terms of a non-existent court order, "I am not involved with setting up visitation as discussed on the last court date.

I was just giving you a courtesy to see if one has been set up which one has been set up as I saw from Mr[.] Ruci sent me." Defendant Peebles insisted she saw a group chat with Plaintiff listed as a member. For example, on 6/11/2021, Defendant Peebles told Krasner that Plaintiff was part of a group chat previously created by Defendant Ruci. On various previous occasions Plaintiff stated to Defendants they were engaged in trafficking and money laundering. Since Defendant Shulman did not approve funding for Defendants' ACS to supervise visitation, and related services thereto, while Defendant Ruci was in Albania with R.R. (3), the denial proves she was both aware of and cognizant of illegal and criminal association.

571.    Interestingly, per Dashboard, Plaintiff was listed as not present on 6/11/2021, so Defendant Peebles was perpetuating a specific false narrative because she knew Plaintiff was present. Defendant Peebles assumed Plaintiff would not know she was listed as being in default because Dashboard is an internal record that is not distributed to litigants. Defendant Peebles perpetuated the scheme by lying about issuance of a non-existent custody and visitation order that she knew was processing. In addition, Defendant Peebles claimed the purportedly existing group chat was just created by Defendant Ruci and Plaintiff, a purported pre-existing member, was just added to it, "I just saw the conversation he sent it." When Plaintiff requested proof of the purported group chat, Defendant Peebles sent a screenshot of a WhatsApp Group Chat that did not list Plaintiff's name or phone number as a member.

572.    Each time Plaintiff debunked a layer of Defendant Peebles patent lies, the latter changed her story. That is, Defendant Peebles went from claiming there was already a group chat with Plaintiff in it on 6/11/2021, to stating, "[h]e sent me the message I see it with your name number in the group chat he created" to "Mr. Ruci informed me that you left the group chat and blocked him so how are you supposed to have visits with R.R. if you blocked him?" Before Defendant Peebles claimed Plaintiff "left" the chat and "blocked" Defendant Ruci, Plaintiff sent her a screenshot of the WhatsApp chat history, where no group chat between Defendant Ruci and Plaintiff existed. Defendant Peebles feigned ignorance about WhatsApp group chats to falsely accuse Plaintiff of leaving a group chat that never included Plaintiff.

573.    Defendant Peebles used the communication via text to stage a false narrative that Plaintiff refused to see R.R. (3), which she intended to use in court as "blocking" Defendant Ruci from a group chat, since funding for her services was not authorized. Defendant Peebles intended to use the false narrative to lie in court that she a) contacted Plaintiff to set up the visits and b) made sure to inform Plaintiff to contact Defendant Ruci directly to set up the visits c) that Plaintiff was aware of a non-existent order and (d) defied it by not contacting Defendant Ruci to see R.R. (3). Recognizing Defendant Peebles' deception and propensity to lie, Plaintiff requested a copy of the purported order containing this setup.

574.    Rather than send it, Defendant Peebles falsely claimed, "I e-mailed the new visitation order in case you didn['] t receive it," though she refused to say when it was sent or what e-mail address it was sent to. To show just how pervasive the Municipal Enterprises nexus is, consider that Plaintiff borrowed money from her father, George in desperation and in response to Defendant Galchus's OTSC dated 5/21/2021 to hire Krasner to prevent Defendant Ruci from taking R.R. (3) out of the U.S. to a non-extradition country. For example, Plaintiff subsequently contacted Krasner to inform her, inter alia, that Defendant Peebles lied about the pre-existing group chat on 6/11/2021 and now, claimed to have sent her a copy of a visitation order dated 6/11/2021.

575.    Krasner denied receiving an e-mail with a copy of an order for Plaintiff but also avoided asking Defendant Peebles to simply re-send the purported e-mail. Instead, Krasner called her client, Plaintiff, and requested a screenshot to see the WhatsApp chats screen because she was too scared to fend off Defendant Peebles' lies with competent and zealous representation. Further, Krasner, like other family court attorneys, chose to expend her resources to bill Plaintiff for additional time spent on a witch hunt, directing her staff to locate a copy of an un-filed, non-existent order dated 6/11/2021. Then, Krasner called Plaintiff to say she spoke to Defendant Peebles, who claimed she e-mailed it to victoriacn2020@outlook.com.

576.    To add insult to injury, Krasner did not ask Defendant Peebles to resend the purported e-mails, she called to relay what she was told -- incompetence or stupidity? The unfortunate answer to this is family court attorneys take advantage of these anomalies, they pretend not to notice specious discrepancies because they assume, even expect, the

client is not remotely knowledgeable of the law and exploit this by charging for unnecessary billable hours spent on misrepresented witch hunts.

577.    Consider another example of attorney gross indifference to irregularities in family court proceedings, such as the PaintShop fax numbers at the top of each page of the unregistered FCA 1034 reports submitted by Defendants ACS for Plaintiff's custody proceedings in May and June 2019. Sending and/or receiving a fax is not an uncommon function in a legal office setting and yet Shapiro failed to notice this on May 22, 2019, June 7, 10, and 13, 2019.

578.    To misrepresent the origin of the faxed fraudulent reports, Defendants ACS reversed the fax information, which showed QFC had a special fax number solely devoted to SCDSS, i.e., "From- Suffolk County DSS." As a result of the oversight, Plaintiff was billed for fraudulent proceedings on 6/03/2019, 6/07/2019, 6/10/2019, and 6/13/2019. Defendants' Galchus, Rodin, and Kaplan misrepresented the fraudulent FCA 1034 reports as "confidential" and told Shapiro Plaintiff could not get a copy. However, Plaintiff is familiar with sending and/or receiving faxes due to employment in office settings, would have sought criminal and/or civil remedies to address the fraudulent FCA 1034 reports, including sending them to SCDSS.

579.    According to the e-mails sent Plaintiff regarding the expensive witch hunt, Krasner's staff spoke to a woman, who identified herself as "Magistrate Shulman," that claimed her "clerk" had a copy of the order but was out that day and would be in on Monday 6/21/2021. Coincidentally, Plaintiff previously requested a copy of said Order and others from QFC records. No such order existed in the court file. On 6/21/2021, Plaintiff received an Amended Nunc Pro Tunc Order dated 6/11/2021 (at the top right corner) on each of the 7 V-dockets under file 180803 from @SecureFile:180803 but an electronic signature dated "20210621." Hence, Defendant Peebles' ridiculous claims on 6/15/2021 about e-mailing a non-existent visitation order to Plaintiff was merely an alibi, a premeditated false narrative a false instrument of filing that did not exist before 6/21/2021.

580.    Another example of the intoxicating effect in the Municipal Enterprises perverse redefinition of basic law school education, consider Krasner's response to Plaintiff about the meaning of *amended*, "typically, it means it's modifying a prior order," though Plaintiff sent a box to her office with a copy of every single record under file number

180803. Krasner told Plaintiff she reviewed every single record sent. Krasner's motion for Plaintiff sought to obtain an order of visitation because there was none. And yet, Krasner, who purportedly knew there was no prior visitation order for R.R. (3) in place, based on all the records provided to her, filed a motion seeking to establish a visitation order on Plaintiff's behalf, but could not explain *how* an amended visitation order could modify 7 non-existing orders. And no doubt, Krasner will justify billing Plaintiff for this incompetent blunder under the pretense of legal services rendered.

581.    Another example of feigning inadequate law school education, occurred on 3/09/2020, while Defendants' Castillo-Lovaglio, and Lovaglio sat across from Plaintiff and Defendant Going outside the Part 14 waiting area after Defendant Shulman adjourned. Plaintiff gave Defendant Going a copy of the dismissal order with Chief Clerk #1's signature dated October 1, 2019, and OTSC #1 with the dated court stamp at 7:09am. Defendant Going asked for a copy of an Order of Restoration. Plaintiff told Defendant Going that Chief Clerk #1 was not able to locate such an order. Instead, Chief Clerk #1 gave Plaintiff a copy of OTSC #1 dated stamped at 7:09am, and he was visibly agitated, "I need a specific date. We've been here for over an hour searching for records." None of the records given to Plaintiff were found, i.e., entered, on the purported dates listed and searching for the speciously filed records took time.[332]

582.    Defendant Going claimed she would *ask* Defendant Galchus when the Order of Restoration was filed, which meant she cognizant of a procedural irregularity at a minimum, even if she was feigning legal expertise on jurisdiction. Defendant Castillo-Lovaglio subsequently told Plaintiff "it" was filed on September 4, 2019, per Defendant Going. Defendant Castillo-Lovaglio said Defendant Going advised her to have Plaintiff "order the minutes." Plaintiff paid $320.00 for tampered transcripts 1 & 2, "Duplicate Official Court Transcripts." Altered transcripts 1 & 2 were not in the court file on October 13, 2020, and they should have been because they were duplicate copies. When Plaintiff inquired as to why these records were missing, a QFC clerk told her to pay for transcripts.

---

[332] For example, the December TOC/V, issued on invalid and void docket numbers V-05120-19 and V-20987-18, was entered on 12/19/2019, though it had 12/17/2019 listed on the top right corner; hence, it was a Nunc Pro Tunc Order.

583.    A subsequent example of the Kool-Aid effect[333] goes further back to August 30, 2019, when a Part 14 court officer repeatedly told Plaintiff and Defendant Castillo-Lovaglio that nothing was scheduled under Plaintiff's name. And yet, the same court officer witnessed a hearing on a false instrument of filing take place, without seeing an entry in the computer system. The court officer said the Part 14's computer records did not reflect a case for Plaintiff. Despite knowing this, he remained silent about what was happening.

584.    See Example A.

585.    Underreporting caseload numbers is the same as underreporting taxes, or tax evasion. Defendant Shulman does this to circumvent Dashboard's algorithm by replacing petitions, supplemental petitions, and permanency planning hearings with motions and OTSC's. Dashboard is a unique tool not programmed to equate docket numbers on motions and OTSC's with petitions. Motions and OTSC's are not the statutorily prescribed methods for originating as specified in the FCA. It makes no sense to convolute an algorithm with unnecessary additional criteria. Like Employer QFC's accounting program, Dashboard extracts every instance of a petition, supplemental petition, and permanency planning hearing to calculate the rate of disposition based on a preset formula, i.e., a goal of 180 days from the date of origination. Just as there is no excuse for employees who feign ignorance of Employer QFC's tax evasion scheme because they benefitted from the additional un-taxed earnings, the same concept extends to the court clerks who knowingly reclassify motions and OTSC's as "conferences," despite the existence, implementation, and purpose of the taxpayer funded Dashboard tool.

586.    Therefore, Plaintiff can sufficiently establish the Municipal Enterprise, including a nexus of those incidentally related, with a proximate cause in perpetuating practices and policies for racketeering, which has become indisputable fronts for Kidnapping Schemes, not family court proceedings. And the pervasive ubiquitous intoxicating occurrence of perverse inexplicable anomalies with specious nomenclatures, like "clerical errors" or "administrative errors," serve to delay, frustrate, hinder, and prolong underlying forms of fraud, while obfuscating criminal activities, including but not

---

[333] The term was initially used to describe the charismatic and delusional cult leader, Jim Jones, who ordered his followers to drink poison and they did so willingly. The term is now used to describe any inoculating effect of inane ideologies on the public.

limited to, trafficking, money laundering, bondage, and extortion. Even litigants that hire private counsel can become unsuspecting prey to an unscrupulous level of exploitative billing for feigned legal expertise.

587.    In that Defendant ACS utilize their stature as a purported "child protection agency" to engage in practices and policies that subjugate, confine, control, and leverage child welfare is unequivocally consistent with Defendant OCFS's gross depraved deference for not monitoring the accuracy of records in Connections. It is unfathomable that Defendants OCFS failed to notice a consistent decline of registered court orders for CPS investigations in Connections, while also reciting false narratives of increased child protective proceedings in New York City family court. Instead, Defendant OCFS pretends to know nothing about Defendant ACS's defiance for registering court orders with the SCR, while also ignoring its sinister weaponization to register anonymous reports against unsuspecting parents and children under color of law, "[w]hen a court orders an investigation under Section 1034 of the FCA, the law requires the investigation to be in compliance with the rules for such investigations as required by the SSL. As such, court-ordered investigations (COI) are transmitted to the SCR. The SCR verifies that the report contains adequate information (valid alleged subject(s), maltreated/abused child(ren), and locating information) to allow the SCR to register the allegations of suspected abuse or maltreatment, and transmit them to the appropriate LDSS's CPS unit to complete an investigation as required by Article 6 of the SSL and 18 NYCRR 432."[334]

588.    For example, in June 2019, Defendants' Rodin, Steele, McFarlane, and Alozie submitted 3 unregistered FCA 1034 reports with forged signatures of SCDSS social workers, supervisors, and 1 purported director and drew fax numbers at the top of each page with PhotoShop. They even copied and pasted the official Suffolk County logo on fabricated "FCSA 1034 forms" in anticipation of Plaintiff's custody litigation before Defendant McGrady. Unregistered FCA 1034 #7 was submitted on 8/26/2019, and supported Plaintiff's custody of R.R. (3). Defendants' Rodin, Alozie, Kaplan, Galchus, Ruci, and McGrady conspired to discredit the report and discarded it.

589.    Curiously, while Plaintiff's FOIA records had no record of any registered Intake Stage ID's coinciding with the June 2019 FCA 1034 court orders, Defendant

---

[334] Local Commissioners Memorandum 19-OCFS-LCM-05.

Heaven's purported discovery contains scattered entries for the aforesaid June reports. Had Plaintiff also sent Defendant Heaven the January and May 2019 reports, there is no doubt it would have been retroactively entered in Connections and part of the 368 pages of counterfeited Discovery she intended to use for the OCFS fair hearing.

590.    Based on Defendant Heaven's blatantly contradictory misinformation for R.R. (3), L.N. (6), and Plaintiff in Connections, the retroactive frenzy of entries in sections that were previously left blank was grossly missed by Defendants OCFS, who aid and abet the Kidnapping Schemes by turning a blind eye to fabricated compliance, "OCFS does not maintain adequate oversight of direct placement to ensure that Local Districts comply with applicable laws and regulations and that children are placed in safe environments. Of 30 direct placement cases we sampled, 10 lacked evidence that the Local District provided the courts with all critical case information, which the courts rely on to make decisions regarding the safety and well-being of a child."[335]

591.    Defendants OCFS turn a blind eye to chronologically inconsistent disinformation in Connections, disguised as "managerial reviews" by Defendants ACS, "[d]irect placement data in CONNECTIONS was not always complete or accurate, which may compromise its integrity and usefulness for OCFS' data analysis, reporting, and performance measure purposes, as well as the reliability of direct placement case tracking. For example, we found discrepancies between source information and CONNECTIONS data for 23 of the 30 cases we reviewed. Additionally, the field indicating why a child was removed from direct placement was blank for over 40 percent of the children whose placement had ended. We also identified four cases where children were misclassified as being in direct placement."[336]

592.    What purpose do Defendants OCFS serve if, for example, Defendant Rodin can submit 3 unregistered FCA 1034 reports for CPS investigations that Defendants Peebles and Alozie did not conduct for R.R. (3) or L.N. (6), "[t]hroughout its response to the draft report, OCFS attempts to minimize our audit findings and deflect attention from the report's core issue of child safety. In general, OCFS officials took issue with our

---

[335] Audit for Office of Children and Family Services' Oversight of Direct Placement of Children by NYC Comptroller's Office (3/02/2020) (p. 1).
[336] Id. at 1-2.

"flawed" audit objective, proclaiming that the scope of our audit terminates after the court has placed a child."[337]

593.    Giving family court judges, like Defendant Shulman, access to Connections is a catastrophic mistake, endangering the safety and well-being of any child brought before the Part 14, "[c]hapter 595 of the Laws of 2008 requires that the New York State Office of Children and Family Services (OCFS), in conjunction with the New York State Office of Court Administration (OCA), study, evaluate, and make recommendations concerning the feasibility of using computers connected to the Statewide Central Register of Child Abuse and Maltreatment (SCR), as a means of providing the courts with information regarding parties requesting orders of custody or visitation."[338]

594.    For example, on 7/24/2020, Defendants ACS in New York County submitted an unregistered FCA 1034 report for Plaintiff's proceeding in Nassau County Family Court without the preparer, Shakeyla Whitaker's, signature nor the signature of the supervisor, Bette Durham. Despite the uncorrected and unchecked discrepancies, the fraudulent report was submitted anyway, "…[a]ccording to ACS' Managerial Random Review Policy, managers must perform random reviews of three cases per week…[t]hese reviews intended to ensure that managers assess the supervisors' oversight of investigative team case work."[339] The unregistered FCA 1034 report resulted in parent Jagnarain's loss of custody for child A.A. (6).

595.    For example, on 10/19/2020, 1/11/2021, 5/21/2021, Defendants ACS in Kings County submitted 3 unregistered FCA 1034 reports for parent R.M.'s proceedings. The 1/11/2021 unregistered FCA 1034 report speciously referenced a false record of criminal charges, false arrest, false plea deal, and false criminal conviction for a purported criminal proceeding for parent R.M., which Defendants ACS maliciously fabricated to spearhead a witch hunt at his expense. Aside from the criminally defamatory effect of the heinous, unsubstantiated criminal record, the unregistered FCA 1034 report resulted in terminating parent R.M.'s supervised visitation with child M.

---

[337] *Id.* at 2 (Referring to Lisa Rodin Exhibits C, D, and E for sham proceeding 10/26/2020).
[338] Feasibility Study of Family and Supreme Court Access to the Statewide Central Register of Abuse and Maltreatment.
[339] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.

596.    Defendant ACS preys on innocent children to seize them with fabricated probable cause because they have no need for directives, policies, procedures, or the law. Defendants ACS repeatedly provide false information, both written and verbal, to AG James, the FBI, NYC Comptroller, and Children's Bureau, "ACS officials asserted that they had mistakenly provided us with procedures that had not actually been in effect during our scope period. ACS officials claim that some of the procedures were modifications to prior procedures…[h]owever, we found no practical evidence to support this new assertion…[t]he fact that these supposedly controlling policies and procedures were brought to our attention more than a year and a half after we commenced this audit raises serious questions about ACS's management…[a]t best, these late produced rules illustrate that ACS is so disorganized that its senior officials and line staff are not in agreement with regard to the policies and procedures governing various aspects of its operations, which would in part explain the deficiencies we found in this audit…[h]owever, the last minute production of supposedly controlling rules could also reflect a breach of the good faith and cooperation that are essential to the audit process…[u]nder present circumstances, we fear that the weaknesses we found will persist unless management changes its operating philosophy and refocuses away from trying to build defenses for its actions to addressing agency weaknesses."[340]

597.    Despite repeated efforts to raise Defendants ACS awareness of mishandled reports of suspected abuse or neglect, based on missing or flawed records, missing reviews, errors, oversights, etc. paid for by New York State taxpayers, the patterns of gross negligence persist in subsequent audits by the New York City Comptroller. Although, Defendants ACS grossly neglected to implement corrective action years before conspiring to kidnap Plaintiff's innocent child, R.R. (3), the audits themselves were made known to Defendants OCFS, "[w]e found that supervisors did not conduct the required supervisory case reviews on a consistent basis. Even when the reviews took place, supervisors failed to consistently note when certain key investigation steps were not performed. In the cases where required steps were not completed, supervisors rarely

---

[340] New York City Comptroller Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016 (p. 12)

reminded the case workers that such steps were necessary or ensured that corrective actions took place."[341]

598.    Further, "[b]ased on our review of the case records recorded in CNNX, we found that only 47 of the 75 required supervisor reviews took place within the required timeframes. Of the 28 reviews that were not conducted within the required timeframes, 20 were conducted late and 8 were not conducted at all."[342]

599.    Under threats of foster care, incarceration, and severing Plaintiff's familial association with R.R. (3), to protect L.N. (6) from a cruel and unusual seizure under color of law by Defendants Alozie, Steele, and Best, who's perverse inclination for foster care sought to put child L.N. (6) in a foster home, Plaintiff had no other choice but ask Defendants' Castillo-Lovaglio and Lovaglio to take custody. Had Defendants OCFS fulfilled their robust taxpayer funded job, Defendant Alozie's false anonymous call would have been flagged as inconsistent with previously documented indicated findings made against Defendant Ruci, "CPS case transfers generally occur when a family moves from one district to another district within New York State during the course of an open CPS investigation or FAR, or when there is an open protective services case. The case may be transferred to the LDSS of the district to which the family has relocated. The LDSS making the transfer relinquishes case responsibility and primary legal accountability going forward."[343]

600.    Accordingly, "...traffickers force their victims into the international sex trade, prostitution, slavery and forced labor through coercion, threats of physical violence, psychological abuse, torture and imprisonment. To deter these crimes, Congress passed and the President signed into law the Trafficking Victims Protection Act (the Act) in October 2000. The law aims to combat trafficking through increased law enforcement, to ensure effective punishment of traffickers, to protect victims and to provide Federal and State assistance to victims..." Due to Defendants OCFS gross negligent, children R.R. (3) and L.N. (6) qualify as victims under the Trafficking Victims and Protection Act ("TVPA"), in that R.R. (3) as they are minors and unable to consent to their bondage.[344]

---

[341] *Id.* at 12.
[342] *Id.* at 13.
[343] Office of Children and Family Services, Child Protective Services Manual 2020 (p. 75).
[344] https://www.acf.hhs.gov/archive/otip/policy-guidance/state-letter-01-13

601.    Defendants ACS kidnapped child R.R. (3) to conceal a reported pattern of bruises and marks, which occurred during unsupervised overnight weekend visits under the exclusive control of Defendant Ruci. Defendants ACS unscrupulously leveraged R.R.'s (3) kidnapping to extort a self-incriminating false confession, written by Defendant Best, from Plaintiff on 8/29/2019.

602.    As an incidental consequence of the ongoing fraud, Defendant Ruci's acknowledge of paternity for R.R. (3) was deleted more than 1 year ago, yet Defendants' ACS and Shulman repeatedly permit the trafficking of R.R. (3) between the U.S. and Albania, with simultaneously inconsistent custodial records. Under one set of records, R.R. (3) and Defendant Ruci are purportedly under "ACS supervision," which is the order that Defendants ACS utilize to get paid for the false instrument of filing on docket NN-17995-19. Meanwhile, Defendant Rodin provided the FBI a false record of custody for R.R. (3) on 5/26/2020 to obstruct an investigation into his international kidnapping. Lastly, on or about 1/30/2020, Defendant Ruci used a United States Passport obtained by fraudulent means to kidnap R.R. (3), a child without legally established paternity to Defendant Ruci, to Albania.

    a.  Agent Zegarra, from the Department of State, U.S. Passport/Visa Fraud, said Defendant Ruci made 2 applications for R.R.'s (3) U.S. passport.

    b.  Agent Zegarra said both applications were mailed from a Queens County USPS office.

    c.  Application #1 was sent on or about 10/10/2019 and rejected due to "insufficient proof of custody," because it expiration on 12/17/2019.

    d.  Application #2 was sent on or about 12/19/2019, and approved due proof of "sufficient custody", i.e., "until further order from this Court."

603.    Although Defendants ACS and Shulman are responsible for perpetuating organized child trafficking from an established industry, i.e., the Municipal Enterprise, operating fronts as family court proceedings, the mere exercise of access and control over UCMS to enable Defendant Ruci to obtain a U.S. passport for R.R. (3) via fraudulent records of custody issued on invalid and void docket numbers is the result of Defendants OCFS egregiously careless and indifferent response to accountability, "OCFS also states that our "narrowly construed" scope places OCFS in an "impossible" position to satisfy our recommendations and that our findings presume that OCFS has the authority to overrule a

court's placement decision."[345] That response, alone, suggests that Defendants OCFS are not only aware of the causal connection between subpar recordkeeping in Connections, but deploy cowardly defenses to obfuscate their culpable oversight of unlawful seizures with counter opposite family court determinations.

604.    Plaintiff is the only legal parent for R.R. and was never asked by any of the Defendants for permission to take R.R. (3) to Albania. As the only legal parent for R.R. (3) Plaintiff never gave permission for R.R. (3) to have a U.S. passport. Even though Defendants' Shulman, Rodin, Ruci, Galchus, Blond, and Kelly share a delusion that Special Agent Maguire was never given a fraudulent document and so, there was no obstruction because not only did it not happen, but Defendants collectively claim the Nunc Pro Tunc "CPS Order #7259254" dated 8/30/2019 is controlling. For example, on or about 5/16/2020, Defendant Clarry falsely informed an investigator from Governor Cuomo's office that Plaintiff participated in a "proceeding in August" where Plaintiff "was silent when the US passport was discussed." The same falsehood was reiterated to the FBI, Department of State, SCR, and others investigating the unlawful removal of R.R. (3) from the U.S. on 4/25/2020.

605.    Consider another example of a clerical error. On 9/18/2020, Judge Hughes informed Plaintiff that Defendants' Castillo-Lovaglio and Lovaglio's order of custody for L.N. (6) was not in the UCMS, "who has custody of L.?" Since Judge Hughes is *the* Judge who signed it on 11/20/2019, it is impossible for him not to see *his* own order in *his* court computer. Therefore, Judge Hughes' order of custody for L.N. (6) was deleted. Given that Judge Hughes had no reason to delete records related to his cases from UCMS, the only plausible explanation is that Defendant Shulman deleted it on or about 3/09/2020.

606.    Due to Plaintiff's forced participation in fraudulent proceedings children, R.R. (3) and L.N. (6), have been commercialized, collateralized, and subjected to egregious ownership transfers by Defendants ACS, Shulman, Going, Kelly, Galchus, Ruci, Castillo-Lovaglio, Kaplan, Wisler, and Blond, since both have false, fraudulent, fabricated records of purported custody, which are simultaneously used to artificially sustain Plaintiff's bondage and conceal blatant trauma and child abuse.

---

[345] Audit for Office of Children and Family Services' Oversight of Direct Placement of Children by NYC Comptroller's Office 3/02/2020 (p. 2).

607.    As stated by the Administration for Children and Families, Plaintiff qualifies as an adult victim of trafficking, "(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[346] Therefore, Plaintiff is a victim under the provisions of the TVPA in that Defendants, collectively, forced, or attempted to force, plaintiff to perform additional labor—i.e., searching for a job—under threats of serious harm—i.e., the threat of incarceration and the threat of losing both R.R. (3) and L.N. (6), who Defendants seized, unless Plaintiff paid Defendants demands for private counsel fees, upwards of $15,000 or deal with Defendants numerous caustic and vindictive adjournments, which sought to further prolong Plaintiff's separation from both R.R. (3) and L.N. (6) with the eventuality of terminating Plaintiff's parental rights to both via court order.[347]

608.    Defendants OCFS negligent oversight and monitoring of Connections, permitted Defendants' ACS et al to conspire a scheme to enslave Plaintiff psychologically, emotionally, and physically, to seize Plaintiff's children R.R. (3) and L.N. (6) under color of law through fraud and fabricated allegations, intended to conceal grossly negligent omissions of a documented pattern of child abuse and funnel the illegal proceeds obtained from the constructive front of so-called family court proceedings via false instruments of filing.[348]

609.    Defendants ACS selective predation of similarly situated victims, like Plaintiff, has been documented by class, "they [mothers] contend that as a group, and individually, battered mothers punished physically by their abusers are punished a second time psychologically and emotionally by the government which deprives them of their children, and the children of them. Defendants do this, it is claimed, in large part because being passively battered has been characterized by ACS as "engaging in domestic violence," making the victim unfit to care for her children."[349] Last June, the predation was documented by race, consisting of a disproportionate number of seized minority children

---

[346] The Trafficking Victims Protection Act of 2000.
[347] 18 U.S.C. §§1589, 1592, 1594 (a).
[348] 18 U.S.C. §1960 Illegal Money Transmitting Business; IRS Code 9.5.5.2.
[349] *See* Nicholson v. Williams, 205 F.R.D. 92 (2001).

by Defendants ACS, "[a]lmost 7,900 New York City children lived in foster care as of March, 87% who are Black or Latino, according to state data."[350]

610.    Likewise, traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities," luring them "into their networks through false promises of decent working conditions at relatively good pay." 22 U.S.C. § 7101(b)(4). Congress specifically found that these widespread activities "substantially affect[] interstate and foreign commerce." 22 U.S.C. § 7101(b)(12)."[351] Put another way, consider the implicit exercise of rank choice predilections for determining business partnerships in the context of professional services. To enforce racial equity, "…a legislative package De Blasio signed in September of 2017, which mandated training on implicit bias, discrimination and structural inequity at city agencies…holding all city agencies accountable for racial equity applications in their departments."[352]

611.    Defendants ACS business partnerships are annually rated by funding allocations to either Minority Business Executives ("MBE") or Women Business Enterprises ("WBE"), which directly reflects an inherently ingrained predation for certain types of people as opposed to others. For example, since 2017, Defendants ACS have maintained a consistent D grade for African American owned businesses; a C grade for Hispanic American owned businesses in fiscal year 2017, a D grade in fiscal year 2018, which slightly rose to a B grade in fiscal year 2019 and an A grade for fiscal year 2020. Consider that Defendants ACS maintained steady A grades for Asian American business partnerships since 2014. Despite those grades based on race, Defendants ACS received consistent D grades for women owned business partnerships overall, which implies there is an inherent bias against Hispanic and African American women.[353]

612.    Defendants' ACS targeted Plaintiff, a female, Hispanic, single mother and victim of domestic violence, from day one: 12/13/2018, after former, "Queens Family Court Referee Wanda Wardlaw Matthews orders a 1034 on Docket # V-20987-18. Due Date 1/16/19," which stated, "ACS is ordered to explore and report to the court on the

---

[350] The Imprint, *No Evidence of Pandemic Child Abuse Surge in New York City, but Some See Other Crises For Child Welfare System* (6/15/2021).
[351] *See* (United States v Tutstone, 525 F App'x 298 [6th Cir 2013]).
[352] The Imprint, *New York City Confronts Massive Overrepresentation of Black Children in Foster Care* (2/27/2019).
[353] https://comptroller.nyc.gov/mwbe/administration-for-childrens-services-fy-2020/

circumstances that caused the criminal court full stay away order of protection in favor of both mother and the subject child" due on 1/16/2019.[354] Since then, Defendants have employed various forms of racketeering, including but not limited to extortion to subjugate Plaintiff by leveraging children, R.R. (3) and L.N. (6), to sustain egregious race and sex based selective prosecution with federal, state, city, and county funds. Defendants ACS utilize malicious prosecution to conceal gross compounded gross misconduct from omissions and misrepresentations of Defendant Ruci's acts of domestic violence perpetrated against Plaintiff in front of R.R. (3).

613.    Defendants ACS grossly and intentionally omitted Janet Richter ("Richter"), R. R.'s (3) assigned Suffolk County caseworker's, case notes in Connections, which substantiated the initial determination of the indicated finding against Defendant Ruci, "…[a]llegations of XOTH are substantiated against father Ruci as it could be shown that the physical, mental or emotional condition of his children were placed at risk of impairment by his actions"[355] whereas Defendants ACS misrepresented the relevant section of the FCA 1034 report as, "The father/petitioner has no indicated history with NYC children services."[356]

614.    That Plaintiff Parents have been involuntarily bound to invalid, unlawful money laundering fronts at QFC under color of law via specious methods utilized by the Municipal Enterprise was previously documented in AG James's investigation of Defendants ACS gross seizure of children, "[c]ombining anecdotal reports from the hotline and publicly available data, the Office of the Public Advocate identified several deficiencies including, but not limited to, ACS removal of children without proper court process, failure to identify and provide adequate services for parents of children in care and subsequent delays in reunification, failure to place children appropriately and thus creating instability, failure of ACS and the Contract Agencies to be prepared for court dates, failure of ACS to recruit, train and support adoptive placements, failure to engage in concurrent planning, failure to protect children from maltreatment and failure to provide adequate health and mental health services to children in care. Those deficiencies and

---

[354] Connections Stage Summary (12/14/2018).
[355] Connections Stage Summary, "Legal Definition of Maltreatment".
[356] FCA 1034 Report (1/16/2019).

recommendations for addressing them were cited in a report that was issued on July 2, 2015."[357]

## Wire Fraud & The Lanham Act

615.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-614, above as if specifically set forth herein.

616.    Defendant Hansell has been publicly quoted by various media and news outlets regarding purported reforms or corrective actions implemented by Defendant ACS, for which he provided false information about the agency's performance, compliance, and its status thereof.

617.    For example, many publications noted that the number of SCR reports have steadily declined, yet the number of child protective proceedings in family court continues to rise.[358] Despite the inexplicable levels of child protection proceedings, State Defendants reported numbers do not align with the misrepresentations. *(Put another way, consider this analogy: the number of police arrests has steadily declined but criminal court proceedings continue rising. How do the alleged criminals end up in court?)* If Defendant ACS was preying on children, through their parents custody proceedings, then the reduced SCR report numbers supports Plaintiff's theory of undocumented, unaccounted predation, "when an official is charged under 42 U.S.C.S §1983 with default in exercise of the affirmative responsibility, there are two fundamental requisites for §1983 liability to be imposed. The first is that the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or interest. The second is that the officials in charge of the agency being sued must have displayed a mental state of deliberate indifference in order to meaningfully be termed culpable under §1983."[359]

618.    Defendant Hansell publicly advocates for changes to mandated reporting, "[u]nder the law, states operating child protection hotlines must screen calls and refer to local authorities any that suggest abuse or neglect may be taking place…[m]ost callers are "mandated" reporters such as teachers, law enforcement or medical professionals, but

---

[357] *See Elisa W. v. City of N.Y.*, No. 15 CV 5273-LTS-HBP [S.D.N.Y. Sep. 12, 2016]); 18 U.S.C. §371 or 18 USC §1956(h) Conspiracy; IRC 9.5.5.2.
[358] New York State Unified Court System, 2018 Annual Report ("[i]n New York City, Family Court has managed to hold its own despite a surge in neglect and abuse cases, among the most difficult cases handled in the Family Court.")
[359] *See* Doe v. New York City Dep't of Social Services 649 F.2d 134; 1981 U.S. App. LEXIS 13300, ***3.

anyone can report anonymously"[360] to conceal his knowledge of and evidence of CPS investigations not performed by Defendant ACS. For example, Defendant OCFS's memo regarding updated procedures for transmitting FCA 1034 investigations and COI's to the SCR, such as switching from paper to electronic forms, was specifically addressed to all the social services Commissioners in New York State.

619.    It has been repeatedly determined that Defendant OCFS does not have adequate control of its documentation and records for children in Connections, especially for cases involving Defendant ACS.

620.    Agents and employees acting on behalf of the Municipal Enterprise also use NYC Administration as the purported child protective entity listed on reports prepared and submitted for court proceedings. For example, Plaintiff and parents' Jagnarain, Cibelli, and R.M. all have copies of fabricated FCA 1034 reports and COI's that Defendants ACS submitted for legal proceedings in family court, none of which were registered with the SCR and no letters from Defendant OCFS were mailed as confirmation of a registered court order in compliance with SSL§§ 413, 415 and Title 6.

621.    It is a publicly documented fact that Defendant ACS routinely lies to parents and violates their rights with misinformation about their authority to override parental rights over child(ren), "[m]issing here is any evidence that ACS has been too quick to take kids from parents, let alone any sign that it seeks to frame parents as abusive in order to steal their children."[361]

622.    So, Defendant Hansell knowingly uses misinformation to scare the public about purported dangers to effective child protection, should lawyers be assigned at the onset of a CPS investigation by Defendant ACS to continue the current self-enacted policy of disallowing attorneys to participate in so-called conferences held by his employees and agents. Defendant Hansell does not want the public to know what goes on during purported "child safety conferences" or that its purpose also serves as Defendant ACS's initial hurdle to file a case against parents in family court. He knows Defendant ACS routinely lies and misinforms parents about the purpose of these so-called conferences.

---

[360] The Imprint, *New York City Child Welfare Chief Calls for Changes to Mandated Reporting System* (03/15/2021).
[361] The New York Post, *Child Abuse Investigation? Don't Send in the Lawyers* (11/01/2019).

623.    Specifically, he seeks to withhold information from the public, that is purposely concealed to lure unsuspecting parents to their offices under false pretenses. This information is not revealed until the end of the purported conference, which is determined by Defendant ACS as noncompliance with signing false confessions of guilt, "[the] goals of our initial investigation are to understand what may or may not have happened to a child, and to connect families to the services they need," the ACS commissioner said. "Invoking legal representation at this stage could undermine our ability to accomplish these steps.""[362]

624.    Defendant Hansell is an attorney that excels in damage control, supplying knowingly false information to the public when reported failures and/or shortcomings of Defendant ACS is revealed or made known, such as claiming the "assault[][of] a 6-year-old boy inside an ACS youth shelter in Manhattan"[363] by a convicted criminal who "served three decades in prison for murder, attempted murder and other charges in Brooklyn,"[364] is attributable to his predecessor, "Hansell said Edwards wouldn't have been hired under policies revised when he replaced ex-Commissioner Gladys Carrion..."[365] in 2018.

625.    Unfortunately, the purported negligent hiring of a convicted criminal by the former Commissioner does not resonate with a more current, negligent hiring of an esteemed pedophile to work with, inter alia, the City's troubled foster youth under his custody and care, "...on the topic of pedophilia published between 1979 and the early 1990s, Sandfort wrote that children as young as age 10 can be in consensual sexual relationships with adults decades older and should not always be labeled as "victims.""[366]

626.    According to an interviewee by The Imprint, "[Sandfort] is considered a pioneer in identifying mental health risks for the LGBTQ population[]and is an editorial board member for several well-regarded academic journals. His former students have praised him on social media in recent years for his mentorship,"[367] such as published works that focus on perpetuating HIV transmission in an already vulnerable population, appropriately titled, *The feasibility of recruiting and retaining men who have sex with men*

---

[362] New York Post, *ACS Chief Says City Bill Guaranteeing Lawyers Could Endanger Children* (10/31/2019).
[363] New York Post, *ACS Worker Who Served Time for Murder Arrested for Assaulting Child* (08/07/2018).
[364] *Id.*
[365] *Id.*
[366] The Imprint, *New York City Foster Care Agency Cuts Ties With Columbia Professor After Pedophilia Studies Resurface* (12/15/2020).
[367] *Id.*

*and transgender women in a multinational prospective HIV prevention research cohort study in sub-Saharan Africa*, focusing on, inter alia, the "[p]rimary objective of the HIV Prevention Trials Network (HPTN) 075 study was to assess feasibility of recruiting and retaining a multinational prospective cohort of MSM/TGW in SSA for HIV prevention research."

627.    To further exemplify Defendant Hansell's routine and reckless rubberstamping and lies to the public, "[o]n Friday, the Administration for Children's Services (ACS) informed The Imprint that the agency's current leadership had not previously known about these publications and…"severed all ties" with Sandfort"[368] is a bald-faced lie. Sandfort, "is a postdoctoral training director at Columbia University's HIV Center for Clinical and Behavioral Studies" and has been a notable figure in a particular community of at risk persons,"…"gay and lesbian sexuality and mental health, determinants of HIV risk behavior, and sexual health promotion[,]""[369] which is the same community that Defendant Hansell served "[f]rom 1997 to 2001, Hansell was the Associate Commissioner for HIV Services at the New York City Department of Health and was the government representative for the NYC HIV Prevention Planning Group. He played a crucial role helping the DOH provide funding to combat HIV/AIDS in communities of color."[370]

628.    Incidentally, in a press release on January 6, 2020, "NYC Administration for Children's Services (ACS) Commissioner David A. Hansell today unveiled the agency's brand-new logo: "NYC Children… The logo change is consistent with the logos of sister agencies across the City, including: The Department of Health and Mental Hygiene (NYC Health), the Department of Veterans' Services (NYC Veterans), the Department of Buildings (NYC Buildings), among others… The official name of the agency, Administration for Children's Services, will not change."[371]

629.    Defendant Hansell falsely claimed the new logo was not intended to change the Municipal Enterprises name, i.e., Administration for Children's Services. However, the logo NYC Children is used by its attorneys, caseworkers, and others to both

---

[368] *Id.*
[369] *Id*
[370] The BodyPro, Farewell David Hansell: OTDA Commissioner Heads to D.C.; Advocates Praise His Efforts in New York (06/17/2009).
[371] NYC Children Immediate Press Release dated 1/06/2020.

replace and substitute its chartered name in official reports, subpoenas, and legal documents. For example, bi-annual attorney registration filings with OCA have NYC Children listed as the business entity for several registered attorneys. Currently, 6 attorneys, including Alan W. Sputz, register their business name as NYC Children – the logo.

630.    By Executive Order, the Children's Welfare Administration ("CWA") was renamed the "Administration for Children's Services." In its Charter, Defendant ACS is a subsection of the position created for ACS Commissioner, which does not include the use of aliases NYC Children, NYC ACS, NYC Children's Services, et. al, to engage in commercial transactions, such as, under parens patriae founded intervention, "[i]n a sense, all commercial injuries from false advertising are derivative of those suffered by consumers deceived by the advertising. But since the Lanham Act authorizes suit only for commercial injuries, the intervening consumer-deception step is not fatal to the proximate-cause showing the statute requires. Cf. Bridge v. Phoenix Bond & Indemnity Co., 553 U. S. 639, 656."[372] For example, Exhibit A for the Jan. 2021 OTSC sent to the FBI, was a "Judicial Subpoena Deuces Tecum for The Release of Medical Records" and at the bottom it said, "All invoices must be sent to: Stephanie Taylor, Esq., NYC Children, Business Law Unit, 150 William Street 15th Floor, New York, New York 10038."

631.    Regardless, attorneys, agents, and employees conducting the affairs and activities by and through the Municipal Corporation put NYC Children on subpoenas as the purported child protective agency to obtain, inter alia, HIPAA protected medical records.

632.    On or about January 25, 2021, Defendant Whitfield, on behalf of Defendant Rodin, sent 5 OTSC's ("Jan. 2021 OTSC's) to the same exact e-mail addresses as the ones from on or about January 12, 2021. At 11:00pm on January 27, 2021, Defendant Whitfield sent the same 5 OTSC's to the same e-mail addresses in an e-mail to Plaintiff and copied Defendant Blond. On February 1, 2021, Defendant Whitfield sent 7 signed OTSC's, including a duplicate for the FBI and 1 for VIBS, to the same e-mail addresses, including Plaintiff, Defendant Blond, and VIBS.[373]

---

[372] *See* LEXMARK INT'L INC. v. STATIC CONTROL COMPONENTS, INC. 697 F. 3d 387, affirmed.
[373] See ¶ 760.

633.    In all the Jan. 2021 OTSC's, Defendant Rodin indicated, "I make this Affirmation in Support of the application by the NYC Children (hereinafter "NYCC") for a judicial subpoena and order...", all were signed in their entirety by Defendant Shulman. Coincidentally, the purported written decision was never issued nor filed, hence a pretext for a sham proceeding. Clearly, the Municipal Enterprise has changed its name or intends to change its name without requisite legislative approval.

634.    Defendant Shulman's biased inclination for Defendant ACS, precipitated by her own participation in the conspiracy to violate Plaintiff's rights under color of law, resulted in the egregious disregard for signing and issuing subpoenas for, inter alia, medical records requested by a logo – a non-existent entity. The corresponding false affidavits of service for both Notices of Motion and the OTSC's also contained NYC Children as the entity Defendant Whitfield purported to work for, which Defendant Keller notarized as true statements.

635.    Of the 5 e-mail addresses originally sent on January 12, 2021, two for Stony Brook University Hospital and Long Island Jewish Health Management ("LIJHM"), who relied on the false misrepresentations in purported notices of motion, orders to show cause, draft subpoena exhibits, etc. with the logo "NYC Children" as the valid employer of Defendant Rodin and released Plaintiff and R.R.'s (3) HIPAA protected medical records, "[t]hus, a plaintiff suing under §1125(a) ordinarily must show that its economic or reputational injury flows directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff. Pp. 13–15."[374]

636.    According to Amanda McCann ("McCann"), Supervisor for Health Information Management at LIJHM, R.R. 's (3) medical records were released because the address "NYC Children" used was valid. Specifically, Defendant Whitfield used the address at QFC, 151-20 Jamaica Avenue, Queens, New York, as the address for "NYC Children." No doubt, Defendant Shulman's signature on the "Order To Show Cause Affirmations in Support to Release Medical Records" prepared by Defendant Rodin, further validated the false, or misleading, misrepresentations "of the application by the NYC Children (hereinafter "NYCC")." In fact, in all of Plaintiff, parent's Jagnarain,

---

[374] *Id.*

Cibelli, and R.M.'s unregistered FCA 1034 reports, employees and agents of Defendant ACS use all sorts of aliases and nicknames in reference to the Chartered agency.

637.    No doubt Defendants' ACS, Shulman, and Wisler will attribute the oversight as a "clerical error" to misrepresent how grossly negligent Defendants' Rodin and Whitfield were in trying to conceal their fraud as a frenzy of OTSC's, many of which were sent to invalid e-mail addresses, while others had "Felicia Donaldson" as the respondent on the subpoena. After all, what purpose is there for establishing criminal and legal consequences for HIPAA violations when an entity does not exist. Not surprisingly, as expected, Defendant Wisler's e-mail with the signed OTSC's on 2/01/2021 speciously contained the corrections to "Felicia Donaldson" as "[a]ttached are orders to show causes filed by ACS seeking records. The ACS attorney must serve all parties and the facilities with a copy of these motions, as this email will not suffice as service on the parties or facilities"[375] i.e., directing Defendant Whitfield to fraudulently re-serve them.

638.    In the event the aforesaid Defendants do provide a "clerical/administrative/erroneous error" explanation as a *harmless oversight*, it should also be noted that both Stony Brook University Hospital ("SBUH") and Moses Cohen's Children's Hospital relied on the "official" misrepresentations of validity and legitimacy in Defendant Whitfield's e-mails regarding the entity she represents, i.e., NYC Children. Consider the following examples:

   a. In a worker's compensation claim, SBUH receives a subpoena from Lisa Rodin, an attorney representing "NYC Buildings", requesting John Doe's medical records.
   b. In a medical malpractice suit, Moses Cohen's Children's Hospital receives a subpoena from Lisa Rodin, an attorney representing "NYC Health", requesting Baby Doe's medical records.
   c. In an administrative review hearing for the denial of coverage for certain benefits or services, Victims Information Bureau of Suffolk (VIBS) receives a subpoena from Lisa Rodin, an attorney representing NYC Veterans, for Jane Doe's medical and/or treatment records.
   639.

640.    Defendants' Ruci, Rodin, Shulman, McFarlane, Whitfield, Galchus, Blond, Wisler, and Kelly conspired to obtain Plaintiff and R.R.'s (3) medical records with a

---

[375] 2/01/2021 – E-mail from Wisler with signed OTSC's.

subpoena for a non-existent entity NYC Children, pertaining to a docket number that is itself a false instrument of filing.

641.     Given aforesaid Defendant's propensity to counterfeit records to finance various money laundering schemes, as done to Plaintiff's records to conceal their own gross negligence, there is no doubt her records have been altered, tampered, and/or ultimately compromised to retroactively fit the false narrative, for which Defendant Teplansky provided suborned perjury on March 26, 20201.

642.     Nonetheless, this puts Plaintiff in a position that requires legal action against both SBHU and LIJHM for gross negligence: releasing medical records to a logo because it had a valid address, i.e., QFC.

## **Racketeering á la Federal Grants**

643.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-630, above as if specifically set forth herein.

644.     The Department of Health and Human Services is authorized to administer various grants and programs from the Social Security Administration to States via the Children's Bureau,[376] but also includes reporting and accountability under various Internal Revenue Codes from the United States Department of the Treasury.

645.     For example, as part of State Defendant's agreement pursuant to Title IV-E, Defendant OCFS must "…inform any individual who is adopting, or whom the State is made aware is considering adopting, a child who is in foster care under the responsibility of the State of the potential eligibility of the individual for a Federal tax credit under section 23 of the Internal Revenue Code of 1986[.]"[377]

646.     Under Title IV-D, State Defendant must remit accurate information from the records of Defendant Poole for Defendant DCSE, "data, by State, on use of the Internal Revenue Service for collections, the number of court orders on which collections were made, the number of paternity determinations made and the number of parents located, in sufficient detail to show the cost and benefits to the States and to the Federal

---

[376] Congressional Research Service Report, *Child Welfare: Funding for Child and Family Services Authorized Under Title IV-B of the Social Security Act* - R41860 (October 24, 2012).
[377] 42 U.S.C. 671 §471 (33).

Government[.]"[378] In addition, "[t]he Secretary of the Treasury shall have access to the information described in paragraph (2) for the purpose of administering those sections of the Internal Revenue Code of 1986 which grant tax benefits based on support or residence of children."[379] Further, "[t]he Secretary of the Treasury shall have access to the information in the National Directory of New Hires for purposes of administering section 32 of the Internal Revenue Code of 1986, or the advance payment of the earned income tax credit under section 3507 of such Code, and verifying a claim with respect to employment in a tax return."[380] Lastly, "[i]nformation in the Federal Parent Locator Service, and information resulting from comparisons using such information, shall not be used or disclosed except as expressly provided in this section, subject to section 6103 of the Internal Revenue Code of 1986."[381]

647.    HHS is also authorized under 28 C.F.R. Part 35, Subpart G, to conduct compliance reviews and investigate alleged violations of Title II of the ADA by a public entity relating to the provision of health care and social services.  HHS is also responsible for investigating complaints and conducting compliance reviews to determine if recipients of HHS funding operate their programs and activities in compliance with Section 504, and, where appropriate, take enforcement actions authorized by law.

648.    Defendants' Ruci, Galchus, Kaplan, Rodin, Steele, Alozie, Tingue, and McGrady conspired to use their knowledge and awareness of Plaintiff's learning disability as the pretext in the Anonymous Report. Aforesaid Defendants used misrepresentations of material facts to weaponize their knowledge and familiarity with the SCR to register the false report by stating Plaintiff "takes psychotropic" medication without any medical proof. Then, aforesaid Defendants, including Defendants' Shulman and Teplansky, conspired to sever Plaintiff's familial association with R.R. (3) by falsely claiming the learning disability was "Munchausen" and directed their in-house psychologist, Dr. Miller, to engage in specious psychiatric practices to codify *their* diagnosis in the MHO.

649.    As instructed by "my boss", Dr. Miller attempted to diagnose Plaintiff with Munchausen by repetitively asking, "how many times do you wash your hands?" and

---

[378] 42 U.S.C. 652 §452 (a)(10)(G).
[379] 42 U.S.C. 652 §453 (h)(3) Administration of Federal Tax Laws.
[380] Id. at (i)(3).
[381] *Id.* at (l)(1).

"how often do you take your child to the doctor?" Aforesaid Defendants did not inform Dr. Miller about Plaintiff's second child, which resulted in him rephrasing the question, "how many times a year would you say you take your children to the doctor?" Dr. Miller was not, and is not, an expert on Munchausen and neither is Defendant Teplansky, who made the diagnosis. It is a fact that Defendant ACS has been, and is, engaged in false or misleading advertising of "mental health disorders" to label women as unfit mothers and these misrepresentations caused Plaintiff to relinquish custody of L.N. (6) due to fear of incidental and caustic stigma associated with an unsubstantiated diagnosis by an unlicensed person, and then, through specious use of quack science in violation of 43(a) of the Lanham Act, 15 U.S.C. §1125 (a).

650.    For example, each time an agent of federal, state, or local enforcement contacted Defendant ACS to inquire about the kidnapping of R.R. (3) by Defendant Ruci, including for the U.S. passport obtained by fraud, agents and employees of the Municipal Enterprise, said Plaintiff was diagnosed "crazy" and "delusional." These false allegations stem from Defendant Kaplan's hearsay, which Defendant' Rodin, Alozie, Galchus, McGrady, and Ruci witnessed being said on August 26, 2019. It was Defendant Kaplan who claimed Defendant Teplansky made a "judgment call" based on "his many, many, many years as a police officer," despite Defendant Rodin's assertion that Defendant ACS did not intend to file an FCA Article 10 against Plaintiff.

651.    The patently false and misleading accusations to state, federal, and local law enforcement, made by Defendants' Clarry, Peebles, Rodin, Alozie, Steele, were used time and again to obstruct investigations into the illegal activities and affairs of Defendant Ruci, and no doubt to protect their own illegal activities and affairs by and through the Municipal Enterprise. The intentional and malicious slander caused Plaintiff significant emotional and physical distress, resulting from Defendant's knowing use of junk science. Plaintiff has suffered irreparable harm, both financially and emotionally, trying to combat their false allegations and protect R.R. (3) from further harm. The use of false or misleading propaganda of purported undiagnosed mental illness is both stigmatizing and detrimental to Plaintiff's credibility, which state, federal, and local law enforcement rely on as official statements from child protective agents to justify closing their investigations.

652.     For example, Agent Zegarra contacted Defendant Peebles to verify the authenticity of the void and invalid December TOC/V. According to Agent Zegarra, Defendant Peebles confirmed Defendant Ruci had custody of R.R. (3) via the December TOC/V, meanwhile, Defendants' Rodin, Shulman, Galchus, Wisler, Kelly, and Blond provided Special Agent Maguire the March TOC as proof of custody. None of these orders are valid because Plaintiff never re-filed a petition at QFC before or after learning of the order of dismissal, yet both have Plaintiff's docket number on them in its pre-dismissal form.

653.     The malicious and illegal false advertising of Plaintiff's purported mental unfitness is the cover story aforesaid Defendants use to explain their sequestration of R.R. (3), which derivatively endangers L.N. (6), "[t]he "plus" requirement of a "stigma plus" claim requires a material state-imposed burden or alteration of a plaintiff's status or rights. See McCaul, 514 F. App'x at 4 (stigma must be combined with "state-imposed alteration in [the plaintiff's] legal status" (citing Paul, 424 U.S. at 708–09)); Valmonte, 18 F.3d at 999 (holding that "a plaintiff must show . . . a material state- imposed burden or state-imposed alteration of the plaintiff's status or rights"). The injuries that flow directly from a tarnished reputation cannot, standing alone, satisfy the "plus" element. See Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) ("'[D]eleterious effects flowing directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine.'" (alteration omitted) (quoting Valmonte, 18 F.3d at 1001)); Tafuto, 2012 WL 4459803, at *5 ("To qualify as a 'plus,' the state-imposed burden must be separate from 'the deleterious effects which flow directly from a sullied reputation.' . . . The impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation' are not, by themselves, constitutionally cognizable injuries." (alteration omitted) (quoting Valmonte, 18 F.3d at 1001)); Rankel v. Town of Somers, No. 11-CV-6617, 2014 WL 715702, at *15 (S.D.N.Y. Feb. 25, 2014) ("damage that merely flows from the injury to reputation . . . is insufficient to state a claim for stigma-plus" (citing Sadallah, 383 F.3d at 39))."

654.     Due to patently false labels and malicious slander, Plaintiff's ability to resume lawful custody of L.N. (6) has been ostensibly delayed. Plaintiff cannot obtain relief in any state court where aforesaid Defendants' counterfeit records are assumed to be

the legitimate records of a money laundering front upheld and co-sponsored by Judicial participation. For example, in September 2020, the Order of Custody for L.N. (6), issued by Judge Hughes, was no longer a record in UCMS. It was deleted by Defendant Shulman when she deleted the actual entry in the court's computer to re-enter Defendants' Castillo-Lovaglio and Lovaglio's petition, V-01066-20, as a motion on or about January 9, 2020. This was done to falsify records of her performance in compliance with Standards & Goals, submitted as reports to Chief Judge DiFiore from Dashboard. By doing this, Defendant Shulman can protract, delay, prolong, and extend malicious prosecution without alerting her superiors about the extensive amount of time it takes her to dispose of a case.

655.    Therefore, enabling aforesaid Defendants, including Defendants' Shulman, Galchus, Kelly, and Blond to engage in malicious misrepresentations about Plaintiff's transfer of custody of L.N. (6) to Defendants' Castillo-Lovaglio and Lovaglio to further stigmatize and malign the record against Plaintiff to conceal that SCDSS took no action to intervene and supported her custody of both children. Aforesaid Defendants are knowingly protecting Defendant Ruci, who has a criminal record for acts of domestic violence against Plaintiff in Queens and Suffolk County, including subsequent violations of her OOP. Aforesaid Defendants know Defendant Ruci was indicated 3 times for maltreatment and inadequate guardianship of R.R. (3), which occurred before and was the basis of maliciously targeting Plaintiff with a purported FCA Article 10.

656.    Under SSA Title IV-D child support and establishment of paternity program, State Defendant and Defendant Poole were, and are, required to monitor and restrict unauthorized access to confidential taxpayer information stored in its "…single statewide automated data processing and information retrieval system"[382] with "[p]rocedures to ensure that all personnel (including State and local agency staff and contractors) who may have access to or be required to use confidential program data are informed of applicable requirements and penalties (including those in section 6103 of the Internal Revenue Code of 1986), and are adequately trained in security procedures."[383] The "single statewide" system, Defendant DCSE, and is under the control and management of Defendant Poole.

---

[382] 42 U.S.C. 654a §454A (a).
[383] *Id.* at (d)(4) Training and Information.

657.    Part of Defendant ACS's authority includes child support enforcement, which enables its employees and agents to access the records of Defendant DCSE. By virtue of UCMS, Defendant Shulman has access to court records and records of proceedings. It is only due to this combined and concerted effort that both Defendants' Shulman and Rodin conspired to gain unauthorized access to Plaintiff's social security number to prepare a subsequent AP (AP #2) for Defendant Ruci without her presence or signature to validate parentage of R.R. (3).

658.    That State Defendant and Defendant Poole know, or should have known, that R.R. (3) cannot have more than 1 AP, let alone 3, at the same time is not an acceptable or permissible oversight. That Defendants' Shulman and Rodin have manipulated the state's system to simultaneously enforce different fraudulent support orders, with different determinations, including to establish retroactive collection for the self-serving August support order should have been flagged. Accordingly, "[e]xpedited administrative and judicial procedures (including the procedures specified in subsection (c)) for establishing paternity and for establishing, modifying, and enforcing support obligations"[384] are "not subject to retroactive modification by such State or by any other State; except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice of such petition has been given, either directly or through the appropriate agent, to the obligee or (where the obligee is the petitioner) to the obligor."[385]

659.    Furthermore, not only must State Defendant and Defendant Poole have safeguards in place, but punishment for unauthorized access and use, "[a]dministrative penalties (up to and including dismissal from employment) for unauthorized access to, or disclosure or use of, confidential data,"[386] because Defendants' Shulman and Rodin's illegal breach of Plaintiff's social security number was used to locate her last place of employment to mail a letter for wage garnishment under the March 17, 2021 fraudulent default support order ("March default order"), with the support magistrate's forged signature, and remitted to Defendant DCSE as "final support order" to enforce.

---

[384] 42 U.S.C. 666 §466 (a)(2).
[385] Id. at (9)(C).
[386] 42 U.S.C. 654a §454A (d)(5) Penalties.

660.    Defendants' Rodin, Kaplan, Galchus, Ruci, Naughton, Alozie, Wisler, and Shulman knowingly and maliciously conspired to prevent Plaintiff from enforcing their loss of jurisdiction by engaging in racketeering. Specifically, aforesaid Defendants fabricated and entered a fraudulent August support order for Defendant Ruci on docket number F-05491-19, after deleting Plaintiff's temporary support order on docket number F-05491-19 from May 2019. Docket number F-05491-19 was issued to Plaintiff's support petition in March 2019.

661.    On October 1, 2019, Plaintiff and Defendant Castillo-Lovaglio obtained a copy of a purported temporary order of custody from QFC records department that Defendant Ruci asserted existed and attempted to enforce the week before to prevent R.R. (3) from access to his grandparents. Chief Clerk of Court, Robert Ratanski ("Chief Clerk #1), handed Plaintiff 1 signed and sealed official copy of the dismissal order and 1 signed and sealed official copy of the August TOC/V. Chief Clerk #1 also told Plaintiff nothing was pending under file number 180803, "quickly, go file your petition."

662.    Plaintiff attempted to break free from the bondage of material misrepresentations Defendants' Shulman, Steele, Alozie, Tingue, Kaplan, Wisler, Rodin, Galchus, Naughton, and Ruci were using to restrain, confine, and control her and R.R. (3), by filing for custody in SFC ("SFC petition"). On October 8, 2019, Defendant Ruci was served with process for Plaintiff's SFC petition. Around 10:00 pm, Defendant Galchus speciously e-mailed OTSC #1 to, inter alia, "restore the dismissed petitions to the calendar." According to Defendant Wisler, OTSC #1 was signed the day before and in the "Part 14 bin." Had Plaintiff not filed in SFC, aforesaid Defendants would not have fabricated the false instrument of filing, i.e., OTSC #1, under the pretext of a clerical error to misrepresent a jurisdictional defect in their campaign to sustain malicious and selective prosecution, founded solely on a concerted effort to conceal child abuse.

663.    An additional attachment was included in the e-mail, "Ruci – N petition order release & visitation," a Nunc Pro Tunc Order, i.e., CPS Order, electronically signed by Defendant Shulman on "20190903." Accordingly, the CPS Order purported, "IT IS ORDERED that subject child is released to non-respondent father Ruci with ACS supervision; supervised by agency or an agency approved resource for the mother Victoria C. Navarro." Technically, the purported CPS Order does not exist because Defendant

Rodin never legally filed an FCA Article 10 petition on docket number NN-17995-19 nor did she submit one to Chief Clerk #1, who never issued summons nor entered it as a record of the family court. And he would have seen it on October 1, 2019, when he confirmed nothing was pending and handed Plaintiff an official copy of the order of dismissal.

664.    Nonetheless, the CPS Order qualifies as a non-custodial parent visitation order for payment under SSA Title IV-D grant, "Access and Visitation Program", pursuant to 42 U.C.S. 669b §469B (a), "[t]he Administration for Children and Families shall make grants under this section to enable States to establish and administer programs to support and facilitate noncustodial parents' access to and visitation of their children, by means of activities including mediation (both voluntary and mandatory), counseling, education, development of parenting plans, visitation enforcement (including monitoring, supervision and neutral dropoff and pickup), and development of guidelines for visitation and alternative custody arrangements."

665.    This constructive fraud is enforced by Defendant Shulman, who knows, or should have known, by virtue of her former employment that, "[a] State to which a grant is made under this section may not use the grant to supplant expenditures by the State for activities specified in subsection (a)…"[387] Hence, Defendant Galchus's labeling of the attachment as "release & visitation", intended to supplant Defendant McGrady's August TOC/V to retroactively misrepresent continuity of jurisdiction. Parent's Cibelli and R.M. have received the exact same "CPS Order" under the ACS social worker's CPS number, issued by the family court judges presiding over their purported FCA Article 10 fronts.

666.    Furthermore, not only are Nunc Pro Tunc orders disallowed but Defendant Hansell's boilerplate forms, which are not remotely close to statutorily prescribed petitions, is an Affidavit for an Addendum, "[n]either affidavits nor nunc pro tunc orders will be accepted as verification documentation in support of reasonable efforts and contrary to the welfare judicial determinations except for a Tribal title IV-E agency for the first 12 months that agency's title IV-E plan is in effect as provided for in section 479B(c)(1)(C)(ii)(I) of the Act."[388] Therefore, Defendant ACS is using illegal records by statutory prescription and disallowed by federal law, to sequester children and finance both their captivity and their

---

[387] 42 U.S.C. 669b §469B (d) No Supplantation of State Expenditures for Similar Activities.
[388] CFR §1356.21 (3)(d)(2).

parent's bondage via money laundering fronts, spearheaded under the pretense of child protection.

667.    Specifically, proof, "to satisfy the "reasonable efforts" requirements of section 471(a)(15) (as implemented through section 472(a)(2) of the Act), the title IV-E agency must meet the requirements of paragraphs (b) and (d) of this section"[389] must be submitted as a record of a "[j]udicial determination of reasonable efforts to prevent a child's removal from the home"[390] for a "a child…removed from his/her home…as to whether reasonable efforts were made or were not required to prevent the removal"[391], which Defendant Shulman did not have because she was solicited ex parte by Defendants' Rodin, Galchus, Ruci, Alozie and Kaplan, who lied to conceal, inter alia, gross negligence consistent with hiding reported child abuse.

668.    That is because aforesaid Defendants', including Defendants' Steele and Tingue, did not have requisite standing, let alone, jurisdictional eligibility, to sequester R.R. (3), under the pretense of a purported child protective proceeding, where the sole purpose was to hide constructive fraud, fraudulent CPS reports, and conceal reports of suspected child abuse made by mandated reporters. None of this is subject matter jurisdiction of the family court, pursuant to the FCA. That is why aforesaid Defendants conspired to fabricate the tampered transcripts 1 & 2 to circumvent the requisite, "judicial determinations regarding contrary to the welfare, reasonable efforts to prevent removal, and reasonable efforts to finalize the permanency plan in effect, including judicial determinations that reasonable efforts are not required, **must be explicitly documented and must be made on a case-by-case basis and so stated in the court order.**"[392]

669.    And yet, despite Defendants' Shulman and Rodin's knowledge, familiarity, and experience of this, Defendant Galchus was permitted to advance the conspiracy of retroactively reinstating jurisdiction for his client and on behalf of Defendant ACS to "…reinstate the temporary order of custody…the court said that it was not going to disturb the referee's orders," to finance fraud, false instruments of filing, false claims for

---

[389] *Id*. at (b).
[390] *Id*. at (b) (1).
[391] *Id*. at (b) (1) (i).
[392] *Id*. at (3)(d).

reimbursement and grants, and trafficking of persons, to engage in money laundering schemes by and through the Municipal Enterprise.

670.    On October 10, 2019, Defendant Wisler purported to hold a "Trial Ready Conference" in Part 14A by pretending to enter updated case status notes into the court's computer. That is, Defendant Wisler was literally typing on the keyboard, pretending to enter responses for questions she asked Defendant Alozie about Plaintiff's supervised visits with R.R. (3), since no report was provided. Specifically, there was no record or file for Plaintiff at QFC because the latter sent the entire court file to Judge Hughes at SFC, after Plaintiff filed the SFC petition on October 1, 2019. Both the computer printout report and Dashboard records confirm the transfer of Plaintiff's court file from QFC on October 1, 2019, and the subsequent transfer back on October 18, 2019, the latter of which was caused by Defendant Shulman's entry of multiple false instruments of filing into the QFC court's computer, thereby UCMS, to misrepresent fraud as a pending FCA Article 10.

671.    Previous audit reports also reflect Defendant ACS's backdating and retroactive entries of records for purported child protective cases, case notes, and information in furtherance of its money laundering schemes:

  a.  Example Backdating Case Files: "An amended order was submitted in November 2018, three years after the original placement in December 2015 and one month after OCFS began pulling our requested sample. The child had been removed from the direct placement in September 2016."[393]

  b.  Example Tampering with Court Records: "We also identified additional discrepancies between the original case files and the CONNECTIONS data for 23 of the 30 cases we reviewed. For example, some cases had incorrect placement start or end dates, while others had no end date at all, even though the file contained a court order showing that the placement had ended.[394]

672.    As part of the activities and affairs of the employees and agents by and through the Municipal Enterprise, constructive fraud and false instruments of filing are disguised as orders to misrepresent their intent for "service of process", such as the title of Defendants' Galchus and Ruci's second attachment, "Ruci – N petition order release." Defendants' Galchus, Kaplan, Wisler, Rodin, and Naughton, with the blessing and

---

[393] Audit Report: Oversight of Direct Placement of Children, March 2, 2020,
[394] Id. at 13.

assistance of Defendant Shulman, conspired to obtain jurisdiction by fraud, conveyed as a response to a prior request for "copies of orders…also attached Judge Shulman's August 30th order,"[395] In fact, 2 copies of OTSC #1 were made and *served* under the pretense of an OTSC to obtain jurisdiction by fraud over Defendant Ruci's dismissed custody petition and as a substitute underlying action for Defendant ACS's neglect case.

673.    In addition, employees and agents acting by and through the Municipal Enterprise, counterfeit summons and put in the court file to validate the money laundering fronts' jurisdictional claims and procedural due process. For example, the conspiracy to supplant support proceedings as the underlying action for the neglect proceeding was executed in Defendant Shulman's courtroom on February 28, 2020, where the counterfeit summons with Chief Clerk #2's signature, drawn with PaintShop, was used to retroactively assert statutory compliance and legal standing.

674.    The counterfeit summons was never intended to be served on Plaintiff because it was purportedly scheduled for March 9, 2020, which was the return date Defendant Shulman had lied about scheduling as the FCA 1028 hearing back on January 9, 2020. Defendant Shulman knew Plaintiff would go to court on March 9, 2020, because she asserted false expectations of granting a hearing for the return of R.R. (3), which she never intended to hold. Specifically, in her official position, Defendant Shulman conspired to lure Plaintiff to her courtroom to fabricate documentation of service of summons.

675.    The family court is a court of limited jurisdiction, for which jurisdiction is specifically prescribed by statute in the FCA, yet Defendants' Shulman, Galchus, Rodin, Kaplan, Naughton, and Wisler used their knowledge of the law, and bankruptcy law, to conspire a specious scheme of "filing on the eve of trial," a tactical fraud used to delay, frustrate the SFC petition, and speciously misrepresent the exercise of jurisdiction, i.e., the intent to re-start a case with constructive fraud, to retroactively enter dismissed dockets, V-20987-18 and V-05120-19 to the calendar for October 10, 2019. Specifically, in her official capacity, Defendant Shulman executed fraud to steal jurisdiction from SFC. In this regard, Defendant Shulman is the judicial proponent of jurisdiction by fraud and is more than an

---

[395] 10/08/2018 E-mail from Galchus to Soffer, Naughton, and Kaplan.

interested party to the litigation - she is a party to it by voluntary participation and
execution of illegal schemes.

676.    Defendant Galchus is not employed by the Commissioner of ACS, nor is
he an agent authorized to act for or on behalf of Defendant Hansell. Likewise, Defendant
Rodin is not authorized to relegate her purported powers under Defendant Hansell to
subcontract the origination of FCA Article 10 docket numbers on motions or OTSC's.
Further, there is no statute, rule, procedure, or law in New York State that permits *any*
attorney to file a motion or order to show cause to litigate malicious prosecution against his
client's legal adversary in family court under the pretense of a child protective proceeding
pursuant to FCA Article 10. And yet, this is what occurred and is permitted to occur by
purported judicial discretion.

677.    Under New York Law, Defendant Rodin's illegal relegation of duty, by
Charter, to Defendant Galchus, the subcontractor, is considered fraudulent and voidable
claims under the Uniform Voidable Transactions Act ("UVTA") because the legislature did
not include nor infer third-party contractual standing for persons like Defendant Ruci, who
is acting through counsel. Whatever duties, functions, and/or obligations Defendant ACS
does not itself perform is contracted and/or outsourced to third parties and subject to the
standards under State Defendant's General Business Law, "…those voidable as to present
and future creditors (Section 273), which includes both transfers made with fraudulent
intent or that lack fair consideration (called "reasonably equivalent value" in the UVTA)"
and "those voidable only as to present creditors (Section 274), which includes transfers
made without fair consideration (using a different test than in Section 273)" and transfers
made to insiders under certain circumstances. While courts applying the prior law had
found that transfers to insiders to satisfy antecedent debts could be considered fraudulent
conveyances, the UVTA for the first time has codified such claims."

678.    Likewise, there is no statute, law, rule, or policy in New York State,
whereby Defendant Galchus is permitted to represent dueling parties to a litigation in a
state court, as reflected by his inclusion of a petition and supplemental filings, pertaining to
Plaintiff, not pending at QFC since June 2019, nor after entry of the order of dismissal,
which Defendant Shulman authorized to facilitate financing for him under the 18B
assigned counsel program as Plaintiff's attorney. This was done retroactively subjugate

Plaintiff and retain jurisdiction by fraud, using the last signed stipulation of consent that was in place on June 13, 2019, when Defendant McGrady was the referee. Therefore, Shapiro appears as Plaintiff's "Retained Attorney" on docket number V-05120-19/19C, which was restored by Defendant Galchus on October 10, 2019.

679.    Plaintiff's docket number V-05120-19, last heard on May 22, 2019, is for the first signed stipulation of consent between Shapiro and Defendant Galchus, which Defendant Shulman subsequently merged with Anthony Augustus ("Augustus"), who Defendant's McGrady and Rodin summoned on August 26, 2019. Augustus appears as "18B assigned attorney" for Plaintiff in the same entry as Shapiro to falsify continuity of proceedings byway of false entries made under attorney information in the court's computer. That is *if* Plaintiff had signed a stipulation of consent for Defendant McGrady on August 26, 2019, then Augustus would have been her 18B assigned counsel – Plaintiff did not sign such a stipulation. Defendant Shulman's utilization of churning explains why each entry for Plaintiff's docket numbers, V-05120-19, 19B, and 19C, have two attorneys listed as "Retained" and "18B Assigned." Since Shapiro filed her Consent to Change Attorney on July 31, 2019, the last binding stipulation on file reverted to the first day she appeared in Defendant McGrady's court, i.e., May 22, 2019.

680.    Interestingly, Plaintiff received a copy of Shapiro's filed Consent to Change Attorney form, which has a dated court stamp of "August 14, 2019." Shapiro's last appearance for the support matter was in July 2019, at which time the magistrate did not give or schedule a return date to Plaintiff or Defendant Ruci because she received all the financial information at the last date, and only a final determination, i.e., Order of Fact Finding, was expected. Since Augustus never appeared for or on Plaintiff's behalf after his initial, and only, summoning, Shapiro's Consent to Change Attorney was used to fabricate the August support order to retroactively, and artificially, show the continuity of representation from July 2019 to August 2019.

681.    Specifically, it means Defendant Shulman's unauthorized and perverse use of a consent to change attorney form was used on the fraudulent August support order, entered on Plaintiff's behalf, to add Shapiro's name on the subsequent entries used in conjunction with Defendant Galchus's OTSC #1 for October 10, 2019. Then, the unstamped copy of Augustus's signed Notice of Appearance ("NOA") dated August 26,

2019, which he signed before Plaintiff was allowed into Defendant McGrady's courtroom, was used to enter his information into the court's court computer via the same August support order, as "18B assigned counsel", in conjunction with Defendant Galchus's OTSC #1. Absent a petition or supplemental petition filed with the court, the only way an attorney's information can be entered into the court's computer is via entry of a motion or OTSC, which Shapiro nor Augustus filed on Plaintiff's behalf after entry of the order of dismissal.

682.    The arbitrary removal of records from the court file is the destruction of government property, which Defendants' Wisler, Shulman, Galchus, Rodin, Blond, Kelly, Naughton, McFarlane, and Keller use to subjugate unsuspecting litigants in a conspiracy to finance their subjugation and bondage, thereby engaging in human trafficking, by and through the Municipal Enterprise.

683.    Augustus's NOA *should* have been in the court file at QFC since August 26, 2019, because he told Plaintiff it was completed in Defendant McGrady's courtroom that same day, so it *should* have been stamped when the clerk filed it. There was no dated court stamp on Augustus' NOA.

**Defendants rely on, inter alia, unsubstantiated allegations that equate Plaintiff's learning disability with Munchausen to justify R.R.'s (3) sequestration but they, too, must suffer from collective delusions of repetitive feigned "clerical errors" whenever a layer of their fraudulent plot comes off.**

684.    On October 18, 2019, at Plaintiff's first appearance for the SFC petition, Judge Hughes said he was in physical possession of the entire contents of the QFC court file. Specifically, he asked Plaintiff, "what is the status of the forensic evaluation?" as he physically held Defendant McGrady's Forensic Order - information not included in the SFC petition or mentioned by Plaintiff. Since Judge Hughes was surprised proceedings at QFC appeared pending in UCMS, where he previously saw none, he directed L.N.'s (6) attorney, Margaret Schaefler ("Schaefler"), to contact Defendants' Wisler, Shulman, Kaplan, and/or Galchus for an explanation. Defendant Ruci supplied the phone numbers to Schaefler– aforesaid Defendants never bothered to answer. In fact, Schaefler tried to contact Defendant Kaplan back in September 2019, after the first appearance for Defendant's Castillo-Lovaglio and Lovaglio's petition for custody of L.N. (6).

685.    Defendant ACS, as enabled by Defendant Poole, has demonstrated its capacity to deceive parents about their purported authority to kidnap their child(ren) "…for over 40 percent of the children whose placement ended, the field for explaining why a child was removed from direct placement was blank…[w]ithout accurate and complete information, OCFS cannot effectively monitor direct placements using CONNECTIONS."[396] On the other hand, Defendant Hansell deceives the public and officials about the purported reforms and corrective actions implemented since *his* appointment.

686.    Defendant ACS has a documented track record of gross negligence for improperly documenting CPS investigations to substantiate a child's removal or document the well-being of a child that was removed, "[a]s described in this report, our access to case files and CONNECTIONS records was limited…[i]n addition, we found instances where information in CONNECTIONS could not be relied upon, as it was inaccurate and/or incomplete…[a]s a result, we placed limited reliance on the data, mainly using it to select our sample and for background information."[397]

687.    In 2017, Defendant Hansell was appointed Commissioner due to the previous commissioner's failures after, "…a new spate of child fatalities…[was]…brought in to clean up ACS after these deaths has retained the nation's leading institutional advocate for family preservation to review the agency's practices."[398] Defendants' Poole, State and City conspired to keep the compounded failures hidden from the public, "[a]nd last Friday, Jan. 27, [2017] the state's Office of Children and Family Services approved a monitor for ACS whom Mayor de Blasio said on Dec. 13 [2016] he would appoint — without mentioning that Gov. Cuomo had ordered the city to do so one day earlier."[399]Before former ACS Commissioner Gladys Carrion resigned, she was the former Commissioner for Defendant OCFS, who replaced former ACS Commissioner Ronald Richter, a former New York County Family Court Judge. Richter, replaced former ACS Commissioner, John B. Mattingly, "who presided over the Administration for Children's

---

[396] Audit Report on The Office for Children and Families: Oversight of Direct Placement of Children, March 2, 2020.
[397] Audit Report on The Office for Children and Families: Oversight of Direct Placement of Children, March 2, 2020.
[398] City Journal, *Massacre of the Innocents: New York's misguided family-reunification policies continue to have fatal consequences* (Winter 2018).
[399] Queens Chronicle, State-ordered ACS Monitor is Approved: Four children known to city child welfare officials dead since Sept. (2/02/2017).

Services during the high-profile child deaths of Nixzmary Brown and Marchella Brett-Pierce has resigned after seven years at the helm."[400]

688.    Former ACS Commissioner Mattingly's predecessor was former ACS Commissioner William Bell, "who served from 2002 to 2004…and former Child Welfare Administration official whom Scoppetta had brought over as deputy commissioner when ACS was formed" that resigned amid the revelation Defendant ACS had "allowed more than 100 HIV-positive foster kids to be used as guinea pigs in medical experiments over the past 12 years"[401] And before him, Defendant ACS was mired in controversy under former ACS Commissioner Nicholas Scoppetta, who was appointed to the newly created agency after the tragic death of Eliza Izquierdo. To say that child protection is difficult to determine or emotionally consuming is not remotely within the purview of Defendant ACS, it is an afterthought. The agency was drowning in incompetence before the name change in 1996 and well before the tragic death of Eliza Izquierdo, since the public only knows about their deaths when people speak up.

689.    City and State Defendants do not care about the savage and inhumane manner of severing familial associations between parent and child, when they protect the swamp of corruption that is Defendant ACS. To consider that more children must die before City and State Defendants are held accountable for their own role and participation in cleaning up after Defendant ACS is sickening. And yet, the funding for annual coroner reports for dead children known to Defendant ACS saw its last year in 2018, well after Defendant Hansell took over. More sinister, when it was revealed in 2002 that Defendant ACS was using vulnerable hostages as cheap test subjects for 12 years, "…given dangerously high doses of experimental AIDS drugs[,]" Defendant Hansell was the Associate Commissioner for HIV Services and was instrumental in "helping the DOH provide funding to combat HIV/AIDS in communities of color."[402]

690.    Not saying that accumulated coincidences of incidental resignations for each of its Commissioners was unrelated to the death of an innocent child, is saying our children are expendable sacrificial lambs, whose deaths are good publicity. Because

---

[400] New York Daily News, *ACS Commissioner John Mattingly Leaving Post After Seven Years; Presided During Nixmary Brown Death* (7/26/2011).
[401] The New York Post, *100 Guinea-Pig-Kids-Shocking New Number in HIV Tests* (3/02/2004).
[402] The BodyPro, *Farewell David Hansell: OTDA Commissioner Heads to D.C.; Advocates Praise His Efforts in New York* (6/17/2009).

publicity means money. Defendant ACS has been broken from its inception because of the people employed there, not an egregiously incompetent chieftain. There is no corrective action and no amount of taxpayer funded reform campaigns, spearheaded by specious intentions, that could replace legitimate accountability for traumatizing children illegally seized, "ACS misinterprets our use of the term "corrective actions," believing that we are referring to disciplinary actions taken against ACS personnel."[403]

691.    Defendant ACS routinely defers to the Court for cover under judicial immunity to evade responsibility for gross mishandling of undocumented, or improperly documented, specious child removals, "State Comptroller's Comment 1 – OCFS' assertion that the scope of our audit terminates after court placement is wrong…[t]hroughout the report, we explicitly explain what we reviewed during the audit…[a]t no point did we purport that OCFS may overrule the court's authority regarding the placement decision, or state anywhere that OCFS holds exclusive responsibility to ensure the safety of children in direct care…[r]ather, we evaluated OCFS on its responsibilities related to the safety of children placed in the direct care of relatives before, during, and after the court placement decision…"

692.    But like its underling, Defendant Poole also passes the buck to the court, [r]ather than attempting to challenge our audit scope and minimize the findings of this audit, we urge OCFS to consider our recommendations and implement changes to ensure the health, safety, and welfare of children in direct placement."[404] Defendants ACS grossly neglected to follow any guidelines, procedures, or instituted policies when they chose to violate Plaintiff's constitutional right to maintain a familial relationship with R.R. (3) under color of law. Defendants' Rodin and Alozie discredited their own unregistered FCA 1034 #7 to conceal the documented marks and bruises on R.R. (3) from various SCR investigations, "State Comptroller's Comment 9 – As explained in comment 8, work done under OCFS regulations is used by courts in deciding whether direct placements should continue or be terminated."[405]

---

[403] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[404] Audit Report of the Office for Children and Family Services' Oversight of Direct Placement of Children, March 2, 2020.
[405] *Id.* at 23.

693.    Just as with Plaintiff, Defendant ACS selectively chooses when domestic violence exists or who they perceive to be a victim of domestic violence for documentation and recording purposes, "State Comptroller's Comment 10 – The facts presented in this report were taken from case notes completed by caseworkers, as well as actual police reports…[f]urthermore, the key contact in question made statements recorded in the case notes such as, "he scared me," referring to the new relative responsible for the children, and "I was afraid for his safety," referring to the safety of one of the siblings placed with this relative…[b]eing that this relative had a history of domestic violence, we maintain all known facts should be reported to the court so it can make an informed decision on where a child is placed. OCFS' attempts to question our audit scope and misconstrue the facts, rather than acknowledge areas to improve its services to this vulnerable population, is a concern."[406]

694.    Case in Point: Defendant Rodin approved an FCA Article 10 proceeding at QFC for the same allegations reported by Plaintiff against Defendant Ruci, "On October 9, 2018, a neglect petition was filed against the respondent father alleging, inter alia, that he fails to provide the children with proper supervision or guardianship by perpetrating acts of domestic violence against the non-Respondent Mother. On December 19, 2018, a derivative neglect petition was filed against the respondent father alleging similar allegations as in the October 9th, 2018 petition, as well as alleging the respondent father's failure to engage in services."[407] Parent Cibelli was not arrested, not charged, not indicted, and did not endanger the welfare of his child or unborn child whereas Plaintiff's perpetrator, Defendant Ruci, was arrested, charged, pleaded guilty, and was charged with endangering the welfare of his child; Defendant Ruci was arrested 2 more times for violating Plaintiff's OOP, and pleaded guilty.

695.    The difference between Plaintiff and parent Cibelli is Defendant ACS's perspective: vilifying innocent people is child protection when your corporation's motto is founded on commercializing children.

696.    Case in Point: Defendant ACS in Kings County filed a purported FCA Article 10 against parent R.M. for the same exact things Plaintiff has reported against

---

[406] *Id.* at 24.
[407] Affirmation in Opposition to Motion for Summary Judgment by Mohammed Talha Shaikh (5/10/2021).

Defendant Ruci, "[o]n or about June 29, 2018, the non-respondent mother stated to the undersigned that respondent PLR "verbally and mentally abuses the non-respondent mother, controls everything within the family including the money, and the non-respondent mother cannot make any decisions without the respondent PLRs permission. The non-respondent mother stated that the respondent PLR monitors the non-respondent mother's text messages and in front of the children including calling the non-respondent mother a "bitch," and that the non-respondent mother is afraid of the respondent PLR. The non-respondent mother stated that she is afraid of what the respondent PLR "is capable of" and stated that the respondent PLR threatened the non-respondent mother that if she ever leaves with the subject child M., he will go to the nursing home of the maternal grandmother and hurt the maternal grandmother."[408]

697.    The only difference between Plaintiff and parent R.M. is Defendant ACS's perspective: traumatizing a child to target the target a parent, who only seeks to protect his/her child when the responsible person is the other parent.

698.    Defendant ACS's grossly mishandled SCR investigations for R. R. (3), by closing the reports without conducting any CPS investigations, directly contributed to Defendant Ruci's ability to conspire with Defendants' McHugh and Teplansky, thereby causing Plaintiff's assault and 4-hour unlawful detainer on August 12, 2019, where she sustained emotional, physical, psychological injuries in front of R.R. (3), which Defendant Castillo-Lovaglio witnessed, and Defendant Ruci was permitted to watch. Defendant McHugh made a false report to the SCR under the pretense of obtaining assistance for a "custody dispute." Defendant McHugh knew Plaintiff had an active full stay away OOP against Defendant Ruci, it was her job to enforce the court order, had there been any dispute, and there was not. Plaintiff and R.R. (3) were hostages of Defendants' McHugh, Teplansky, Allen, and unnamed others, who watched the violations and did nothing.

699.    On Friday April 24th, 2020, Defendant Peebles repeatedly ignored signs of hunger as R.R. (3) begged Defendant Ruci for food and he did not want to feed him. Plaintiff had to watch as R.R. (3) whimpered and repeatedly signaled for Defendant Ruci to feed him. Defendant Peebles only intervened, to the extent of asking Defendant Ruci if R.R. (3) was hungry, because Plaintiff kept insisting and was persistent. By virtue of her

---

[408] Kings County Family Court ACS #5236894.

access to Connections, Defendant Peebles knew, or should have known, that Defendant Ruci had 3 previous indicated findings. The money laundering fronts are what pays the bills, "State Comptroller's Comment 8 - Furthermore, one of the cases in question contained a document stating that there was enough credible evidence to support allegations of inadequate guardianship, and inadequate food, clothing, and shelter, and yet we found no evidence this was reported to the court…[w]e maintain that OCFS should provide courts with all information relevant to the safety of children in direct placement and are concerned by OCFS' unwillingness to recognize these deficiencies, given the vulnerable population it serves."[409]

700.    Defendant ACS assumes no responsibility for its failures, mismanaged time and resources, misappropriated expenditures spent on repeated instances of dereliction of duty for the children removed from their home under the pretense of "safety" and "protection." To the extent that Defendant ACS does not bother to verify if the children seized were still alive because it's *all about the money*, is not news to State and City Defendants, "[i]n its response, ACS attempts to dismiss the importance of the findings in this audit report as a means of deflecting responsibility for weaknesses in its oversight…[w]e are concerned that ACS focuses on what it calls "miniscule" gaps and obfuscates the connection between such "gaps" and the efforts necessary to ensuring the safety and well-being of adopted children whose adoptive parents may be deceased or who may themselves have died, unbeknownst to ACS, while ACS continued to issue publicly funded adoption subsidy payments—in some cases for years— intended for their support."[410]

701.    For Defendants ACS, the motto is not child welfare, it is about effectuating a scheme of kids for cash, since the outcome of their grossly negligent conduct has resulted in commercializing child protection and trading children like commodities in court proceedings to obtain lucrative funding for adoption subsidies, "[i]n the **continuum** of child welfare services, adoption provides permanency for children who have been placed

---

[409]Audit Report of the Office for Children and Family Services' Oversight of Direct Placement of Children, March 2, 2020.
[410] Audit Report on the Administration for Children's Services' Controls Over Adoption Subsidies, June 30, 2021.

in foster care, and who the Family Court has determined—following reasonable efforts to preserve or reunify children and parents—cannot safely return to their birth families."[411]

702.    Defendants ACS are not only grossly unresponsive to any constructive criticism but unwilling to put forth meaningful corrective action because commercializing children's safety has become a financially lucrative business levied at taxpayer's expense, "[m]oreover, the "**$4 billion in payments**" ACS cites in its response is misplaced and misleading for two reasons, both of which ACS should know: (1)... our audit covered a shorter 31-month period in which ACS issued **approximately $585 million in adoption subsidies**, including $1,401,182 (.24 percent) in the names of 106 persons (101 adoptive parents and 5 adopted children) who were or may have been deceased...[a]fter identifying those cases, we looked back at ACS payment records for those 106 cases only and determined, as we informed ACS, that ACS may have issued an additional $2,061,300 in the names of those same persons in prior years; (2) Even if ACS' representation of the scale of the potentially improper payments was accurate, which it is not, the sums in question, totaling $3,462,482, would demonstrate—rather than negate—the need for ACS to implement proper internal controls to prevent waste and protect the interests of the adopted children and the City."[412]

703.    In fact, the NYC Comptroller's audit uncovered millions of dollars in misappropriated expenditures sent to dead parents and dead children that Defendants ACS did not know were dead, "[s]pecifically, we estimate that ACS issued at least $1,638,193 in subsidy payments to 39 adoptive parents who appear to have been deceased, and $539,544 in subsidy payments to support 3 adopted children after their reported dates of death as they appear in the death records...[i]t is particularly troubling where, as in the case of the 39 adoptive parents we have provisionally identified as deceased, the adoptive parents were the sole caretakers for the adopted children on record with ACS."[413]

704.    That is, Defendants' ACS removed children under the pretense of protection, prolonged their protective proceedings to free them for adoption, obtained adoption subsidies on their behalf and not only grossly neglected to follow up on their

---

[411] Jennifer Fiellman - Assistant Commissioner, Response to Audit Report on the Administration for Children's Services' Controls Over Adoption Subsidies, June 21, 2021.
[412] Audit Report on the Administration for Children's Services' Controls Over Adoption Subsidies, June 30, 2021.
[413] *Id.* at 12-13.

continued safety and/or well-being but did not care about their safety and/or well-being after shifting responsibility to another person, "[a]uditor Comment: ACS' response again misstates our audit finding, and misleadingly conflates this finding with the previous finding of this audit report. ACS also, again, provides no evidence that any adoptive parent we included in this finding as reportedly deceased is instead alive. Rather, it appears that ACS misconstrued a case we included in this finding because ACS issued adoption subsidy payments to the living adoptive parent after the adopted child had died."[414]

705.    Aside from the obvious fact that a "change of guardianship" for an "adopted child" implies the child was either subsequently removed from the adopted parent's home or the adopted parents relinquished custody of the child to another adult, both of which resulted in the child's return to Defendants ACS, who traded the child between homes like a commodity, "…we identified $133,169 in duplicate payments…in cases involving changes of guardianship of adopted children."[415] This further suggests that Defendant ACS grossly mishandled the vetting process for both foster and adoptive parents. Hence, Defendants ACS repeatedly shift and shirk their responsibility to the child but have no qualms about collecting the adoption subsidies.

706.    Under the pretense of overburdened caseloads and too many cases to review, such as "[w]hen we interviewed supervisors, they stated that it was not reasonable to expect them to be able to review all case details within the progress notes, given their caseload. Supervisors stated that is why, to a great extent, they rely on face-to-face interactions with case workers to discuss case details…[t]he lack of an effective tracking system increases the risk that important steps may not be followed, and that such omission may go undetected."[416]

707.    And yet, these same purportedly overburdened Defendants casually PhotoShop fax numbers on top of unregistered FCA 1034 reports, forge signatures of social workers and supervisors in other counties, falsify criminal records for unsuspecting Plaintiff Parents, grossly fail to document an ongoing pattern of marks and bruises on a child, lie to law enforcement, lie about fraudulently obtained US passports, and forget to

---

[414] *Id.* at 16.
[415] *Id.* at 11.
[416] New York City Comptroller Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016 (p. 15).

legally file petitions, but have no problem with someone else *filing* on their behalf or picking a random John and Jane Doe to house a child they speciously took, "…[s]pecifically, we found significant failures to follow guidelines for each of the cases reviewed. Furthermore, we found no evidence that supervisors reminded the case workers to take specific actions required by the guidelines, thereby leaving unresolved the question of whether key investigative steps required by the guidelines had been taken."[417]

708.    Further, Defendants ACS are so morally bankrupt that they have no issue spending so much additional time unnecessarily severing familial associations, so long as they can profit from sequestrations en masse, " [s]pecifically, we identified adoption subsidy payments ACS issued in the names of adoptive parents who were no longer eligible to receive them, including instances where we provisionally determined that the adoptive parents or the adopted children appear to have died, based on death records compiled by federal agencies, including the U.S. Social Security Administration…[a]s a result of these deficiencies, we provisionally estimate that ACS issued inappropriate payments totaling at least $3,462,482 to individuals who were not entitled to them."[418]

709.    Defendant Alozie maliciously and intentionally weaponized his position, control, and access to the SCR to seize R.R. (3) from Plaintiff 's custody under color of law by registering an anonymous false report of suspected abuse or neglect for both R.R. (3) and L.N. (6) on 8/27/2019:

> "Victoria (mother) is diagnosed with anxiety, ADD, adjustment disorder, and depressive mood. She is prescribed psychotropic medications, but it is unknown if she takes them. She is also not compliant with treatment. As a result, she experiences serious mental health concerns while caring for L. (4) and R. (1). She exhibits irrational behavior out in the community. She also harasses and threatens others. She often believes that R. has bruises and marks, even though nothing is visible on his body. The role of Gerd (R.'s father) is unknown."

710.    Plaintiff has never been "diagnosed with anxiety, ADD, adjustment disorder, and depressive mood." Plaintiff has been successfully employed in accounting for over a decade, despite having a learning disability that poses no problem in her ability to

---

[417] *Id.* at 11.
[418] NYC Comptroller Audit Report on the Administration for Children's Services' Controls Over Adoption Subsidies, June 30, 2021 (p. 2)

perform insurance audits, federal and state tax audits, general bookkeeping, and monthly reconciliations for multiple entities at a time.

711.    Plaintiff does not, and has not been, given or prescribed any "treatment." Unless Defendant Alozie is purporting to be Plaintiff's treating physician, his inflammatory accusation amounts to defamation of character under color of law and the unauthorized practice of medicine as he is not a licensed doctor, psychologist, psychiatrist or qualified expert in the field of psychology, psychiatry, or medicine, from which to opine or diagnose psychiatric ailments for persons who are not his patients. And Plaintiff is not, nor has ever been, a patient of Defendant Alozie or his wife, who is a physician's assistant.

712.    Defendant Alozie currently purports to have unfounded SCR investigations for reports about "bruises and marks" on R.R. (3), though he never travelled to Plaintiff's home in Suffolk County to physically observe R.R. (3) at any time before 8/26/2019. Similarly, Defendant Alozie never met R.R. (3) until he made the false report to the SCR against Plaintiff on 8/27/20219. Defendant Aloze's written confession was submitted as unregistered FCA 1034 report and included as Exhibit E in Defendant Rodin's Affirmation in Opposition to Grandparent's Application for Expanded Access submitted for a purported proceeding on 10/26/2020.

713.    Plaintiff denies the inflammatory and unsubstantiated allegation, "[s]he also harasses and threatens others," unless Defendant Alozie is referring to the numerous complaints Plaintiff made to report Defendants Alozie and Steele's gross mishandling of R.R.'s (3) SCR investigations and unregistered FCA 1034 investigations and the agency's non-existent policy for domestic violence cases.

714.    At the time Defendants ACS were submitting fake, fraudulent, false FCA 1034 reports with forged signatures for Plaintiff's custody proceedings in QFC, i.e., May 2019 – August 2019, OCFS was under audit by the NYC Comptroller, "[t]he audit covers children who were in direct placement between January 1, 2014 and December 31, 2017 and includes subsequent documentation and information provided by OCFS through August 26, 2019."[419]

    a. "c. The subject child is known to the Queens Family Court pursuant to an Article 6 proceeding, dockets V-20987/18 and V-05120/19, wherein Referee McGrady issued a temporary order of physical custody to the non-

---

[419] Audit Report: Oversight of Direct Placement of Children, March 2, 2020.

respondent father, and supervised visitation only for the respondent mother, on or about August 26, 2019."[420]

b. "Furthermore, ACS' policies require case workers to note all interviews with collateral sources (e.g., physicians) in CNNX and so any contact made with a physician should have been noted there as well as in medical records."[421]

715.    Defendants ACS are the literal definition of what it is to be irreparably broken.

## **State-Sanctioned Racketeering: Part 2**

716.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-715, above as if specifically set forth herein.

717.    The governing body of each county and the governing body of the city in which a county is wholly contained shall place in operation throughout the county a plan for providing counsel to persons charged with a crime or who are entitled to counsel pursuant to section two hundred sixty-two or section eleven hundred twenty of the family court act, article six-C of the correction law or section four hundred seven of the surrogate's court procedure act, who are financially unable to obtain counsel…[i]n proceedings under the family court act, representation by a private legal aid bureau or society, or by any corporation, voluntary association, or organization permitted to practice law under the authority of subdivision five of section four hundred ninety-five of the judiciary law…"[422]

718.    The New York City Department of Finance, Payment Unit, is responsible for paying the attorneys and experts who submit vouchers for professional services rendered. The Payment Unit compensates attorneys who represent indigent clients pursuant to section 722-c of the County Law in family and criminal matters.[423]

719.    Due to the recent pandemic, New York State was awarded a substantial amount of COVID-19 relief funding to preserve access and availability of indigent counsel, "The Commission made clear that the $100 million JCLS funding will become even more

---

[420] False Instrument of Filing on docket number NN-17995-19 dated 8/30/2019.
[421] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[422] §722 (2) County Law Article 18-B Representation of Persons Accused of a Crime or Parties before the Family Court or Surrogate's Court.
[423] New York City Department of Finance (DOF), Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments (p.2).

necessary as civil legal needs multiply in the fallout from the crisis and providers are inundated with requests for assistance. The letter emphasized the need to keep continued and sustained support for civil legal services at the core of the court system's short- and long-term policy responses to COVID-19."[424] witnesses to lie to FBI agents who were

720.    Defendants Blond, Kelly, and Galchus are seasoned attorneys and members of the 18B assigned panel and Attorney for the Child Program from the Appellate Division Second Department. As such, they are fully cognizant of the constitutional violations perpetrated on Plaintiff by Defendant Shulman but remain silent as Plaintiff's pleas for assigned counsel were repeatedly denied, "[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."[425]

721.    Even Defendants McFarlane and Rodin, present during Defendant Shulman's denials of Plaintiff's requests for assigned counsel, as recipients of federal grants, are obligated to report whether they fully complied with the terms and conditions of their grants from SSA Title IV-E, Title IV-D, Title XX, Title IV-B, which includes providing Plaintiff Parents and children in FCA Article 10 proceedings.

722.    Further, Defendants Galchus and Ruci's OTSC dated 10/08/2019 corroborates the existence of a conspiracy to speciously remove pending dockets ex parte for the purpose of forum and judge shopping on 8/28/2019, "2. The neglect petition against the mother was first heard by this court on August 28, 2019, and "3. The mother's initial appearance on the neglect docket was September 4th."[426]

723.    Defendants Kaplan, Rodin, Galchus, and Ruci knew Plaintiff had no counsel on 8/26/2019 and proceeded with an ambush of flagrantly, inflammatory, sexist,

---

[424] Access to Justice Commission Report, November 2020 (p.17); *see Former Brooklyn Assemblywoman sentenced to prison for fraud schemes and witness tampering* ("…between 2012 and 2017, Harris defrauded the Federal Emergency Management Agency (FEMA) and the New York City Council (NYC Council), among other entities, of tens of thousands of dollars, and then pressured conducting the grand jury investigation into her fraud schemes." https://www.justice.gov/usao-edny/pr/former-brooklyn-assemblywoman-sentenced-prison-multiple-fraud-schemes-and-witness
[425] NYCRR Rule 8.3 (a).
[426] Galchus OTSC (10/08/2019).

uncorroborated hearsay to kidnap R.R. (3) under color of law, "A lawyer or law firm shall not…engage in conduct involving dishonesty, fraud, deceit or misrepresentation."[427]

724.    Plaintiff never consented to a, or any, transfer of Plaintiff's custody petition to the Part 14, "…[i]t was your affirmant's understanding and, upon information and belief, the court's understanding, that the custody dockets had been or were going to be transferred to the Part 14 calendar…"[428] Accordingly, "[a] lawyer or law firm shall not…knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."[429]

725.    More importantly, Defendants' Kaplan, Rodin, Galchus, have sufficient legal experience to know Referees do not have "power" to relinquish an assigned case, "[a] Referee to determine an issue or to perform an act shall have all the powers of a court in performing a like function; but he shall have no power to relieve himself of his duties, to appoint a successor."[430] That is why Defendant Shulman corroborated the blatant misrepresentations in Defendant Galchus's OTSC dated 10/07/2019 regarding the "August 28th" date as opposed to the actual date of 8/30/2019, "[a] lawyer or law firm shall not violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."[431]

726.    Defendants are attorneys with a century of legal *expertise* combined, compared to Plaintiff's crash course lesson in family law via QFC's School of Hard Knocks. Plaintiff, however, has over a decade of experience in tax accounting, auditing, and bookkeeping and can show that Defendants routinely offer false instruments of filing, "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— (A) (i) with the intent to promote the carrying on of specified unlawful activity; shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one

---

[427] NYCRR 1200 Rule 8.4 (c).
[428] Galchus OTSC (10/08/2019).
[429] NYCRR 1200 Rule 8.4 (f).
[430] CPLR 4301 Powers od Referee to Determine.
[431] NYCRR 1200 Rule 8.4 (a).

involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement."[432]

727.    Plaintiff has included visual aids to assist with some of the terminology Plaintiff has coined to identify the many *magical, spectacular,* and *extraordinary* things that have taken place because of Defendants collective efforts to sustain fraud on the court as money laundering fronts, which Defendants describe as an all-encompassing term of "clerical/administrative/erroneous error."

728.    On 8/28/2019, Defendant Shulman knew she was conspiring against 2 Co-Jurists, when approached by Defendants' Galchus, Rodin, Kaplan, and Ruci, by soliciting biased extra-judicial favors to assist with malfeasance and the malicious prosecution of an FCA Article 10 against Defendant Galchus's client's legal adversary: Plaintiff. Defendant Shulman had access to the same information that Judge Jolly noted in the court's computer on the afternoon on 9/04/2019, in that Plaintiff and Defendant Ruci were "scheduled for further proceedings."[433]

729.    Defendant Shulman believes racketeering is a judicial function that enables her to use extortion, child trafficking, and money laundering in a family court proceeding to subjugate Plaintiff and kidnap R.R. (3) and L.N. (6), whereas Defendants' ACS believe they are shielded by judicial extension for "stuffing" Plaintiff's court file with false instruments of filing, all of which sustains Plaintiff's constitutional violations under color of law.

730.    Defendants' ACS expect Defendant Shulman's judicial authority to wipe their filthy slate of gross dereliction of duty clean and criminal misconduct during Plaintiff's custody proceedings, by issuing a favorable disposition against Plaintiff to effectively coverup child abuse. Apparently, Defendants' ACS misunderstood the requisite "trauma-free" terminology in the terms and conditions of their grant funding to exclude unnecessarily forcing a breastfeeding child, R.R. (3), to be weaned cold turkey because it was done to benefit *their* long-term employment goals.

---

[432] 18 U.S. Code §1956 [A][1] - Laundering of Monetary Instruments; IRS Code 9.5.5.2 (3)(a).
[433] 18 U.S.C. §2 Aiding and Abetting; IRS Code 9.5.5.2.

731.    Federal Courts have jurisdiction over federal crimes involving the regulation of human slavery in organized crime, racketeering, bondage, extortion, child trafficking, and criminal activity aimed at defrauding the federal government, all of which have been utilized to subjugate Plaintiff through misappropriated judiciary functions by Defendant Shulman, assisting Defendants' ACS et al conceal child abuse via malicious persecution for Plaintiff's refusal to sign a false confession that would otherwise exonerate Defendants' ACS from gross negligent liability, "[a] mandated reporter's willful failure to report suspected child abuse or maltreatment is a Class A misdemeanor (punishable by up to a year in jail and/or a fine of up to $1,000) and the mandated reporter can also be held civilly liable for the damages proximately caused by the failure to report [SSL 420]. When a commissioner of social services in a LDSS has reasonable cause to suspect that a mandated reporter has willfully failed to report a case of suspected child abuse or maltreatment, the commissioner must inform the district attorney of the suspected failure [18 NYCRR 432.8]."[434]

732.    Defendant Shulman has repeatedly extorted Plaintiff for money to pay for private counsel under threats of losing a familial relationship with R.R. (3), while also laundering money obtained from both city and state funds to pay Defendant Galchus's legal fees to represent Defendant Ruci *on* Plaintiff's docket number V-05120-19/19C. Meanwhile, Defendant Shulman consistently violates Plaintiff's due process rights and right to an attorney by not only denying repeated requests for assigned counsel for a purported FCA Article 10 proceeding but maliciously rejecting the Center for Family Representation's request to represent Plaintiff in December 2019, "[e]very parent and child in our Empire State must receive timely, quality legal counsel before a family unit is torn asunder…[o]ur focus upon child welfare matters in our Interim Report reflects our grave concern that the crisis in legal representation for parents in this arena requires immediate attention…[t]he members of the Commission are unanimous in their belief that a transformation of our publicly funded system of parental representation in child welfare matters is urgently needed."[435]

---

[434] 18 U.S.C. §1956.
[435] Commission on Parents Legal Representation, November 2020 (p. 4).

733.    Defendant Shulman cites vague and ambiguous reasons for denying Plaintiff assigned counsel, i.e., "there was a hearing," but refuses to provide the date of said hearing or what the hearing determined to extort Plaintiff under color of law because she permitted Defendant Galchus to file docket number V-05120-19/19C on 10/10/2019 on Plaintiff's behalf *as* Plaintiff's *attorney.*

734.    Defendants weaponized their collective knowledge of family law and access to the judiciary to criminalize Plaintiff's outspoken duty to protect R.R. (3) and L.N. (6), despite Defendants' ACS gross deference for child safety and the exorbitant stream of state and federal funding to ensure it is done by depriving Plaintiff the right to obtain counsel, "[n]o counsel assigned pursuant to this section shall seek or accept any fee for representing the person for whom he or she is assigned without approval of the court as herein provided, pursuant to Judiciary Law §35.[436]

735.    Plaintiff never participated in a hearing, on the merits or impromptu, to determine either eligibility or ineligibility for assigned counsel in the purported FCA Article 10 proceeding, "…[f]or representation upon a hearing, compensation and reimbursement shall be fixed by the court wherein the hearing was held, and such compensation shall not exceed four thousand four hundred dollars."[437]

736.    Coincidentally, on 09/17/2020, Plaintiff was granted a public defender for another proceeding in SFC, where the determination was based on a review of Plaintiff's financial records.

737.    Plaintiff was forced to endure cruel and unusual punishment for speaking up to protect R. R. (3), including fabricated proceedings, arbitrary malfeasance under color of law, misrepresented as a purported FCA Article 10 to suppress child abuse, not prosecute it, which was arduously prolonged with repeated denials of Plaintiff's requests for assigned counsel, "[p]ersons involved in certain family court proceedings may face the infringements of fundamental interests and rights, including the loss of a child's society and the possibility of criminal charges, and therefore have a constitutional right to counsel in such proceedings. Counsel is often indispensable to a practical realization of due process of law and may be helpful to the court in making reasoned determinations of fact and proper

---

[436] Attorneys for Children Administrative Handbook (p. 6).
[437] *Id*. at 6.

orders of disposition. The purpose of this part is to provide a means for implementing the right to assigned counsel for indigent persons in proceedings under this act."[438]

738.    Defendants exploited Plaintiff's inexperience with family law to take advantage of Plaintiff's lack of legal education and unfamiliarity with social services laws, which was further impaled by Defendants flagrant use of false technicalities, such as "improper service" each time Plaintiff attempted to regain standing through time spent self-educating and submitting motions and OTSC's to assert both knowledge and awareness of the constitutional deprivations committed against Plaintiff under color of law.

739.    To exploit Plaintiff's lack of access to internal computer records and UCMS, Defendants engaged in a scheme consistent with offering various false instruments of filing as motions and orders to show cause to substitute, merge, incorporate, consolidate, amend, etc. the underlying functions of petitions for various FCA Articles, which were submitted either directly to Defendant Shulman to enter, or an individual authorized by Defendant Shulman to make such entries, in UCMS to further enslave and subjugate Plaintiff to the Part 14 under color of law.

740.    New, or supplemental petitions, are filed by a clerk, not *a* Judge, and not *the* assigned Judge. Instead, Defendants submitted a total of 193 motions and orders to show cause to substitute "petitions" in UCMS.

741.    Plaintiff uncovered a scheme in Defendant Kaplan's calendar of assigned cases, which showed he was exploiting his past familiarity with prolonged and protracted child abuse and neglect hearings as a former ACS attorney to establish a career of guaranteed stable cash flow to surpass the statutorily capped maximum of $4,400.00 per case by conspiring to spearhead his indigent assignments into child protective proceedings for Defendants ACS, "[i]In order to receive compensation in excess of the set statutory limits, an attorney must complete an affirmation online of "extraordinary circumstances" to the Payments Unit which will then be sent to the judge presiding over the case for review and approval. If the judge finds extraordinary circumstances, the judge will then return the affirmation and signed voucher to the ACP. The voucher will then follow normal payment procedures. Factors which may be considered in determining whether extraordinary

---

[438] FCA §261 Legislative findings and purpose.

circumstances exist are: unusually complex factual or legal issues; novel issues of law requiring extensive legal research; and/or a lengthy trial or protracted in-court proceedings which alone raise the compensation claim above the statutory limits."[439]

742. On 1/09/2020, Defendants' Ruci, Galchus, Blond, Going, Kelly, Clarry, Kaplan, Naughton, Rodin, McFarlane, and Shulman conspired to fabricate allegations with the force of law to incarcerate Plaintiff under color of law vis a vis "CPS Order #7259254" dated 1/09/2020, directing Plaintiff to, inter alia, "stay away from the homes of ACS attorneys."

743. Outside the Part 14, Defendant Going obnoxiously blurted out, "they found something in your daughter's report! They found something!" Defendant Going also claimed Defendants ACS showed Defendant Shulman a video of Plaintiff and Plaintiff's "father" at Defendant Naughton's home. Then, Defendant Going obnoxiously accused, her client, Defendant Lovaglio, of going to Defendant Naughton's home.

744. Defendant Lovaglio never went to Defendant Naughton's home.

745. The aforesaid video was not produced nor directly mentioned in court that day, while Defendant Naughton, the alleged and non-present complainant, was represented by her co-worker, Defendant Clarry, who accused Plaintiff of going to the former's "home" and requested an Order of Protection.

746. Whomever showed the aforesaid video was never mentioned, though it served as a pretext for Defendant Shulman's capricious denial of R.R.'s (3) return to Plaintiff's custody, which she cited was due to "the mother's lack of judgment."

747. Defendant Shulman never saw a video of Plaintiff at Defendant Naughton's home. Defendant Shulman was shown a video of Plaintiff's process server being unnecessarily interrogated by Defendant Naughton, who was filming her obnoxious litany of questions from her second-floor patio, while Plaintiff stood on a public sidewalk watching the unwarranted abuse of a process server trying to do his job.

748. Nonetheless, Defendant Shulman sought to humiliate and castigate Plaintiff for serving process, by denying Plaintiff's 3 pleas for assigned counsel after Plaintiff said, Joseph Soffer "was only hired because ACS threatened me with jail." As

---

[439] New York City Department of Finance (DOF), Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments (p. 7).

expected from the extortionist with a copy of Plaintiff's and Joseph Soffer's signed retainer agreement, which specifically stated the contract terms for representation terminated on disposition of the case, i.e., 9/04/2019. Defendant Shulman callously replied, "I am not ready to address that at this time."

749.    Defendant Shulman declared "open season" on Plaintiff for what she perceived to be an affront to fellow co-worker, Defendant Naughton, which was unleashed on Plaintiff as a floodgate of irrational and ridiculously petty allegations made on-the-record for a proceeding wholly without subject-matter jurisdiction. It was a malicious witch hunt, a sanctimonious crusade, and a misappropriation of taxpayer's money for judicial authority taken without legislative approval, "[t]his act defines the conditions on which the family court may intervene in the life of a child, parent and spouse. Once these conditions are satisfied, the court is given a wide range of powers for dealing with the complexities of family life so that its action may fit the particular needs of those before it. The judges of the court are thus given a wide discretion and grave responsibilities."[440]

750.    For example, Defendant Galchus stood up to express his irrational fear of being intimidated by and scared of "unknown packages left at his office," referring to Plaintiff's Emergency OTSC dated 12/26/2019, which was left at the front desk of his office building. Notwithstanding the obnoxious declaration of a contrived phobia portrayed by the general concept of receiving mail, Defendant Shulman allowed it.

751.    Plaintiff told Defendant Shulman what Defendant Naughton's husband did to Plaintiff's grandfather, who was helping serve process, but that, too, went ignored. Defendants' ACS and Shulman weaponized their status, authority, and access to the court to target Plaintiff and family to conceal how Defendant Naughton's husband attacked a 70-year-old man, i.e., Plaintiff's grandfather, for leaving the Emergency OTSC dated 12/26/2019 on the doorstep.

752.    On 12/29/2019, Defendant Naughton's husband chased Plaintiff's grandfather down the street, screaming and hollering profanity, like a lunatic, while waving the box with Plaintiff's papers, that he removed from the doorstep, in a fast circular motion, like winding up to throw it. Defendant Naughton, along with her 4 children, stood in the doorway watching a hostile, aggressive, angry man, i.e., husband and father, screaming and

---

[440] FCA §141.

chasing Plaintiff's grandfather down the street as he swung the box around. As soon as Plaintiff's grandfather got in the car and closed the door, Defendant Naughton's husband threw the box directly at Plaintiff's car.

753.    Example #2: Defendant Clarry requested an Order of Protection against Plaintiff in favor of Defendant Ruci and R.R. (3). She pointed to Plaintiff's uncle, and indirectly accused him of going to "the father's home," right after Defendant Ruci tapped her on the shoulder and whispered in her ear. On 10/08/2019, Plaintiff's uncle served Defendant Ruci with service of process for Plaintiff's petition filed in SFC. Try as they may, service of process is not a penal offense any provision under FCA Article 8, for which subject-matter jurisdiction is conferred to the family court. After it was denied, Defendant Clarry followed up with a concocted allegation, "we found new evidence in the psych evaluation," referring Defendant Shulman's October 18, 2019 Order, directing Dr. Miller to diagnose Plaintiff with Munchausen on 12/03/2019. Dr. Miller attempted to do this by repeatedly asking Plaintiff, "how many times a day do you wash your hands?"

754.    Defendants just wanted an excuse to show off their concerted *power* and *legal prowess* to publicly intimidate Plaintiff by launching petty yet ceremonious attacks because Plaintiff only had 5 days to serve process, financially constrained, and working full-time, so how dare Plaintiff serve process to Defendant Naughton at home, when her own husband admitted it had been 5 weeks since she went to work. Even though Defendant Naughton failed to appear in court, she also does not qualify as a "person who can file" against Plaintiff under any provision in FCA Article 8, since we are unrelated, not living together nor intimately involved, "[w]here a statute expressly describes the particular individuals or class of individuals to which it applies, it is assumed that the individuals omitted or not included were intentionally omitted and excluded."[441]

755.    Here is why this is *not* a collateral attack on a state court judgment or a proceeding: In open court, Defendant Clarry's requests for an Order of Protection against Plaintiff were denied by Defendant Shulman because the point was to punish Plaintiff with impunity but leave no record of it, such as on the electronic recording system, For the Record ("FTR"). Defendant Shulman also asked everyone in court if Plaintiff went to their homes and no one responded in the affirmative, "[t]he **court** indicated that it could

---

[441] N.Y. Stat. §240.

not continue the temporary order of protection since it had concluded

that **Family Court lacks** statutory authority to issue an order of protection against a parent

on behalf of a foster care agency [***5] caseworker."[442]

756.    In other words, Defendants *staged* a hearing for an FCA Article 8, while

not holding a hearing for an FCA Article 8 on-the-record, because Plaintiff was being

targeted under color of law for *their* perceived wrongs, such as reporting Defendant

Naughton to the SCR for permitting her children to watch their father scream profanity,

attack, harass, intimidate, and chase Plaintiff's 70-year-old cancer-surviving grandfather

down the street for simply serving process.

757.    Defendant Shulman's orchestrated denial of Defendant Clarry's request

was to prevent Plaintiff from having a record on appeal because the transcript of the

proceeding was being tampered in real-time by staging the narrative, which would reflect a

distorted and unbiased handling of the proceeding for CPS Order #7259254 dated

1/09/2020.

758.    Defendant Shulman's misappropriated authority spearheaded the witch-

hunt without subject-matter jurisdiction under color of law to publicly humiliate, shame,

chastise, and castigate Plaintiff for serving process and extort Plaintiff to get an attorney or

face the same level of concerted retaliation next time, "[t]he respondent mother is

prohibited from appearing at the homes of any ACS attorneys or individuals who work for

the agency, at the homes of the father's counsel, counsel for the child or counsel for the

maternal grandparents."[443]

759.    This was a pretext to subjugate and control Plaintiff, manifested as an

Order carrying the force of law, to confine Plaintiff's rights to conform to *their* carefully

scripted false narrative for detaining R.R. (3) under "ACS supervision" and in the custody

of his abuser, Defendant Ruci, until Plaintiff agreed to pay for an attorney to play

Defendant Shulman's game. That is why Defendants' ACS and Shulman did not show the

video or mention it in front of Plaintiff, they simply spread a malicious rumor about its

contents for hysterical attorneys to facilitate deluded misrepresentations about something

they did not see as being sinister, rather than a routine act of service of process.

---

[442] *See* Matter of B.H. Children (Robert H.), 29 Misc 3d 161, 164 (Fam Ct 2010).
[443] Invalid/Void CPS Order #7259254 (1/09/2020).

760.    Perhaps, Defendants' ACS do not like being served process or do they not like non-attorneys, such as Plaintiff, learning and understanding the particulars of serving process as required by law. Plaintiff has heard Defendants' Peebles, Alozie, Steele, and Best say "that's not ACS does it" or "ACS does it differently," which is reflected in the specious ways these people conduct business, "filed an Article X" or "filed an Article 10" as opposed to child protective services having *filed* an FCA Article 10 *petition*, "[w]here a statute describes the particular situations in which it is to apply and no qualifying exception is added, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded."

761.    For example, on 3/26/2021, Defendants ACS in Kings County staged a Hybrid proceeding, a purported derivative FCA Article 10 merged with a pending FCA Article 10, referred to as "an amended FCA Article 10," that were incorporated into an FCA Article 8 against respondent father, R.M.[444] Defendants ACS were supposed to serve parent R.M. the Order of Protection, "[x] Service directed by other means: Petitioner to Arrange" but never did. Defendants ACS did, however, attempt to enforce it by trying to have him arrested, and casually admitted it was never served but that "he knew about it."

762.    For example, Defendant Shulman is heavily influenced by her substantial experience working for Defendants ACS for 12 years because she, too, believes that "filing" and "service of process" is a matter of perspective and participation, grossly unrelated to due process or protected constitutional rights, *"…her belief that an article 10 petition under NN-17995/19 has not been filed, **despite her appearance in court on 9-4-19 with her retained counsel in which she acknowledged service of the petition**… her belief that this court should not have restored cases and orders to the calendar, done on notice to her with her and her counsel present, that were erroneously dismissed for a parties' failure to appear before another jurist, when that party was before this jurist earlier in the day at which time all parties had been notified that the matters would be added to this court's calendar for further proceeding, thus obviating the need to appear before the other jurist,"* and yet, Defendant Rodin *wrote* the Decision *for* Defendant Shulman – "I won't lie, you do it since you didn't file it."[445]

---

[444] (This process is done by copy and pasting parts of different FCA Article petitions to create a Frankenstein, so to speak, which Defendants ACS casually call "a family offense proceeding under a neglect proceeding," which is taken in the most literal sense).
[445] *Decision and Order on Application for Recusal As Made by Victoria Navarro* by Judge Shulman (4/14/2021).

763.    For example, respondent parent Cibelli, not an attorney and having no legal expertise in uncovering specious forms of attorney fraud, realized that Defendants ACS did not legally file the 2 neglect petitions against him because QFC did not, and still does not, have electronic filing in 2018.[446] Shaikh attempted to unscrupulously deflect attention away from parent Cibelli's constitutional violations under color of law by outrageously stating, "[t]he respondent father has actively participated in all aspects of this case since it was filed and if he felt the case should have been dismissed he should have filed something much earlier."[447]

764.    Contrary to Shaikh's claims, there is no electronic filing system, pilot program or otherwise, that exists at QFC or any of the family courts in Defendants' ACS jurisdiction. So, whatever "electronic" submissions Defendants' ACS purportedly used is not one supported by UCMS, such as the current and only form of electronic filing, i.e., New York State Electronic Filing ("NYSEF"), which is not available to Defendants' ACS in family court.

765.    Shaik attempts to carve out parent Cibelli's constitutional deprivations as inconsequential, insignificant collateral faux pas, as though implying, "sucks for him for not being an attorney and not knowing that jurisdiction by fraud is no jurisdiction at all." Instead, Shaikh offers a casually stated litany of reasons to overlook the deception and do away with parent Cibelli's protected constitutional rights, "[t]he respondent further seeks affidavits of service of both neglect petitions...[p]etitioner is unable to provide said affidavits as they do not exist, because the respondent through his attorney accepted service of the petitions when he appeared at arraignment or on the return of service dates...[s]ince the respondent accepted service of the petitions in court, the petitions were not served on him and thus no affidavit of service exists...[i]n the alternative, even if the respondent father did not accept service or if service was improper, he has waived his right to proper service, by appearing at these proceedings and actively participating in the various court appearances, hearings, filing motions such as this one, and etc...[t]he point of being served is knowing that there is a court case and it is undisputed that the respondent father is aware that he has a pending court case."[448]

---

[446] Plaintiff incidentally uncovered this in records submitted for Jewell Law, PLLC v. Gerd Ruci – Index Number 665702-2019.
[447] Affirmation in Opposition to Motion for Summary Judgment by Mohammed Talha Shaikh (5/10/2021).
[448] Affirmation in Opposition to Motion to Compel the Discovery of Records by Mohammed Talha Shaikh (5/10/2021).

766.    Defendants' ACS racketeering is a blatant practice of jurisdiction by fraud, coupled with an unscrupulous policy of withholding service of process, i.e., petition with summons. As such, Defendants' ACS are not legally, as in by statute, filing FCA Article 10 petitions with the Chief Clerk of Court, who is solely responsible for issuing summons, which is the manner and method of service of process specifically prescribed pursuant to FCA §1035 (i)(a) as, "…the court shall cause a copy of the petition and a summons to be issued the same day as the petition is filed…" FCA §1035 (b) specifically states, "[i]n a proceeding to determine abuse or neglect, the summons shall contain a statement in conspicuous print informing the respondent…" And FCA §1035 (c) states, "On the filing of a petition under this article… the court shall forthwith cause a copy of the petition and a summons to be issued, clearly marked on the face thereof "Child Abuse Case", as applicable."

767.    If summons was not produced, then it is not possible for Defendants' ACS purported Article 10 proceedings to have *originated*, as in by statute, by the *filing* of a petition, which explains why the word "petition" is often omitted in references to child protective proceedings, "[w]hen an order is entered by a court that lacked jurisdiction to grant the relief awarded, the order cannot support a finding of contempt. Such an order is not voidable; it is simply void. When a court makes such an order, it is a nullity. No one is bound to obey it or is liable for disobeying it." Defendants' ACS, Galchus, Kaplan, Naughton, Clarry, McFarlane, Ruci, and Shulman fabricated the accusations to sever Plaintiff's custodial rights over R.R. (3) with the force of law under threat of contempt and incarceration, since service of process is a method that enables Plaintiff the possibility of freedom from their bondage.

768.    Furthermore, Defendant Shulman was, in effect, extorting more money from Plaintiff by preventing relatives, friends, or strangers from helping with service of process under threat of contempt and incarceration, since Plaintiff was financially constrained, "[i]f a court has jurisdiction of the proceeding and yet makes an order beyond its authority, the order is void. In the one case, there is action without any authority; in the other, action in excess of authority. In both cases the order is a nullity[] and affords no foundation for contempt proceedings."

769.    Defendants weaponized their access and authority over the family court to restrain Plaintiff by prohibiting Plaintiff from seeking forms of refuge and relief under color of law, such as preventing access to the Appellate Court by tampering with transcripts, i.e., no record on appeal for 8/30/2019, 9/04/2019, 10/10/2019, 12/17/2019, 1/09/2020 and 3/09/2020. Defendant Shulman even nullified Plaintiff's service of process for Motion to Dismiss dated 1/07/2020, filed directly with the 5th floor clerk on 1/08/2020, as "improperly filed." Defendant Shulman gave it back, "I can't accept this" because it was stamped by the clerk. Not only was Plaintiff being financially extorted for money to pay legal fees and prohibited from seeking cost-effective forms of services by asking friends or relatives, but Plaintiff's participation *in* the proceedings was also coerced, since Defendants were leveraging R.R.'s (3) safety and well-being to force Plaintiff's attendance.

770.    Ultimately, Defendants, collectively, seek to *break* Plaintiff *in* via forms of cruel and unusual treatment: holding a child hostage with his, and his mother's, abuser to force the mother's absolute obedience. Defendants weaponized their knowledge of the law, access to the law, and their experience with the practice of law, regardless of if what they said or did was, in fact, *legal*, to forcibly condition Plaintiff to comply with *their* prescribed access to the courts and *their* access to justice.

771.    Defendants concerted efforts to degrade Plaintiff, to ensure Plaintiff understands *their* determination of Plaintiff's freedom from *their* involuntary captivity happens when *they* say it does, will continue if the dollars keep coming in - federal, state, city, and county funds to both sustain and maintain it. Defendants, collectively, portray their power and authority like a pimp describes his style of subjugating, or *breaking in*, his workers.

> "The motivation may be different for each of them, as far as whether it's power or control," said Sgt. Jaycin Diaz, who oversees sex trafficking cases in the Seattle Police Department's vice unit. "But at the end of the day, they see these girls as a commodity. It's about money."
> The money was so important to Harper, he said he got physical with the women who refused to work or bring the money back.
> "I had this one hoe. She used to always — I had to damn near choke the (explicative) out of her just to get her to — just to get her to want to go out," he said.
> That's how Harper kept control of the women. He made sure they knew his rules.
> "They couldn't do nothing unless they asked me," he said. "'You not doing nothing. Don't talk to nobody.' You know?"

"How would I break a woman? I would get you to trust me," he said."
When I get you to trust me, then I come on in."[449]

772.    Defendants ACS have a bizarre and dangerous predilection for racketeering: kidnapping children to force their parent's compliance, much like how Stockholm syndrome is described, "psychological response wherein a captive begins to identify closely with his or her captors, as well as with their agenda and demands…. [a]s the Stockholm bank robbery incident proves, it takes only a few days for this bond to cement, proving that, early on, the victim's desire to survive trumps the urge to hate the person who created the situation…[v]ictims live in enforced dependence and interpret rare or small acts of kindness in the midst of horrible conditions as good treatment…[t]hey often become hypervigilant to the needs and demands of their captors, making psychological links between the captors' happiness and their own… [b]y the 21st century, psychologists had expanded their understanding of the Stockholm syndrome from hostages to other groups, including victims of domestic violence, cult members, prisoners of war, procured prostitutes, and abused children."[450]

773.    Even though Defendant Kaplan, was previously employed by Defendants ACS in New York County, Defendant Shulman permitted him to jump on the bandwagon of sustained blows of impunity to offer more unsubstantiated allegations, without subject-matter jurisdiction to entertain them, to materialize a Hybrid FCA Article 8 - Vexatious Litigant – Visitation Order, "[i]n the instant case, [***6] the **court lacks** subject matter **jurisdiction** to entertain the agency's motion. The parties do not fall within a relationship classification for which an order of protection may be entered."[451]

774.    Defendant Kaplan sought retribution because Plaintiff terminated his cash flow, funded by R.R.'s (3) captivity. Plaintiff exposed his connection to Defendants' ACS and requested his immediate disqualification for also violating ethics rules[452] by remaining as R.R.'s (3) attorney in the money laundering front, "[t]he attorney for the child is subject to the ethical requirements applicable to all lawyers, including but not limited to constraints on: ex parte communication; disclosure of client confidences and attorney work product;

---

[449] Excerpts from a nine-month nationwide investigation into sex trafficking from Seattle, Washington. *A Pimp's Playbook: How a Former Pimp Talked His Way into Women's Lives* by Taylor Mirfendereski.
[450] https://www.britannica.com/science/Stockholm-syndrome.
[451] See Matter of B.H. Children (Robert H.), 29 Misc 3d 161, 164 (Fam Ct 2010).
[452] Lawyer as Witness Rule 3.7 (a), pursuant to 22 NYCRR §1200.00 (Glenn Kaplan was Plaintiff's accuser on 8/26/2019).

conflicts of interest; and becoming a witness in the litigation."[453] It was Defendant Kaplan who made hearsay accusations against Plaintiff on 8/26/2019, based on a phone call he received on Saturday 8/24/2019 from a purported "Lieutenant Tetlansky," who he never met or whose identity he bothered to verify before going to court.[454]

775.    Defendants wanted to silence Plaintiff and suppress the Emergency OTSC dated 12/26/2019 and Motion to Dismiss dated 1/07/2020, for its exculpatory evidence, such as transcripts for 8/26/2019, where unregistered FCA 1034 #7 confirmed bruises and marks were reported and supported Plaintiff's physical and residential custody of R.R. (3) and L.N. (6). The transcripts proved Defendants' Kaplan, Rodin, Steele, Alozie, Tingue, Galchus, McGrady, and Ruci conspired to suborn perjury from Defendant Alozie to create the false instrument of filing on docket NN-17995-19. It further revealed that Defendant McGrady clearly and unequivocally stated only "Suffolk County Attorneys" could initiate an FCA Article 10 due to Plaintiff and R.R.'s (3) residence in Suffolk County.

776.    Other exculpatory evidence included text messages between Plaintiff and Dr. Samantha Steele ("Stehle"), who confirmed Defendant Ruci canceled his initial appointment and told her about the FCA Article 10 on or about 8/28/2019. Plaintiff provided a copy of the signed agreement ("Stehle Agreement") with Stehle as proof that Defendant Kaplan lied on August 30, 2019 when he asked Defendant Shulman to "cease" the forensic evaluation because "it had not started." Plaintiff provided text messages confirming Stehle faxed her initial report to the court on August 26, 2019. After Defendant Shulman speciously issued the Order on Motion on March 3, 2020, tampered transcripts 1 & 2 contained retroactive alterations to coincide with the incriminating texts.

777.    For example, tampered transcript 2 showed Defendant Kaplan requested permission to contact Stehle to "halt" the evaluation because "the parties met with the doctor" but "it was in the beginning stages." On August 30, 2019, it was Defendant Kaplan who not only requested the September 4, 2019 adjournment, but said it was because Defendant McGrady previously scheduled it. Defendant Kaplan's statements were deleted

---

[453] Rules of the Chief Judge §7 (b).
[454] Exhibit Glenn Kaplan, Attorney For Child & Attorney As Witness ("AAW"); Exhibit See "ACS Suborns Perjury to Hide Child Abuse (08302019).

and replaced with statements purportedly made by Defendant Shulman[455] in tampered transcripts 2.

778.    Since Defendants' Rodin, Galchus, Kaplan, Ruci, and Shulman maintained a collective delusion that Defendant McGrady "transferred" her case or "gave" Plaintiff's custody petition to the Part 14, the incidental discovery of the dismissal order threatened to dismantle the carefully crafted and artificially sustained alibi. Currently, Defendant Shulman shifted the narrative to more vague and obscure claims about *how* she obtained the custody litigation, "her belief that the custody matters pending before another jurist should not have been transferred to this court to join the neglect proceedings."[456]

779.    Interestingly, while Defendant Galchus's OTC #1 purported "appearances were scheduled before another referee," due to Defendant McGrady's untimely retirement, he also claims "no notice was given to the attorneys" about the assigned Judge in Part 16, who dismissed the custody litigation. Specifically, the purported hearing before Defendant Shulman took place on the morning of September 4, 2019, whereas the assigned Judge dismissed it at 4:00pm the same day. Neither tampered transcript 1 nor 2 contained any reference to the 3:00pm hearing pending in the Part 16, despite Defendant Shulman purportedly scheduling a conference for October 10, 2019 directly in her computer.

780.    On 2/24/2020, Defendant Peebles informed Plaintiff she received an alert on her computer for the 2/28/2020 court date. Defendant Peebles further stated that Defendant Ruci confirmed a court date on 2/28/2020 the week before. So, Plaintiff took the day off from work.

781.    On 2/28/2020, Plaintiff arrived at QFC around 9:12am. Plaintiff saw Defendant Ruci, formally dressed in suit and tie, waiting to be let in by security. Previously, Defendant Ruci wore jeans, sneakers, and a sweater or regular long sleeve shirt, so this was unusually different attire. Defendant Ruci had no papers or suitcase in hand. When Defendant Ruci saw Plaintiff, he pulled out his phone from his back pocket and started using it. After passing security, he darted in another direction as though to conceal *where* he was going. Nonetheless, Plaintiff went to the 3rd floor waiting area, adjacent to the Part 14, and sat down quietly. Moments after, Defendant Ruci showed up to

---

[456] *NAVARRO RUCCI RECUSAL* final signed by Judge Monica Shulman (4/14/2021).

the Part 14 and walked in. As the adjacent waiting room filled up with litigants, Plaintiff was not called to the Part 14 for a proceeding.

782.    Defendants' Ruci, Galchus, McFarlane, Naughton, Clarry, Rodin, and Shulman conspired against Plaintiff under color of law to fabricate 1 FCA Article 4 "Support Petition" on docket F-05491-19[457] and 1 FCA Article 5 "Paternity Petition," on docket F-04656-20, disguised as a second Article 4 "Support Petition" in the Part 14. Behind closed doors, aforesaid Defendants were not only fabricating Summons for the aforesaid 2 fraudulent support petitions, but also fabricating retroactive Summons for docket NN-17995-19,[458] replete with an unmistakable use of PaintShop for the Chief Clerk #2's signature.

783.    A typical Part 14 Court Officer[459] recognized Plaintiff and smiled but never called Plaintiff's case.

784.    Both Defendants' McFarland and Clarry recognized Plaintiff and made eye contact but said nothing. Defendant Naughton also walked by, saw Plaintiff, and immediately lifted the manila folder she was carrying and covered her face as she made her way into the Part 14.

785.    It was not until Defendant Galchus appeared in the Part 14 that a Court Officer[460] and a female clerk[461] began harassing Plaintiff, causing all sorts of unnecessary attention and announcements made to scare Plaintiff to leaving the premises for absolutely no other reason than witnessing the clandestine meeting of co-conspirators in the Part 14.

786.    First, the aforesaid male Court Officer walked up and down the waiting room yelling "there is no recording in the court by order of the Chief Judge Janet DiFiore!"

787.    Second, the aforesaid Court Officer called out Plaintiff's name, "Navarro!" as he casually walked by and handed Plaintiff an adjournment slip for 3/09/2020, "your case is on March 9th."

> Plaintiff: How did you know I was here?
> Court Officer: Because you checked in…

---

[457] Defendants deleted Plaintiff's original support petition on docket F-05491-19.
[458] Included in the mass records dump of 7/02/2021 was an attachment with the aforesaid Summons.
[459] Same helpful and respectful young man from 8/30/2019; shorter Caucasian male, short dark brown hair, average build, kind vivid green eyes.
[460] He always demands Plaintiff's phone before being allowed to enter but not the same from anyone else; tall male Caucasian mid 30's to early 40's, short dark brown hair, average build.
[461] Long thinning dirty blond long hair, tall older Caucasian woman, heavy set – bad attitude.

> Plaintiff: No, I didn't. I haven't told anyone I was here. How did *you* know I was here?
> Court Officer: [mumbling] Didn't you check in?
> Plaintiff: No. Did Frank Galchus tell you I was here because I have been here for almost 2 hours, and no one bothered me until he saw me.
> Court Officer: No.
> Plaintiff: So, *who* told you I was here?
> Court Officer: Uhm, let me go check.
> Plaintiff: Yeah, you do that.

788.    Third, the same Court Officer casually paced up and down the waiting room yelling, "there is no recording permitted in the court! You have to get permission from the Chief Judge to record in court!" As such, "[w]hile the outcomes of the various cases [\*29] addressing this issue have thus varied, most courts seem to agree that absolute quasi-**judicial immunity** should not extend to court officers enforcing judicial orders if either (1) the judge's order is facially invalid, *see Penn v. U.S.,* 335 F.3d 786, 789 (8th Cir. 2003), *and Roland v. Phillips,* 19 F.3d 552, 556-57 (11th Cir.1994); or (2) the judge's order is not facially invalid, but the court officer exceeds the scope of that order, *see Cruz v. Bodek,* 1997 U.S. Dist. LEXIS 1331, No. 96 Civ. 6989, 1997 WL 55947, at \*3 (S.D.N.Y. Feb. 10, 1997) (Koeltl, J.) (citing *Brown v. Costello,* 905 F. Supp. 65, 75 (N.D.N.Y. 1995), *Roland v. Phillips,* 19 F.3d 552, 555 (11th Cir. 1994), *and Cok v. Cosentino,* 876 F.2d 1, 3 (1st Cir. 1989)), or enforces it in an improper manner. *See, e.g., Martin v. Board of County Comm'rs,* 909 F.2d 402, 405 (10th Cir. 1990)."[462]

789.    Fourth, another round of yelling by the aforesaid Court Officer about not recording, etc. It was the Court Officer's constant eye contact with Plaintiff that got the attention of person's sitting nearby and around Plaintiff to notice the announcements were directed solely at Plaintiff.

790.    Lastly, a female began screaming Plaintiff's name "Navarro!" Plaintiff got up to follow the sound of the voice and saw a tall, long dirty blond haired Caucasian woman, about mid-50's to early 60's. The woman stood at the podium/front desk directly in front of the Part 14 courtroom door with the aforesaid Court Officer and shoved another adjournment slip at Plaintiff, "your case isn't until March 9th, you can go."

> Plaintiff: Am I bothering anyone?
> Woman: No.

---

[462] *Id.* at 28-29.

> Plaintiff: Am I not allowed to sit here and court watch? I have not
> bothered *anyone*. I have been *absolutely* quiet. Is there a problem
> with me being here?
> Woman: No.
> Plaintiff: Then *what* is the problem?
> Woman: Fine. I don't care. You can stay.

791.    The female from the Part 14 not only refused to look at Plaintiff as she
spoke, but she also actively hid her face and turned to look at the wall – as she rested her
elbow on the edge of the desk, slightly bent over, and turned to the wall, using her hand to
hold up her chin as she physically kept moving her hair to cover her face. Plaintiff
recognized her: the female clerk at the Dependency Department on 12/26/2019, who gave
Plaintiff's Emergency OTSC to Judge Emily Ruben, "wait for me on the 5th floor because I
have to find a judge that can sign this." Plaintiff saw this woman physically stamp the
Emergency OTSC but returned it to Plaintiff signed without the dated court stamp. She also
told Plaintiff to "serve each attorney personally," pointing to a torn off piece of paper with
each attorney's name and party affiliation listed, even after Plaintiff asked if it could be
served via e-mail, "like the other attorney's normally do."

    a.  On 12/30/2019, this same woman showed Plaintiff the court's computer
        screen, where no record of Joseph Sopher existed, "do you have an
        attorney?"
    b.  On 3/09/2020, this same woman threw Defendant Shulman's purported
        orders at Plaintiff.

792.    Defendant Shulman even employs psychological, emotional, and physical
torture as cruel and unusual punishment, such as pretending to grant **Plaintiff** an FCA 1028
hearing for the return of R.R. (3) on 1/09/2020, which she maliciously scheduled for
3/09/2020. Although the statute stipulates it should be held within 3 days of the request or
as soon as is practicable.[463] These dates were purportedly on the calendar when Defendant
Shulman arbitrarily and capriciously scheduled **Plaintiff's** FCA 1028 hearing on
03/09/2020, instead of 2/28/2020. Defendant Shulman even threatened to give Defendant
Galchus a copy of Plaintiff's psychological evaluation if she did not agree to be extorted
and appear with an attorney on 3/09/2020.

793.    Defendant Shulman had no intention of granting the FCA 1028 hearing,
she just needed Plaintiff to think it would happen and not act, hence, immobilized and

---

[463] On 12/17/2019, Defendant Wisler had scheduled the following 3 trial dates: 1/09/2020, 2/28/2020, and 3/09/2020.

controlled, in the meantime. Unlike in recent proceedings, where Defendant Shulman repeatedly uses the term "vacate" to purportedly delete a calendared date from UCMS, the term was never used on 1/09/2020 to remove the 2/28/2020 date from the calendar of the Part 14.

794.    On 3/09/2020, Defendant Shulman told Plaintiff she never granted an FCA 1028 hearing, and further implied Plaintiff was "lying" for even mentioning it. In fact, Defendant Ruci was not even present in court and no explanation was given. Right after Plaintiff said Defendants' ACS made a false report on 8/27/2019 to open a closed, unfounded SCR investigation dated 8/12/2019,[464] Defendant Shulman began to extort Plaintiff, demanding Plaintiff pay for private counsel, while also accusing Plaintiff of "delaying proceedings" by not appearing with representation. Plaintiff repeatedly told Defendant Shulman that Plaintiff cannot afford private counsel and repeatedly asked for the Court to assign counsel – all denied.

795.    Defendants' Going, Blond, Kelly, Galchus, Castillo-Lovaglio, Lovaglio, and Peebles were all present and heard Defendant Shulman deny Plaintiff's request for counsel. They also witnessed Defendant Shulman extort Plaintiff for money to pay for an attorney and threatened to punish Plaintiff with proceeding directly to trial if she failed to appear with an attorney at the next scheduled date of 5/18/2020.[465]

796.    Likewise, Plaintiff witnessed Defendant Naughton lie to Soffer to get the medical records, "send me your client's medical records, if it shows she was not taken to Stony Brook by ambulance," and "send me R.R.'s (3) medical records, if it shows bruises were documented, I'll drop the charges" to obtain both Plaintiff's and R.R.'s (3) medical records by fraud and deception, without a signed HIPAA authorization form. The medical records were sent directly to Defendant Naughton via e-mail in October 2019 and she reneged on her promise to "drop the charges" and kept Plaintiff's records, "[t]he Health Law chapters were updated to address the American Recovery and Reinvestment Act of 2009, which (among other things) expanded HIPAA's application and permit State Attorneys General to bring enforcement actions based on HIPAA violations."[466]

---

[464] That is the date stated in the suborned perjury dated 8/30/2019 on docket NN-17995-19.
[465] Curiously, Defendants' Galchus and Ruci submitted a motion on 5/15/2019 and 5/21/2021.
[466] Report of the New York State Bar Association's Task Force on Privacy.

## Conspiracy to Kidnap a Minor & 3rd Party Custodial Interference Under Color of Law

797.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-796, above as if specifically set forth herein.

798.    Defendants' ACS, Rodin, Alozie, Steele, Clarry, and McFarlane and Defendants' Shulman, Kaplan, Galchus, Blond, Kelly, and Ruci knowingly conspired, and/or voluntarily participated in a conspiracy, to violate Plaintiff's constitutional right to maintain familial association with R.R. (3) under color of law.

799.    Defendants weaponized and enhanced persecutions, which they call family court proceedings, to openly target Plaintiff with directed malignant attacks of Plaintiff's character speciously misrepresented as FCA 1034 reports, from court orders Defendants' ACS grossly neglected to register with the SCR. To satisfy personal vendettas, including but not limited to Plaintiff's written and verbal complaints against Defendants' ACS to various Senators, organizations, and Congresswomen/men for gross mishandling of the first 2 FCA 1034 reports. Defendants' ACS grossly omitted, and intentionally concealed Defendant Ruci's indicated findings. Defendants' ACS targeted Plaintiff for reporting Defendant Steele's telephone confession that ACS has no policy for domestic violence related cases, so repeated acts of domestic violence do not factor into their investigations after the first time. That was in response to Plaintiff's direct questions about Shakera Smith's use of illegal wiretapping audio, given to her by Defendant Ruci.[467] Meanwhile, their own training manual states, "[f]or the purposes of this section, "domestic violence" refers to a pattern of coercive tactics, which can include physical, psychological, sexual, economic, and/or emotional abuse, perpetrated by one person against an adult intimate partner with the goal of establishing and maintaining power and control over the partner. Importantly, not all domestic violence involves physical violence, although there may be an implied threat of physical violence."[468]

800.    Defendants' ACS targeted Plaintiff for the acts of domestic violence perpetrated by Defendant Ruci, which Plaintiff sustained on 9/19/2018, while holding R.R. (3), by grossly omitting it from the FCA 1034 report dated 1/16/2019 to openly advocate

---

[467] FCA 1034 Report (5/22/2019).
[468] Office of Children and Family Services, Child Protective Services Manual 2020 (p.188).

and vocalize their defense of Defendant Ruci on 1/22/2019 at Queens Criminal Court, where the report was given to Judge Guarino to plea bargain for lesser charges.

801.    On 1/22/2019, Queens Criminal Court Judge Guarino relied on the misrepresentations in Plaintiff's FCA 1034 report dated 1/16/2019 to remove R.R. (3) from the criminal court order of protection, which is why Defendants' ACS intentionally withheld submitting the determination of the indicated finding until 1/28/2019 to OCFS, so it could be used in Defendant Ruci's Queens Criminal Court Proceeding.

802.    Defendants' ACS misappropriated use of their status and position as official child protective specialists, which they portrayed as misrepresentations of R.R. (3) and Plaintiff's health and safety in an outrageous child protective services report, knowing Defendant Ruci would use it to request R.R.'s (3) removal from both orders of protection, Suffolk and Queens County, and aid reducing pending criminal charges in Queens Criminal Court and Suffolk County First District Court.

803.    Defendants ACS maliciously obstructed Plaintiff's and R.R.'s (3) equal protection under the law, by misrepresenting, altering, and tampering the contents of the FCA 1034 investigation ordered on 12/13/2018 to "minimize" the severity and "obfuscate" the propensity for violence and aggression by Defendant Ruci.

804.    By 8/12/2019, Defendant Ruci had begun a routine of arriving at the SCPD 2nd Pct. in Huntington, NY earlier than the time stipulated on the 6/13/2019 TOC, i.e., 6:30 pm, to inform Defendants McHugh and Teplansky of his situation and what he wanted and enlist their services and support to execute a plan to kidnap R.R. (3) from Plaintiff's custody to conceal his 3 indicated findings and his culpability as the only person legally responsible for the marks and bruises reported in several SCR investigations. The plan was first executed by Defendant McHugh's public demonstration of force and support of Defendant Ruci on Monday 7/22/2019 as soon as Plaintiff arrived at the 2nd Precinct to pick up R. R. (3).

805.    On 7/22/2019, Plaintiff entered the 2nd precinct to pick up R.R. (3). As soon as Plaintiff opened the second set of lobby doors, Defendant McHugh began berating and threatening Plaintiff, "I checked your baby! There are no bruises! I know about the Order of Protection! I'm not playing any games!" Before that day, Plaintiff never met Defendant McHugh or knew her name.

806.    As Plaintiff received the raw end of Defendant McHugh's verbal attacks and threats, Defendant Ruci stood next to the front desk, holding R.R. (3). Defendant Ruci had a sinister smirk on his face and appeared very confident with Defendant McHugh's display of official police support. As soon as the public berating ended, Defendant Ruci handed R.R. (3) to Plaintiff. Plaintiff left the 2nd Precinct. Besides Defendant McHugh, there was only 1 other officer behind the front, who witnessed the demonstration, though he pretended to be looking down at his phone the entire time. After informing Defendant Castillo-Lovaglio, who drove Plaintiff to pick up R.R. (3), about what occurred, Defendant Castillo-Lovaglio suggested Plaintiff to go back in and ask for Defendant McHugh's name, since Defendant McHugh never identified herself prior to screaming and making threats.

807.    Plaintiff went back in and saw Defendant Ruci standing in the same place as before, though it appeared as though he was speaking with Defendant McHugh but stopped as soon as they saw Plaintiff walk in. As Plaintiff asked Defendant McHugh for her full name and spelling of her last name, the officer who was previously focused on his phone, suddenly looked up at Plaintiff and began paying attention to the conversation. During the time Plaintiff asked Defendant McHugh for her name and when Plaintiff walked out of the 2nd Precinct, no other officer or person in uniform came out to the lobby or behind the desk.

808.    Later that night, Plaintiff called the 2nd Precinct and asked to speak with the desk Sergeant to report Defendant McHugh's misconduct. A female voice picked up the phone and put Defendant McHugh on. Plaintiff repeatedly told to Defendant McHugh to put the desk Sergeant on the phone, but she refused. Instead, Defendant McHugh apologized to Plaintiff for screaming, then tried to explain why she did it. According to Defendant McHugh, she had not, in fact, "checked" R.R. (3) as she screamed to Plaintiff she had done. Defendant McHugh said she noticed Defendant Ruci would often come in with R.R. (3), sit down and try to engage officers at the desk. Defendant McHugh said when Defendant Ruci arrived at the precinct, sat down and began undressing R.R. (3).

809.    Defendant McHugh told Plaintiff, "I thought it was weird" but also, "I thought he might be trying to report abuse," so she just watched him from the desk. Defendant McHugh told Plaintiff that, to get her attention, Defendant Ruci, held a fully naked R.R. (3) in his arms and waived his hand at her, "psst. Come here," which prompted

her to leave the front desk and go out to the lobby. Defendant McHugh said she walked out to the lobby, looked at R.R. (3) and Defendant Ruci said "see. Nothing there." Defendant McHugh admitted to Plaintiff, "I didn't check your child." Plaintiff asked Defendant McHugh, "then why were you screaming at me?" Plaintiff also Defendant McHugh, "what are your credentials?" Rather than answer, Defendant McHugh began to bully and threaten Plaintiff to return to the precinct with R.R. (3).

810.    Given Defendant McHugh's aggressive and hostile tone, Plaintiff did not return to the 2nd Precinct with R.R. (3). Plaintiff attempted to file a complaint the following week and spoke to a male desk Sergeant, who told Plaintiff that Defendant McHugh was not even supposed to be at the front desk that day, according to the "logbook." The male desk Sergeant told Plaintiff that Defendant McHugh was in Squad C and that any complaint would have to be made directly to *her* Supervisor, but their shift did not start until Saturday.

811.    On 8/12/2019, when Plaintiff arrived at the 2nd Precinct, Defendant McHugh and an unidentified black male officer sat behind the desk whereas, Defendant Ruci stood next to front desk, with a smug look on his face, as he held R.R. (3). Defendant Ruci handed R. R. (3) to Plaintiff. Plaintiff sat down with R.R. (3) and waited for Defendant Ruci to leave. Defendant Ruci did not leave. Instead, Defendant Ruci stood towering over Plaintiff with his arms crossed and looking down. Defendant Ruci was brazenly standing over Plaintiff, showing off his power and support. Given that Defendant McHugh previously told Plaintiff, "I know about the order of protection," Defendant Ruci's display *should have* appeared defiant and inappropriate. As Defendant Allen subsequently told Plaintiff, "the lobby is a public place," no one did anything unless Plaintiff asked for their help.

812.    In a loud voice, Plaintiff told Defendant Ruci to go, which prompted Defendant Allen to berate Plaintiff with questions, such as "what are you doing!" Defendant McHugh, fully aware of the full stay away order of protection remained silent as Defendant Allen continued to interrogate Plaintiff and demand Plaintiff to walk up to the front desk and *show him* R.R. (3). Police officers have guns. Plaintiff was in a police precinct, which was full of armed police officers. Plaintiff was in no position to negotiate or argue with an armed and blatantly hostile police officer in his own home, so Plaintiff

obeyed. Plaintiff showed R.R. (3) to Defendant Allen as he asked her to do and he said, "those are discolorations," referring to light purple areas on R.R.'s (3) body. Plaintiff responded by saying "bruises" and Defendant Allen repeated "discolorations."

813.    Defendant Allen ordered Plaintiff and Defendant Ruci to remain in the precinct, "he's not leaving in case I need to arrest someone." Defendant Allen also said, "I'm going to call social services and have them sort this out." However, it was Defendant McHugh who made the call. Plaintiff asked Defendant Allen for permission to go to the car to get Plaintiff's phone because Plaintiff had pictures of R.R. (3) from Friday, when the "discolorations" were not there. As soon as Plaintiff went to the car and called Defendant Castillo-Lovaglio to come to the precinct because Plaintiff was scared.

814.    Defendants' McHugh and Teplansky were so well-informed of Plaintiff's custody proceedings at QFC that, without identifying himself, Defendant Teplansky made a quick debut in the lobby and asked Defendant Ruci, "what is the law guardians' number?" Defendant Ruci comfortably took out his phone and handed it to Defendant Teplansky, "this is the last number I have." After Defendant Teplansky took down the number, he left. At no time did the bald, overweight man identify himself to Plaintiff. Neither Defendants McHugh nor Defendant Allen say who the bald overweight man that stood behind the desk for less than 5 minutes was. About 10 minutes later, Defendants' Castillo-Lovaglio and Lovaglio arrived as Defendants' McHugh and Allen were taking turns screaming and threatening Plaintiff, while holding R.R. (3).

815.    Within the records sent by Defendant Heaven on 3/26/2021, is the ORT for 8/12/2019 with Defendant McHugh's report to the SCR. Essentially, Defendant McHugh, a police officer, called the SCR to make a report for a domestic dispute between Plaintiff and Defendant Ruci. Defendant McHugh knew, had there been any instance of a dispute, and there was not, it would have constituted a violation of Plaintiff's full stay away order of protection. Defendant Ruci was subject to arrest. Instead, as Plaintiff and Defendant Castillo-Lovaglio sat, Defendant McHugh was on the phone saying, "she's crazy", referring to Plaintiff, and claimed Plaintiff was saying "there are bruises," which Plaintiff never said.

816.    Plaintiff witnessed Defendant McHugh make a false report to the SCR, in her official capacity and as a mandated reporter, lied that she physically "checked" R.R. (3)

and "saw nothing." Defendant McHugh never checked R.R. (3), while Plaintiff was there. Although, she was behind the desk with Defendant Allen, she did not come closer when he ordered Plaintiff to bring R.R. (3) to him. On the phone, Defendant McHugh also said, "don't worry, I'll stand right next to you the whole time" and laughed. Plaintiff was ordered to stay in the precinct for over 4 hours, while Defendants' McHugh and Allen took turns screaming and making threats for absolutely no reason. At no time did Defendants' McHugh or Allen tell Plaintiff she was being detained or provide an explanation for why Plaintiff, R.R. (3) and Defendant Castillo-Lovaglio could not leave.

817.    Beth Sullivan ("Sullivan") arrived around 8:00pm. As soon as she walked in Defendant McHugh said, "my Lieutenant would like to speak with you" and took Sullivan to the back. She was gone around 20 minutes. Up to Sullivan's arrival, 2.5 hours, neither Defendants' McHugh nor Allen informed Plaintiff of any reason why Plaintiff could not leave. Plaintiff asked to leave numerous times, such as when R.R. (3) threw up all over himself and Plaintiff. Plaintiff had no food to feed R.R. (3) and no diapers to change him. R.R. (3) was hungry and fussy. In between erratic, and hostile screams by Defendants' McHugh and Allen, Plaintiff breastfed R.R. (3) in front of them and others who walked in and out of the precinct.

818.    Defendant McHugh insisted Sullivan speak with Defendant Ruci, even though Sullivan said no. Defendant McHugh did not take no for an answer. Even after Sullivan left, Defendant McHugh ordered Plaintiff to remain and did not say why or what for. Plaintiff saw Defendants' Ruci and McHugh talking to each other in the back. Defendant Allen remained at the front desk. Defendant Allen saw Plaintiff grab a piece of paper from the front desk and write down the phone numbers for IAB from a poster. When Allen saw Plaintiff give the paper to Defendant Castillo-Lovaglio, he went to the back. Moments later Defendant McHugh came out and Plaintiff said, "I'm going to file a report against you with internal affairs for what you've done."

819.    Defendant McHugh looked at Plaintiff and ordered Plaintiff not to go anywhere. About 20 minutes later, Defendant McHugh came out with 2 large male police officers, ordered Plaintiff to hand R.R. (3) to Defendant Castillo-Lovaglio and proceeded to commit assault and battery without explanation. Specifically, Defendant McHugh yanked Plaintiff's left arm and forcibly pulled it to the right, put handcuffs on, then ordered

Defendant Castillo- Lovaglio to give R.R. (3) to Defendant Ruci, "CPS wants you to give the baby to his father."

820.    To discredit, humiliate, and punish Plaintiff, Defendants' Ruci, McHugh, Teplansky, and Allen's conspired to violate Plaintiff's rights under color of law by not only handcuffing and illegally transporting her in a police vehicle without an official report,[469] but leaving her at SBUH Emergency Psychiatric Unit under false pretenses, "CPS ordered her to be taken to CPEP." Plaintiff was later informed by Richter that SCDSS had nothing to with it and had been trying to speak with someone at the precinct about it.[470] Defendant Ruci wanted to guarantee himself sole custody of R.R. (3), jeopardize Plaintiff's standing in QFC, and discredit the order of protection in place because his co-conspirators are police officers that he recruited to help him.

821.    On 8/13/2019, Plaintiff called the Family Service League ("FSL") to reschedule the appointment and explained to their staff what had happened the day before. Plaintiff's appointment with FLS was scheduled over 1 month in advance and had absolutely nothing to do with Stony Brook University Hospital.[471] In fact, Defendant Kaplan lied in court that it did and further lied that SCDSS told him it did. Plaintiff met with case worker Abdulla-Latiff ("Latiff"), signed a HIPAA for the medical records for SBUH for 8/12/2019 and was cleared of any wrongdoing. In fact, Latiff advised Plaintiff to file a complaint against the police officers. Even Richter told Plaintiff to file a complaint for, "unlawful imprisonment." Had SCDSS sent Plaintiff to SBUH, and they did not, it would have been done much sooner, but there were bruises and marks on R.R. (3).[472]

822.    SCDSS told Defendant Ruci to return R.R. (3) to Plaintiff. Defendant Teplansky did not expect this because he a) threatened Sullivan and b) secured R.R. (3) with Defendant Ruci by illegally transporting Plaintiff to SBHU. So, Defendant Ruci purposely withheld R.R. (3) to lure Plaintiff to the 2nd Precinct to file a police report for a violation of the temporary order of visitation ("TOV"), where Defendants' Teplansky, McHugh, Allen and others were waiting to attack. Latiff told Plaintiff not to go back to the

---

[469] As Plaintiff sat in the back seat of the police car, the two male officers rummaged through a bin of files, looking for a form but could not find what they were looking for.
[470] Defendant McHugh made a report to the SCR but was never available to speak with Richter about why she called.
[471] The appointment was scheduled for a Tuesday. Plaintiff worked part-time on Monday, Wednesday, and Friday.
[472] On 8/13/2019, Defendant Ruci returned R.R. (3) with finger-like bruises all over his forearms. Defendants' Ruci, Teplanksy, McHugh, Allen, and ACS wanted Plaintiff to stop reporting abuse. Plaintiff was too scared to take R.R. (3) to document his bruises and marks. Plaintiff took pictures that same night, instead.

2nd Precinct for fear of further retaliation from the police. Latiff asked Plaintiff if there was another precinct for the exchange. Plaintiff provided Latiff with the address to Nassau County Police Precinct in Woodbury, located about 10 minutes from Plaintiff's home.

823.    If Defendant Ruci refused to return R.R. (3), Plaintiff was advised to file a police report in the police precinct closest to his home, which was the 111th Precinct in Bayside, Queens. Later, Latiff called to inform Plaintiff she spoke to Defendant Ruci, gave him the address to the Nassau Precinct, and he agreed to call and exchange R.R. (3). Around 5pm, several hours later, and no call from Defendant Ruci, Plaintiff and Defendant Castillo-Lovaglio drove to the 111th precinct. There, Plaintiff and Defendant Castillo-Lovaglio explained the situation to Officer Gravagna ("Gravagna"), who subsequently called Defendant Ruci and advised him to return R.R. (3). Defendant Ruci told Gravagna, "ACS said it was up to me to return R.R. (3)." With the copy of the TOV, Gravagna said, "your failure to return the child could be seen as a violation in family court."[473]

824.    Since Gravagna had Defendant Ruci on speakerphone, Plaintiff heard Defendant Ruci confirm Latiff's call to return R.R. (3). That is why Defendant Ruci countered with advice he received from Defendant Alozie, "ACS told me." Defendant Ruci tried to justify custodial interference by saying Plaintiff was taken to CPEP. Gravagna had Plaintiff's discharge papers in hand and said, "she was cleared and released, you have to return the child." Gravagna hung up and told Plaintiff there was nothing more she could do because the TOV specifically stated "the 2nd Precinct is the place of exchange." Both Gravagna and another male officer told Plaintiff not to go back to the 2nd Precinct because the police officers could retaliate or do something worse. Gravagna said the precincts share a same computer system, so Plaintiff could file the police report in any SCPD precinct.

825.    Warnings of further retaliation caused Plaintiff and Defendant Castillo-Lovaglio to document Defendant Ruci's refusal to return R.R. (3) at the third precinct (3rd Pct.") in Bay Shore. Plaintiff needed proof of the violation to show Defendant McGrady. At the 3rd Pct., Plaintiff and Defendant Castillo-Lovaglio received inexcusable hostility and aggression from Defendant Koenig, who screamed and claimed he owned the precinct to

---

[473] According to Defendant Heaven's retroactively altered "Discovery," the case notes show Richter told Defendant not to return R.R. (3), when it was Defendant Alozie who said it on 8/13/2019.

justify his refusal to write the report. With Plaintiff's license in his hand, Defendant Koenig said, "there's nothing in the computer."

826.    Without a word, he abruptly left Plaintiff and Defendant Castillo-Lovaglio standing at the front desk. Plaintiff saw Defendant Koenig walk to the back, then pacing back and forth talking on his cell phone, for about 20 minutes or so. When he returned, he said, "I know what happened. You were delusional and taken to CPEP." Defendant Koenig's hostility escalated. In a lobby full of people, he openly threatened to commit assault and battery, illegally detain and transport Plaintiff to CPEP.[474]

827.    Defendant Koenig had called the 2nd Pct. from his cell phone to find out why nothing showed up in SCPD's computer system for August 12, 2019. It is apparent Defendant Koenig conspired to alibi Defendant Teplansky against members of the public and the community based on the factual background of the pending class action federal lawsuits against the 2nd and 3rd Pct.'s in Suffolk County. Plaintiff asked Defendant Koenig to return her license because she was scared and wanted to leave. Defendant Koenig said, "fine! I'll write the report!" and threatened, "I better never see you in here again or I'll have you taken back to CPEP, like they did to you at the 2nd Precinct!" Defendant Koenig did not write the report to document custodial interference and violation of a court order. Defendant Koenig, like his colleagues at the 2nd Pct., decides which court orders to enforce based on selective prosecution and discrimination.

828.    Since Defendant Teplansky did not write up a report to document the violation of Plaintiff's civil rights on August 12, 2019, Defendant Koenig conspired to do it for him by withholding Plaintiff's license and pretended to do his job: write a police report. Plaintiff received a text message from Defendant Ruci, who said he knew she was at the 3rd Pct. Defendant Ruci said he was waiting to do the exchange at the 2nd Pct. Plaintiff told Defendant Koenig about the text message, but he ignored it.[475] Defendant Koenig only showed Plaintiff 1 page to sign to conceal he had written 2 reports. After Plaintiff signed the 1 page, Defendant Koenig threw 2 pages at Plaintiff. That is, Plaintiff realized Defendant Koenig wrote up an alibi for the 2nd Pct.

---

[474] As part of the IAB investigation for this incident, no one was interviewed, and no footage from the security camera, located in the main lobby of the 3rd precinct, was utilized or reviewed.
[475] Koenig was grunting and moaning as he wrote.

829.    Defendant Teplansky never bothered to write up a police report for the incident on August 12, 2019, because he expected CPEP to commit Plaintiff based on the false narrative his 2 unnamed male officers ("Defendant Police Officers") gave the triage nurse, that "social services" ordered SCPD to do this. That is why Defendant Teplansky instructed Defendant McHugh to have Sullivan go to his office, so he could threaten her to agree and submit false paperwork for Plaintiff's commitment, while Defendant Police Officers did his dirty work. Defendant Teplansky's beliefs are founded on a routine practice of committing people to the psychiatric ward in Stony Brook, while Huntington Hospital, located within minutes, also has a psychiatric ward.

830.    Before Plaintiff could respond, let alone react due to shell shock, Defendant Koenig began screaming. He threw Plaintiff and Defendant Castillo-Lovaglio out of the 3rd Pct. He stood up, stretched out his arm and screamed, "Get out of my precinct! If I ever see either one of you back here, I'm going to lock you up and take you to CPEP!" These threats continued until Plaintiff and Defendant Castillo-Lovaglio ran out to the car.

831.    More importantly, Plaintiff had physical and residential custody of R.R. (3) from 8/13/2019 to 8/26/2019. Defendants' ACS, Kaplan, and Galchus were informed via Connections and Defendant Ruci, which they used to execute R.R.'s (3) kidnapping on 8/26/2019. Defendants' Rodin and Alozie lied in court to misrepresent their awareness and concealed the SCR investigation from 8/12/2019 was closed unfounded on 8/16/2019. On the morning of 8/26/2019, Defendants' Ruci and Galchus contacted Defendant Lucana-Morales to enlist her services "to supervise" visitations between R.R. (3) and Plaintiff. Defendant Lucana-Morales was already angry at Plaintiff and spiteful.

832.    On 8/26/2019, Defendants' Ruci and Galchus utilized Defendant Lucana-Morales' agreement to supervise to speciously misrepresent Plaintiff's family's awareness and/or concern. In fact, Defendant Lucana-Morales was with Defendant Castillo-Lovaglio at CPEP on 8/13/2019. Defendant Lucana-Morales heard the discharge nurse repeatedly apologize to Plaintiff for what the SCPD did. Defendant Lucana-Morales was present when the nurse said the SCPD does this frequently. That is, the SCPD unlawfully detains people and, having no reason to charge them, takes them to CPEP under color of law. Defendant Lucana-Morales agreed to supervise visitations that were not ordered. Since then,

Defendant Lucana-Morales has agreed to be a resource, though she never appeared in court. Defendant Lucana-Morales has posted receipt of bribery on social media, such as paid vacations to Albania by Defendant Ruci.

833.    After Defendant Ruci's arrest in 2018, Defendant Lucana-Morales told Plaintiff to forget about the acts of domestic violence and get back together with him for the sake of R.R. (3) and L.N. (6). Defendant Lucana-Morales told Plaintiff that having children out-of-wedlock, "makes you look like a bad woman." She also told Plaintiff, "when I was married to your grandfather, Georgie's father, he would get angry, he had a bad temper and slapped me, but I stayed for your father and Virginia." Defendant Lucana-Morales wanted Plaintiff to do the same thing she did. In Defendant Lucana-Morales's twisted view of domestic violence, receiving bribery is what is best for R.R. (3) and L.N. (6). Defendant Lucana-Morales supports Defendant Ruci's hostility and aggression because Plaintiff is supposed to put up with abuse for the sake of appearing stable.

834.    Defendant Shulman's reign of terror began, on or about August 28, 2019, when Defendants' Galchus, Kaplan, Ruci, Rodin, and Alozie solicited her extra-judicial services ex parte to supply venue for initiating Plaintiff's selective and malicious prosecution for the false instrument of filing dated on docket number NN-17995-19.

835.    Defendant Shulman is so involved in the Municipal Enterprise, she enjoys Plaintiff's bondage and sequestration of parental rights under color of law so much, that she openly extorts money, endorses racketeering, aids and abets witness tampering, signs fake OTSC's for a non-existent entity called "NYC Children" attached to subpoenas with "Felicia Donaldson" as the "respondent" for R.R. (3) citing,

> "*A recusal as a matter of due process is required only where there exists a direct, personal, substantial or pecuniary interest in reaching a particular conclusion[…]or where a clash in judicial roles is seen to exist. People v. Alomar, 93 NY2d 239, 246, 689NYSed 680. Absent a legal disqualification pursuant to Judiciary Law 14, a trial judge is the sole arbiter of whether recusal is warranted and the discretion to exercise that power falls within the personal conscience of the court. People v. Moreno, 70 NY2d 403, 516 NE2d 200, People v. Grier, 273 AD2d 403, 79NYs3d 607.*
> *As the respondent has failed to articulate a mandatory basis for the court to recuse itself, and the court is confident in its ability to remain impartial in these proceedings, the application seeking this court to recuse itself is denied in its entirety.*"[476]

---

[476] *Decision and Order on Application For Recusal As Made by Victoria Navarro* by Judge Monica Shulman (4/14/2021).

836.    On August 26,2019, aforesaid Defendants seized R.R. (3) under fabricated pretenses, to conceal a gross accumulation of misinformation provided by Defendants' Alozie, Steele, Tingue, and Ruci submitted as various unregistered false, fabricated, and fraudulent FCA 1034 investigations and reports. Defendants' Rodin, Steele, Alozie, Tingue wanted to circumvent the requisite proof for a pre-removal hearing by forcing Plaintiff to participate in a child safety conference at their office. Defendants' Galchus, Ruci, Kaplan, Alozie, and Rodin used the adjournment to initiate a money laundering front in Queens County, "Armand Rosenberg's filing of the complaint falsely alleging standing when none existed and the subsequent submission of knowingly and materially false affidavits did work a deceit on the court, and therefore the certified questions should be altered accordingly."[477]

837.    Under the pretense of a purportedly "legally filed" petition pursuant to FCA Article 10 on August 30, 2019, Defendant ACS carried out the conspiracy under color of law in the Part 14, with a wholly different set of allegations than those hand-written on Augiust 29, 2019. The new allegations were Defendant Kaplan's hearsay as well as a series of Defendant ACS's grossly negligent, mishandled unregistered SCR investigations for R.R. (3), closed without performing CPS investigations, pursuant to SSL Title 6.[478]

838.    SCR reports in New York City have been steadily declining because Defendant ACS is grossly withholding to register court orders for COI's and FCA 1034 investigations, "[c]hild abuse and neglect reporting, which may be under-reported even during non-pandemic periods, has declined significantly as a result of COVID-19. Reports to the Statewide Central Register of Child Abuse and Maltreatment (SCR) decreased by 54 percent between March 23, 2020 and May 4, 2020, when compared to the same period in 2019. In real numbers, the number of reports fell from 8,351 in 2019 to 3,855 in 2020."[479]

839.    If Defendants' Steele, Alozie, Tingue Rodin, Naughton, and McFarlane had a legitimate cause to file an FCA Article 10 against Plaintiff, nothing barred the assigned Judge Jolly from presiding over such an action, "…[a]ll cases involving abuse

---

[477] *See* Matter of Schildhaus, 23 AD2d 152; Schindler v Issler Schrage, 262 AD2d 226; Guardian Life Ins. Co. of Am. v Handel, 190 AD2d 57; Salouaara v Eckert, 222 F3d 19.
[478] In Defendant Heaven's "Discovery" are pages of retroactively entered case notes related to some of the closed investigations, where Defendant Alozie claims to have seen R.R. (3) in Suffolk County. In other case notes, backdated case notes for Richter.
[479](Note on the Fiscal 2021 Executive Budget for the Administration for Children's Services (ACS) Committee on General Welfare and Committee on Justice System.

shall be originated in or be transferred to this part from other parts as they are made known to the court unless there is or was before the court a proceeding involving any members of the same family or household, in which event the judge who heard said proceeding may hear the case involving abuse. Consistent with its primary purpose, nothing in this section is intended to prevent the child abuse part from hearing other cases."[480]

840.    *If* Defendants Rodin, Naughton, Alozie, Steele, Tingue, and McFarlane had cause to suspect "imminent risk" for R.R.'s (3) safety, then all prior court orders for FCA 1034 investigations and COI's should have been properly registered, obviating the need to conspire to cause an after close of business anonymous call to the SCR against Plaintiff, kidnap R.R. (3) under color of law, and hold him for ransom, "[s]ocial services workers are required to report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child is an abused or maltreated child where a person comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child."[481]

841.    In fact, had "imminent risk" been legitimate, nothing barred SCDSS from filing an FCA Article 10 petition against Plaintiff, even before Defendant Alozie made the anonymous SCR report with vague, obscure, and generalized accusations, "any report filed with the statewide central register of child abuse and maltreatment by a person or official required to do so pursuant to section four hundred thirteen of the social services law shall be admissible in evidence."[482]

842.    Defendant Alozie made the false report anonymously because he needed to conceal his identity from SCDSS or else it would be known that Defendants' ACS wanted to open a closed, unfounded report from 8/12/2019 by making a new one, "...mandated reporters who make a report which initiates an investigation of an allegation of child abuse or maltreatment are required to comply with all requests for records made by a child protective service relating to such report, including records relating to diagnosis,

---

[480] Family Court Act §117 (c).
[481] SOS §413 (d).
[482] FCA §1046 (v).

prognosis or treatment, and clinical records, of any patient or client that are essential for a full investigation of allegations of child abuse or maltreatment pursuant to this title."[483]

843.    Unlike Defendants ACS, SCDSS had physically observed R.R. (3) in Plaintiff's custody and care and supported Plaintiff's custody of R.R. (3) and L.N. (6). Rather than file an Article 10 petition, SCDSS indicated Defendant Ruci 3 times and obtained a full stay away order of protection in favor of R.R. (3) against Defendant Ruci, immediately following his arrest for violating Plaintiff's order of protection on 3/25/2019.

844.    Since Defendant's ACS and OCFS portray a distorted and displaced practice for justifying kidnapping children under color of law, such as a policy of "take the child and file the claim," there has been no shortage of misrepresentations, blatant fraud, and malfeasant shortcuts for legally prescribed forms of filing that Defendants ACS routinely "minimize" and "obfuscate" with deceptive labels, like clerical errors, "…it appears that rather than seeking to strengthen its policies and procedures and to better help the vulnerable children in its charge, ACS has resorted to trying to discredit our findings with irrelevant and possibly outdated procedures."[484]

845.    How often "clerical", "administrative" and "erroneous" errors appear as an excuse provided by Defendants:

    a.   *"her belief that this court should not have restored cases and orders to the calendar, done on notice to her with her and her counsel present, that were **erroneously dismissed** for a parties' failure to appear before another jurist, when that party was before this jurist earlier in the day at which time all parties had been notified that the matters would be added to this court's calendar for further proceeding, thus obviating the need to appear before the other jurist."*[485]

    b.   "They are the petitions that both parties that both parties had filed and that had been litigated in Part 40 since 2018. They were dismissed only because of what seems to be **a clerical error**."[486]

    c.   "The Judge signed this and put it on for Thursday as a general AM.  It appears this was just an **administrative error** in the V dockets getting dismissed so I am not quite sure what the opposition would be.  In any event, the OTSC is in the signed bin in Part 14."[487]

---

[483] SOS §415.
[484] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[485] *Decision and Order on Application for Recusal As Made by Victoria Navarro* by Judge Shulman (4/14/2021).
[486] Galchus Order to Show Cause (10/08/2019).
[487] 10/07/2019 E-mail from Wisler to Galchus.

     *d.* "Generally, when ACS files a case the Clerk of Court does not stamp the petition, unless there appears to be a **technical glitch in the system** ACS uses to send the petition electronically to the court. On December 19, 2018, ACS filed a neglect petition on behalf of the subject child, N. Cibelli, against the respondent father. At the time of the filing of the petition ACS was unable to send the petition to the court electronically thus the petition needed to be manually stamped. Any error resulting from this process is **clerical in error** and the respondent father has not cited any legal authority why this **clerical error** must result in the dismissal of the instant matter."[488]

846.    If financial and personal benefits were not at issue, then Defendants, collectively, would have no need to equate *their* alternative forms of false instruments of filing as valid child protective proceedings properly originated for R.R. (3) against the correct respondent, who is not Plaintiff, "proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible."[489]

847.    Defendants' ACS, Kaplan, Galchus, and Ruci knew the marks and bruises on R.R. (3) happened while he was exclusively in Defendant Ruci's custody, not Plaintiff. Defendants ACS did not intend to use an FCA Article 10 proceeding against Plaintiff to protect R.R. (3), but to conceal their knowledge of a reported pattern made by mandated reporters, which was exacerbated by Defendant Ruci's bizarre refusal to explain or justify them. Further, Defendants knew the situation was exacerbated due to their gross negligence for closing SCR investigations without providing an explanation to Richter nor did they make corresponding entries in Connections, from which Richter could explain to Plaintiff as being the reason. Instead, Defendants pretended not to know, closed the SCR investigations they accepted notice of for Defendant Ruci as the subject and opened new ones for Plaintiff to shirk responsibility to Suffolk County.

848.    Defendants not only wanted to conceal their compounded, accumulated gross negligence, beginning with Defendant Ruci's omitted indicated finding of inadequate guardianship of R. R. (3) in the initial FCA 1034 report dated 1/16/2019, but to also conceal their role in helping Defendant Ruci remove R.R. (3) from the criminal court order

---

[488] Affirmation in Opposition To Motion for Summary Judgment by Mohammed Talha Shaik (5/10/2021).
[489] FCA §1046 (ii).

of protection, "…and other courts have found attorneys liable under the statute for a single intentionally deceitful or collusive act. See *124 Izko Sportswear Co., v. Flaum, 809 N.Y.S.2d 119, 122, 25 A.D.3d 534, 537 (2d Dep't 2006) (misrepresentation of conflict); NYAT. Operating Corp. v. Jackson, Lewis, Schnitzler Krupman, 741 N.Y.S.2d 385, 386, 191 Misc.2d 80, 82 (N.Y.Sup.Ct. 2002) (single instance of lying under oath)."[490]

849.    In that Defendants' ACS, Galchus, Kaplan, Ruci, and Rodin initiated the conspiracy to persecute Plaintiff under color of law for acts of domestic violence perpetrated in front of R.R. (3) by Defendant Ruci does not justify the voluntary participation from the other attorneys, i.e., Defendants' Going, Blond, and Kelly, who's actions and inaction contribute to its perpetuity and transformation, "[r]ather, section 487 is a unique statute of ancient origin in the criminal law of England. The operative language at issue — "guilty of any deceit" — focuses on the attorney's intent to deceive, not the deceit's success. And as the District Court pointed out, section 487 was for many years placed in the state's penal law, which "supports the argument that the more appropriate context for analysis is not the law applicable to comparable civil torts but rather criminal law, where an attempt to commit an underlying offense is punishable as well [as] the underlying offense itself, (Amalfatino, 428 F Supp 2d at 210). Further, to limit forfeiture under section 487 to successful deceits would run counter to the statute's evident intent to enforce an attorney's special obligation to protect the integrity of the courts and foster their truth-seeking function."[491]

850.    Accordingly, "[w]hen a party commences an action grounded in a material misrepresentation of fact, the opposing party is obligated to defend or default and necessarily incurs legal expenses. Because, in such a case, the lawsuit could not have gone forward in the absence of the material misrepresentation, that party's legal expenses in defending the lawsuit may be treated as the proximate result of the misrepresentation."[492]

851.    Defendants' ACS are criminally responsible for misappropriating billions of state and federally reimbursed expenditures, costs, and liabilities for purported child protective services, when the actual costs incurred are the proceeds of racketeering. Defendants ACS knowingly and intentionally misrepresent their use of grants to obtain

---

[490] *See* Amalfitano v. Rosenberg 533 F.3d 117 (2nd Cir 2008).
[491] *Id.*
[492] *Id.*

funding for their corrupt organization, "[e]ach year, states are required to submit information on their planned and actual expenditures for several child welfare programs to the U.S. Department of Health and Human Services (HHS). Section 432(c) of the Social Security Act (the Act) requires HHS to compile and submit copies of the state expenditure forms to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate. The law also requires HHS to synthesize the information from the state reports by providing the national totals of planned spending by service category for the Stephanie Tubbs Jones Child Welfare Services Program (Title IV-B, Subpart 1 of the Act), as well as planned and actual spending by service category for the Promoting Safe and Stable Families Program (Title IV-B, Subpart 2 of the Act)."[493]

852.    For example, in Federal Fiscal Year ("FFY") 2019, New York State was awarded $18,095,921 in grants for Promoting Safe and Stable Families Program ("PSSF"), "…to enable states to develop and operate coordinated programs of community-based family support services, family preservation services, family reunification services, and adoption promotion and support services (Section 430 of the Act)."[494]

853.    Defendants ACS have submitted so many false, fraudulent, fabricated claims, with exacerbated numbers of kidnapped children, i.e., under custody and care, that they *have to* take more children to comply with their awards and claim larger amounts in subsequent years because the law requires states to spend a "significant portion" of PSSF funds on each of the four categories of services. Therefore, HHS instructs states that spending in each of the four categories of services must approximate 20 percent, unless the state provides a rationale for spending less than this proportion. No more than 10 percent of federal funds can be used for administrative costs (Section 432(a)(4) of the Act).[495]

854.    If Plaintiff were to walk through neighborhoods under Defendants ACS jurisdiction and knocked on doors to ask the public of their experience with Defendants ACS and how many of them received services, programs, vouchers, etc. paid by Defendants ACS from New York State's FFY 2019 grant of $18, 089, 921, the number would not closely resemble what was claimed:

---

[493] Report to Congress on State Child Welfare Expenditures 2019, Children's Bureau, Administration on Children, Youth and Families, Administration for Children and Families (p. 1).
[494] *Id* at p.3.
[495] *Id* at p.3.

    a. Crisis Intervention (Family Preservation) in Dollars - $3, 619, 184.
    b. Prevention & Support Services (Family Support) in Dollars - $7, 238, 369.
    c. Family Reunification Services in Dollars - $3, 619, 184.
    d. Adoption Promotion and Support Services in Dollars - $3, 619, 184.
       (Attachment D)

855.   "The Title IV-B, Subpart 1, Stephanie Tubbs Jones Child Welfare

Services program is designed to promote flexibility in the development and expansion of a

coordinated child and family services program (Section 421 of the Act). Funds may be

used to support and expand services to children and families to:

    a. Protect and promote the welfare of all children.
    b. Prevent child abuse and neglect.
    c. Support at-risk families through services that permit children to remain in
       their own homes, or to return to those homes in a timely manner whenever
       it is safe and appropriate.
    d. Promote safety, permanency, and well-being for children in foster care or
       those in adoptive families.
    e. Provide training, professional development, and support to ensure a well-
       qualified child welfare workforce.

856.   For FFY 2019, New York State was awarded $12, 858, 953 in grants for

the Stephanie Tubbs Jones Child Welfare Services program for use "within 17 broad

categories," of which New York State opted to use the entire amount for Protective

Services. (Attachment C)

    a. For FFY 2019, New York chose not to spend on the following:

       i. Family Preservation - $0.
      ii. Prevention/Family Support - $0.
     iii. Family Reunification - $0.
     iv. Adoption Promotion and Support - $0.

## **Conspiracy to Fabricate Probable Cause & Malicious Persecution**

857.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-

856, above as if specifically set forth herein.

858.   On 8/26/2019, Defendants' Alozie, Steele, Best, Rodin, Galchus, Kaplan.

Ruci, and Tingue conspired to register a false report to the SCR against Plaintiff for the

sole purpose of weaponizing the state's resources to steal R.R. (3) from Plaintiff's custody

and finance his sequestration.

859.    Defendant Kaplan is a predator and an opportunist, who anticipated profiting from a closed, unfounded SCR investigation dated 8/12/2019, by conspiring to register a new one, "[j]urisdictional assignments can be changed by the LDSS in limited circumstances…[w]hen the SCR has made jurisdictional assignments per these guidelines, but the LDSS obtains information after intake that affects the appropriateness of the assignments, or the LDSSs involved otherwise agree to change the assignments, the LDSSs are responsible for reassigning the reports as needed."[496]

860.    Upon information and belief, Defendant Kaplan contacted SCDSS on Friday 8/23/2019 to ascertain the social workers position on removing L.N. (6) from Plaintiff's custody. Defendant Kaplan expected to profit from the representation of two children in protracted proceedings based on the uncorroborated misinformation given to him first, by Defendant Galchus, then by Defendant Rodin.

861.    Upon information and belief, Defendant Kaplan was told by SCDSS neither R.R. (3) nor L.N. (6) would be removed from Plaintiff's custody.

862.    On 8/27/2019, at 6:13 pm, Defendant Alozie knowingly and maliciously caused a call to be made from Queens County to Albany, New York via the SCR to register an anonymous false report against Plaintiff, in Suffolk County, in a conspiracy to kidnap R.R. (3) out of the jurisdiction of his local social services district to Defendant ACS's jurisdiction in Queens County.

863.    Defendant Alozie made the report under color of law, "[c]ertain individuals, including some professionals with certifications or licenses issued by New York State, are mandated reporters of child abuse and maltreatment [SSL §413(1)(a)] (see Chapter 2, Reporters). Mandated reporters are required to submit LDSS Form 2221-A to the CPS of the county where the child resides within 48 hours of the SCR registering the report [SSL §415]."[497]

864.    Defendants' Steele, Alozie, and Tingue also wanted to seize L.N. (6), so Defendant Alozie included his name in his anonymous report, "…[g]enerally, the SCR assigns joint jurisdictional assignment when the subject(s) and the child(ren) alleged to be maltreated or abused are located in more than one LDSS…[i]n these situations, SCR

---

[496] Office of Children and Family Services, Child Protective Services Manual 2020.
[497] Office of Children and Family Services, Child Protective Services Manual 2020.

usually assigns two or more LDSSs to jointly address the report and protect the children named in a report."[498]

865.    Defendants' Alozie, Steele, Best, Ruci, and Tingue conspired with Defendants' Rodin, Galchus, Kaplan to weaponize their knowledge of and experience with the SCR to speciously establish R.R.'s (3) physical location in Queens County under the pretense of initiating a false CPS investigation against Plaintiff, during pendency of an adjournment, "[s]ection 487 thus permits a civil action to be maintained by any party who is injured by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation, and it provides for treble damages. (*See* Fields v. Turner, 147 N.Y.S.2d 542, 543-44, 1 Misc.2d 679, 680-81 (N.Y.Sup.Ct. 1955) (holding that the predecessor to section 487 provides a remedy to any party injured by the deceit of an attorney representing a party to an action, not only that attorney's client). The act of deceit need not occur during a physical appearance in court; the statute applies to any oral or written statement related to a proceeding and communicated to a court or party with the intent to deceive. Id. at 544, 1 Misc.2d at 681, 147 N.Y.S.2d 54."[499]

866.    Aforesaid Defendants conspired to circumvent the procedural jurisdictional assignment of the SCR to steal Plaintiff's child. Specifically, the report was made anonymously to preclude SCDSS from challenging it, "[t]he specialist then assigns jurisdiction and immediately transmits the report electronically via CONNX to the appropriate CPS unit."[500] The district court further found that the other evidence, described above, of "a persistent pattern of unethical behavior," id. at 203, constituted a "chronic, extreme pattern of legal delinquency," Izko Sportswear, 809 N.Y.S.2d at 122, 25 A.D.3d at 534, to the extent (if any) such a finding was required under New York law."[501]

867.    Upon information and belief, on 8/28/2019, Defendant Alozie made repeated calls to demand SCDSS immediately file an FCA Article 10 against Plaintiff. Defendant Alozie was showboating, he figured SCDSS would not suspect he made the anonymous false report because it was made after close of business, "…[t]he preliminary, or seven-day, assessment of safety begins with CPS's first review of a report of suspected

---

[498] *Id.* at p.52
[499] Amalfitano v. Rosenberg 533 F.3d 117 (2nd Cir. 2008).
[500] Office of Children and Family Services, Child Protective Services Manual 2020.
[501] *See* Amalfitano, 428 F.Supp.2d at 207 n. 36.

child abuse or maltreatment and the first contact with persons relevant to the intake information, including the source of the report."[502]

868.    Defendant Alozie was *extremely* anxious and *bizarre*. He desperately wanted to "make contact" with R.R. (3), since he repeatedly closed all previous SCR investigations against Defendant Ruci without ever observing the "subject child" in the reports, "[w]e found that the majority (67 percent) of manager reviews of high priority cases were not conducted or were not conducted within the time frames mandated by ACS in its guidelines…[t]he timeliness requirement is particularly significant in child protective cases where the case workers are working under a mandate to take all necessary steps to conclude an investigation within 60 days[]so they need immediate timely feedback from their supervisors and managers…[w]hile applicable to all of ACS's child protective investigations, it is all the more the critical in those cases designate high priority…cases that involve fatalities or families with a history of four or more prior cases are considered high priority by ACS."[503]

869.    Upon information and belief, Defendant Alozie was repeatedly told there was no basis to file an FCA Article 10 proceeding for an anonymous call to the SCR, "[u]nder federal and state law, LDSSs have a responsibility, where appropriate, to make reasonable efforts to prevent or eliminate the need for removal of the child from the home…[t]he term "reasonable efforts" is not defined in statute or regulation."[504]

870.    Upon information and belief, Defendants' Alozie and Steele subsequently demanded SCDSS relinquish jurisdiction of R.R. (3) to Queens County ACS under the false pretense of conducting a CPS investigation, which never took place, "…[o]nce a report has been accepted by an LDSS, the SCR does not reassign the report or add jurisdictions…[t]his must be done at the district level…[f]or more information, see CONNECTIONS Step-by-Step Guide: Training for CPS Workers."[505]

871.    On 8/29/2019, Defendant Steele threatened to incarcerate Plaintiff, unless Plaintiff signed a false confession to deny reports of suspected abuse or neglect were made by mandated reporters for R.R. (3). Defendant Steele threatened to violate Plaintiff's right

---

[502] 18 NYCRR 432.2(b)(3)(i); Office of Children and Family Services, Child Protective Services Manual 2020.
[503] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[504] Office of Children and Family Services, Child Protective Services Manual 2020.
[505] *Id.* at 69.

to maintain custody of R.R. (3) unless Plaintiff agreed to never having seen bruises and marks on R.R. (3). Defendant Steele threatened to forcibly separate R.R. (3) from his sibling L.N. (6) unless Plaintiff agreed to sign a false confession, written by Defendant Best, stating bruises and marks were never documented, i.e., photographed, by Plaintiff or other mandated reporters.

872.    Defendant Steele threatened to seize L.N. (6) from Suffolk County with an "Order of Special Jurisdiction" and put him in foster care unless Plaintiff agreed to sign a false confession, written by Defendant Best, stating Plaintiff never saw bruises or marks on R.R. (3). Defendant Steele threatened to seize L.N. (6) from Plaintiff unless Plaintiff agreed to sign a false confession, written by Defendant Best, that "doctors never reported" bruises or marks on R.R. (3).

873.    Plaintiff repeatedly refused to sign the false confession, written by Defendant Best, and refused to agree to deny that various reports of suspected abuse or neglect were registered with the SCR by mandated reporters, so Defendants' Steele, Best, and Alozie threatened to seize R.R. (3) indefinitely.

874.    Defendants' Steele and Alozie further threatened Plaintiff with placing R.R. (3) in the custody of the subject of all the SCR reports, Defendant Ruci, unless Plaintiff agreed to self-incriminate by stating she "exposed [R.R. and L.N.] to acts of domestic violence" perpetrated by Defendant Ruci.

875.    On August 29, 2019 and October 9, 2019, Defendant Alozie admitted he never spoke to the "Lieutenant Detective" and the allegations in the false instrument of filing were solely based on Defendant Kaplan's hearsay statements from August 26, 2019. On November 18, 2019, Judge Hughes allowed Plaintiff to copy the FCA 1034 report submitted by Defendant Alozie, where he further admitted the money laundering front in the Part 14 was based on Defendant Kaplan's hearsay allegations and the false instrument of filing on docket NN-17995-19 consisted of suborned perjury.

876.    In that Defendants' ACS sought to commercialize R.R.'s (3) safety under various provisions of the Social Security Act is evidenced by Defendants' Alozie and Steele's knowledge of the jurisdictional requirement for originating money laundering fronts, i.e., an FCA Article 10, because only SCDSS had jurisdiction to file and did not. So Defendant Alozie made a false report to the SCR against Plaintiff anonymously, "…[i]f the

neighboring LDSS finds that it is necessary to initiate a court proceeding, the actions based upon those findings must be undertaken by the "home" LDSS in its own jurisdiction [FCA §1015]."[506]

877.    On 9/10/2019, Defendant Alozie said Defendant Steele's supervisor, Defendant Tingue, authorized legal proceedings against Plaintiff.

878.    In November 2019, during a phone call with ACS Director Robyn Church, Plaintiff was told the decision to register the anonymous report with the SCR was made on 8/26/2019 and Defendant Alozie was directed to make the call.[507]

879.    In United States v. Walls, "The panel held that when Congress used the language "in or affecting interstate or foreign commerce" in the TVPA, it intended to exercise its full powers under the Commerce Clause. Consistent with the outer limits of the commerce power defined in Gonzales v. Raich, 545 U.S. 1 (2005), the panel held that any individual instance of conduct regulated by the TVPA need only have a de minimis effect on interstate commerce, and that the district court therefore did not err when it instructed the jury that "any act that crosses state lines is 'in' interstate commerce" and "an act or transaction that is economic in nature" and "affects the flow of money in the stream of commerce to any degree 'affects' interstate commerce."[508]

880.    Defendants' ACS conspired to seize R.R. (3) under color of law.

881.    Defendants' ACS conspired to seize L.N. (6) under color of law.

882.    Incidentally, on 3/26/2021,[509] Plaintiff asked Defendant Teplansky[510] when he met with Defendant Alozie for the false instrument of filing on docket NN-17995-19, the former responded, "Chimi-who?"

883.    Even AG James noted, "…these harms are a direct result of Defendants long-standing and well documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued New York City's child protective system for years. All of Defendants' actions and inactions as described herein substantially depart from accepted professional judgment and constitute deliberate

---

[506] Id.

[507] Id. at p. 40 ("[t]he mandated reporter law is not intended to require more than one report from any institution, school, facility or agency on any one incident of suspected child abuse or maltreatment [SSL §413(1)(b)].")

[508] See United States v. Walls, No. 13-30223 (9th Cir. 2015).

[509] The date 3/26/2021, chosen by Shulman, was the same date as the 2 false instruments of filing on F-05491-19 and F-04656-20 were originally scheduled, i.e., 3/26/2020.

[510] Plaintiff never received notice of Teplansky's appearance.

indifference to the harm, risk of harm and violations of legal rights suffered by Plaintiff Parents."[511]

## Conspiracy to Deprive Due Process & Selective Prosecution

884.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-883 above as if specifically set forth herein.

885.    Rather than conduct CPS investigations, Defendants' ACS chose to malign, silence through humiliation, castigate, and retaliate against Plaintiff under color of law, solely because Defendant Alozie did not want to do his job and investigate suspected reports of abuse or neglect for R.R. (3).[512] Instead, Defendant Alozie was closing SCR investigations and blaming it on Richter during Plaintiff's court proceedings, " [t]he failure to conduct timely manager reviews significantly undermines ACS' efforts to ensure that complete and thorough investigations are conducted, including the ability of the Deputy Directors at each borough office to carry out their responsibilities and ensure that managers are performing their required reviews…since only high priority investigations require managers to give their final approval prior to closing the investigation, these managerial reviews take on added importance…[a]ccordingly, failure to perform all of the required reviews increases the risk that some investigations may not be handled in accordance with established guidelines, and that such occurrences may go undetected."[513]

886.    Defendants' ACS violated Plaintiff's right to equal protection under the law by grossly reducing traumatic experiences with acts of domestic violence perpetrated by Defendant Ruci, in front of R.R. (3), to 1 small, insignificant paragraph.[514] Meanwhile, Defendants' ACS were reducing Defendant Ruci's level of risk and pending criminal court charges to kidnap R.R. (3), "[i]n the remaining case (involving an allegation of domestic violence), ACS argues that no Domestic Violence (DV) screening was required because the alleged perpetrator was arrested and referrals for counseling had been made…[h]owever, ACS' policy specifically requires a DV screening to be conducted for all allegations,

---

[511] *Elisa W. v. City of N.Y.*, No. 15 CV 5273-LTS-HBP (S.D.N.Y. Sep. 12, 2016).
[512] On 6/26/2019, Defendant Welch called the SCPD pretending to be "someone from Albany" and demanded police officers be sent to Plaintiff's home. This was done to frame Plaintiff for what would later be used as "filing false police reports" after Defendant Alozie closed the open investigations against Defendant Ruci. (Referring to retroactive entry by Deirda Welch at 2:48 am in Defendant Heaven's Discovery.)
[513] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[514] FCA 1034 Report 1/16/2019.

without exception…[t]his policy makes sense because, absent a DV screening, ACS cannot demonstrate that it appropriately assessed the situation and determined that (1) there are no remaining signs of domestic violence, and (2) it identified all of the service needs of the family."[515]

887.    Acts of domestic violence was given 1 miniscule paragraph out of 8 pages in the FCA 1034 report prepared by Defendants' ACS whereas, Defendant Ruci was afforded every inch of the report to undermine his severity and propensity for aggression, hostility, and prior acts of domestic violence against Plaintiff, "[w]e found that ACS has failed to create an effective mechanism to enable supervisors and managers to monitor whether staff consistently follows the required investigatory steps…[t]he lack of an effective tracking mechanism significantly hinders ACS' ability to ensure that: (1) there is sufficient monitoring and oversight of the investigation; and (2) all of its policies and procedures are carried out in the course of an investigation…[t]his failure increases the risk that investigative results may be based on incomplete, insufficient information or that cases may improperly be deemed unfounded, leaving children in potentially dangerous situations."[516]

888.    In that the aforesaid was maliciously manifested by Defendants to stigmatize, humiliate, and falsely condemn Plaintiff for being a victim of domestic violence was purposeful and premeditated, "…annexed as Ex.1 to plaintiff's opposition, detail conduct that a trier of fact could find rises to the level of intentional infliction of emotional distress and therefore, this claim as to defendant, Alston remains. (Berrios v. Our Lady of Mercy Med. Ctr., 20 AD3d 361 [1st Dep't 2005]). The court finds defendant, Alston's argument that plaintiff's intentional infliction of emotional distress claim is barred by public policy unpersuasive in light of the alleged facts."[517]

889.    The intentional abuse and infliction of emotional distress was supported, encouraged, and aided by Defendant Shulman, who did not hold any legal proceedings and had no record of legal proceedings from which to make determinations because her judicial services were solicited ex parte by Defendants' Galchus, Ruci, Rodin, Alozie, and Kaplan.

---

[515] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[516] *Id.* at p. 15.
[517] Pilcher v City of New York, 68 Misc.3d 1211 (A) (2020).

890.    Nonetheless, in the same manner that Defendants' ACS carry out their money laundering fronts, Defendant Shulman did too. For example, Defendant Shulman pretended to hold an Article 8 hearing to entertain concocted accusations from Defendants' Kaplan, Clarry, Galchus, Ruci, and non-present accuser, Defendant Naughton. Defendant Shulman issued an order to further intimidate and extort money for private counsel from Plaintiff or suffer the Court's wrath, "a violation of this order will result in contempt proceedings being filed and can result in incarceration."[518]

## **Evidence Tampering, Computer Crimes & Witness Tampering**

891.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-890, above as if specifically set forth herein.

892.    AG James's lawsuit also noted that hiring inadequate, inexperienced, untrained staff was a recurrent problem of Defendants' ACS, "[p]ut simply, as a result of Defendants' failures, caseworkers employed by…ACS…often are inexperienced, undertrained, under-supervised, overworked[,] and underpaid; case planning often is sloppy and ineffective…and a lack of urgency and accountability pervades New York City's [child protective] system."[519]

893.    Job postings for social workers, case workers, attorneys, and others for Defendants ACS specifically indicates the type of candidate desired, presumably those who meet the criteria apply. In any case, there is a sinister inconsistency between the educational and experiential requirements Defendant ACS posts and who is hired, "[c]ase worker turnover is currently 48.2%."[520]

894.    Defendants' Rodin, McFarlane, Alozie, Steele, Roman, Peebles, and Tingue withheld 6 court orders for FCA 1034 investigations for the period of June 2019 to October 2020. Two additional FCA 1034 investigations were altered to, inter alia, assist Defendant Ruci with reducing his pending criminal court charges in both Queens and Suffolk County in January and May 2019.

---

[518] False Instrument of Filing CPS Order #7259254 dated 1/09/2020.
[519] *Elisa W. v. City of N.Y.*, No. 15 CV 5273-LTS-HBP (S.D.N.Y. Sep. 12, 2016).
[520] Administration for Children's Services Fiscal 2021 Preliminary Budget Fact Sheet. https://council.nyc.gov/budget/wp-content/uploads/sites/54/2020/04/ACS-Dashboard-FY21-Prelim.pdf

895.    Defendant Peebles withheld registering 1 court order for an FCA 1034 investigation due on 10/26/2020. Defendant Roman is Defendant Peebles supervise, who both covered her obstruction of justice and withholding of the court order. Defendant Roman is a CPSS Level 1 supervisor who signed a fraudulent FCA 1034 report, for which only CPSS Level 2 supervisors are authorized to sign.

896.    Defendants' Jean-Louis, Velasquez, Welch, Morton, Milan, Carbajal, Celestin, and Chasan tampered with Plaintiff's case notes in Connections by backdating entries to falsify steps not taken and delete unfavorable entries. Aforesaid Defendants were fabricating compliance with both managerial and supervisory reviews of case records, "[i]n addition to high priority case reviews, managers must perform weekly random case reviews…currently, ACS is not able to ensure that such reviews are being conducted."[521] Instead they wreaked chronological havoc and destruction, "[f]ailure to conduct the required manager case reviews increases the risk that in instances where required investigatory steps have not been followed, corrective action may not be taken timely or at all, which could compromise the quality of the investigation."[522]

**Plaintiff presumes the City's counsel will revive a previous poor excuse to explain away the subpar recordkeeping, handwritten alterations and counterfeit records provided as Discovery.**

897.    For example, Defendant Welch backdated an entry for 2:48 am in Connections, for an SCR investigation in June 2019, but forgot to include how she identified herself as an operator from the SCR in Albany when she sent the SCPD to Plaintiff's home at 4:00am.

898.    One of Defendant Alozie's backdated entries for the same SCR investigation covers the entire page whereas, the text box in the program only reaches halfway down the page. Clearly, the entry was made outside of the program Connections, which is consistent with the crooked headings and hand drawn borders.

**Defendant Rodin routinely permits subordinates to, inter alia, tamper with court records, suborn perjury, tamper with witnesses, intimidate witnesses, and encourages all sorts of illegal activity to finance constitutional deprivations under color of law.**

---

[521] Audit Report on the Administration for Children's Services' Control Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[522] *Id.* at p. 14.

899.    In June 2019, Defendant McFarlane appeared for Defendant Rodin in Plaintiff's custody litigation. Defendant McFarlane brought a false, fraudulent, and fabricated FCA 1034 report, which she further misrepresented as sent by SCDSS. Defendant McFarlane willingly accepted copies of unverified social media posts from Defendant Galchus.

900.    Upon information and belief, Defendant Ruci tried to give the same, or similar, records to SCDSS on 2 prior occasions. Upon information and belief, it was rejected for being outside the scope of CPS investigations.[523]

901.    Defendant McFarlane received a court order for another FCA 1034 investigation to, inter alia, focus on the safety and well-being of R.R. (3), previously requested. That is, the unregistered report consisted of unrelated misinformation intended to frustrate and humiliate Plaintiff, so the Court ordered another one.

902.    At the return date, another fraudulent unregistered FCA 1034 report was submitted by Defendant Rodin. Interestingly, Defendant Galchus's social media posts were attached at the end. Defendant Rodin further misrepresented the report as sent by SCDSS because Defendant Galchus's copies were put through a copy machine to give the paper a darker, more shaded appearance,

903.    In October 2019, Defendant Naughton lied and deceived Plaintiff to obtain medical records without signed HIPAA forms. Defendant Naughton pretended to be unaware R.R. (3) had medical records that contained descriptions of marks and bruises reported to the SCR, which contradicted the suborned perjury from Defendant Alozie.

904.    Further, Defendant Naughton was told Defendant Alozie fabricated the ambulance to Stony Brook University Hospital scenario and Plaintiff's medical records confirmed this. In exchange for the exculpatory evidence, Defendant Naughton promised to drop the charges against Plaintiff. Specifically, Defendant Naughton said, "if the medical records corroborate the reports of child abuse" she would drop the case, "the goal is to reunite mother with baby." Upon receiving the medical records for both Plaintiff and R.R. (3), including pictures, and criminal court OOP's, Defendant Naughton reneged on her

---

[523] Per Heaven's Discovery, the case notes for the separate instances were combined into 1 retroactive record for June 2019 to falsely accuse SCDSS of receiving it and frame them for the inflammatory content.

promise. She further concealed her knowledge of and receipt of the exculpatory evidence she obtained by fraud and deception.

905.    The first time Plaintiff learned Defendant Clarry's name was in response to an e-mail sent to Defendant Rodin regarding the blatantly false information given about the non-existent August proceeding in May 2020. It was Defendant Going who identified Defendant Clarry as the "supervisor" responsible for giving the false information. Plaintiff had to Google Defendant Clarry's name to know she was the anonymous ACS attorney in court on 1/09/2020. She was also in the Part 14 on 2/28/2020, when the false instruments of filing for support petitions were fabricated.

906.    On or about February 2020, Defendant Peebles provided knowingly false information to the FBI to obstruct the investigation into R.R.'s (3) kidnapping from the U.S. by Defendant Ruci, who is not his legal father.

907.    On or about April 2020, Defendant Peebles provided knowingly false information to law enforcement, the FBI, and the Department of State to obstruct 2 separate investigations for R.R.'s (3) kidnapping, and the U.S. passport obtained by fraudulent means.

908.    Defendants' Keller and Whitfield conspired to falsify numerous duplicate copies of the same false affidavits of service[524] for records Plaintiff did not receive. These false affidavits of service were then entered in Plaintiff's court file at QFC. On or about January 12, 2021, Defendant Whitfield e-mailed 5 notices of motion for NYC Children to Stony Brook University Hospital, Moses Cohen Children's Hospital, FBI, Suffolk County Police Department Headquarters, and SCDSS requesting, inter alia, Plaintiff's medical records.[525] Three of the e-mails were invalid, while the e-mail used for Plaintiff belonged to Defendant Rodin.[526]

909.    As part of Defendant Gildin's representation of Defendant Ruci for the support matter, i.e., 2 false instruments of filing dated 2/28/2020, the former instructed his employee, Delaney Beckhorn ("Beckhorn"), to e-mail Plaintiff an incomplete Emergency OTSC on 10/21/2020 to obtain jurisdiction by fraud. The Emergency OTSC consisted of

---

[524] 10 for 1/13/2021, 5 for 1/27/2021, 2/02/2021, 3/12/2021, 3/19/2021, and 4/15/2021.
[525] Plaintiff was not a recipient in the e-mails for notices of motion.
[526] FCLS.Victoria.N@acs.nyc.gov is an inbox controlled by Rodin. Whitfield also e-mailed Joseph Soffer, Plaintiff's former attorney.

only 2 pages but referenced other documents not included. On the first page, Defendant. Gildin used PhotoShop to add docket number F-5491-19/20B below Magistrate Grey-Humphreys cross out of docket number F-04656-20. He did this because it was the docket number on a speciously filed NOA dated 10/08/2020.[527] On 11/09/2020, Defendant Gildin purposely arrived late because Plaintiff submitted a Motion to Dismiss with Exhibits[528] that pointed out his use of PhotoShop. Apparently, Defendant Gildin had a crisis of conscience and debated whether to appear in court to face his actions. Luckily, his co-conspirators removed Plaintiff's Motion to Dismiss from the court file, so the exhibits were not immediately clear to Magistrate Grey-Humphreys.[529]

910.    After being ordered to "serve Ms. Navarro properly", as in for docket F-05491-19/20B, due to his unethical conduct, Defendant Gildin instructed Beckhorn to e-mail Plaintiff 3 attachments consisting of various specious-looking records. As such, Plaintiff requested copies of the records Defendant Gildin filed related to the support matter from QFC records. The package Plaintiff received included less than 1/3 of the records e-mailed by Beckhorn, including the same false affidavit of service for F-05491-19/20B that Magistrate Grey-Humphreys mentioned on 11/09/2020. Apparently, Defendant Gildin thought adding "November 15, 2020" to the same false affidavit of service,[530] that indicated it was served on Plaintiff via e-mail on 10/01/2020, was legal, let alone ethical. Plaintiff's Motion to Dismiss and exhibits were separated; the former was not in the package, only the latter. When asked by Magistrate Grey-Humphreys what date his client filed docket F-05491-19/20B, Defendant Gildin lied and said he did not know.

911.    By November 9, 2020, the summons page for F-05491-19/20B was removed from the petition and as such, from the court file.[531] Docket F-04656-20 was entirely removed from the court file when Plaintiff requested copies from QFC records after 11/09/2020. Had the summons page for docket F-05491-19/20B been in the court file on 11/09/2020, Magistrate Grey-Humphreys would not have asked Defendant Gildin the

---

[527] Included in the records dump on 7/02/2021, was an attachment with Steven Gildin's Notice of Appearance dated 10/08/2020 on docket F-04656-20, not F-05491-19/20B.
[528] Submitted via Electronic Document Delivery System ("EDDS") and e-mailed to Delaney Beckhorn.
[529] Magistrate Grey-Humphreys removed Defendant Ruci's docket F-04656-20 altogether.
[530] On 11/09/2020, Magistrate Grey-Humphreys said, "Mr. Gildin this affidavit of service is dated before I signed your motion."
[531] In October 2020, Plaintiff requested and received a large package of records for everything in the court file from Defendant Ruci's initial filing in October 2018 to October 2020. Records predating Defendant Ruci's petition, not requested by Plaintiff, were included; even records in the court file Plaintiff was not aware of were included, whereas a majority of the

date it was filed. Defendant Gildin's office is in the same small building that Defendant Galchus's office in Fresh Meadows, New York. Defendant Gildin is also representing Defendant Ruci in a lawsuit filed by his former attorney, Robert Kenneth Jewell ("Jewell") in New York County Supreme Court. Since Defendant Gildin's involvement, Plaintiff has been sent 5 fraudulent support orders on default with Magistrate Grey-Humphreys forged signature, for which the last one, dated 7/07/2021, lists Defendant Ruci *as not present*.

912.    For example, in Plaintiff's case, Defendants' ACS were maliciously obfuscating the SCR investigation from 3/17/2019 by exaggerating the false, fraudulent, and fabricated FCA 1034 reports to attack Plaintiff under color of law because Defendant Ruci indicated two times for repeated acts of domestic violence in front of R. R. (3) against Plaintiff, which Defendants' ACS sought to conceal and withhold from the court or face accountability for depraved gross indifference, "[c]ourts must evaluate parental behavior objectively: would a reasonable and prudent parent have so acted, or failed to act, under the circumstances then and there existing (see Matter of Jessica YY., 258 AD2d 743, 744 [3d Dept 1999]). The standard takes into account the special vulnerabilities of the child, even where general physical health is not implicated (see Matter of Sayeh R., 91 NY2d 306, 315, 317 [mother's decision to demand immediate return of her traumatized children without regard to their need for counseling and related services "could well be found to represent precisely the kind of failure `to exercise a minimum degree of care' that our neglect statute contemplates"]). Thus, when the inquiry is whether a mother — and domestic violence victim — failed to exercise a minimum *371 degree of care, the focus must be on whether she has met the standard of the reasonable and prudent person in similar circumstances."[532]

913.    Defendants' ACS fabricated various FCA 1034 reports, corresponding to court orders for FCA 1034 investigations, submitted as legitimate CPS investigations pursuant to SSL Title 6 in Plaintiff's legal proceedings in June 2019, i.e.,

      a.  Fax information at the top of each page had "FROM- Suffolk County DSS" via PaintShop.
      b.  Forged signatures of Richter and supervisor, Dangelo.
      c.  Fabricated an "FCSA 1034" form, replete with copy and pasted official Suffolk County logo and headings.

---

[532] Nicholson v. Scoppetta 3 N.Y.3d 357 (N.Y. 2004).

914.    Defendants' Alozie, Steele, Rodin, and McFarlane acted under color of law when they chose to withhold registering court orders for CPS investigations with the SCR. Defendants were intentionally tampering and altering their rate performance standards and compliance with, inter alia, documentation, case closures, and case notes in Connections to subvert unfavorable determinations and outcomes during audits.

915.    Defendants believe their grossly negligent practice of "stuffing papers" in Plaintiff's court file at QFC and calling it "filed" is permissible since Defendant Shulman enforces both its practice and ideology.

a. "[w]henever a petitioner requests an order of protection or temporary order of protection or files for an extension of such order or a petition or motion for modification or a violation of such an order under any article of this act."[533]

b. "[n]o clerk of the court or probation officer may prevent any person who wishes to file a petition from having such petition filed with the court immediately."[534]

c. "[i]n every proceeding in family court, a copy of the petition filed therein shall be served upon the respondent at the time of service of process or, if that is not practicable, at the first court appearance by respondent."[535]

d. "[a] proceeding to adjudicate a person a juvenile delinquent is originated by the filing of a petition."[536]

e. "[p]roceedings under this article are commenced by the filing of a petition, which may be made on information and belief."[537]

f. "[p]roceedings are commenced by the filing of a verified petition, alleging that the person named as respondent, or the petitioner if the petitioner is a person alleging to be the child's father, is the father of the child and petitioning the court to issue a summons or a warrant."[538]

g. "[a] proceeding under this article is originated by the filing of a petition in which facts sufficient to establish that a child is an abused or neglected child under this article are alleged."[539]

916.    Defendants use alternative methods to artificially misrepresent "active" family court proceedings on the calendar by substituting motions and OTSC's. Defendants make numerous copies of said orders and OTSC's to manipulate the appearance of entries

---

[533] FCA §153-b.
[534] FCA §216-c.
[535] FCA §154-a.
[536] FCA §310.1.
[537] FCA §423.
[538] FCA §523.
[539] FCA §1031.

in QFC's computer and UCMS as individual "conferences" for individual docket numbers. Defendants used the aforesaid to schedule future appearance times and dates.

917.    According to the foster children's lawsuit, "Defendants have long been aware of these systemic failures and the resulting harm to the vulnerable children in ACS custody…[s]ince 2000, OCFS has undergone two federal performance audits of the New York State child welfare system, known as Child and Family Services Reviews ("CFSR")…[t]hese reviews are conducted by the United States Department of Health and Human Services to assess the performance of child welfare systems across the country, including the outcomes achieved for children, to identify areas in which systemic improvement is required to assure appropriate outcomes for children, and to implement corrective actions where outcomes for children are found to be deficient…[s]tates are evaluated on seven outcome indicators of safety, permanency and well-being—the unequivocal goals of all foster care systems pursuant to federal statutory law—and on seven systemic factors that affect the state's capacity to deliver foster care services effectively."[540]

918.    In addition, "[t]he two federal audits completed to date revealed myriad areas in which the New York State [child welfare] system was causing harm to the children in its care, and that New York State's [child welfare] system was getting worse…[t]he first CFSR audit, which was published in 2002, found that New York State failed to conform to federal expectations in five of the seven safety, permanency and well-being indicators, and in three of the seven systemic factors. Seven years later, New York State performed worse…[d]uring the second CFSR audit, which was published in 2009, the federal government determined that New York State failed to conform to federal expectations in all seven safety, permanency and well-being indicators, and in five of the seven systemic factors. New York State's CFSR results are heavily influenced by New York City's child welfare system, which accounted for well over 60% of children in foster care in New York State in both 2002 and 2009."[541]

919.    Back in 2015 it was also noted, "Defendants are not acting with sufficient urgency to address these known failures or to meet their legal obligations to protect the

---

[540] *See Elisa W. v. City of N.Y.*, No. 15 CV 5273-LTS-HBP (S.D.N.Y. Sep. 12, 2016).
[541] Id.

children in New York City's [child welfare] system,"[542] and the urgency for an immediate injunction is worthy as Defendants' ACS are due for their 3rd audit this September 2021.

920.     For example, in Plaintiff's case, on October 10, 2019, utilizing the April OTSC on void and invalid docket number, V-05120-19/19A, Defendant Shulman issued the October TOC/V to substantiate financing for the Kidnapping Scheme as proof of jurisdiction, pertaining to R.R.'s (3) physical residence in Queens County. However, it was subsequently deleted and replaced with October TOC/V #2[543] because there was no proof that Defendant Ruci had established parentage of R.R. (3). Defendant Ruci's legal standing over R.R. (3) was supplanted by the subsequent filing of a purported petition on docket number F-05491-19/19A, which further supported financing for the money laundering front under FCA Article 10 on docket number NN-17995-19. As such, Defendant Shulman, using her knowledge and former experience prosecuting cases for Defendant ACS, was aware that Defendant Ruci had to establish paternity by fraud or else he lacked standing for custody of R.R. (3).

921.     Defendant Ruci's purported petition on docket F-05491-19/19A was dismissed on default the same day as its first appearance, i.e., December 5, 2019. Defendants' Shulman, Galchus, Kaplan, Naughton, Ruci, and Rodin were retroactively replicating the original order of dismissal. On the one hand, Defendant Ruci's petition was substituted with another false instrument of filing, [544] created from a previous false instrument entered on or about August 14, 2019. On the other hand, aforesaid Defendants manipulated proceedings before a co-Justice, to setup a money laundering front,[545] and substitute the original dismissal order with the new one. As such, aforesaid Defendants supplanted an alternate narrative regarding the purpose of the proceeding and entered it in UCMS.

922.     Aforesaid Defendants repeatedly told Plaintiff the August Nunc Pro Tunc Order, which "released R. to…Gerd Ruci" under "ACS supervision," was the *only order.*

---

[542] Id.
[543] Incidentally, the invalid order is referenced in Castillo- Lovaglio and Lovaglio's 12/27/2019 visitation petition on docket V-25483-19, which they filed at QFC.
[544] False instruments of filing on dockets NN-17995-19, F-05491-19, F-05419-19/19B, and F-04656-20.
[545] The proceedings themselves, including those initiated by manipulating the calendars of co-Justices.

And yet, unbeknownst to Plaintiff, Defendant Shulman had issued 3 different TOC/V's on invalid and void docket numbers, V-20987-18 and V-05120-19.[546]

923.    On January 31, 2020, the QFC Petitions Clerk showed Plaintiff her computer screen with all the dockets under file number 180803 listed as "inactive." According to the clerk's information, "[r]espondent [Gerd Ruci] obtained custody of the child on August 26th, 2019 as follows: an Order of Reference was issued by Ref. McGrady to obtain custody."[547]

924.    For example, on 2/28/2020, Defendants' ACS, Shulman, Galchus, Ruci, McFarlane, Naughton, and Clarry conspired under color of law to maintain the seizure of Plaintiff's children, R.R. (3) and L.N. (6) by, including but not limited to, fabricating false instruments of filing, altering entries in UCMS to fabricate summons for the fabrication of 2 FCA Article 4 support petitions created in the Part 14.  Docket number F-04656-20 is an intentionally mislabeled paternity petition[548] whereas, docket number F-05491-19/20B is really Plaintiff's original support petition on docket F-05491-19, filed on 3/18/2019.[549]

925.    Both purported petitions did not have an electronic signature below, or near, the Chief Clerk of Court's signature on the summons, though both were created at QFC and scheduled a First Appearance date of 3/26/2020.[550]  Neither of the purported FCA Article 4 false instruments of filing dated 2/28/2020 had the name of an attorney listed on the calendar of the Part 28, when both appeared scheduled for 7/17/2020. Both purported petitions listed Child Support Management System Number ("CSMS #") PB37270Z1, originally issued to Plaintiff on 5/09/2019 on a temporary order of support on docket F-05491-19, based on Defendant Ruci's previously filed Acknowledgement of Paternity.

926.    For example, Plaintiff obtained a copy of Defendants' Castillo-Lovaglio and Lovaglio's OTSC dated 9/21/2020[551], which was crammed under a copy of Defendants' Galchus and Ruci's OTSC dated 10/08/2019 and the Nunc Pro Tunc CPS Order #7259254 dated 8/30/2019 was the last page. This version of the OTSC dated

---

[546] Dated 10/11/2019, 12/17/2019, and 3/09/2020.
[547] 1/31/2020 Writ of Habeas Corpus.
[548] Petition for Support After Acknowledgement of Paternity (Individual) dated 2/28/2020 ("[t]he Respondent is chargeable with the support of the above-named child in that she is the mother of said child and she further acknowledged Gerd Ruci to be the only possible father of said child.")
[549] 5/28/2020 Letter from QFC, pertaining to administrative adjournments due to COVD-19, mailed to Plaintiff's home.
[550] 10/13/2020 QFC records request.
[551] Id.

10/08/2019 was stamped at "7:10 am" and had 2 sets of signatures for Defendant Shulman. That is, the individuals handwriting for "/s/ Monica Shulman" was identical, or remarkably similar, to the person who signed for Referee "/s/" Wanda Wardlaw-Matthews" on April OTSC.

927.    For example, Defendant Shulman intentionally wrote docket number "V-010060-20", instead of V-01066-20, on her Decision dated 10/26/2020. If UCMS and the court's computer distinguish time, or passage of time, by petition filings, supplemental filings, etc. done by year, then it would make sense Defendants were tampering with government property. In this case, if Defendant Shulman wanted to tamper with UCMS, and she did, retroactive entries from docket V-25843-19[552] to docket V-01066-20 would appear as a sequence of supplemental filings on similarly situated sequences.

928.  Such as:

   a.   file number 188329: NN-01057-19/19A, NN-01058-19/19A, and NN-01059-19/19A were listed "Permanency Planning Hearing" for 2/28/2020 – at 2/10/2020.
   b.   file number 188328: NN-01055- 19 and NN-01056- 19 were listed "Post-Dispositional Review" on 4/23/2020 Part 14A – at 2/10/2020.
   c.   file number 188329: NN-01057- 19, NN-01058- 19, and NN-01059- 19 were listed "Control Purposes" for 8/11/2020 - At 5/15/2020.
   d.   file number 188329: NN-01057-19/19A, NN-01058-19/19A, and NN-01059-19/19A were listed "Permanency Planning Hearing" for 8/11/2020.
   e.   file number 188329: NN-01057- 19, NN-01058- 19, NN-01059- 19 were listed "Control Purposes" for 8/11/2020 disappeared – at 7/14/2020.

929.    For example, on 1/28/2021, Plaintiff re-submitted 2 previously filed Orders of Dismissal dated 9/04/2019 and the corresponding transcript from the Part 16 through the Electronic Document Delivery System ("EDDS"). The following day, a clerk from QFC e-mailed Plaintiff to confirm the aforesaid Orders of Dismissal were already in the court file, and hence, a duplicate submission. If it wasn't for Defendants unique and unrestricted direct *access* to court records, the 3 additional copies for the same "Affidavit of Service" should have been kicked back as duplicate records.[553]

930.    Another example, on 3/16/2021, Defendant Heaven deflected questions about how she knew Plaintiff sent an e-mail to the Part 28 requesting an adjournment.[554]

---

[552] Castillo-Lovaglio and Lovaglio's petition for visitation with R.R. (3) sans order of custody for L.N. (6) from Suffolk County.
[553] Whitfield's false Affidavits of Service for Notice of Motion dated 1/13/2021 were sent to invalid e-mail addresses.
[554] Heaven et al conspired to stage Plaintiff's default, for which 2 fraudulent orders with forged signatures were *served* on 3/26/2021 as "The Father's Affidavit."

Defendant Heaven hung up and had Defendant Lederman call Plaintiff at home to offer a pithy concession: reschedule another adjournment of the fair hearing to May 17, 2021, instead of October 2021. Defendant Lederman told Plaintiff to send Defendant Heaven the unregistered FCA 1034 reports from June 2019 and any other records.[555]

931.    On 4/03/2021, Plaintiff submitted a Motion for Defendant Shulman's Recusal via EDDS on docket V-05120-19 and requested a filing confirmation from the clerk – no confirmation was sent back. By 4/07/2021, still no confirmation was sent. Plaintiff noticed the Part 14 calendar also did not have the motion listed for 4/08/2021. Plaintiff subsequently sent it directly to the Part 14 general inbox at QFCPart14@nycourts.gov.

932.    On 4/08/2021, Defendant Shulman was visibly upset with Plaintiff's direct submission to the Part 14 general box, "who told you to send it there!"[556] Plaintiff repeatedly asked, "how did it get on the calendar without a filing confirmation from the clerk?" Amidst repeated attempts to nullify Plaintiff's motion titled, Victoria C. Navarro versus Judge Monica Shulman, Defendant Shulman admitted communicating directly with the other parties. That is, Defendant Shulman said, "it was improperly served" because the other parties were not in receipt of Plaintiff's motion. While Plaintiff was logged in to Microsoft Teams, no one said anything about the motion. In fact, without prompting, Defendant Galchus said, "I don't see it in UCMS"[557] to reinforce Defendant Shulman's "improperly filed" narrative.

933.    Refusing to answer Plaintiff's question about the spontaneous appearance of the motion on docket V-05120-19/19C, Defendant Shulman asked, "do all parties waive defects of service?" Despite Defendant Galchus's inability to *see* Plaintiff's motion, Defendant Shulman confirmed it was in UCMS, "I don't know why you can't see it. I can see it." The others remained silent throughout the feigned searching of a motion that showed up on Dashboard, while Defendant Shulman tampered with the transcripts about service of process.

---

[555] Defendant Heaven sent Plaintiff records that were backdated and retroactively entered in various sections.
[556] Shulman pulled the same maneuver on 1/09/2020 for Emergency OTSC signed by Judge Ruben, "who told you to serve this!"
[557] On 6/17/2021, Plaintiff inadvertently received 4 pages of Dashboard records. Accordingly, Plaintiff's motion was filed on 4/06/2021 on docket V-05120-19/19C.

934.    Not surprisingly, on 4/15/2021, Defendant Shulman denied recusal, "vacated"[558] the scheduled Fact-Finding date of 4/16/2021 and rescheduled it for 6/11/2021,[559] stating, "I have nothing on 6/11/2021 at 10:00 am."[560] Four days later, on 4/20/2021, Plaintiff received an e-mail from "@Secure File 180803" with 1 attachment for Defendant Shulman's written denial to recuse.[561] However, the body of the e-mail showed 8 individual "Orders: Decision on Recusal."[562] Hence, 8 copies of the same Decision individually filed for each docket number by Defendant Shulman, when Plaintiff only listed 1 docket number, V-05120-19.

935.    On 5/21/2021,[563] Defendant Galchus sent 1 attachment to Plaintiff's personal e-mail address, not the one used for court-related correspondence, with a purported OTSC dated 5/21/2021 at 12:12 pm, "Good Afternoon, I have attached an order to show cause that I will be filing through EDDS today." At 4:45pm that same day, Defendant Wisler promptly responded by e-mail with the OTSC signed in its entirety,[564] "Mr. Galchus, Attached is the signed OTSC which will be heard on the next court date of June 11th at 10am." Defendant Ruci left the U.S. with R.R. (3) on 5/27/2021 as permitted in the intentionally mislabeled Order dated 5/21/2021.

936.    A motion or OTSC signed in its entirety is the equivalent of an Order that grants all the requested reliefs sought by the Petitioner. Plaintiff, the only non-attorney, made that correlation[565] whereas, the other licensed attorneys, i.e., Defendants' Rodin, Galchus, Wisler, Blond, Kelly, and McFarlane, utterly devoid of spinal fortitude, remained silent in anticipation for the performance on 6/11/2021. Even the privately retained attorneys Smith and Krasner[566] pretended there was a hearing scheduled for 6/11/2021 for a motion from Defendant Ruci, who left as soon as it was signed.

---

[558] Exhibit The Morning Before the Vacatur (04152021); Exhibit Ten For 10 (04162021).
[559] There were proceedings on June 10, 2019 and June 13, 2019; there were also proceedings scheduled for 6/01/2020 and 6/12/2020.
[560] On 4/15/2021, Shulman had a Fact Finding scheduled for 10:00 am on 6/11/2021 for another case.
[561] *Decision and Order On Application for Recusal As Made By Victoria Navarro* by Judge Shulman (4/14/2021).
[562] Exhibit J. Monica Shulman Attorney of Record for All Litigants (06112021); Exhibit V-15250-19 On Decision is Intentional, Not a Mistake.
[563] Galchus mailed an OTSC dated 5/15/2019 for a proceeding on 5/22/2019; and 5/18/2020 was a date Shulman chose on 3/09/2020. The latter date was canceled to obstruct the FBI investigation into R.R. (3).
[564] Just like the fake OTSC's from Rodin on 1/27/2021 - another sham proceeding.
[565] Shulman and Rodin pulled this same maneuver on 2/01/2021.
[566] On 6/10/2021, Krasner called Plaintiff to say "judges don't like to be told they're wrong" as a pretext for self-imposed limitations regarding the scope of her legal representation.

937.    For example, the 5/21/2021 e-mail to all counsel from Defendant Wisler contained an earlier e-mail from 1:59 pm from Catherine Lavvas ("Lavvas") to Defendant Shulman, "Please see attached unsigned OTSC and Exhibits[567] for review. The underlying case(s) is/are scheduled to your Part. If this application is approved, once the signed OTSC is returned, that too will be scheduled. If the application is not approved, could you please forward "declined to sign" OTSC back so the case can be processed. Thank you."[568] And yet, the same level of expediency, not even consideration, was afforded to Plaintiff on 4/06/2021 because Defendant Shulman discriminates and exercises bias among litigants.[569]

938.    Exactly 4 days later, on 5/24/2021, fraudulent Order #4 titled, "Temporary Order of Support By Default" dated 5/20/2021 on docket F-04656-20 with an electronic signature of "20210524", was sent to Plaintiff via @Secure File:180803, i.e., "Order: Order – Temporary Order of Support (and Referral to Support Magistrate). The purported order alleged, "IT IS HEREBY ORDERED that upon notice of this order, Victoria C. Navarro shall pay the sum of $150.00 weekly to Gerd Ruci payable through the Support Collection Unit, such payments to commence on May 28, 2021; IT IS FURTHER ORDERED that all payments payable through the Support Collection Unit shall be made by check or money order payable to and mailed to: NYS Child Support Processing Center, PO Box 15363, Albany, NY 12212-5363. The county name and New York Case Identifier number (CSMS #PB37270Z1) for the matter must be included with the payment for identification purposes…"[570] If Magistrate Grey-Humphreys had signed the order, she would not refer her own case to herself,[571] especially after asking Plaintiff to send the fraudulent orders from August 2019 and March 2021.[572] This fraudulent order is the result of Defendants' Galchus and Ruci's false instrument of filing on 5/21/2021, misrepresented as an OTSC dated 5/21/2021.

---

[567] There were no attachments in either Galchus's e-mail or Defendant Wisler's e-mail, which included only 1 attachment for the 5/21/2021 OTSC.
[568] On 4/15/2021, Shulman said she saw Plaintiff's motion to recuse and rejected it.
[569] There was no mention of attachments or motions from other parties by Defendant Shulman and yet there were additional records she was of that Plaintiff was not given – again.
[570] False Instrument of Filing: Temporary Order of Support By Default dated 5/20/2021.
[571] FCA §433 Hearing ([b] If the initial return of a summons or warrant is before a judge of the court, when support is an issue, the judge must make an immediate order, either temporary or permanent with regard to support. If a temporary order is made, the court shall refer the issue of support to a support magistrate for final determination pursuant to sections 439 (A) of this act.")
[572] E-mail to qfcpart28@nycourts.gov with copies of the fraudulent orders request by Magistrate Grey-Humphreys on 4/29/2021.

939.    For example, the letters from NYS Child Support Processing Center mailed to Plaintiff's home referenced a new case number for R.R. (3) "New York Case Id PC01509M1", which is due to a subsequent Acknowledgement of Paternity filed by Defendants' Ruci, Galchus, and Shulman on 2/28/2020, docket F-04656-20.[573] R.R. (3) cannot have 2 NYS CSMS Numbers, unless Defendant Ruci vacated the original one filed on October 22, 2018. On 4/29/2021, Magistrate Grey-Humphreys told Plaintiff she never issued any orders, temporary or otherwise.

940.    Defendants know Plaintiff is now subject to consequential deprivations for their fraudulent support orders, such as loss of driving privileges and incarceration, but they continue to issue and submit them under color of law, "[s]ince 2016, New York State has received more than $248, 445, 687 in Local Administrative Costs and Incentives under SSA Title IV-D §458 [42 U.S.C. 658a]. Due to Defendant Ruci, et al, R.R. (3) has a total of 2 Acknowledgements of Paternity for the same "father" – so far.

941.    Defendant Shulman's sham proceeding on 6/11/2021[574], to retroactively put on-the-record a moot OTSC dated 5/21/2021 was really meant to serve as a hearing for the fraudulent temporary support order on default and referral to support magistrate dated 5/20/2021. Per Dashboard, Defendants' Galchus and Ruci's 5/21/2021 OTSC was used to re-file the false instrument of filing on docket NN-12995-19 under the support proceeding, for which it was processing as "Court Purpose" for 6/25/2021 on docket number F-04656-20.[575] Curiously, without being prompted, but in response to Plaintiff's issues from 4/08/2021 regarding filing, Defendant Shulman blamed the clerks for both the delays in filings submitted via EDDS and delays to the calendar for the same. Not only was Defendant Shulman tampering the electronic record with false information but, based on Defendant Wisler's e-mail on 5/21/2021, any delays in filing are attributable to the judge's refusal to sign a motion or OTSC.

---

[573] FCA §563 Paternity and Support Proceedings Combined; Apportionment ("[w]hen a proceeding to establish paternity is initiated under this article, the court on its own motion or on motion of any person qualified under article four of this act to file a support petition may direct the filing of a petition under article four to compel the mother to support her child.")
[574] The For The Record ("FTR") timer was malfunctioning and appeared to have been affected by short-circuiting. This obvious malfunction was ignored by all.
[575] This is the same tactic Defendants tried to do on 3/26/2021 as "The Father's Affidavit", which resulted in 2 fraudulent orders on default; FCA §411 Jurisdiction ("[o]n its own motion, the court may at any time in the proceedings also direct the filing of a neglect petition in accord with article ten of this act.")

942.    Upon information and belief, "all the filing is done by the Part Clerks." It is important to note that Defendant Shulman is perpetuating a false narrative about ubiquitous "clerical errors" and delays to the calendaring of submissions by purposely attributing them to unsuspecting clerks at QFC, who have no control over the individual Park Clerks filings and calendaring. Put a different way, Defendant Shulman is fabricating an alibi to conceal the false instruments of filing submitted by Defendants, for which money laundering fronts appear as inactive[576] dockets in the computer records of the clerks at QFC.

943.    On 7/02/2021, Plaintiff received 10 e-mails from EDDS with a total of 76 attachments, which included records ranging from 2018 to 2021. Many of the records, such as the QFC template for Notice of Appearance and Affidavits of Service from 2018 and 2019 *should* have already been in Plaintiff's court file. Interestingly, none had dated court stamps from being filed. Also included were various affidavits of service from 2018 and copies of Plaintiff's Request for Appellate Division Intervention ("RADI")/Notice of Appeal from June 2021. Plaintiff submitted the completed RADI form via EDDS and it was sent to the Appellate Division. Unless these records were deleted from QFC records, there is no explanation for the series of e-mails sent on 7/02/2021 with these records attached. Duplicate submissions are rejected not remitted.

 a.   The 8th E-mail from "@Secure File 180803" had 2 attachments for the exact same 2 Affidavits of Service for "Notice of Motion" dated 1/12/2021 for the Federal Bureau of Investigation ("FBI").

 b.   The 8th E-mail from "@Secure File 180803" had 2 attachments for the exact same 2 Affidavits of Service for "Notice of Motion" dated 1/12/2021 for SCDSS.

 c.   The 8th E-mail from "@Secure File 180803" had 2 attachments for the exact same 2 Affidavits of Service for "Notice of Motion" dated 1/12/2021 for SBUH.

 d.   The 9th E-mail from "@Secure File 180803" had 2 attachments for the exact same 2 Affidavits of Service for "Notice of Motion" dated 1/12/2021 for VIBS.

---

[576] New York City Department of Finance (DOF) Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments ("[t]he 18-B Web system verifies all appearance dates against OCA data. There will be instances in which court appearances entered by attorneys are not verified by OCA. In such instances, the attorney must send documentation from the court to the ACP confirming the court appearance. Upon receipt of such documentation, the voucher will continue through the payment process.")

944.    Likewise, the 2 attachments for "Affidavit of Service" for docket V-20987-18 from 2018, 2 attachments for individual "Summons" pages for docket V-20987-18 from 2018, and several of the Court's version of "Notice of Appearance" for docket V-20987-18 should have been kicked back, since these records were, presumably, filed directly with the 5th floor Clerk of Court at QFC in 2018. In fact, Defendant Ruci's petition on docket V-20987-18 was not included in the package of records Plaintiff picked up from QRF records on 10/13/2020, though it was included in the request for records.

945.    The latest fraudulent order of default support is dated 7/7/2021 and indicates a 3rd Acknowledgment of Paternity for R.R. (3) was purportedly signed by Plaintiff, who is a biological woman and has never used pronouns other than she/her to establish identity. In fact, unless New York State's laws have changed, Plaintiff is not a person that can establish paternity as a biological woman. There was no proceeding held or scheduled for the latest fraudulent order. Upon information and belief, Defendant Ruci returned to the U.S. from Albania the week of 7/07/2021 to bribe Defendant Lucana-Morales with plane tickets and a paid vacation to Albania, using money wired by Defendants Ruci 1 and Ruci 2.[577]

946.    The experiences and current situations of the Named Plaintiffs as described above are neither unusual nor aberrational. Rather, they are merely examples that are far too typical of the irreparable harm being suffered by Plaintiff Parents, whose children are subject to seizure without cause, evidence, and utilized to fund money laundering fronts by Defendants, "ACS workers routinely falsify documents and manufacture lies against families who have done nothing wrong."[578]

## **Younger Abstention & Rooker-Feldman**

947.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-946, above as if specifically set forth herein.

---

[577] *See* USA v. Hussain, Slip Copy (2020) (referring to "the transmission of misrepresentations via US wires coupled with the victims of the fraud being located in the United States constitutes domestic application of the statute. Citing Ninth Circuit precedent in United States v. Garlick, the government argues that "'the focus of the mail and wire fraud statutes is upon the misuse of the instrumentality of communication,' not the overall fraud scheme." Thus, according to the government, "when defendants execute a wire-fraud scheme by domestic interstate wires . . . prosecuting the scheme does not involve extraterritorial application of the statute—even if the scheme involved some foreign conduct.")

[578] http://queensaeslawyer.com/; https://nycacslawyer.blogspot.com/2015/12/false-acs-charges.html

948.    Plaintiff is not State Court loser nor does she seek to challenge a particular state court judgment, "…"[t]he fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment. If the injury alleged resulted from the state court judgment itself, Rooker-Feldman directs that the lower federal courts lack jurisdiction." *Lombard v. Lombard*, 2001 U.S. Dist. LEXIS 6720, 2001 WL 548725, at *3 (S.D.N.Y.2001)(quoting *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996))."[579] Rather, Plaintiffs seek an injunction to bar money laundering fronts from proceeding in the family court, where Plaintiffs and Plaintiffs' child(ren) have been unlawfully imprisoned, subjugated, and seized under color of law.

949.    Plaintiff is, for all intents and purposes, the prevailing party in a state court judgment, resulting from the dismissal order entered on Defendant Ruci default on. Both the initial purported filing on or about October 22, 2018, and the subsequent dismissal order occurred in the commission of a conspiracy to kidnap R.R. (3) and deprive Plaintiff equal protection of the law. Constructive fraud and false instruments of filing are void and enforceable yet, individuals in positions like, Defendant Shulman and Defendant Rodin, have created an industry out of it: the Municipal Enterprise.

950.    Defendants' ACS Ruci, Galchus, Kaplan, Shulman, Wisler, Blond, and Kelly rely on false instruments of filing to sustain fraud on the court, finance their income on void and invalid docket numbers to participate in money laundering fronts to circumvent jurisdiction over the finality of domestic relations custody proceedings.[580]

951.    Had child safety or imminent risk been legitimate, Defendants would have utilized their authority to initiate a neglect proceeding against Defendant Ruci for 3 indicated findings, acts of domestic violence, and subsequent acts of domestic violence for violating Plaintiff's full stay order of protection. Instead, Defendants' Alozie, Tingue, Steele, and Rodin use selective prosecution to target victims of domestic violence by assisting the abuser with obtaining reduced charges in criminal court proceedings.

---

[579] *See* (Tyber v. Adams, 2001 US Dist LEXIS 24448, at *13 [SDNY June 19, 2001, 00 Civ. 4942 (KMW)(THK) Pro Se])
[580] *See* Burke v. Reid-Cherry, Dkt. No. 20-cv1835, _ F. Supp. 3d _, 2021 U.S. Dist. LEXIS 97916, *8-14 (S.D.N.Y. May 24, 2021) (recommending dismissal of claim challenging custody decisions made by Family Court).

952.    Likewise, Plaintiff is not barred from seeking injunctive relief, redress, and restitution for, including but not limited to money and damages for fraud, kidnapping, racketeering, and constitutional deprivations under color of law from the Defendants in their individual capacities. There is no amendment to the FCA that enables Defendants with the power and authority to seize Plaintiffs' children to conceal fraud, child abuse, and enforce unequal protection under the law based on implicitly entrenched forms of cronyism. When a judge repeatedly abuses his/her authority, wholly acting outside of his/her jurisdiction, to target a litigant with punitive orders and directives, grossly neglects to issue, or file, an order to deny appellate relief, it is called ransom, unlawful imprisonment, extortion, and bondage. And this is exactly what has been permitted to occur because of the fear, loss, humiliation, and subsequent retaliation that occurs for speaking up.

953.    Moreover, Defendants know their victims and know because litigants are vetted for vulnerabilities before they are chosen. When the judge is responsible for assigning counsel to a case, the attorney becomes financially dependent on the judge for survival. These unsettling dynamics lead to voluntary incompetence, inadequate representation, compounded constitutional violations, and opportunities to appeal arbitrary and capricious decisions are lost due to the passage of time. When litigants educate themselves in the law and assert their rights or point out procedural inconsistencies, their own attorneys use deceptive and/or blatantly false advice to maintain their own favorable appearances before the judge.

954.    For example, parent Cibelli's court appointed attorney, Stephen A. Gargiulo ("Gargiulo"), grossly neglected to inform his client that summons with petition must be served, when he was assigned to represent him on 10/09/2018 and 12/19/2018. Gargiulo knew Shaikh was lying about electronically filing both false instruments of filing on docket numbers NN-20004-18 and NN-24930-18 because no system of electronic filing exists in QFC. Gargiulo maintains this level of ignorance and incompetence to appease the Court and Defendants' ACS by not putting up a zealous fight for his client and show voluntary complacency and assistance. After all, Judge Piccirillo signed Gargiulo's 18B

voucher, approving the need to lift the cap of $4,400.00 when he was assigned to represent parent Cibelli.[581]

955. For example, when Defendants' Steele, Alozie, and Best threatened to incarcerate Plaintiff on 8/30/2019, Soffer was hired. Soffer asked Plaintiff to continue representation but misrepresented his experience and familiarity with child protective proceedings, beginning with the retainer agreement that listed "custody matter" as the scope of his legal services. Soffer never filed a notice of appearance at QFC for Plaintiff and continued to appear in Defendant Shulman's court, though custody issues never took place. Even though Plaintiff repeatedly told him that a hearing was scheduled for 9/04/2019, Soffer repeatedly said "who cares!" Soffer's inexperience led to months of lost custody for Plaintiff because he never requested an FCA 1028 hearing. On 10/01/2019, when Plaintiff informed Soffer the custody petitions were dismissed in QFC, he pretended to act surprised.

956. When he realized the actual implications of the terminated retainer agreement, he accused Plaintiff of misrepresenting her access to the physical court file, which could only be done by direct request to the Judge. Soffer continued to represent Plaintiff before Defendant Shulman and without a new retainer agreement in place. On 10/08/2019, Soffer accepted Defendant Galchus's OTSC dated 10/08/2019, to "restore" the dismissed custody petitions, including re-filing Plaintiff's docket V-05120-19/19C, for his purported client, because it benefitted him financially. Soffer's contract makes it explicitly clear that his services are only related to custody and that it terminates upon an order of disposition, i.e., the 9/04/2019 order of dismissal from Judge Jolly.

957. Many of these attorneys are lazy, bordering incompetent, on purpose. They are so used to not seeing proper enforcement of statutes by family court judges that questioning things, like proper service and jurisdiction, is irrelevant. On the one hand, 18B attorneys like Gargiulo willingly overlook procedural defects because opposition does not get him paid or assigned to another case. Not playing along with self-imposed unscrupulous rules is the difference between survival in a competitive field and ethics. On

---

[581] New York City Department of Finance (DOF) Assigned Counsel Plan, Payment Unit, Rules and Procedures for Attorneys and Experts on Payments ("[i]n order to receive compensation in excess of the set statutory limit, an attorney must complete an online affirmation of "extraordinary circumstances" along with their voucher and submit to ACP. ACP will send voucher to the judge for approval.")

the other hand, attorneys like Soffer willingly ignore procedural defects and constitutional deprivations because family matters are susceptible to protracted hearings and provide a steady cash flow. Plaintif has spoken to other private attorneys and despite their recognition of "weird" or "funky" anomalies that defy explanation in family court, they're willing to overlook it to bill their clients unnecessarily.

958.    Playing the part, like a monkey trained to jump through hoops, is a common expectation Plaintiff Parents are advised and/or told to do. This misconception is more consistent with false self-incrimination because, complying with arbitrary ransom demands, equates to admitting to acts and/or behavior Defendants make up at will. When your child(ren) are seized under false pretenses, there is no shortage of what Defendants can and will make up against any unsuspecting parent under color of law. When judges are unable to maintain impartiality and voluntarily perpetuate false narratives, enforce false instruments of filing, subjugate jurisdiction under color of law, the matter ceases to be legal and becomes a money laundering front. No doubt State Defendants will deny this is what they do, but the evidence speaks for itself.

959.    As such, Defendants are conspiring to initiate fraud on the court in family court with false instruments of filing and do so with premeditation and malice. Defendants are exploiting a class of people like Plaintiff Parents, who are not attorneys, have no legal experience, and no formal training or familiarity with family law. By kidnapping Plaintiff Parent's children, or holding them for ransom, such as under "ACS supervision" or transferring custody to the other parent, Defendants are betting the odds that Plaintiff Parent's focus will be on their children and not learning family or social services laws to uncover defects and deception. Defendants are blatantly circumventing the statutory prescription of service of summons with petition, utilizing motions and OTSC's to substitute legal records, which are repeatedly misrepresented as "petitions" under various Articles of the FCA, to enforce racketeering.[582]

---

[582] *See* The Rooker-Feldman restriction on jurisdiction holds even if the plaintiff is alleging [*14] that the manner in which the state court reached its decision was unconstitutional. *See Feldman*, 460 U.S. at 462, 103 S. Ct. at 1303. Moreover, a plaintiff cannot circumvent the restrictions of the doctrine simply "by casting [his] complaint in the form of a civil rights action." *Brooks-Jones*, 916 F. Supp. at 281 (citations omitted); *see also Bell v. State of New York*, No. 99 Civ. 5809 (AGS), 2000 U.S. Dist. LEXIS 12854, at *17 (S.D.N.Y. Sept. 6, 2000)("The fact that plaintiff alleges that his civil rights have been violated is insufficient to shield a claim from Rooker-Feldman where plaintiff is in actuality seeking review of a state court judgment."); *Murray v. Admin. for Children's Servs.*, 1999 U.S. Dist. LEXIS 689, 1999 WL 33869, at *1 (S.D.N.Y.1999)("[A] plaintiff may not seek reversal of a state court judgment simply by recasting his complaint in the form of a civil rights action

960.    For example, there is no legal purpose for Plaintiff's file number 180803 to have a combination of 26 motions and OTSC's listed on Dashboard as of 3/26/2021. Motion #5 was last noted on 3/09/2020 as docket V-20987-18 whereas, Motion #5 was listed as docket number V-01066-20 on 9/21/2020.[583] Recall, on 2/01/2021, Defendants' Rodin and Whitfield attempted to cover up motions 6 -10, scheduled for 3/26/2021, as their own 5 OTSC's speciously sent on 1/27/2021. Further, Defendant Wisler misrepresented the same by entering the 5 OTSC's, which resulted in motions 11 – 14, including 1 "restore to calendar" motion to appear. Then, Defendant Shulman signed duplicate OTSC's for VIBS and the FBI, resulting in additional motions 15 – 17 to appear scheduled for 2/01/2021. Lastly, Defendant Wisler speciously e-mailed the aforesaid duplicate OTSC's signed as 1 combined attachment. The fraud is unmistakably clear when you do the math:

> 5[584] (motions 6 – 10 for 3/26/2021)
> + 7 (new motions 11 – 17 for 2/01/2021)
> + 2 (restore to calendar motions for 2/01/2021 & 2/09/2021)
> + 2 (Unspecified OTSC's dated 3/15/2021)
> + 7 (copies of motions 11 – 17 for 2/09/2021)
> + 1 (Unspecified OTSC dated 3/17/2021)
> + 1 (Motion on docket V-01066-20 for 3/26/2021)
> <u>+ 1 (Motion on docket V-25843-19 for 3/26/2021)</u>
>  26 motions and OTSC's

So, the nexus of perpetrators and players is unmistakably clear as these numbers come from their own Dashboard records.

961.    Even *if* Defendants' ACS purport to have a valid claim against Plaintiff, and they do not, any attempt to initiate an FCA Article 10 proceeding would be founded in bad faith, it will either protect the child abuser or conceal child abuse. The latter is currently being done by Defendants' ACS, Shulman, Galchus, Kaplan, Blond, Kelly, and Ruci because their money laundering front is done to cover up a pattern of reported marks and bruises on R.R. (3), hiding 3 indicated findings for Defendant Ruci, and sustaining selective prosecution over Plaintiff without subject-matter jurisdiction, "[s]ubject matter **jurisdiction** has been defined as the 'power to adjudge concerning the general

pursuant to 42 U.S.C. § 1983.")(citations and internal quotations omitted). (Tyber v Adams, 2001 US Dist LEXIS 24448, at *13-14 [SDNY June 19, 2001, 00 Civ. 4942 (KMW)(THK) Pro Se])
[583] The copy of Defendants' Castillo-Lovaglio and Lovaglio's OTSC filed by Defendant Going, received from QFC records on 10/13/2020.
[584] Motions 1 – 5 are docket numbers V-20987-18, 19B; V-05120-19B, 19C; and NN-17995-19.

question involved, and is not dependent upon the state of facts which may appear in a particular case, arising, or which is claimed to have arisen, under that general question'."[585]

962.    Unless Defendants' ACS and OCFS can *prove* the Legislature provided the FCA with a loophole that confirms, "child abuse and/or neglect is only permissible if done by so-and-so and for such-and-such reason," then any proceeding initiated by Defendants' ACS against Plaintiff is malicious and QFC is without jurisdiction by legislative enactment, which has been the case for Plaintiff Parents. What has been permitted to occur is akin to malicious and selective prosecution. It is so remotely unrelated to the general purpose of "child protective services," that it unequivocally amounts to perpetuating state-sponsored trauma and child abuse, "[t]he **Family Court** has subject matter **jurisdiction** over all legal proceedings brought on behalf of neglected or abused children *(see,* NY Const, art VI, § 13 [b] [1]; **Family** Ct Act § 115 [a] [i]; § 614 [1]; § 1013 [a]). The State Constitution (NY Const, art VI, § 13 [b] [1]) confers upon the **Family Court** subject matter **jurisdiction** over all proceedings relating to "the protection, treatment, correction and commitment of those minors who are in need of the exercise of the authority of the **court** because of circumstances of neglect * * * as the legislature may determine."[586]

963.    In anticipation of Municipal Enterprises defense counsel opposing the injunction, Plaintiffs respectfully submit this argument in opposition: the family court is a court of limited jurisdiction by legislative enactment. And though it may have original jurisdiction over the aforesaid proceedings, the requirement for exercising said jurisdiction *requires* the origination of a petition, which the Municipal Enterprise does not have, "[i]n any proceeding commenced pursuant to the provisions of the social services law in which the family court has exercised jurisdiction, the provisions of articles one, two and eleven of the family court act shall apply to the extent that they do not conflict with the specific provisions of the social services law."[587]

964.    Summons is not a waivable defect, it is a statutory prescription under various sections of the FCA, including §1035, which Defendants' Shulman, Ruci, Galchus,

[585] See *Thrasher v United States Liab. Ins. Co.,* 19 NY2d 159, 166, quoting from *Hunt v Hunt,* 72 NY 217, 229; *see also, **Lacks** v **Lacks**,* 41 NY2d 71, 75; 28 NY Jur 2d, **Courts** and Judges, § 182; 1 Carmody-Wait 2d, NY Prac § 2:80, at 93) (In re Stanley R., 147 AD2d 284, 288 [2d Dept 1989]); FCA §115 Jurisdiction of family court.
[586] *See* In re Stanley R., 147 AD2d 284, 288 [2d Dept 1989].
[587] FCA §165 Procedure (b).

Rodin, McFarlane, Naughton, and Clarry used PaintShop to add Chief Clerk Byrnes signature on a retroactive piece of constructive fraud dated 3/09/2020 for a false instrument of filing dated in 2019, "[w]hen used in this act, "exclusive original jurisdiction" means that the proceedings over which the family court is given such jurisdiction must be originated in the family court in the manner prescribed by this act…[t]he provisions of this act shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of article six of the constitution of the state of New York ."[588]

965.    In parent Cibelli's case, Shaikh admitted no summons was used for either of the false instruments on docket numbers NN-20008-18 and NN-24930-18. Jurisdiction by fraud is not enforceable and sinister when the prosecutor admits it. To prohibit parent Cibelli from challenging the fraud, Judge Piccirillo issued a Decision, which is unappealable paper, "[f]raud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury...[i]t is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."[589]

966.    Defendant Ruci's failure to properly vacate his dismissal on default[590] not only terminated the proceedings in Plaintiff's favor, but effectively terminated Defendants' jurisdiction over R.R. (3). After 10/08/2019, Defendants were without standing to maintain any proceeding in QFC, given it took Defendant Shulman 35 days[591] to notice the case completely disappeared from UCMS. Not only was Defendant Shulman not the Judge who dismissed Defendant Ruci's petition, she had no authority to steal dockets from a Co-Justice under the pretense of transferring it. This was unequivocally clear when the assigned Judge dismissed Defendant Ruci's petition because Defendant Shulman had no control to move it, remove it, transfer it, or assign it to herself.[592] Alternatively, Defendant

---

[588] FCA §114 Exclusive original jurisdiction.
[589] See Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985).
[590] CPLR §5511.
[591] FCA §1113.
[592] Rules of the Chief Judge Part 33 Temporary Assignment of Justices and Judges - Section 33.0 General ("[t]emporary assignments of judges and justices of the Unified Court System pursuant to article VI, section 26, of the Constitution shall be made by the Chief Administrator of the Courts, in his or her discretion, subject to the Constitution, art. VI, section 28, subdivision b, after determining the need therefor and the advisability thereof consistent with the objectives of the Unified Court System."); Part 36 Appointments by The Court – Section 36.0 Preamble ("[p]ublic trust in the judicial process demands that appointments by judges be fair, impartial and beyond reproach. Accordingly, these rules are intended to ensure that appointees are selected on the basis of merit, without favoritism, nepotism, politics or other factors unrelated to the qualifications of the

Shulman's own participation in fraud caused Defendant Ruci's dismissal on default. Her actions are bias and beholden to false corrective action, disguised as self-proclaimed judicial functions, inconsistent with the legislature.

967.    In parent Cibelli's case, Defendants' ACS *casually* flaunt their ability to file an Article 10 at any time, day or night, "…[i]t must be noted that there is no legal authority restricting the ability of ACS to file a petition at any time it wants…[h]owever, the case will be heard according to court rules, but that does not in any way mean that ACS cannot file a case on the weekends, holiday, or at 2:32 A.M…[t]his court does not have the authority to limit when ACS can file an Article 10 petition"[593] whereas, in Plaintiff's case, Defendants' ACS voluntarily deferred that responsibility to Defendant Galchus on 10/07/2019, by making 10 copies of his OTSC but only date stamped 2 at "7:09 am" and "7:10 am."

968.    Furthermore, even *if*, hypothetically, Defendants' ACS were to file an FCA Article 10 petition tomorrow against Plaintiff (and they cannot), it would constitute an admission of fraud on the court, since Defendant Shulman strongly believes the Chief Clerk of Court's position and his function for issuance of summons is unnecessary and optional, "her belief that an article 10 petition under NN-17995/19 has not been filed, despite her appearance in court on 9-4-19 with her retained counsel in which she acknowledged service of the petition."[594] Defendant Shulman is an attorney, she knows the separation of powers and duties is the legislative intent for not relegating the function of issuing summons to Defendants ACS, or an agency similarly situated. If the legislature intended for Defendants' ACS to have both summons power and authority to originate, it would have been included in the SSL. The fact is the legislature only intended for Defendants' ACS to prosecute neglect and/or abuse by the filing of a petition, for which filing is validated by the issuance of summons, a function the Chief Clerk of Court is designated to perform.[595]

---

appointee or the requirements of the case. The rules cannot be written in a way that foresees every situation in which they should be applied. Therefore, the appointment of trained and competent persons, and the avoidance of factors unrelated to the merit of the appointments or the value of the work performed, are fundamental objectives that should guide all appointments made, and orders issued, pursuant to this Part.")

[593] Affirmation in Opposition to Motion for Summary Judgment by Mohammed T. Shaikh (5/10/2021).

[594] *Decision and Order on Application for Recusal As Made by Victoria Navarro* by Judge Shulman (04/14/2021).

[595] FCA §216-a Clerk of Court ("[t]here shall be a clerk of court for the family court in each county. The clerk of court shall keep the court records and seal and have such other responsibilities as may be provided in accord with article seven-a of the judiciary law.")

969.    Likewise, had the legislature intended to authorize the judiciary to issue summons, it would have been inserted into the FCA. Instead, it states "[a]ny family court judge who in good faith issues process in any proceeding under this act shall not be liable therefor unless it is shown that his action in so doing was malicious or a deliberate abuse of his discretion."[596] Furthermore, judicial immunity cannot extend to Defendants' Galchus, Blond, or Kelly for offering false instruments of filing under FCA Article's 10, 6, 4, and 5 because Defendant Shulman told them to do it. And, without subject-matter jurisdiction and jurisdiction, Defendants have no state court action pending against Plaintiffs.

970.    For example, Defendants' ACS have successfully evaded detection, terminated legal and lawful federal and state investigations that Plaintiff initiated against them for aiding and abetting R.R.'s (3) international kidnapping to Albania on 1/30/2020, 4/25/2020, and 5/27/2021, while travelling with a US passport Defendant Ruci obtained by fraudulent means and as well as subsequently using the Albanian passport to evade detection. Nowhere in the FCA does it say that judicial immunity includes obstruction of justice nor did the legislature include it because judicial functions do not include criminal conduct and fraud. When a judge obtains a witness without a subpoena and intends for said witness to suborn perjury to sustain malicious prosecution, she better make sure the witness does not lie about impending legal actions against his county of employment when asked by Plaintiff.[597]

971.    If knowingly providing false information, records, documentation, files, etc. to the FBI, during an active federal investigation into international parental kidnapping, as was done by Defendants' Rodin, Wisler, Shulman, Blond, Kelly, Peebles, Alozie, Roman, Galchus, Ruci, and Going, on 5/26/2020, is not a federal crime, then Martha Stewart and General Michael Flynn are innocent and need to be pardoned by the United States Government effective immediately.

---

[596] FCA §145 Liability of Judge.
[597] On 3/26/2021, Plaintiff asked Defendant Teplansky if there was a lawsuit pending against the 2nd and 3rd precincts for discriminatory practices against minorities. Defendant Teplansky willfully lied and said "no."

## Immunity v. Qualified Immunity v. Absolute Immunity

972.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-971, above as if specifically set forth herein.

973.    The Supreme Court has held that absolute **judicial immunity** is generally overcome in only two sets of circumstances: "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not **taken in** the judge's judicial **capacity**." *Mireles,* 502 U.S. at 11 (citing *Forrester v. White,* 484 U.S. 219, 227-229, 98 L. Ed. 2d 555, 108 S. Ct. 538 (1988)); and *Stump,* 435 U.S. at 360. "Second, a judge is not immune for actions, though judicial in nature, **taken in** the complete absence of all jurisdiction." *Id.* at 12 (citing *Stump,* 435 U.S. at 356-357; and *Bradley v. Fisher,* 80 U.S. 335, 351, 20 L. Ed. 646 (1871))."[598]

974.    Defendant Shulman violated the New York State Constitution by perverting rules of motion practice to substitute and replace statutory prescriptions for filing and/or originating proceedings in the FCA. In essence, Defendant Shulman has usurped the powers of the legislature to amend FCA §145 and perform functions like legal representation and advocacy, such as preparation of and service of process for motions and OTSC's, executed as multiple copies of suborned perjury from Defendants' Ruci, Galchus, Going, Blond, Naughton, Alozie, Peebles, Rodin, Steele, Tingue, Roman, Kelly, Gildin, McFarlane, and Wisler, which are subsequently sent under the false pretense of unscheduled hearings, hearings scheduled without notice, hearings on the papers.

975.    Defendant Shulman violated her oath of office to conceal repetitive violations of due process, biased and discriminatory targeting of litigants, and manufacture alibis for the criminal activities and affairs executed by co-conspirator employees and agents to advance slander campaigns and stigma. By accepting and using false instruments of filing on motions and OTSC's, Defendant Shulman is manufacturing an impeccable performance record; she is impeding and supplanting accurate reporting of timely adjudication and compliance with due process of law. Inclusive, Defendant Shulman's self-serving manipulations obfuscate the accuracy of status and statistical reports, in a conspiracy to mislead the public about the purported progress or reform within the family

---

[598] *See* (Levine v. Lawrence, 2005 US Dist LEXIS 11663, at *18 [EDNY June 15, 2005, No. 03-CV-1694 (DRH) (ETB)]).

court. That is, her fraud is affecting commerce in that public officials make budgetary decisions based on this misinformation, such as payroll increases, health insurance plans, flex accounts, calculation of leveraged pension allocations, and overtime funding.

976.    Inclusive, the perverse emendation of the good faith liability pursuant to FCA §145, enables Defendant Shulman to perform non-judicial functions akin to "engag[ing] in the practice of law, act[ing] as an arbitrator, referee or compensated mediator in any action or proceeding or matter or engag[ing] in the conduct of any other profession or business which interferes with the performance of his or her judicial duties."[599] There are no accurate performance measures for Defendant Shulman because motions and OTSC's are not included or counted in any status or statistical report. In her official capacity, as an exercise of judicial discretion, Defendant Shulman has destroyed and manufactured Plaintiff's court records to illegally extend and protract her separation from R.R. (3), to give her co-conspiring Defendants' Rodin, Galchus, McFarlane, Blond, Kelly, Naughton, Peebles, Roman, Alolzie, Steele, Tingue, Ruci, Gildin, Going, and Clarry sufficient time to fabricate narratives that align with artificial procedural and due process of law, to maintain financing for the activities and affairs of the Municipal Enterprise.

977.    The on and off button for the electronic recording system ("FTR") used to record proceedings at QFC is physically installed on Defendant Shulman's desk, which she turns on and off at will to manipulate the record in real time. As part of its included services, the FTR manufacturer allows users to create accounts for remote access, cell phone access, and obtain official court transcripts in 24 hours. Specifically, Plaintiff's relief from subjugation is in Defendant Shulman's direct possession, control, and access.

978.    For example, to fabricate a retroactive narrative, such as a purported "clerical error" caused the dismissal order ("dismissal order") entered on Defendant Ruci's willful default on September 4, 2019, Defendants' Shulman and Rodin fabricated 2 sets of transcripts dated August 30, and September 4, 2019 ("tampered transcript 1 & 2") that were not filed.[600] These records were produced for the sole purpose of defrauding the federal government, included as part of false reimbursement claims for docket NN-17995-19 dated

---

[599] New York State Const. Article VI §20 (b) (4)
[600] *See* S.E.C. v. McNulty 137 F.3d (2d Cir. 1998) (The Second Circuit has "interpreted 'willfulness,' in the context of a default, to refer to conduct that is more than merely negligent or careless." S.E.C. v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998). "On the other hand, the court may find a default to have been willful where the conduct of counsel or the litigant was egregious and was not satisfactorily explained.")

August 30, 2019 ("CPS Order").[601] To maintain the money laundering fronts, the transcripts are intended to backdate proof of jurisdiction, as required for claims, and payments under SSA Title IV-E or IV-D.[602] Incidentally, Plaintiff paid $320.00 for aforesaid transcripts, with "Duplicate Official Court Transcript" on the front, in March 2020.

979.    The fraudulent counterfeiting of court records to subvert accurate statistical reporting of compliance with Standards and Goals,[603] empowers tyranny that feeds Defendant Shulman's reign of terror, in a way that portrays a master-slave relationship between the Court, as stand in for the litigation, and the litigant, who is subjugated by it. Specifically, Defendant Shulman ultimately determines *when* the litigation is finished. Alternatively, Defendant Shulman controls the narrative of the litigation because each entry of a copy of a suborned false instrument of filing not only substitutes the underlying actions petitions and supplemental petitions but in so doing, causes entries of notes and purposes related to, and for, each motion and OTSC.

980.    Since Defendant Shulman knows, or should have known, that Dashboard, including its predecessor, only counts petitions and supplemental petitions, including permanency planning hearings to calculate the rate of compliance with a goal of 180 days to disposition, which is measured by the length of time petitions and supplemental petitions and permanency planning hearings remain active for each family court judge, in each county, and for each of his/her case.

981.    As a result of the painstaking, detail-oriented, and calculated misrepresentations of fraud on the court, Defendant Shulman was, and is, personally involved in the outcome, including regularly interfering in the proceedings to zealously advocate one side's unspoken position in her own defense, such as manipulating her words and statements and censoring unfavorable statements, or parts, of the electronic record

---

[601] Foster Care Maintenance Payments Program Implementation Requirements 45 CFR §1356.21 (d)(2) ("[n]either affidavits nor nunc pro tunc orders will be accepted as verification documentation in support of reasonable efforts and contrary to the welfare judicial determinations except for a Tribal title IV-E agency for the first 12 months that agency's title IV-E plan is in effect as provided for in section 479B(c)(1)(C)(ii)(I) of the Act.")

[602] *See* Carol Yuan-Leung v. Orsyn Land Services, Inc., In Bum Chung, and Min Chong Lee, Memorandum & Order 18-CV6236 (denial to vacate judgment on default "[t]o now retroactively annul that judgment, set aside the correction of her tax status, and restart from the beginning, based on the flimsy assertions now offered by defendants, would be unjust and prejudicial indeed.")

[603] New York State Unified Court System, 2018 Annual Report ("[t]he courts use a number of barometers, including "standards and goals," for the timely resolution of different categories of cases… in Family Court, 180 days. Cases that have not been resolved within these established benchmarks are considered "over standards and goals.""")

before, during, and after hosting each money laundering front. Essentially, Defendant Shulman is protecting her own interests, including the backup for her manufactured performance record, in the proceedings as the judicial advocate for the party, or parties, aligned with her manufactured entries and rate of compliance.

982.     For example, on March 26, 2021, Defendant Shulman brought Defendant Teplasnky to her virtual courtroom as "my witness" (her words). In Defendants' Rodin and Whitfield's January 25, 2021-OTSC's, requesting, inter alia, Plaintiff's medical records for "respondent Felicia Donaldson," was an e-mail to former employee of SCPD Headquarters ("HQ"), Suzanne Luca ("Luca"). Specifically, Luca had not been employed there since on or about September 2020. According to Doria Smith ("Smith"), listed as a contact in Luca's auto-response message, no one at SCPD HQ responded to, or did anything with, Defendants' Whitfield and Rodin's Notice of Motion, unsigned OTSC, or the signed OTSC. During Plaintiff's interrogation of Defendant Teplansky, he was asked for proof of a police report, which Defendant Shulman responded with "objection. There is no report. The witness can speak to me about it in private." It is unlikely the transcripts for March 26, 2021, will include this, and/or other, statement(s) made by Defendant Shulman, acting as the attorney of record for Defendant Teplansky. *(Per Dashboard, Plaintiff was conveniently marked in default on June 11, 2021, though present whereas, Augustus was marked as present, though not present.)*

983.     Defendants' Rodin, Galchus, Kaplan, Blond, Kelly, Gildin, McFarlane, and Naughton are wholly indebted to Defendant Shulman's prostituting of judicial influence, for self-enacted "judicial acts" and self-proclaimed "judicial discretion," that aid and abet, enforce and sustain, every illegal, unlawful, indiscretion and instance of misconduct, including blatant acts for contempt of court contrived, conspired, and carried out as the activities and affairs of the Municipal Enterprise.

984.     For example, on January 31, 2020, Defendant Peebles called Plaintiff to cancel future supervised visits because Defendant Ruci took R.R. (3) to Albania the day before. That same day, Plaintiff contacted the FBI to file a report because R.R. (3) did not have a US passport – or so Plaintiff thought. Plaintiff and Defendants' Castillo-Lovaglio and Lovaglio went to QFC to file a Writ of Habeas Corpus ("Writ"), who issued a new docket number, V-02806-20, and assigned it to Judge Fassler. According to the petition

clerk's records, "[a] custody or visitation proceeding concerning the same child is pending in New York State. The court docket number is V-21774-19 and the status of the case is: Adjourned March 9, 2020."[604]

985.    Further, QFC's records did not have Defendant Shulman listed as the assigned judge, "[t]he child is not the subject of any order, mandate, judgment or decree of any court or competent jurisdiction, nor has any appeal been taken from any such order, mandate, judgment or decree…[n]o court or judge of the United States has exclusive jurisdiction to order the child released." *Id.*

986.    Interestingly, Defendant Galchus was notified of Plaintiff's Writ and appeared with 2 clients.[605] After telling his clients to sit down, he walked in to Judge Fassler's courtroom. When Plaintiff was called in, Judge Fassler said Defendant Shulman "called to inform me about the case." Further, Defendant Galchus lied to Judge Fassler that his client, Defendant Ruci, received an August TOC/V. With a stupefied look on her face, Judge Fassler replied, "I only see a court date on August 26, not a temporary order." Defendant Galchus remained silent. In fact, Judge Fassler said, "anyways it doesn't matter," because Defendant Ruci received the December TOC/V. Judge Fassler dismissed Plaintiff's Writ because "you filed the wrong form," though she never said what form.[606]

987.    On February 7, 2020, Plaintiff presented with an Emergency OTSC (Feb. 2020 OTSC"), requesting, inter alia, an immediate hearing for the return of R.R. (3). After Plaintiff's Emergency OTSC was stamped and while it was being altered by Defendant Shulman in chambers, Plaintiff went to the 5th floor Clerk of Court to file a Voluntary Withdrawal of Petition on docket number V-05120-19. The form was stamped and handed to the Clerk to be filed. *(It should be noted, QFC is the only place where Plaintiff must withdraw a petition that was shown to be inactive on January 31, 2020, and dismissed*

---

[604] Writ of Habeas Corpus dated 1/31/2020; see ("[a]s set forth in the indictment, Cho has been employed as a Special Agent with Internal Revenue Service Criminal Investigation… worked on an investigation through which he obtained identifying information for an individual described in the indictment as "John Doe." The investigation was eventually closed, but Cho retained items he obtained during the investigation and used John Doe's identifying information to create false identification documents and open a corporate entity overseas in John Doe's name. The fraudulent documents included purported identification cards for the Philippines and the Republic of Marshall Islands in the name of John Doe, but bearing photos of the defendant, and a purported passport in the name of John Doe for the Republic of Guinea-Bissau.) https://www.justice.gov/usao-edny/pr/internal-revenue-service-agent-charged-identity-theft-and-wire-fraud

[605] The individuals (both Hispanic) told Plaintiff, Castillo-Lovaglio and Lovaglio their case finished "a long time ago" and they did not know why Galchus brought them there but they came from a different section of the courthouse.

[606] In Castillo-Lovaglio and Lovaglio's 12/27/2019 petition: Ruci obtained custody on docket V-05120-19A on 10/10/2019; in Plaintiff's Writ of Habeas, "on August 26 2019: an Order of Reference was issued by referee McGrady to obtain custody."

*before that, on September 4, 2019. QFC is also the only place where, even after Plaintiff does all the aforesaid, the petition remains listed on the calendar.)*

988.    Not surprisingly, Defendant Shulman denied a sooner hearing because she needed time to process fraud on Plaintiff's docket number V-21774-19. Defendant Shulman signed it but kept the date for March 9, 2020. To castigate Plaintiff, she added more constraints on service of process: prohibiting Plaintiff from physically mailing the papers. In direct contradiction to her own false instrument of filing from January 9, 2020, Defendant Shulman wanted third parties to mail copies of the Feb. 2020 E-OTSC to the other parties.

989.    Plaintiff is not blaming the clerks, this fraud is being done by Defendant Shulman, who is manually entering, and re-entering, false instruments of filing, i.e., the same motion or OTSC, to artificially maintain inactive dockets to finance money laundering fronts.[607]

990.    On May 26, 2020, Defendants' Rodin, Galchus, Wisler, Blond, Kelly, and Going conspired to give Special Agent Maguire of the Kidnapping/Child Trafficking Unit at the FBI a fraudulent March 9, 2020 "temporary order of custody" issued on Plaintiff's void and invalid docket number V-05120-19 to obstruct her investigation of R.R.'s (3) abduction to Albania by Defendant Ruci.[608]

991.    When Defendant Alozie chose to indicate Plaintiff for his own Anonymous Report at 6:13pm, he opted to maintain R.R.'s (3) FSS case file open with the SCR. Accordingly, when Defendant ACS was notified a child in their custody was kidnapped, Defendants' Peebles, Steele, Roman, and Tingue were required to report it, "any child or youth over whom the State agency has responsibility for placement, care, or supervision and who the State has reasonable cause to believe is, or is at risk of being, a sex trafficking victim (including children for whom a State child welfare agency has an open case file but who have not been removed from the home, children who have run away from

---

[607] Rules of the Chief Administrative Judge Part 115. Caseload Activity Reporting – Section 115.2 Filing of Caseload Activity Reports ([a] "[u]nless the Chief Administrator shall otherwise direct, the chief clerk of each trial court, other than the Court of Claims, shall report caseload activity information, on a form prescribed pursuant to section 115.1 within ten calendar days following the end of each term of court or calendar month as specified by the Chief Administrator.")

[608] *See* Haas v Henkel, 216 US 462 (1910) ("[t]he statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government . . . [A]ny conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operation and reports as fair, impartial and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation."

foster care and who have not attained 18 years of age or such older age as the State has elected under section 475(8) of this Act, and youth who are not in foster care but are receiving services under section 477 of this Act)."[609]

992.    Unless the FCA includes a provision for the commercialization of children, city and state Defendants are prohibited from asserting self-proclaimed edicts, doctrines, orders, or decrees that perpetuate child trafficking, international and domestic.

993.    Since, Defendants' ACS, Defendants Shulman, Galchus, Ruci, Blond, Kelly, Wisler, and Going repeatedly stated, reiterated, validated, confirmed, etc. that Plaintiff had "supervised visitation" with R.R. (3) and Defendant Ruci was under "ACS supervision" per the CPS Order, then R.R. (3) was internationally kidnapped. And Plaintiff reported the R.R.'s (3) kidnapping on April 27, 2020 (Intake Stage ID 33081772) because Defendants' Steele, Peebles, Alozie, Tingue, and Roman grossly failed to do it as required by law. But it's ok when Defendant ACS waits 8 years for notice that a foster child's main caregiver died. Despite, Defendant Alozie being assigned to the case by the SCR claiming, "ACS was not aware the father left the country", he subsequently closed the report unfounded. Go figure.

994.    On July 10, 2020, OCFS mailed Plaintiff a letter with the determination of the report on "April 28, 2020,"[610] "[t]his letter is to give you the results of the investigation into a report of suspected child abuse or maltreatment investigated by the local child protective services (CPS) office. Your local CPS office determined this report to be "unfounded." This means that CPS did not find believable proof (credible evidence) that a child was abused or maltreated."[611]

995.    On August 3, 2020, Plaintiff contacted the SCR and spoke with an operator about the April 27, 2020, report. Plaintiff was told aforesaid report was entered as an additional information ("Add Info") report because R.R. (3) already had an open case; i.e., the FSS case. The SCR operator further confirmed that a child under "agency

---

[609] SSA Title IV Part E §471 (9)(C)(i)(l).

[610] Plaintiff made the report on 4/27/2020. It is likely that Defendant Alozie called in another false report on 4/28/2020 to change jurisdiction of the SCR investigation to Suffolk County, then closed it. Evidence of this is found in his unregistered FCA 1034 report, where Plaintiff is accused of filing 3 more SCR reports against Defendant Ruci, included as an Exhibit in Defendant Rodin's Affirmation in Opposition for the sham proceeding on 10/26/2020.

[611] OCFS Letter dated 7/10/2020; *see Former New York State Senator from Queens pleads guilty to conspiring to defraud the State* ("Huntley used her knowledge of the system to steal funds intended to help some of her neediest constituents, lining her own pockets at the expense of parents in need, and ultimately their children.") https://www.justice.gov/usao-edny/pr/former-new-york-state-senator-queens-pleads-guilty-conspiring-defraud-state-over-87000

supervision", like R.R. (3), must be reported missing, abducted, etc. when it happens. Since the mailing of the OCFS letter, there were no open cases, of any kind, for R.R. (3) with the SCR.

996.    Even *if*, hypothetically speaking, the State could argue Defendant Shulman's cover up of the fraudulent order, i.e., by completely deleting all traces of Plaintiff's docket number from UCMS, not just removing it from the calendar, or directing her subordinate, Defendant Aubrey Wisler to do it, *could be* construed as an extension of a judicial function (though it is not) covered by qualified immunity at the least (though it is not), is not remotely supported by its intentional and singular use in a conspiracy to obstruct an FBI investigation on May 26, 2020. Absent Agent Maguire's involvement, the March TOC would have remained a secret hidden from Plaintiff. It was also never filed.

997.    The State would have to show that immunity covers conspiracy to obstruct justice, including shielding those acting as an extension, i.e., carrying out directives or orders, of the Court, that includes lying to federal investigators and law enforcement, "quasi-judicial" absolute immunity may at times protect various persons who are not judges from any and all lawsuits arising out of their actions, if (1) such persons are themselves "integral parts of the judicial process," *Briscoe v. LaHue,* 460 U.S. 325, 335, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983), or (2) their actions are taken pursuant to a direct judicial order. *See Richman v. Sheahan,* 270 F.3d 430, 435 (7th Cir. 2001) (citing cases from First, Fifth, and Ninth Circuits); *see also Respass v. New York City Police Dep't,* 852 F. Supp. 173, 177 (E.D.N.Y. 1994) (citing *Roland v. Phillips,* 19 F.3d 552 (11th Cir. 1994)).[612]

998.    The State's argument for immunity would have the strength to overturn the recent indictment and sentencing of former Suffolk County District Attorney Thomas Spota and his anti-corruption unit chief, Christopher McPartland.

999.    Defendant Shulman is so intimately hypervigilant of Plaintiff's *profound* maternal instinct, and that she won't just "let it go," no matter what Defendants' ACS do to curtail, obstruct, and impede her custody of R.R. (3). Defendant Shulman seized the opportunity to deliver subsequent blows of impunity at Plaintiff, while also concealing Defendants' Peebles, Alozie, Steele, Roman, Blond, Kelly, Galchus, Ruci, Wisler, and Rodin's deliberate lies to the FBI, deliberate lies to law enforcement, and lies to the

---

[612] *See* Levine v. Lawrence, 2005 US Dist LEXIS 11663, at *26 [EDNY June 15, 2005, No. 03-CV-1694 (DRH) (ETB)].

Department of State, "[t]he mother has been found by ACS to repeatedly make unsubstantiated allegations that the child R.R. (3) is being harmed in the father's care and has reached out to various government agencies including but not limited to the FBI, New York State Senators, The Commissioner of Social Services and local police with her unfounded claims."[613]

1000.   Accordingly, obstruction of justice, witness tampering, destruction of evidence, and witness intimidation are not inherently judicial functions, "[t]he Second Circuit has assumed without deciding that judges in courts of limited jurisdiction are entitled, as are judges in courts of general jurisdiction, to judicial immunity for all judicial acts *not* performed in the *clear absence of jurisdiction. Tucker v. Outwater* 118 F.3d 930, 937-38 (2d Cir. 1997) (noting that "the clear weight of authority" has applied absolute immunity to both types of judges)."[614]

1001.   Unless the legislature amends Judiciary Law 487 to include state-sponsored kidnapping, extortion, U.S. passports obtained by fraud, money laundering, and destruction of government property, "[a]ny court seeking to dispose of court records shall make a written request for such disposal to the Deputy Chief Administrator for Management Support. The request shall describe in appropriate detail the records sought to be disposed of, including the nature of the records and the range of dates of their filing or creation."[615] Clearly, no compelling reason exists for AG James, or the U.S. Attorney, to file criminal proceedings against employees and agents engaged in the activities and affairs of the Municipal Enterprise.

1002.   Defendant Shulman is unique, and her appointment, like many others, appears to be an ongoing trend of mayoral picks of former ACS attorneys to the family court. That is, Defendant Shulman was appointed because of her extensive experience, i.e., "12 years" working for Defendants' ACS, in both a supervisory and prosecutorial capacity.[616] It also means Defendant Shulman has sufficient experience with handling court orders for FCA 1034 investigations, and yet she was either unable to recognize a correctly formatted SCR questionnaire - which is a problem - or she is too attached to her former co-

---

[613] Footnote ², Decision on Application for Expanded Access by Judge Shulman (10/26/2020).
[614] *See* (Levine v Lawrence, 2005 US Dist LEXIS 11663, at *22 [EDNY June 15, 2005, No. 03-CV-1694 (DRH) (ETB)]).
[615] Rules of the Chief Administrative Judge Part 104 - Section 104.3 (a) Procedure for disposition of court records.
[616] Practising Law Institute, *Hot Topics in Child Custody and Guardianship for New York Practitioners* (2016).

workers, which inevitably affects her ability to adjudge acts of contempt of court - also a problem. A bird with clipped wings cannot fly.

1003.   Likewise, a judge, without the ability to exercise his or her contempt power, is like a bird with clipped wings, "[f]rom the very beginning of this Nation and throughout its history the power to convict for criminal contempt has been deemed an essential and inherent aspect of the very existence of our courts." *Levine v. United States,* 362 U.S. 610, 615, 4 L. Ed. 2d 989, 80 S. Ct. 1038 (1960). Generally speaking, all "contempts committed in the face of a court" may be "instantly punished without proof or examination." *U.S. v. Lumumba,* 741 F.2d 12, 16 (2d Cir. 1984). As the Eleventh Circuit has noted, "summary adjudication and sentencing of contempts occupies a unique niche in our criminal justice system. Only in this kind of proceeding do the otherwise inconsistent *functions of prosecutor, jury, and judge mesh into a single individual." Sandstrom v. Butterworth,* 738 F.2d 1200, 1209 (11th Cir. 1984) (emphasis added)."[617]

1004.   Defendant Shulman knows Defendants' Rodin, Peebles, and Alozie defied her orders for FCA 1034 investigations but chose not to hold them in contempt because of cronyism, bias, and partiality, "[t]he provisions of the judiciary law relating to civil and criminal contempts shall apply to the family court in any proceeding in which it has jurisdiction under this act or any other law, and a violation of an order of the family court in any such proceeding which directs a party, person, association, agency, institution, partnership or corporation to do an act or refrain from doing an act shall be punishable under such provisions of the judiciary law, unless a specific punishment or other remedy for such violation is provided in this act or any other law."[618]

1005.   For example, Plaintiff included a copy of Local Commissioners Memorandum 19-OCFS-LCM-05 and pointed out that Defendants' ACS did not register Defendant Shulman's court orders for FCA 1034 investigations with the SCR in September 2020, when Defendant Going submitted the false instrument of filing dated 9/17/2020. Instead, given her criminal proclivities and tenacity for lawlessness, Defendant Rodin submitted 3 fake FCA 1034 reports as "Exhibits C, D, & E" in her perjury-flooded

---

[617] *See* (Levine v Lawrence, 2005 US Dist LEXIS 11663, at *9 [EDNY June 15, 2005, No. 03-CV-1694 (DRH) (ETB)]).
[618] FCA §156 Contempts.

"Affirmation in Opposition" for the sham proceeding on 10/26/2020. Apart from obviously incorrect formatting, the signature of unauthorized persons, and the specious attempt to copy an SCR approved questionnaire, no prior letter(s) was mailed to Plaintiff's home from OFCS to confirm the registered court orders, "[i]n addition, we found that Local Districts do not always report all the details of a case to the court, as we identified three cases with questionable conditions that lacked documentation that they had been reported to the court…[i]n one case, siblings were placed with an adult relative who had a history of domestic violence and suspected drug use…[a] neighboring Local District performing its own investigation expressed concerns about the adult relative, including possible drug use and unlicensed driving."[619]

1006.   This is a form of abuse and control. Nowhere does it say that Defendants' ACS have a monopoly on CPS investigations, "[i]t is not necessary to assign primary or secondary responsibility to the LDSS with case management responsibility. CONNX automatically sends an alert to all other assigned workers in a case when individuals are related and a new stage is created and merged into an open case. The alert to all assigned workers meets the notification requirement to advise the LDSS of any prior history."[620] It is because of Defendant Shulman's unique set of skills, underlying the purpose of her judicial appointment, that presupposes her familiarity with these procedures. Yet, she chose to shield and protect Defendants' ACS blatant fabrication of 3 FCA 1034 reports, ignored their gross negligence to register *her* 3 court orders with the SCR, which constituted contempt of court, and feigned ignorance for their failure to perform a CPS investigation, pursuant to SSL Title 6, for R.R. (3) and L.N. (6). Defendant Shulman is not fit to continue presiding over child protective proceedings, both real or imagined, when the laws governing child safety procedures and protocols become optional or subject to selective enforcement.

1007.   Lastly, when Plaintiff presented Defendant Alozie with a valid, legitimate Order of Dismissal signed and sealed by Chief Clerk #1 on 10/01/2019, he refused to return R.R. (3). Defendants' ACS did not even *try* to hide the blatant misrepresentations about the obviously missing entry for an FCA Article 10 on docket NN-17995-19 in UCMS or Chief

---

[619] Audit Report of the Office for Children and Family Services' Oversight of Direct Placement of Children, March 2, 2020.
[620] Office of Children and Family Services, Child Protective Services Manual.

Clerk #1's court computer. Like cowards unable to confront their own fraudulent machinations yet expected Plaintiff to "admit to various false narratives about *her* parenting" of R.R. (3) and L.N. (6). Instead, Defendants' ACS simply ran and hid under Defendant Shulman's big black robe of immunity, where Defendants' Ruci, Galchus, Blond, Kelly, Going, Heaven, Lederman, Gildin, Kaplan, Castillo-Lovaglio, Lovaglio, and Lucana-Morales have sanctuary. As long as the aforesaid Defendants support Defendant Shulman's agenda to discredit, invalidate, and jeopardize Plaintiff through any form of fraud, they are protected.

1008.   Defendants' ACS handed off their proverbial ball of *lies*, amounting to a blatant dereliction of duty to grossly shift all responsibility away from themselves and onto the Court. Regardless, the tax funded keepers of the records have no excuse for falling asleep behind the wheel for over a decade, "while it is a family court judge who makes the legal decision as to whether a child will be placed or continue in direct placement, this decision is based, in part, on input from the Local Districts…[w]ithout proper oversight, OCFS has no way of ensuring that Local Districts are providing all relevant information to the courts."[621] Defendant Poole has sat by and watched how blind family court judges continue to make decisions that destroy families. The "I was just following orders" defense was not only rejected during the Nuremberg Trials, but it has no current place today.

1009.   To add insult to criminal injury, Defendant Shulman's Order on Motion, dated 3/09/2020, *dismissing* "mother's motion 5", issued on Defendants' Galchus and Ruci's docket V-20987-18, corresponding to both copies of the OTSC dated 10/08/2019, though speciously done to prevent Plaintiff from exercising Appellate Intervention (or else "restore" Defendant Ruci's default on 9/04/2019), effectively dismissed both entries with docket NN-17995-19 on 2/01/2021. Right after Plaintiff submitted it via EDDS on 1/28/2021 and requested it be filed by the clerk, a confirmation of filing was sent on 1/29/2021 because Defendant Shulman issued the Order on Motion but never filed it on 3/09/2020 or thereafter. The 2 "restore to calendar" motions on 2/01/2021 and 2/09/2021 were the direct result of Plaintiff's filing of the Order on Motion dated 3/09/2020.[622]

---

[621] NYC Comptroller Audit Report: Oversight of Direct Placement of Children, March 2, 2020.
[622] Exhibit 2 Copies of the OTSC dated 10072019 Dismissed (02012021); Exhibit Everything is a Motion in the Parts 1 & 2.

## Sovereign Immunity

1010.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-1009, above as if specifically set forth herein.

1011.   That Defendant Poole was aware the longstanding history of documented constitutional violations by the Municipal Enterprise went uncorrected is undisputable, even AG James' lawsuit against Defendant ACS mentioned children's seizures occurred "without proper court process," information that is *supposed* to be in Connections, "[w]hen a state officer comes into conflict with Constitutional guarantees, "he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."[623]

1012.   Defendant Poole steered close to turning a blind eye for the undocumented, or grossly documented, seizures that are no different than facilitating 3rd party custodial interference or state-sponsored kidnapping. And just like ransom demands follow a kidnapping, the Municipal Enterprise's first instinct is to get paid by collateralizing the child and subjugating the parent to its jurisdiction.

1013.   Not only does Defendant Poole know that warrantless seizures are repeatedly done by Defendant ACS, but she also has VIP access to lacking child abuse and/or neglect records in Connections, "…after signing the confidentiality agreement, OCFS sought to impose additional restrictions based on its misguided interpretation of various laws as well as the confidentiality agreement itself."[624] Defendant Poole *knows,* or should have known, family court judges, like Defendant Shulman, are frequently executing warrantless seizures completely blind, which creates, exacerbates, and compounds Plaintiff and parents constitutional violations under color of law. Specifically, once the family court judge takes over, he or she *will* execute racketeering schemes to protract the money laundering fronts, such that Defendant ACS, attorney for the child(ren), assigned counsel for the interested party can have enough time to execute witness tampering schemes, like Defendants' Teplansky's suborned perjury or kidnapping schemes like Defendant Ruci's purported May 21 OTSC.

---

[623] *See* Ex parte Young, 200 U.S. at 159 (1908); U.S. CONST. amend. XIV.
[624] Audit Report On The Office of Children and Family Services' Oversight Of Direct Placement of Children (March 2020).

1014.   Defendant Shulman's incessant practice of making multiple copies of the same motions and/or OTSC's would be futile if Defendant Poole did her job of monitoring and supervising Connections and the SCR, "her belief that this court should not have restored cases and orders to the calendar, done on notice to her with her and her counsel present, that were erroneously dismissed for a parties'[625] failure to appear before another jurist, when that party was before this jurist earlier in the day at which time all parties had been notified that the matters would be added to this court's calendar for further proceeding, thus obviating the need to appear before the other jurist."[626]

1015.   This way, Defendant Shulman would not feel obligated to secretly represent Plaintiff during the money laundering fronts, while also denying assigned counsel, and performing perverse adjudicatory functions, like representing Defendant ACS, the AFC's, the interested party, including his counsel, and as the stand-in for Suffolk County Attorney, Dennis Cohen, who did not appear on Defendant Teplansky's behalf on March 26, 2021. Had Defendant Poole done her job, Plaintiff would not be in this situation, such as suing Defendant Shulman for refusing to accept that QFC sent the entire court file to SFC on October 1, 2019, and her willful failure to acknowledge there was absolutely nothing for her to restore on October 10, 2019. Essentially, Defendant Shulman is cleaning up after Defendant ACS because Defendant OCFS, has inadequate and subpar leadership at the helm, and the former feels obligated, almost indebted to her former employer, for her current appointment.

1016.   If the legislature intended for motions and OTSC's to substitute prescribed forms for originating a family court proceeding, it would have been included in FCA §154-a. Likewise, had the legislature intended to expand the meaning of persons who can file, it would have been included in FCA §145. Further, the rules of motion practice in the Civil Practice Laws and Rules ("CPLR") 2214 would be amended to include vexatious litigation.[627] Even the concept of collateral estoppel would have to be changed to permit

---

[625] Ruci's willful dismissal on default on 9/04/2019, resulting in Plaintiff's custody of R.R. (3).

[626] *Decision and Order on Application for Recusal As Made by Victoria Navarro* by Judge Shulman (04/14/2021).

[627] *See* Rodriguez v. The State of New York #2021-040-045 *Pro se* Claimant's Motion for Reargument/Renewal denied. ("A motion for reargument, addressed to the discretion of the Court, is designed to afford a party an opportunity to establish that the Court overlooked or misapprehended the relevant facts or misapplied the controlling principle of law (*Matter of Anthony J. Carter, DDS, P.C. v Carter*, 81 AD3d 819, 820 [2d Dept 2011]; *Adderley v State of New York*, 35 AD3d 1043, 1043 (3d Dept 2006). Its purpose is not to serve as a vehicle to permit an unsuccessful party to argue once again the very questions previously decided (*Fosdick v Town of Hempstead*, 126 NY 651, 652 [1891]; *Matter of Anthony J. Carter, DDS, P.C. v Carter*, *supra* at 820)."

infinite litigation of the same requested reliefs. Principles of statutory construction teach that "the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended."[628]

1017.   In essence, Defendant Shulman has re-written and created new statutes to increase her judicial authority and discretion, to impose vindictive decisions to remand and enforce illegal orders by force and threats of incarceration, to transfer custody of Plaintiff's child in all absence of the law, all absence of jurisdiction, all absence of best interests of the child and under color of law. Partisan advocacy and cronyism dominates and guides Defendant Shulman's judicial decisions and forethought. For cases involving domestic violence, like Plaintiff, with concurrent criminal court proceedings for the perpetrator, custody determinations were made to penalize victims, discredit their trauma and experiences, and minimize both the child and victims' safety to benefit the perpetrator.[629]

1018.   Racketeering is not a judicial function.[630]

1019.   Money laundering is not a judicial function.

1020.   Judges are forbidden from representing litigants, including family members, in any court proceedings.

1021.   Human trafficking is not a judicial function.

1022.   Extortion, including but not limited to pay-to-play, ransom & kidnapping are not judicial functions.

1023.   Solicitation is not a judicial function.

1024.   Falsifying, remitting false information, fabricating court records to misrepresent compliance with Standards & Goals are not judicial functions.

---

[628] See People v Finnegan, 85 NY2d 53, 58 [1995], rearg denied 85 NY2d 968, cert denied 516 US 919; see also e.g. Pajak v Pajak, 56 NY2d 394, 397 (1982).

[629] 2009 Omnibus Domestic Violence Bill A.9017/S.5031-A (Referring to "[m]akes numerous changes to various state laws including, requires judges to state on the record how domestic violence and/or child abuse were factored into custody and visitation decisions.")

[630] *See United States v. Thompson*, 685 F.2d 993, 999 (6th Cir. 1982)(en banc) *cert. denied*, 459 U.S. 1072 (1983). Among the government units that have been held to be "enterprises" are offices of governors and state legislators, courts, court clerks' offices. See e.g., *United States v. Stratton*, 649 F.2d 1066, 1072-75 (5th Cir. 1981); *United States v. Clark*, 656 F.2d 1259, 1261-67 (8th Cir. 1981) Office of county judge); *United States v. Frumento*, 405 F. Supp. 23, 29-30 (E.D. Pa. 1975), *aff'd*, 563 F.2d 1083 (3d Cir. 1977). *cert. debued*, 434 U.S. 1072 (1978).

## CONSPIRACY TO FALSIFY AUDIT RECORDS FOR FEDERAL AUDITS

1025.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-1024, above as if specifically set forth herein.

1026.   Congressional power to regulate commerce is rooted in the Commerce Clause, "…[u]nder an expansive concept of the doctrine—that interstate commerce includes intrastate commerce which "substantially affects" interstate commerce —virtually all state workers are likely to be in, or to affect, interstate commerce"(Cf. Wickard v. Filburn, 317 U.S. 111, 124 (1942) (stating that Congress' Commerce Clause power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power") (quoting United States v. Wrightwood Dairy Co., 315 U.S. 110, 119 (1942)).[631]

1027.   The Department of Health and Human Services is the federal agency tasked with distributing Congressional funding among the states, "[t]o make sure that grant funds are used properly, organizations that receive Federal funds must file regular financial status reports… [a]ll agencies/organizations that receive Federal funds are subject to basic audit requirements, including community and faith-based groups…[t]hese audits are intended only to examine the Federally-funded parts of an organization's operations and are not designed to identify unrelated problems…[t]he audits are necessary to make sure that Federal dollars have been spent properly on legitimate costs…[i]t is therefore extremely important for grant recipients to keep accurate records of all transactions conducted with Federal funds."[632]

1028.   The Municipal Enterprise cannot, is not, and does not absorb the entire financial burden of its money laundering fronts, it depends on State, City, and County funds, including "…[f]ederal categorical grants account for another $7.2 billion of non-City revenues…[m]ore than 45 percent of Federal grants go towards social services and account for more than one-fifth of total funding for social services…[a] significant portion of the

---

[631] *See Former State Senate Leader Malcom and Queens GOP Leader Vincent Tabone Found Guilty in White Plains Federal Court of Bribery and Fraud Charges Connected to 2013 NYC Mayor's Race* ("Smith, 57, and TABONE, 48, both of Queens, New York, were found guilty of one count of conspiracy…one count of wire fraud…and one count of Travel Act bribery…Smith was separately convicted of one count of extortion…and TABONE was separately convicted of one count of witness tampering.") https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/former-state-senate-leader-malcolm-smith-and-queens-gop-leader- vincent-tabone-found-guilty-in-white-plains-federal-court-of-bribery-and-fraud-charges-connected-to-2013-nyc-mayors-race
[632] https://www.hhs.gov/answers/grants-and-contracts/what-are-legal-obligations-when-receiving-a-federal-grant/index.html

budgets of the City's social services agencies relies on Federal funding, including 38 percent of the budget for the Administration for Children's Services (ACS)."[633] In fact, the Municipal Enterprise does not directly receive its funding from various sources without Defendant Poole, "all pass-through entities must ensure that every subaward is clearly identified to the subrecipient as a subaward and includes the following information at the time of the subaward and if any of these data elements change, includes the changes in subsequent subaward identification."[634]

1029.    In 2001, the New York City Comptroller published a report, "Connections System Equipment," a financial audit to "(1) evaluate internal controls over this equipment, (2) determine the accuracy and reliability of CONNECTIONS equipment inventory records, and (3) determine whether CONNECTIONS equipment that was purchased for selected City of New York (NYC) locations could be accounted for"[635] because Defendant OCFS is the "state agency" recipient and distributor of awards, in which, "[t]he Federal government pays 75 percent of system development costs, including the first phase of equipment purchases and installation…[t]he State pays for the remaining costs."[636]

1030.    Defendant OCFS's, "…costs totaled $100.7 million, including about $50 million for equipment and the remaining for installation, software training, design changes, record conversions and other non-equipment items…"[637], which included unforeseen "[s]upplemental CONNECTIONS equipment purchases…[that] do not qualify for the 75 percent Federal reimbursement…[s]uch purchases may be eligible for 50 percent Federal reimbursement and 25 percent State reimbursement, with the remaining costs paid by either the local districts or the voluntary organizations."[638] New York City taxpayers funded the remaining costs of, "… a single system for recording and collecting child protective, preventive, foster care and adoption service information statewide."[639]

1031.    The auditors found, "CONNECTIONS equipment [was] missing from some City of New York (NYC) locations and cannot be accounted for…[and] CONNECTIONS inventory records are not accurate and reliable," so they focused on

---

[633] Comments on New York City's Fiscal Year 2020 Adopted Budget (p.16).
[634] 45 CFR 75 §352 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards.
[635] Financial Audit of the Office of Children and Family Services Connections System Equipment (2/29/2000).
[636] *Id.* at p. 3.
[637] *Id.* at p. 6.
[638] *Id.*
[639] *Id.*

equipment valued at $1,000 or more, "[a] population of 16,818 equipment items in OCFS's inventory met this criterion[]" and "…with 90 percent confidence, we project that between 949 and 2,301 items cannot be found in the location recorded on OCFS's inventory records…[w]e estimate that the value of this equipment is between $1.6 million and $7.3 million."[640] For example, "2,729 equipment serial numbers items listed by the vendor as installed, but not on OCFS's inventory" and "57 CONNECTIONS computers, costing more than $164,000, [were] reported as missing or stolen by the local districts or voluntary agencies…[h]owever, OCFS did not report the losses to the State Comptroller's Office, as required."[641]

1032.    Specifically, "[l]ocations in NYC accounted for six of the eight equipment items that we could not find from our original statistical sample…we performed additional inventory counts to help us determine the extent of missing CONNECTIONS equipment at selected NYC locations…[i]nitially, we were unable to find 86 items (10 percent), valued at $275,000, of the 887 items that we tried to locate…[s]ubsequently, NYC officials located 40 of the 86 items which we were able to confirm. Accordingly, it appears that the remaining equipment has been lost or stolen."[642]

1033.    For example, Defendant ACS routinely fails its audits, "…[h]owever, Comptroller Stringer's review found that ACS's annual audits of foster family files are inadequate, poorly conducted, and do not provide appropriate oversight of the certification process…[a]s a result, ACS's audit findings in this area were found to be incorrect in roughly 24 percent of foster files reviewed…[m]oreover, ACS did not consistently ensure that deficiencies found in the agency's own annual audits were corrected – and as such, 7 non-compliant homes found by ACS were allowed to continue operating for up to 484 days."[643]

1034.    The last audit took place in 2016, which assessed Defendant ACS's internal controls for selecting or re-certifying the homes in which seized children are placed, accurately reflects their prevailing gross negligence and deference for responsibility by retroactively supplying one type of misinformation and replacing it with a fabricated alibi, "…[a]t the exit conference for this audit, ACS officials stated that some of the

---

[640] *Id.* at p. 14.
[641] *Id.* at p. 4.
[642] *Id.*
[643] Audit Report On The Oversight Of The Administration For Children's Services' Certification Process For Foster Parents (May 3, 2019).

investigatory procedures they previously supplied to us during the course of the audit were provided in error because they were outdated and no longer applicable…[c]onsequently, the officials contended that a number of the findings in this report of inadequate controls are not significant or no longer valid…[h]owever, the newly provided information does not support their current assertions…[t]o begin with, even if we accept their new claims at face value, the fact that agency officials originally provided inapplicable procedures to us thinking that they were current is itself evidence of a profound lack of controls over the agency's investigatory process."[644]

1035.   For example, page 92 of Defendant Heaven's attachment, "Navarro-Discovery-Investigation Progress Notes," is a purported "FCSA 1034: Court Ordered Investigation Report" that was retroactively entered for June 2019, and is a counterfeit Connections record:

    a) there is no such thing as an "FCSA 1034," and

    b) Defendant Alozie did not register any court orders in June 2019, so no letters
       for CPS investigations were mailed by OCFS.

1036.   Interestingly, the 2014 operating budget report for SCDSS has the acronym "FCSA" as an individual department called "The Family, Children and Adult Services Administration (FCSA)," which stands for a "[d]ivision" further subdivided into 2 separate sections: CPS Investigations, Child Protective and Preventive Services.

1037.   Apart from superficially obvious hand-drawn borders, crooked margins, and shading along the bottom edges on some of the pages, there was no Intake Stage Id number listed by the SCR for the fabricated backdated entry of a purported CPS investigation that clearly states, "Ordered by: Honorable Jane A. Grady, Referee Choose an item."[645]

1038.   Furthermore, unlike the singular thick black border at the top, below "Progress Notes" in the aforesaid "Discovery," parent R.M.'s copy of the same Connections record, shows a border with thin double black lines. Therefore, these are counterfeit records.

---

[644] Audit Report on the Administration for Children's Services' Controls Over Its Investigation of Child Abuse and Neglect Allegations, June 15, 2016.
[645] Navarro-Discovery sent by Defendant Heaven on 3/26/2021.

1039.   Defendants' Kaplan, Galchus, Blond, and Kelly need Defendant Shulman's approval to get paid on their 18B vouchers whereas, Defendants' Rodin, McFarlane, and Naughton need her "judicial rubberstamping" of valid and invalid counterfeit records to maintain financing for the money laundering fronts, "[t]o conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention."[646] And, Defendant Shulman obtains assistance from Defendant Ruci, who knowingly signed fabricated FCA Article 4 and 5 false instruments of filing, to supplant the underlying actions of the Kidnapping Scheme to sustain financing for the money laundering front, for which Defendant Gildin facilitates by representing the latter for Title IV-D money laundering schemes.

1040.   For example, the fraudulent orders on default under FCA Article 4 and 5, to retroactively establish the custody requirement for the Kidnapping Scheme, was used to retroactively validate Defendant ACS's jurisdiction of the false instrument of filing on docket NN-17995-19 to retain jurisdiction over the financing of the money laundering front, was subsequently remitted to Defendant DCSE for enforcement, which is further maintained by the use of the USPS, "[w]hoever, knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeited writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money, shall be fined under this title or imprisoned not more than five years, or both.[647]

1041.   Given that Defendant Shulman, or her co-conspirators with direct access to Defendant DCSE's records, can choose to *exercise* an undertaking at any time against Plaintiff for their fraudulent support orders on default, the fear of being incarcerated unjustly is precisely what aforesaid Defendants seek to instill and control, "[w]hile

---

[646] Hass, 216 U.S. at 479-480.
[647] 18 U.S.C. 47; §1002. Possession of false papers to defraud United States.

"Congress cannot simply deem or announce that a class of workers are in interstate commerce. The courts make the final determination if a class of workers are in, or affecting, interstate commerce."[648]

1042.  Even Defendant Shulman's use of fraudulent temporary orders of visitation and custody, issued on void and invalid docket numbers, utilized in the commission of U.S. passport fraud, also count as federal grant fraud paid via State Defendants voluntary participation with SSA Title IV-D §469B, Access and Visitation Program, which only requires that the fraudulent orders be in the court file at the time of audit.[649]

## **JURY DEMAND**

1043.  Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Parents respectfully requests that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Parents may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Finding that all Defendants are jointly and severally liable for all damages caused to Plaintiff Parents;

d. Permanently enjoin Defendants' from subjecting Plaintiff Parents to practices that violate their rights, including:

1. Prevent the spoliation of records to prevent further injustice.

2. Require that City and State Defendants produce all fabricated records, including records produced with PhotoShop or PaintShop;

---

[648] *See* United States v. Lopez, 514 U.S. 549, 559-60 (1995); Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 392 (1995)
[649] 42 U.S.C. 669b.

and records fabricated with other methods to recreate, alter, and destroy case records and court records.

3. Require that City and State Defendants regularly collect and independently verify and validate the underlying records, documents, files, and case notes to determine compliance with statutory requirements and adequate entries in Connections to substantiate each seizure before, during, and after an Article 10 proceeding is initiated in family court.

4. Require that OCFS conduct semi-annual case record reviews of a statistically significant sample of children in child protective and family court proceedings to measure the degree to which social workers, case workers, and its attorneys are complying with timely documentation of their cases, as required by state and federal law, and the degree to which the aforesaid proceedings are being adjudicated based on proper documentation; issue semi-annual public reports on the findings of these case record reviews; and require corrective action when necessary.

5. The Court shall appoint a Special Master either with special expertise in the areas covered by the Remedial Order, or who shall appoint an Expert Panel to report to the Special Master, to determine whether a) the standards developed by Defendants comport with acceptable professional standards, and to monitor and report on Defendants' compliance with their obligations as contained in the Court's Order. Plaintiffs shall have the right to enforce the provisions of the Court Order entered pursuant to Federal Rule of Civil Procedure 65(d), and the Court shall have continuing jurisdiction to oversee compliance with that Order; and b) hire forensic experts to analyze the paper records and digital records to determine how pervasive ACS's practice of destroying business records for the affected Parent Plaintiff's is and how far back it goes.

e.   Awarding Plaintiff Parents monetary damages in an amount not less than $1,000,000,000, said amount to be proven at trial;

f.   Awarding Plaintiff Parents enhanced (treble) monetary damages pursuant to 18 U.S.C. §1964 (c) and NYS Penal Law §460.20;

g.   Awarding Plaintiff Parents its litigation expenses, including reasonable attorneys' fees, costs, and disbursements;

h.   Award Plaintiff Parents the reasonable costs and expenses incurred in the prosecutions of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

i.   Awarding Plaintiff Parents punitive damages in the sum of not less than $10,000,000,000 or an amount otherwise to be decided by a jury;

j.   Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

   6.   Defendants' violation of Plaintiff Parents rights to be free from harm under the Fourteenth Amendment to the United States Constitution;

   7.   Defendants' violation of Plaintiff Parents rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution;

   8.   City and State Defendants' violation of Plaintiff Parents rights under New York State Constitution, Social Services Law and regulations adopted thereto;

k.   Lastly, pursuant to Rule 60 (b)(3) and (4) of the Federal Rules of Civil Procedure, declare that all of Defendants false instruments of filing are invalid and void, including retroactively, to permit Plaintiff Parents to regain their child(ren) illegally removed and to restore parental rights illegally terminated.

SEP 3 0 2021

Victoria C. Navarro